**If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

**PARR BROWN GEE & LOVELESS**
David C. Reymann (Utah Bar No. 8495)
Kade N. Olsen (Utah Bar No. 17775)
Tammy M. Frisby (Utah Bar No. 17992)
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
**(**801) 532-7840
dreymann@parrbrown.com
kolsen@parrbrown.com
tfrisby@parrbrown.com

**ZIMMERMAN BOOHER**
Troy L. Booher (Utah Bar No. 9419)
J. Frederic Voros, Jr. (Utah Bar No. 3340)
Caroline Olsen (Utah Bar No. 18070)
341 South Main Street
Salt Lake City, Utah 84111
(801) 924-0200
tbooher@zbappeals.com
fvoros@zjbappeals.com
colsen@zbappeals.com

**CAMPAIGN LEGAL CENTER**
Mark P. Gaber*
Aseem Mulji*
Benjamin Phillips**
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
amulji@campaignlegalcenter.org
bphillips@campaignlegalcenter.org

Annabelle Harless*
55 W. Monroe St., Ste. 1925
Chicago, IL 60603
aharless@campaignlegalcenter.org

*Attorneys for Plaintiffs*

*\*Admitted Pro Hac Vice*

## THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF UTAH, MORMON WOMEN FOR ETHICAL GOVERNMENT, STEFANIE CONDIE, MALCOLM REID, VICTORIA REID, WENDY MARTIN, ELEANOR SUNDWALL, and JACK MARKMAN<br><br>Plaintiffs,<br><br>v.<br><br>UTAH STATE LEGISLATURE; UTAH LEGISLATIVE REDISTRICTING COMMITTEE; SENATOR SCOTT SANDALL, in his official capacity; REPRESENTATIVE BRAD WILSON, in his official capacity; SENATOR J. STUART | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**(Tier 2)**<br><br>Civil Action No. 220901712<br><br>Judge Dianna M. Gibson |

ADAMS, in his official capacity; and
LIEUTENANT GOVERNOR DEIDRE
HENDERSON, in her official capacity,

Defendants.

The Utah Legislature has a history of drawing electoral maps that dilute the voting strength of some voters based on their party affiliation, a practice known as partisan gerrymandering. In 2018, Utah voters passed Proposition 4, a bipartisan citizen initiative that, among other reforms, prohibited partisan gerrymandering. In 2020, the Utah Legislature repealed Proposition 4, thereby negating its reforms, in particular, the prohibition on partisan gerrymandering. Then, in 2021, the Legislature adopted a congressional electoral map (HB2004 or the "2021 Congressional Plan") that is an extreme partisan gerrymander.

The 2021 Congressional Plan violates multiple provisions of the Utah Constitution, including the Free Elections Clause, the Uniform Operation of Laws Clause, protections of free speech and association, and the right to vote. Consequently, Plaintiffs—two nonpartisan, nonprofit membership-based organizations and seven individual voters who have been adversely affected by the 2021 Congressional Plan's excessive gerrymandering—seek an order enjoining the implementation of the 2021 Congressional Plan in the 2024 congressional election and all future congressional elections.

In addition, the Legislature's repeal of Proposition 4 violated the people's constitutionally guaranteed lawmaking power and right to alter and reform their government. Accordingly, Plaintiffs also seek an order enjoining the Legislature's replacement law (SB200) and reinstating Proposition 4.

## **INTRODUCTION**

1.    Partisan gerrymandering is "incompatible with democratic principles" and the

2

"core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 824 (2015) (internal citations and quotations omitted). By diluting the voting power of some categories of voters and entrenching the incumbents' control of election outcomes for a decade, partisan gerrymandering violates voters' "fundamental and critical rights to which the Utah Constitution has accorded special sanctity." *Gallivan v. Walker*, 2002 UT 89, ¶ 41, 54 P.3d 1069, 1086. Negating the people's initiative-enacted redistricting reforms to then devise an excessive partisan gerrymander violates both "the right of the people to exercise their reserved legislative power and their right to vote." *Id.*

2.      Over the last several years, the Legislature's approach to redistricting has violated these core principles of republican government and voters' fundamental rights. In the November 2018 election, Utahns passed a citizen ballot initiative titled the Utah Independent Redistricting Commission and Standards Act—numbered Proposition 4 and popularly named Better Boundaries—to establish anti-gerrymandering redistricting standards binding on the Legislature. Among other things, Proposition 4 created the Utah Independent Redistricting Commission (the "Commission"), a group of independent, nonpartisan citizen commissioners who would draw the State's new district lines after the decennial census based on neutral, nonpartisan criteria.

3.      In 2020, right before the decennial census that triggers the redistricting process, the Utah Legislature repealed Proposition 4. The Legislature then replaced it with a new redistricting law, SB200, which rescinded Proposition 4's most critical reforms, including the prohibition on redistricting that favors or disfavors any particular person, group, or political party. At the time of the repeal, the Legislature nonetheless assured Utah's voters that it would allow the Commission to conduct a transparent mapmaking process, and that the Legislature would consider the

Commission's proposals. But come November 2021, the Legislature discarded the Commission's nonpartisan recommendations. Instead, before the Commission had even finished its work, the Legislature devised a partisan gerrymandered map—in violation of the neutral traditional redistricting principles applied under Proposition 4—that would consolidate Republican control of Utah's congressional delegation for a decade while subordinating voters of minority political viewpoints.

4.      The Legislature has acted to the detriment of all Utahns, but especially non-Republican voters living in urban areas along the Wasatch Front. The 2021 Congressional Plan typifies how a ruling political party uses redistricting to resist demographic shifts and skew the electoral process by disaggregating concentrated regions where supporters of a minority political party reside—a practice known as "cracking." The effect is to disperse non-Republican voters among several districts, diluting their electoral strength and stifling their contrary viewpoints.

5.      No neutral redistricting criteria can explain the Legislature's irregular design of the resulting electoral districts. The 2021 Congressional Plan sunders counties and unnecessarily splits municipalities and geographic communities of interest—*i.e.*, communities sharing common policy, cultural, economic, and other social characteristics and needs.





*This image displays the 2021 Congressional Plan*       *This image displays the partisan elections data*

6.    The 2021 Congressional Plan carves up Salt Lake County—Utah's largest concentration of non-Republican voters—among all four congressional districts, when a map drawn according to neutral criteria would have divided it at most three times. The district lines go through the middle of Salt Lake City's Main Street across the heart of Temple Square, and then cut sharply to the east and south, fragmenting major non-Republican residential areas.



*This image displays Salt Lake County quartered between all four districts*



*This image displays the distribution of Democratic voters in Salt Lake County*



*This image displays the Salt Lake City divides*



*This image displays the partisan elections data*

7.    The Salt Lake City dividing border continues south to a point where all four district boundaries meet near the center of Millcreek, a growing city in central Salt Lake County where most voters identify as non-Republican. The four districts then fan out from Millcreek in multiple

directions to partition other increasingly non-Republican urban areas, such as Murray, Midvale, West Valley City, and mountain communities near Park City. Across the State, the 2021 Congressional Plan divides numerous communities of interest that have common and cohesive needs.



*This image displays the four-way split in the middle of Salt Lake County*



*This image shows the Millcreek city boundaries divided between all four districts*

8.      After dividing these non-Republican areas along the Wasatch Front, the Legislature

crafted four large districts, each of which takes a slice of Salt Lake County and grafts it onto large swaths of the rest of Utah. Drawing the map in this manner subordinates the votes of non-Republican urban voters within districts where a majority of Republican voters—scattered among suburban areas and faraway midsized cities—will dictate the outcome of elections. By creating four homogenous districts, each containing roughly two-thirds Republican voters and one-third non-Republican voters, the 2021 Congressional Plan will reliably produce exclusive Republican membership in the State's congressional delegation for the foreseeable future.

9.      The Legislature devised its extreme partisan gerrymander despite the people's popular mandate for a transparent, impartial Commission to take the lead in drawing district lines free of partisan considerations.

10.     Generated through an impartial process using nonpartisan criteria, the Commission's congressional map proposals would have created a competitive district centered on Salt Lake County that allowed non-Republican voters in the impacted area to effectively participate in the political process. The Commission unanimously arrived at its map proposals after hundreds of hours of engaging with community members, livestreaming its collaborative redistricting process online, and then openly debating its line-drawing decisions to increase accountability to the people.

11.     Even though the Commission followed a model process of transparency and commitment to the public good and traditional redistricting criteria, the Legislature cast aside the Commission's work in favor of its own partisan map developed outside public view. In early November 2021, the Legislature released its gerrymandered map to Utah voters late on a Friday night in a manner that limited the opportunity for public input. The following Monday, the Legislature rushed to pass the 2021 Congressional Plan through pro forma hearings and floor

debates; the Governor reluctantly signed it into law a few days later. In the end, both the Legislature's redistricting committee leadership and the Governor conceded that partisan politics had affected the Legislature's redistricting process.

12.    The Legislature repeatedly used anti-democratic measures—repealing Proposition 4 and then ignoring the Commission's nonpartisan map recommendations—to perpetuate one-party rule over Utah's congressional delegation despite the State's changing demographics. At a time when public trust in government is already low, the Legislature has ignored the will of the people, abandoned neutral criteria, and reduced the redistricting process to a partisan exercise.[1] Rather than leaving their complaints to "echo into a void," Plaintiffs turn to their "state constitution[] [to] provide standards and guidance for state courts to apply" to vindicate their rights against the partisan gerrymandered 2021 Congressional Plan. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019).

## PARTIES

**A.    Plaintiffs**

### *Organizational Plaintiffs*

13.    The League of Women Voters of Utah (the "LWVUT") is a nonpartisan nonprofit membership-based organization located in Salt Lake City, Utah that is dedicated to empowering voters and defending democracy. LWVUT encourages active participation in government and works to increase its members and voters' understanding of major public policy issues.

---

[1]    Public Trust in Government: 1958-2021, Pew Research Center (May 17, 2021), https://www.pewresearch.org/politics/2021/05/17/public-trust-in-government-1958-2021/ (last accessed Mar. 15, 2022).

14.     LWVUT has diverse members throughout the State of Utah. LWVUT has members who are registered voters living in each of Utah's four congressional districts. Its members are Republicans, Democrats, and individuals who are unaffiliated with either major political party.

15.     LWVUT's membership includes Democratic voters living in Salt Lake County whose votes are diluted and rendered ineffective, whose voices are muted, and whose interests are impaired because of the 2021 Congressional Plan. Placing these members in a remedial district drawn using neutral traditional nonpartisan criteria through an impartial redistricting process would remedy their harms.

16.     As part of its mission, LWVUT engages in substantial nonpartisan voter education and mobilization efforts throughout Utah, including get-out-the-vote events, voter registration drives, and advocacy of increased electoral participation and access to voting. LWVUT specifically seeks to combat partisan gerrymandering, including through public advocacy for fair maps and a transparent and impartial redistricting process, and public education on redistricting, such as teaching members and voters how to engage with the redistricting process.

17.     The partisan gerrymandered 2021 Congressional Plan threatens LWVUT's voter mobilization mission by silencing the voices of LWVUT's members, making their representatives less accountable, and reducing voter interest in now noncompetitive congressional races.

18.     The partisan gerrymandered 2021 Congressional Plan requires LWVUT to expend additional resources, and divert those resources from other programs, in order to engage and mobilize voters whose votes are diluted, whose voices are muted, and whose interests are impaired by 2021 Congressional Plan.

19.     LWVUT actively supported Proposition 4, including through public messaging, voter education, and signature gathering, among other activities. Numerous League members

9

voted in favor of Proposition 4. LWVUT opposes the Legislature's repeal of Proposition 4 that enabled it to enact partisan gerrymandered maps.

20.    LWVUT has standing on its own behalf and on behalf of its members who, on their own, would have standing to challenge the 2021 Congressional Plan and repeal of Proposition 4.

21.    Mormon Women for Ethical Government (MWEG) is a nonpartisan nonprofit membership organization based in Riverton, Utah. MWEG's purpose is to inspire women of faith—across the political spectrum—to be ambassadors of peace who transcend partisanship and advocate for ethical government. MWEG and its members are guided by its four core values: faithful, nonpartisan, peaceful, and proactive.

22.    MWEG has diverse nationwide membership. Many of MWEG's members live in Utah, and MWEG has members who are registered voters in each of Utah's four congressional districts. MWEG's members are Republicans, Democrats, and individuals who are unaffiliated with either major political party.

23.    MWEG's membership includes Democratic voters living in Salt Lake County whose votes are diluted and rendered ineffective, whose voices are muted, and whose interests are impaired because of the 2021 Congressional Plan. Placing these members in a remedial district drawn using neutral traditional criteria through an impartial redistricting process would remedy their harms.

24.    A key part of MWEG's mission is to educate and empower its members to participate in every phase of the democratic process. The partisan gerrymandered 2021 Congressional Plan threatens MWEG's mission by diluting the voices and political power of its members, making its members' representatives less accountable, and reducing the members' interest in now noncompetitive races.

25.    The partisan gerrymandered 2021 Congressional Plan requires MWEG to expend scarce resources, including diversion of resources from other programs, in order to mobilize voters and members who have been disenfranchised and feel disaffected by the 2021 Congressional Plan.

26.    MWEG leaders and members actively supported Proposition 4, including through organizational messaging, voter education, and signature gathering, among other activities. Numerous MWEG members affiliated with both major political parties voted in favor of Proposition 4. MWEG opposes the Legislature's repeal of Proposition 4 that enabled enactment of partisan gerrymandered maps.

27.    MWEG has standing on its own behalf and on behalf of its members who, on their own, would have standing to challenge the 2021 Congressional Plan and repeal of Proposition 4.

### *Individual Plaintiffs*

28.    The individual voter plaintiffs (collectively, "Individual Plaintiffs") are seven qualified, registered voters in Utah who reside in each of the State's four congressional districts but would live in the same congressional district in a neutral remedial redistricting plan.

29.    Plaintiff Stefanie Condie is a marketing executive residing in downtown Salt Lake City near Temple Square. Plaintiff Condie is a registered voter who resides and will vote in District 2 under the 2021 Congressional Plan. Plaintiff Condie is registered to vote as a Democrat, has consistently voted for Democratic candidates for Congress, and intends to vote for Democratic candidates in 2022, 2024, and future elections. Plaintiff Condie lives in a congressional district where Democratic voters are cracked from other Democratic voters to ensure that Republican candidates will win the district. This cracking dilutes her voting power, impairs her ability to express her views and associate with likeminded voters, and negates her fair opportunity to elect

the representatives of her choice. Plaintiff Condie voted in favor of Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the repeal.

30.    Plaintiff Wendy Martin is a retired business professional and a U.S. Army veteran. Plaintiff Martin lives in downtown Salt Lake City a block east of Temple Square, within District 1 in the 2021 Congressional Plan. She is located steps away from the District 1 and District 2 border along Main Street through downtown Salt Lake City. Plaintiff Martin is registered to vote as a Democrat, has consistently voted for Democratic candidates for Congress, and intends to vote for Democratic candidates in 2022, 2024, and in future elections. Plaintiff Martin lives in a congressional district where Democratic voters are cracked from other Democratic voters, ensuring that Republican candidates will win the district. This cracking dilutes her voting power, impairs her ability to express her views and associate with likeminded voters, and negates her fair opportunity to elect representatives of her choice. Plaintiff Martin voted in favor of Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the repeal. She advocated before the Commission in support of neutral redistricting maps during fall 2021.

31.    Plaintiff Malcolm Reid is a retired professional who worked as a technologist, market researcher, and data manager for two Fortune 200 companies. Plaintiff Reid has long advocated for nonpartisan redistricting and penned an op-ed in the Deseret News calling for Utahns to participate in the Commission's impartial mapmaking process. He lives and will vote in Millcreek, in District 2 of the 2021 Congressional Plan—two blocks from the border with District 1 and about a half mile from the border with District 3. Plaintiff Reid is registered to vote as a Democrat, has consistently voted for Democratic candidates for Congress, and intends to vote for Democratic candidates in 2022, 2024, and in future elections. He lives in a congressional district where Democratic voters are cracked from other Democratic voters, ensuring that Republican

candidates will win the district. This cracking dilutes his voting power, impairs his ability to express his views and associate with likeminded voters, and negates his fair opportunity to elect the representatives of his choice. Plaintiff Reid voted in favor of Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the repeal. He advocated before the Commission in support of neutral redistricting maps during fall 2021.

32.    Plaintiff Jack Markman is a grant manager and recent college graduate. He is a registered voter living in Murray, in District 4 of the 2021 Congressional Plan. Plaintiff Markman is registered as a Democrat. He has consistently voted for Democratic candidates for Congress, and intends to vote for Democratic candidates in 2022, 2024, and in future elections. He lives in a congressional district where voters who support Democrats are cracked from other voters who support Democrats, ensuring that Republican candidates will win the district. This cracking dilutes his voting power, impairs his ability to express his views and associate with likeminded voters, and negates his fair opportunity to elect the representatives of his choice. Plaintiff Markman voted in favor of Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the repeal.

33.    Plaintiff Eleanor Sundwall is a trained biochemist and an active volunteer for school and community groups. She is a registered voter residing in Murray, in District 3 of the 2021 Congressional Plan. Plaintiff Sundwall is registered as a Democrat. She has consistently voted for Democratic candidates for Congress, and intends to vote for Democratic candidates in 2022, 2024, and in future elections. She lives in a congressional district where voters who support Democrats are cracked from other voters who support Democrats, ensuring that Republican candidates will win the district. This cracking dilutes her voting power, impairs her ability to express her views and associate with likeminded voters, and negates her fair opportunity to elect

the representatives of her choice. Plaintiff Sundwall voted in favor of Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the repeal. She advocated before the Commission in support of neutral redistricting maps that would reflect her designated community of interest during fall 2021.

34.    Plaintiff Victoria Reid is a Republican registered voter living in Millcreek in District 2 of the 2021 Congressional Plan. She is a former adjunct professor, public relations professional, and community volunteer. Plaintiff Victoria Reid is a longtime supporter of Republican causes and campaigns and has worked in formal roles for Republican candidates and officeholders. She has also consistently advocated against partisan gerrymandering. Plaintiff Victoria Reid voted in favor of enacting the Proposition 4 initiative in 2018, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the Legislature's repeal. Plaintiff Victoria Reid actively supported the neutral redistricting maps advanced by the Commission in 2021.

35.    Plaintiff Dale Cox is a Republican registered voter living in Murray in District 4 of the 2021 Congressional Plan. He is a former Murray city councilmember and president emeritus of the Utah AFL-CIO labor union. Plaintiff Cox is an advocate for ethical and transparent government that is accountable to the people, and he opposes partisan gerrymandering. He is registered as a Republican and votes in Republican primaries in order to have a political voice in Utah's elections, including in its elections for congressional representatives. Plaintiff Cox does not register as a Democrat to vote in congressional elections and primaries for his preferred moderate Democratic candidates in part because the partisan gerrymandered 2021 Congressional Plan impairs and renders ineffective his ability to express those political viewpoints and engage in associations with likeminded moderate Democratic voters. Plaintiff Cox voted in favor of

14

Proposition 4, opposed the Legislature's repeal of the initiative in 2020, and continues to oppose the Legislature's repeal.

36.     Each Individual Plaintiff who is a voter supporting Democratic candidates has standing to challenge the 2021 Congressional Plan because it dilutes their voting power, negates their expressed political viewpoints and interferes with their political associations, and prevents them from electing the representatives of their choice. Each Democratic-voting plaintiff lives in Salt Lake County, which has a sufficient number of voters with shared political preferences, interests, and social values to allow Democrats to elect a candidate of choice in a single congressional district. The 2021 Congressional Plan cracks Democratic Individual Plaintiffs' voting communities between four congressional districts and then submerges them in districts where Republicans comprise a majority of the voting population. The effect is to block Democratic voters from electing a candidate of their choice to Utah's congressional delegation.

37.     Each Individual Plaintiff who voted in favor of Proposition 4 has standing to challenge SB200 because the Legislature's repeal of Proposition 4 exceeded its constitutional authority and violated Plaintiffs' rights, as citizens of Utah, "to alter or reform their government," Utah Const. art. I, § 2, through their lawmaking authority exercised in the citizen initiative process, *see id.* art. VI, § 1.

38.     LWVUT and MWEG have standing to challenge HB2004 and SB200 on behalf of their members for the same reasons as Individual Plaintiffs. LWVUT and MWEG also have standing because HB2004 and SB200 impair their functions as organizations and require them to expend resources and divert resources from other programs that fulfill their missions.

39.     LWVUT and MWEG additionally have standing because they assert an issue of significant constitutional and public importance, and they have an interest in the case that will

effectively assist the court in resolving the legal and factual questions.

**B.    Defendants**

40.     Defendant Utah State Legislature is the legislative branch of the government of the State of Utah. Utah Const. art. VI, § 1. The Legislature enacted HB2004, which designates the boundaries of Utah's 2021 Congressional Plan, and SB200, which repealed Proposition 4.

41.     Defendant Utah Legislative Redistricting Committee (the "LRC") is the committee of the Legislature tasked with recommending electoral boundaries for Utah's four congressional districts to the full body of the Legislature. It is comprised of twenty members of the Utah Legislature, including fifteen Republicans and five Democrats, who are either state senators or state representatives. Before recommending a map to the full body of the Legislature, the LRC is tasked with holding a hearing and reviewing the Commission's map submissions. Utah Code §§ 20A-20-102(2); 20A-20-303. The LRC devised, adopted, and recommended to the Legislature the 2021 Congressional Plan.

42.     Defendant Senator Scott Sandall is a member of the Utah State Senate and a co-chair of the Legislative Redistricting Committee. Senator Sandall led the LRC in rejecting the Commission's neutral redistricting plans and devising the 2021 Congressional Plan. Defendant Sandall is sued in his official capacity.

43.     Defendant Representative Brad Wilson is Speaker of the Utah House of Representatives. Defendant Wilson is sued in his official capacity.

44.     Defendant Senator J. Stuart Adams is President of the Utah State Senate. Defendant Adams is sued in his official capacity.

45.     Defendant Lt. Gov. Diedre Henderson ("the Lieutenant Governor") is Utah's chief election officer. The Lieutenant Governor coordinates with local, state, and federal officials to ensure compliance with state and federal election laws and oversees voter registration activities

and compliance with the National Voter Registration Act and the Help America Vote Act. Utah Code § 20A-2-300.6. The Lieutenant Governor is further charged with accepting declarations of candidacy or intent to gather signatures in elections for federal office from candidates directly or from county clerks on behalf of candidates. *See id.* §§ 20A-9-201–202. The Lieutenant Governor likewise implements the final 2021 Congressional Plan. *See id.* §§ 20A-13-102–102.2. Defendant Henderson is sued in her official capacity.

## JURISDICTION AND VENUE

46.     This Court has subject-matter jurisdiction over this action under Utah Code §§ 78A-5-102, 78B-6-401, 20A-19-301, and Utah R. Civ. P. 57 and Utah R. Civ. P. 65A.

47.     This Court has personal jurisdiction over the Defendants. *See* Utah R. Civ. P. 17. Defendants are state government entities and officials, sued in their official capacities, who reside and conduct their official business in the State of Utah.

48.     Venue in this Court is proper because the causes of action arise in Salt Lake City in Salt Lake County, Utah. *See* Utah Code §§ 78B-3-302, 78B-3-307.

49.     This case is classified as Tier 2 for discovery purposes.

## FACTUAL ALLEGATIONS

**A.    Decennial census figures revealed large population increases and demographic shifts in Utah between 2010 and 2020.**

50.     Every ten years, the federal government conducts the decennial census count of all persons living in the United States.

51.     After the release of new census data, Congress reapportions the number of congressional representatives for each State based on changes in total population.

52.     States then conduct redistricting processes in which they draw new congressional single-member district lines in the state to reflect changes in population distribution.

53.     Delays in completing the 2020 census count and publishing state-level data because

of disruptions from the COVID-19 pandemic compressed the 2021 redistricting process across the country and in Utah. Census data for 2020 became available for Utah's redistricting on August 12, 2021, and the Census Bureau published the data with tables on September 16, 2021.

54.     The 2020 decennial census showed that Utah experienced the largest percentage population increase of any state in the country between 2010 and 2020, adding about half a million new residents at a staggering 18.4% rate of growth, which far exceeded the nationwide average of 7.4%.[2]

55.     Utah's population growth was not equally distributed across the State. Urban areas along the Wasatch Front in Salt Lake County and Utah County drew the bulk of the State's new residents. Eighty percent of Utahns now live in urban centers along the Wasatch Front. Salt Lake County, the State's most populous county, increased its population to 1,185,238 in 2020—adding 155,583 people, a 15.1% jump since 2010. By contrast, rural areas of the State are losing population.

56.     With this greater concentration of population along the Wasatch Front, Utah has become the seventh most urbanized state in the United States.

57.     Utah's population is also rapidly diversifying in terms of racial and/or ethnic identities, religious beliefs, and political affiliations.

58.     For example, in 2010, 19.6% of Utahns identified as racial and/or ethnic minorities. In 2020, that number increased to 24.6%. Utah's Latino population in particular grew by almost 38% during that time and now comprises 15% of the State's total population.

---

[2]  2020 Census Apportionment Results, U.S. Census Bureau (Apr. 26, 2021), https://www.census.gov/data/tables/2020/dec/2020-apportionment-data.html; Utah Was Fastest-Growing State From 2010 to 2020, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/utah-population-change-between-census-decade.html.

59.     Salt Lake County is the center of Utah's racially and ethnically diverse populations. The percentage of Salt Lake County residents who identify as racial and/or ethnic minorities increased from 26% in 2010 to 32.4% in 2020.

60.     Multiple municipalities in Salt Lake County are now majority-minority cities, meaning racial minority populations constitute a majority of the city's population. For example, in West Valley City—Utah's second largest city—the overall population grew significantly since 2010, and West Valley City's minority groups now make up 51.4% of the 136,166 residents. Census data likewise show that neighboring Kearns is also now a majority-minority city.[3]

**B.      Utah's redistricting history is contentious, but even under prior gerrymanders there have been competitive districts.**

61.     Partisan gerrymandering has been a consistent problem and contentious issue in Utah's history.

62.     For example, in 2001, the Wall Street Journal Editorial Board aptly described Utah's congressional map for that decade as a blatant partisan gerrymander that was a "scam" to unseat Democratic Representative Jim Matheson by cracking his Salt Lake City-based seat.[4]

63.     Also, in 2011, Utah gained an additional seat in Congress because of the State's growing population. During the 2011 redistricting cycle, the Legislature conducted its mapmaking behind closed doors to devise a map that would increase Republican advantage in the State's now-four districts. According to public polling at the time, both Democrats and Republicans supported

---

[3] Bethany Rodgers, *Salt Lake City has never been bigger, one place grew by nearly 9,000%, and more census surprises*, Salt Lake Trib. (Aug. 14, 2021), https://www.sltrib.com/news/2021/08/14/salt-lake-city-has-never/.

[4] *See* Editorial, *The Gerrymander Scandal*, Wall Street Journal (Nov. 7, 2001), https://www.wsj.com/articles/SB1005097828258686800; Lisa Riley Roche, *Matheson: 'There's no question I'm a target' in redistricting*, Deseret News (Aug. 30, 2011), https://www.deseret.com/2011/8/30/20386950/matheson-there-s-no-question-i-m-a-target-in-redistricting.

drawing a district that would keep urban voters together in a single district covering Salt Lake City. Instead, the Legislature divided Salt Lake County into three narrow urban slices that were then combined with large tracts of the rest of Utah. As the ostensible justification, the Legislature asserted that it sought to achieve a mix of urban and rural areas in all four districts—a goal that a majority of polled Utahns opposed at that time.[5]

64.    Among other things, the 2011 congressional map again targeted Democratic Representative Matheson's Salt Lake City-centered district. The 2011 map split Matheson's former district three ways and forced him to shift to the newly created 4th Congressional District, which contained only the southern parts of his former district.

65.    Despite Republican efforts, the 4th Congressional District in the 2011 congressional map became one of the most competitive congressional races in the country.

66.    Representative Matheson defied the partisan gerrymander to retain his seat and narrowly defeated Republican Saratoga Springs Mayor Mia Love in 2012. The 4th Congressional District then changed hands between Democratic and Republican representatives four times in five elections over the decade. In November 2020, Republican Burgess Owens won the district by roughly 3,700 votes over incumbent Democrat Ben McAdams.

67.    Technological advancements over the last decade ensure that the 2021 Congressional Plan will precisely guarantee exclusive Republican membership in Utah's congressional delegation compared to previous maps.

---

[5] Lee Davidson, *Utah poll: 'Doughnut hole' ahead of 'pizza slices' in redistricting*, Salt Lake Trib. (Aug. 17, 2011), https://archive.sltrib.com/article.php?id=52391191&itype=CMSID; *Fair Redistricting: A Better Deal for Rural Utah*, Better Utah Inst. (Sept. 2019), https://betterutahinstitute.org/wp-content/uploads/2019/09/Rural-Redistricting-Report.pdf (last accessed Mar. 15, 2022).

**C.    Exercising their legislative power, the voters passed Proposition 4 in 2018 to reform the government's redistricting authority, process, and standards.**

68.    The Utah Constitution provides that redistricting is a legislative function in the first instance, stating that "the Legislature shall divide the state into congressional, legislative, and other districts accordingly." Utah Const. art. IX, § 1. The Legislature shares authority over the State's congressional map-drawing function. Under the Utah Constitution, the regular legislative process the Legislature employs to adopt redistricting plans is subject to gubernatorial veto and judicial review. Indeed, in previous redistricting cycles, the Legislature's adopted redistricting bill has been vetoed by the Utah governor and the redistricting power has been reviewed in the Utah courts.

69.    Utah has historically employed citizen-led, bipartisan county commissions to independently draw certain state legislative district lines.

70.    Utah has also subjected aspects of the redistricting process to statewide referenda approval votes by Utah's electorate.

71.    In addition, the Utah Constitution recognizes the people's lawmaking power to enact legislation through ballot initiatives that are not subject to gubernatorial veto, and the people's authority to use that process to alter or reform their government.

72.    The people's lawmaking and reform authority extends to redistricting, like any other legislative subject.

73.    In the November 2018 election, the people exercised their sovereign, legislative power to pass Proposition 4, a government reform that established anti-gerrymandering redistricting standards binding on the Legislature, among other provisions.

74.    Proposition 4 started from a grassroots effort led by prominent leaders of both major political parties. The diverse coalition behind Proposition 4 sought to create an independent commission of citizens who would prepare neutral redistricting maps in a transparent process that

21

transcended partisan manipulation.

75.    A local nonpartisan nonprofit named Utahns for Responsive Government, Inc. (doing business as "Better Boundaries") sponsored the initiative and the primary advertisement advocating for Proposition 4, which featured former President Ronald Reagan describing partisan gerrymandering as an "un-American practice," "anti-democratic," and a "national disaster," and advocating that "[t]here should be a bipartisan commission appointed every ten years" to conduct impartial redistricting.[6] The Proposition 4 reforms sought to have redistricting controlled by citizen appointees whom the public could trust to undertake a transparent and impartial redistricting process applying nonpartisan criteria.

76.    Nearly 200,000 Utahns from across the State and political spectrum signed the petition circulated by Better Boundaries to put Proposition 4's government reforms of the redistricting process to a statewide vote, far more than the 113,143 signatures required.[7]

77.    In addition to the Proposition 4 language on the 2018 statewide ballot, voters received an impartial analysis by the Office of Legislative Research and General Counsel describing the practical effects of the initiative, plus arguments for and against the measure from its proponents and opponents. The proponents of Proposition 4 emphasized that gerrymandering

---

[6] Prop4 Utah, *What is Proposition 4 trying to achieve for Utah?*, YouTube (Sept. 20, 2018), https://youtu.be/1qP7nVIK8hk; Lisa Riley Roche, *Ronald Reagan used to help make case for Better Boundaries ballot proposition*, Deseret News (Oct. 2, 2018), https://www.deseret.com/2018/10/2/20654979/ronald-reagan-used-to-help-make-case-for-better-boundaries-ballot-proposition.

[7] Proposition 4 asked voters: "Shall a law be enacted to: create a seven member commission to recommend redistricting plans to the Legislature that divide the state into Congressional, legislative, and state school board districts; provide for appointments to that commission: one by the Governor, three by legislative majority party leaders, and three by legislative minority party leaders; provide qualifications for commission members, including limitations on their political activity; require the Legislature to enact or reject a commission-recommended plan; and establish requirements for redistricting plans and authorize lawsuits to block implementation of a redistricting plan enacted by the Legislature that fails to conform to those requirements?"

"has gotten out of control" in Utah because "[s]ophisticated computer modeling allows incumbents to craft districts with a precision" to "divide[ Utahns] into districts that empower politicians, not voters." The proponents informed voters that Proposition 4 was a government reform measure invoking the people's constitutional lawmaking authority, and it was designed to "return[] power to the voters and put[] people first in our political system."

78.    Proposition 4's supporters echoed these calls in the public sphere and in the press, arguing that "[v]oters should choose their representatives, not vice versa. Yet under current law, Utah politicians can choose their voters" because "Legislators draw their own districts with minimal transparency, oversight or checks on inherent conflicts of interest."[8]

79.    Former Senate Majority Leader Ralph Okerlund, who chaired the Legislature's 2011 redistricting committee that devised the prior decade's partisan gerrymandered congressional map, spoke out against Proposition 4 for taking redistricting away from politicians and giving it to the people.

80.    Proposition 4 created the Commission—a seven-member appointed commission to take the lead in formulating Utah's congressional, state house, state senate, and state schoolboard redistricting plans. Utah Code § 20A-19-203, *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

81.    A bipartisan group of Utah's elected leaders were to appoint the Commission's members. The designated appointers were the incumbent governor, the president of the Utah Senate, the speaker of the Utah House of Representatives, the leader of the largest minority

---

[8] Lee Davidson, *Utahns favor Prop 4 to create an independent redistricting commission by a big margin, poll shows*, Salt Lake Trib. (Oct. 17, 2018), https://www.sltrib.com/news/politics/2018/10/17/utahns-favor-prop-create/.

political party in the Utah Senate, the leader of the largest minority political party in the Utah House of Representatives, the Utah Senate and House leadership jointly who represent the political party that is the majority party in the Utah Senate, and the Utah Senate and House leadership jointly who represent the political party that is the largest minority party in the Utah Senate. *See* Utah Code § 20A-19-201(3), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

82.     Proposition 4 carefully limited the eligibility of potential appointees to the Commission to ensure its independence. Among other things, it required proof of nonpartisanship over the preceding five years for two of the seven commission positions, and it required all potential appointees to lack recent elective officeholding or candidacies, and recent state lobbying work, among other considerations. *Id.* § 20A-19-201(5)-(6), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020. The measure also restricted commissioners from engaging in certain political activities during their service on the Commission and for four years after completing their terms. *Id.* § 20A-19-201(6)(b), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

83.     To promote transparency and public accountability, Proposition 4 prevented Commissioners from engaging in *ex parte* communications about redistricting plans pending before the Commission or proposed for Commission consideration without making such communications available to the public. *Id*. § 20A-19-202(12), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

84.     Proposition 4 required the Commission to conduct its activities in an independent, transparent, and impartial manner, and it required each Commissioner to certify that they would similarly faithfully discharge their duties in an independent, transparent, and impartial manner. *Id.* §§ 20A-19-201(7)(a)(iii), 20A-19-202(a), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

85.     Proposition 4 devised public access procedures to ensure that all the redistricting plans under the Commission's consideration were available for public comment. *Id.* § 20A-19-202, *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020. It also required the Commission to engage the public in numerous fora across the State. *Id.* § 20A-19-202(9), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

86.     Proposition 4 drew from traditional nonpartisan redistricting standards to establish neutral mapmaking criteria that would govern the process and bind both the Commission and the Legislature. Proposition 4's enacted provisions provided that Utah's final maps must "abide by the following redistricting standards to the greatest extent practicable and in the following order of priority:"

a.  "(a) adhering to the Constitution of the United States and federal laws, such as the Voting Rights Act, 52 U.S.C. Secs. 10101 through 10702, including, to the extent required, achieving equal population among districts using the most recent national decennial enumeration made by the authority of the United States;"

b.  "(b) minimizing the division of municipalities and counties across multiple districts, giving first priority to minimizing the division of municipalities and second priority to minimizing the division of counties;"

c.  "(c) creating districts that are geographically compact;"

d.  "(d) creating districts that are contiguous and that allow for the ease of transportation throughout the district;"

e.  "(e) preserving traditional neighborhoods and local communities of interest;"

f.  "(f) following natural and geographic features, boundaries, and barriers; and"

g.  "(g) maximizing boundary agreement among different types of districts." Utah

Code § 20A-19-103(2), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

87.     Critically, Proposition 4 proscribed the excessive partisan gerrymandering and incumbent favoritism that had tarnished Utah's prior redistricting cycles, including the 2011 process. Proposition 4 prohibited the Commission and the Legislature from adopting district lines that "purposefully or unduly" favor or disfavor any incumbent elected official or political party. *Id.* § 20A-19-103(3), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020. Proposition 4 allowed officials to consider partisan election data only as necessary to evaluate already selected maps for compliance with the neutral criteria under established metrics. *Id.* § 20A-19-103(5), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

88.     To prevent the Legislature from overriding the people's expressed objective to take undue partisanship out of redistricting, Proposition 4 required the Legislature to consider the Commission's proposed maps in an open public hearing and to vote to enact without material change or reject the Commission-adopted plans. *Id.* § 20A-19-204(2)(a), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020. If the Legislature rejected the Commission's selected map(s), Proposition 4 required the Legislature to issue a detailed written report explaining its decision and why the Legislature's substituted map(s) better satisfied the mandatory, neutral redistricting criteria. *Id.* § 20A-19-204(5)(a), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

89.     To ensure the enforcement of the reforms, Proposition 4 authorized Utahns to sue to block a redistricting plan that failed to conform to the initiative's structural, procedural, and substantive standards. *Id.* § 20A-19-301(2), *repealed by* Laws 2020, c. 288, § 12, eff. March 28, 2020.

90.     A majority of Utah citizens from a range of geographic areas and across the political spectrum voted to approve Proposition 4 and enact it into law.

91.    In passing Proposition 4, the people of Utah exercised their lawmaking authority under the Utah Constitution to reform their government and fix the broken redistricting process. In Proposition 4, the people delivered a mandate that drawing the State's district lines should be an independent, neutral process following binding nonpartisan redistricting criteria. They reaffirmed that redistricting should empower communities of voters to choose their representatives, not allow legislators to pick their constituents for personal or political advantage. And they designed a redistricting method that safeguards Utahns' constitutional rights to free elections and an undiluted vote and voice.

**D.    The Legislature overturned the voters' reform by repealing the citizen-enacted laws from Proposition 4 and replacing them with SB200.**

92.    Shortly after Utahns approved Proposition 4, Utah's Republican-controlled Legislature began devising a strategy to repeal Proposition 4 and nullify the voters' mandate to make the redistricting process nonpartisan.

93.    On March 11, 2020, the Legislature voted to repeal the Utah Independent Redistricting Commission and Standards Act created by Proposition 4. The Legislature enacted a new redistricting law, titled SB200, that rescinded critical Proposition 4 reforms and enacted watered-down versions of others.[9]

94.    Unlike in Proposition 4, SB200 provided that the Legislature could reject the Commission's impartial maps for any reason or no reason at all and with no explanation. The Legislature did not even have to vote on the Commission-adopted maps. Utah Code § 20A-20-303(5).

95.    SB200 also repealed Proposition 4's ban on district boundaries drawn to unduly

---

[9]    Redistricting Amendments, S.B. 200, 2020 Gen. Sess. (Utah 2020), https://le.utah.gov/~2020/bills/static/SB0200.html.

favor or disfavor an incumbent or political party. SB200 required the Commission to craft its own standard "prohibiting the purposeful or undue favoring or disfavoring" of parties, incumbents, or candidates, but the Legislature could follow its own preferences, permitting the gerrymandering of Utah's maps for partisan advantage. *Id*. § 20A-20-302(5).

96.    SB200 eliminated all mandatory anti-gerrymandering restrictions imposed by the people on the Legislature as well as Proposition 4's enforcement mechanisms.

97.    SB200 returned redistricting to the pre-Proposition 4, unreformed status quo where the Legislature could freely devise anti-democratic maps—as if the people had never spoken. The Legislature eliminated the binding neutral criteria and enforcement mechanisms so that it could draw maps to empower Republicans and disempower non-Republicans.

98.    SB200 also eliminated vital transparency and public accountability safeguards at the core of Proposition 4. *See, e.g.*, *id.* § 20A-20-303(3).

99.    Even after SB200 repealed Proposition 4, many legislators represented that the Legislature would still honor the people's lawmaking decision to reform redistricting. Legislators assured voters that the Legislature would not disregard the people's will to prevent undue partisanship from infecting the mapmaking process.

100.    For example, Senator Curt Bramble, the chief sponsor of SB200, said he was "committed to respecting the voice of the people and maintaining an independent commission[.]" Then -Senate Majority Leader Evan Vickers said he agreed with Senator Bramble and vowed that SB200 would still "meet the will of the voters" who supported Proposition 4, and the Legislature purportedly "agreed to [reinstate in SB200] almost everything they've asked for."[10]

---

[10] Lisa Riley Roche, *Is Utah's voter-approved Better Boundaries redistricting initiative headed for repeal?*, Deseret News (Feb. 21, 2020),

101.    Similarly, Defendant Wilson indicated that the Proposition 4 anti-gerrymandering advancements would be "tweaked" in SB200 but would largely remain intact. Representative Steinquist assured that SB200's repeal of Proposition 4 would still "make sure that we have an open and fair process when it comes time for redistricting."[11]

102.    And then-Governor Gary Herbert reinforced that because Utah has "an overwhelmingly more conservative population, more Republican," the government "need[s] to make sure that the minorities are not frozen out of this, that there's fairness in the redistricting," and promised that SB200 would "help [Utah] have the ability to see what a more fair redistricting process would be."[12]

103.    The Legislature did not abide by these assurances.

**E.    The Commission completed a transparent and impartial redistricting process, unanimously proposing three congressional maps based on nonpartisan criteria.**

104.    The Commission performed its duties under the SB200 advisory redistricting process from April to November 2021.

105.    In February and April 2021, the elected officials tasked with appointing commissioners to the Commission announced their nominees. Governor Spencer Cox named Brigham Young University faculty member Rex Facer, an associate professor of public

---

https://www.deseret.com/utah/2020/2/21/21147285/gerrymandering-repeal-utah-legislature-independent-redistricting-commission; *Senate - 2020 General Session - Day 36*, Senate Floor Debate and Vote on S.B. 200 Redistricting Amendments, Utah State Legislature (Mar. 11, 2020), https://le.utah.gov/av/floorArchive.jsp?markerID=110722 (last accessed Mar. 15, 2022).

[11] Bethany Rodgers & Benjamin Wood, *Utah's new anti-gerrymandering law is at risk, group warns*, Salt Lake Trib. (Feb. 21, 2020), https://www.sltrib.com/news/politics/2020/02/21/utahs-new-anti/; *House - 2020 General Session - Day 44*, House Floor Debate and Vote on S.B. 200 Redistricting Amendments, Utah State Legislature at 0:49:10 (Mar. 11, 2020), https://le.utah.gov/av/floorArchive.jsp?markerID=111527 (last accessed Mar. 15, 2022).

[12] Utah Education Network, Transcript of Governor's Mar. 7, 2020 Monthly News Conference, https://www.uen.org/govnews/article.php?id=174 (last accessed Mar. 15, 2022).

management in the Romney Institute of Public Service and Ethics, as chair of the Commission. Utah Senate President Stuart Adams appointed Lyle Hillyard, a former Republican state senator who represented Utah's 25th Senate District covering parts of Cache and Rice Counties. House Speaker Brad Wilson selected Rob Bishop, a former Republican congressman who represented Utah's 1st Congressional District from 2003 to 2021. Senate Minority Leader Karen Mayne selected former Utah Supreme Court Chief Justice Christine Durham. House Minority Leader Brian King picked former Utah Senate Minority Leader Pat Jones, a retired Democratic legislator who represented Utah's 4th Senate District covering Salt Lake County from 2006 to 2014.[13] The two nonpartisan commissioners were selected jointly by the Legislature's majority and minority party leadership. The choices were N. Jeffrey Baker, a geographic information systems specialist from Davis County, and former Utah Court of Appeals Judge William A. Thorne.[14]

106.    Five of the commissioners reside in typically urban areas along the Wasatch Front. Two commissioners reside in less urban regions of the State. This allocation, selected by the bipartisan group of Utah's top elected officials, gives outsized representation on the Commission to rural residents because 80% of Utah's population lives in urban areas along the Wasatch Front.

107.    Overall, the commissioners met 32 times between April and November 2021. The Commission livestreamed all public meetings and hearings and then posted recordings online, including all 17 of its working meetings.

108.    The Commission began by receiving presentations about the redistricting process from numerous renowned academics and experts.

---

[13] Commissioner Jones resigned before the Commission's first meeting, citing personal reasons, and was replaced by Karen Hale, a former Democratic state senator who represented Utah's 7th Senate District covering Salt Lake County from 1999 to 2006.

[14] Utah Independent Redistricting Commission, UIRC Members, https://uirc.utah.gov/uirc-commissioners/ (last accessed Mar. 15, 2022).

109.     The Commission then deliberated regarding the nonpartisan criteria and transparent process it would use to draw the State's redistricting plans. It published the proposed criteria and other planning proposals on the Commission website, giving the public time and the ability to participate prior to the final adoption of the Commission's governing policies.

110.     The Commission voted unanimously on August 27, 2021, to adopt a set of seven affirmative neutral redistricting criteria and one prohibition on favoring candidates, incumbents, and/or political parties.[15]

111.     The Commission first agreed that it must draw contiguous districts of roughly equal population. It then provided that, "to the extent practicable," district lines should: minimize dividing counties and municipalities across multiple districts; be reasonably compact and avoid contortions unexplainable by other criteria; preserve communities of interest in geographic areas that share common policy interests or other cultural, religious, social, or economic bonds; follow natural or manmade boundaries such as mountain ranges or freeways; preserve cores of prior districts in "lines as previously drawn"; and seek boundary agreements among the different map types.[16] *See also* Utah Code § 20A-20-302(5) (describing the SB200 framework for the Commission's neutral criteria).

112.     Additionally, the Commission sought to draw district lines that would avoid splitting precincts, with the goal of assisting county clerks to revise county precincts to accommodate overlaps between the new congressional and state legislative maps. The Commission contacted every county clerk in the State to identify areas that had precincts requiring

---

[15]   Utah Independent Redistricting Commission, UIRC Meeting – August 27, 2021, https://uirc.utah.gov/uirc-meeting/uirc-august-27-2021/ (last accessed Mar. 15, 2022).

[16]   Utah Independent Redistricting Commission, Synopsis of Threshold Criteria and Redistricting Standards, https://uirc.utah.gov/uirc-meeting/synopsis-criteria-and-standards/ (last accessed Mar. 15, 2022).

additional attention.

113.    Importantly, the Commission's adopted criteria prohibited any process or redistricting decision-making that could facilitate "the purposeful or undue favoring or disfavoring of an incumbent elected official, a candidate or prospective candidate for elected office, or a political party."[17]

114.    To abide by this prohibition on partisan redistricting, the Commission drew maps blind to partisan data of any sort, and it did not have access to or consider the residential addresses of incumbents, candidates, or any prospective candidates.

115.    Commission Chair Facer explained that "[b]y not knowing that information, we're making an explicit effort to not favor or disfavor anybody. If we were looking at that, we could get mired of discussing whether we're favoring someone. We don't . . . want to do that[.]"[18] Facer later reaffirmed in an op-ed that "[t]o facilitate compliance with this [nonpartisan redistricting] criterion, the commission chose to not use political data in drawing maps. I can state with confidence that partisan information did not shape the commission's maps."[19]

116.    SB200 requires the Commission to hold at least seven public testimony hearings in designated regions of the State: Bear River, Southwest, Mountain, Central, Southeast, Uintah, and Wasatch Front. *See* Utah Code § 20A-20-301(1). At the public hearings, the public had to be provided "a reasonable opportunity to submit written and oral comments to the commission and

---

[17] *Id.*

[18] Bryan Schott, *Here come the redistricting maps: What you need to know about who draws them*, Salt Lake Trib. (Aug. 12, 2021), https://www.sltrib.com/news/politics/2021/08/12/here-come-maps-what-you/.

[19] Opinion, *Rex Facer: Independent Redistricting Commission provides nonpartisan map options*, Salt Lake Trib. (Nov. 8, 2021), https://www.sltrib.com/opinion/commentary/2021/11/08/rex-facer-independent/.

to propose redistricting maps." *Id.* § 20A-20-301(2).

117.    The Commission spent hundreds of hours traveling the State to hear Utahns' opinions on the redistricting process. The Commission held 15 total hearings across Utah to solicit public testimony, including in each of the seven regions specified. It added additional public hearing stops as the community requested. Despite strains on the Commission's process from the COVID-19 pandemic and delays in the 2020 census, these public outreach efforts far exceeded the opportunities for citizen participation and comment that SB200 required.

118.    The Commission supplemented its hearing schedule with additional outreach over social and other media. It also reached out directly to organizations and community leaders in Utah. For example, Commission staff contacted hundreds of organizations throughout the State—including universities, faith-based organizations, chambers of commerce, tribal leaders, and other military, ethnic and cultural groups—to educate and involve identified communities in the redistricting process. The Commission additionally hired a communications consulting firm to conduct a robust digital, print, and social media outreach program. It raised awareness about the independent redistricting process by attending large community events in the State, such as the Jordan Stampede, the Wasatch County Fair, and the Brigham City Peach Days.

119.    At each public hearing, the Commission invited voters' participation through in-person comments, online submissions, and virtual contributions and attendance. The Commission also educated the public about its governing nonpartisan criteria, its process for drawing neutral district lines, and the many opportunities for the public to have their voices heard.

120.    Following their governing criteria, the Commission obtained exhaustive public input about communities of interest in Utah and labored to draw district lines to keep those designated communities together. The Commission treated economic, educational, environmental,

ethnic, industrial, language, local government, neighborhood, and religious communities as communities of interest.

121.    Early in the process, the Commission created a website that allowed members of the public to identify communities of interest by selecting a geographic area on a map and describing why the area comprised a community of interest. The Commission received about 1,000 public comments defining communities of interest in Utah and over 2,000 other comments about specific maps, many of which identified particular issues concerning communities of interest.[20]

122.    Commission staff also collected many communities-of-interest maps during public outreach and hearing testimony, and it received additional public input on communities of interest from an online tool called Representable.[21]

123.    Aggregating the submitted communities of interest and ensuring their consistency with the Commission's criteria, the Commission ultimately identified 590 communities of interest in Utah. Once the Commission staff categorized Utahns' communities-of-interest submissions, the staff turned the data into viewable layers within the redistricting software, allowing the commissioners to evaluate whether their drafted maps preserved recognized communities.

124.    SB200 instructed the Commission to "maintain a website where the public may . . . submit a map . . . [and] comments on a map presented to, or under consideration by, the commission." Utah Code § 20A- 20-201(13). To that end, the Commission launched a public-oriented, design-your-own map feature in August 2021, which provided an innovative way for the Commission to engage with the community. This tool empowered Utahns to try their hand at

---

[20]    Utah Independent Redistricting Commission, Communities of Interest, https://uirc.maps.arcgis.com/apps/MapSeries/index.html?appid=6ceab895212242fa888144d31d1 11a47 (last accessed Mar. 15, 2022).

[21] Representable, Utah State Map, www.representable.org/map/ut/ (last accessed Mar. 15, 2022).

redistricting by submitting their own citizen-drawn maps. The Commission published on its website the publicly submitted maps that complied with the neutral criteria, and it actively considered submitted maps in public meetings as a basis for the Commission's proposals.

125.    The Commission also exceeded its baseline transparency requirements by livestreaming team mapping sessions on YouTube as they drew Utah's political boundaries for anyone in the State to scrutinize in real time.[22] The Commission publicly posted all its draft maps online to maximize the time for Utahns to access the maps and provide meaningful feedback to inform the Commission's revisions.

126.    The Commission's iterative mapmaking process with the community enabled it to compile public comments and submissions to improve its maps based on citizen feedback. The Commission received and considered thousands of public comments and submissions in response to its maps. Making redistricting choices in the open ensured that the Commission had to justify its choices to the public.

127.    Despite the overall collaborative efforts of the Commission throughout the redistricting process, one commissioner, Rob Bishop, appointed by Defendant Wilson, abruptly resigned on October 25, 2021, one week before the Commission's final deadline.

128.    Bishop is a former Republican representative of Utah's 1st Congressional District and former Chair of the Utah Republican Party. In explaining his resignation, Bishop claimed that the Commission was biased in favor of urban areas because commissioners residing in urban areas along the Wasatch Front outnumbered commissioners residing in rural areas—notwithstanding rural areas' outsized representation on the Commission relative to Utah's population. In addition,

---

[22]    Utah    Independent    Redistricting    Commission,    Videos,    YouTube www.youtube.com/c/utahindependentredistrictingcommission (last accessed Mar. 15, 2022).

the Commission spent most of its hearing time in areas outside of urban settings along the Wasatch Front. It provided virtual access and opportunity for public access across Utah to contribute to all Commission business, eliminating a need for any physical proximity to the meetings. It actively considered differing urban and rural needs in its communities-of-interest analyses. And one of the Commission's final congressional maps was designed and measured to contain significant urban and rural elements in each district.

129.    Bishop also revealed a partisan reason for his resignation, citing the proposed map that he believed would result in one Democrat being elected to Congress. Bishop argued that all four congressional districts needed to be politically cohesive and represented by the same political party. He stated that "[f]or Utah to get anything done" in Congress, the State "need[s] a united House delegation . . . having everyone working together to oppose" proposals he perceived as unfavorable based on his political viewpoint.[23]

130.    Soon after Bishop's announcement, Defendant Wilson stated during a news conference that the Commission's work was in jeopardy. Defendant Wilson reasoned that because Utah is "in terms of landmass, a rural state," he believed the Commission's maps should reflect that perceived rural nature. Specifically, he asserted that "there's a lot of importance and benefits to this state of having the members of our congressional delegation all understand, and working for rural Utah, back in Congress."[24] Of course, as the Supreme Court held in *Reynolds v. Sims*,

---

[23] *See* Bryan Schott, *Is Utah's independent redistricting commission a success? Depends on who you ask.*, Salt Lake Trib. (Oct. 28, 2021), https://www.sltrib.com/news/politics/2021/10/28/is-utahs-independent/; Utah Independent Redistricting Commission, *UIRC 10/25/21 Meeting*, YouTube (Oct. 25, 2021), https://www.youtube.com/watch?v=z4EuuDmG588 (last accessed Mar. 15, 2022).

[24] Katie McKellar, *'Ink still wet' on proposed maps, but Utah House speaker says Legislature may reevaluate redistricting process*, Deseret News (Oct. 27, 2021), https://www.deseret.com/utah/2021/10/27/22749057/ink-still-wet-utah-redistricting-independent-maps-house-speaker-legislature-reevaluate-commission.

"Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." 377 U.S. 533, 562 (1964).

131.    To fill Bishop's vacancy, Defendant Wilson appointed Republican former state legislator Logan Wilde, who previously served as the Utah commissioner of Agriculture and Food.

132.    On October 25, 2021, soon after Bishop's resignation, the remaining six commissioners approved three Commission congressional maps by unanimous vote. The three impartial maps redrew the State's congressional boundaries by using nonpartisan criteria and reflected the vast public input that the Commission had gathered over the course of several months.

133.    The Commission published the three final maps online for all Utahns to evaluate. The final Commission maps, described in more detail below, are entitled "Purple Congressional 4," "Orange Congressional 3," and "Public Congressional SH 2." The images below show the Commission's three maps, which it posted online to maximize time for public scrutiny.[25]

---

[25] Interactive versions of the Commission's maps are available online. *See* Utah Independent Redistricting Commission, Draft Congressional Maps, https://arcg.is/1uT4y4 (last accessed Mar. 15, 2022).



*Commission's Purple
Congressional 4 Map*



*Commission's Orange
Congressional 3 Map*



*Commission's Public
Congressional SH 2 Map*

134.    Six commissioners—of differing political affiliations, backgrounds, and locations in the State—labored together in full view of the public to draw impartial maps for all Utahns, and each of them attested to this neutral process and outcome.

135.    For example, Defendant Adams' appointee, former Republican state senator Lyle Hillyard from Logan, lauded the Commission and its transparent process as one that was balanced and nonpartisan. Hillyard confirmed that he was "convinced [that] if we had gotten into partisan politics," rather than focusing on neutral criteria such as "keeping cities together" and ensuring needed county splits had a "clean cut," the maps "would have never been completed."[26]

136.    Retired Judge William Thorne, a nonpartisan joint appointee, agreed and summarized that the process demonstrated how "[b]ipartisanship is possible. Fair maps are

---

[26] Katie McKellar, *'Good luck': Independent redistricting commission pitches its maps, but decision rests with Utah lawmakers*, Deseret News (Nov. 1, 2021), https://www.deseret.com/utah/2021/11/1/22757313/independent-redistricting-commission-pitches-maps-but-decision-made-by-legislature-politics-voting.

possible."[27]

137.    Commissioner Karen Hale, a retired state senator, added that the "public process was really helpful to us as we felt like we wanted to truly reflect what the people desired in this mapmaking process."[28]

138.    Commission Chair Facer stated that "[t]he commission used a broad and robust set of criteria, . . . and as a result has drawn high quality maps that accomplish its mandate."[29]

139.    Meeting the Commission's statutory deadline, the Commission presented its three map proposals to the LRC on November 1, 2021. The Commission accompanied its map submission with a 196-page report of thorough quantitative and qualitative analysis, 700 pages of community comments, and additional context on the Commission's nonpartisan criteria and community-driven process.[30]

140.    Throughout the Commission's November 1 presentation to the LRC, members of the Commission explained in painstaking detail the methods they used to draft their maps and the criteria applied, while fielding lawmakers' questions about the maps. "I can say with confidence that partisan information did not shape the commission's maps. We were prohibited from the purposeful or undue favoring or disadvantaging of an incumbent elected official," Chairman Facer

---

[27]  Ben Winslow, *Independent redistricting commission presents maps to the Utah legislature*, Fox13 News (Nov. 5, 2021), https://www.fox13now.com/news/local-news/independent-redistricting-commission-presents-maps-to-the-utah-legislature.

[28]  Bryan Schott, *Independent redistricting commission delivers proposed voting district maps to Utah lawmakers*, Salt Lake Trib. (Nov. 1, 2021), https://www.sltrib.com/news/politics/2021/11/01/independent-redistricting/.

[29]  Opinion, *Rex Facer: Independent Redistricting Commission provides nonpartisan map options*, *supra* note 19.

[30]  Utah Independent Redistricting Commission, Redistricting Report (Nov. 2021), https://uirc.utah.gov/wp-content/uploads/Utah_Independent_Redistricting_Commission.zip (hereafter "UIRC Report").

reaffirmed during the presentation.[31]

**F.    The Legislature conducted its own redistricting process parallel to the Commission's that lacked transparency and commitment to respecting nonpartisan criteria.**

141.    Despite representations in early 2020 that the Legislature would take undue partisanship out of the redistricting process even under SB200, the Legislature ignored the Commission's neutral maps in favor of its own maps reflecting excessive partisan gerrymandering.

142.    In April 2021, the Legislature formed a twenty-member Legislative Redistricting Committee, made up of fifteen Republican and five Democratic state legislators. Representative Paul Ray, a now-retired Republican representative from Clearfield, and Defendant Sandall, a Republican senator representing Tremonton, co-chaired the LRC.

143.    After the census data became available in late summer 2021, the LRC conducted its own closed-door mapmaking process that ran parallel to the Commission's community-driven and transparent process.

144.    The LRC's process was designed to achieve—and did in fact achieve—an extreme partisan gerrymander.

145.    Unlike the Commission, the LRC did not explain or publish the full list of criteria that guided its redistricting decisions. Instead, it offered only a one-page infographic for public map submissions that stated three baseline criteria the Legislature claimed it would consider: population parity among districts, contiguity, and reasonable compactness.[32]

146.    The LRC affirmatively voted not to preserve Utah's communities of interest as one

---

[31] Schott, *Independent redistricting commission delivers proposed voting district maps to Utah lawmakers*, *supra* note 28.

[32]    Utah Legislative Redistricting Committee, Criteria, https://redistricting.utah.gov/wp-content/uploads/2021/09/How-To-Graphics-4-dragged-2.pdf (last accessed Mar. 15, 2022); Utah Legislative Redistricting Committee, Draft 2021 Redistricting Principles (May 18, 2021), https://le.utah.gov/interim/2021/pdf/00002126.pdf (last accessed Mar. 15, 2022).

of its guiding principles.[33]

147.    The LRC also did not commit to avoid unduly favoring or disfavoring incumbents, prospective candidates, and/or political parties in its redistricting process.

148.    In addition, in contrast to the Commission, the LRC conducted its map-drawing and decision-making processes almost entirely behind closed doors. Although the LRC solicited some public input about Utah's communities and voters' preferences during hearings, the LRC does not appear to have used that testimony to guide its redistricting process. The LRC declined to use Utahns' extensive public input on communities of interest, solicited by either the LRC or the Commission.

**G.    The Legislature unjustifiably rejected the Commission's impartial maps.**

149.    In early November 2021, the Legislature adopted its own maps and set aside the Commission's painstaking efforts to follow neutral traditional redistricting criteria, implement community feedback, and produce transparent and impartial congressional district boundaries.

150.    The timing and content of the Legislature's final redistricting plan reveals that the Legislature decided to adopt its own partisan gerrymandered maps and prescreened them with Republican party leaders long before the Commission even reached the deadline for completing its work.

151.    Defendant Sandall conceded that political considerations affected the Legislature's congressional redistricting decisions. He stated that the LRC "never indicated the legislature was nonpartisan." He continued: "I don't think there was ever any idea or suggestion that the legislative

---

[33]    Utah    Legislature    Redistricting    Committee,    Minutes    (May    18,    2021), https://le.utah.gov/interim/2021/pdf/00002847.pdf (last accessed Mar. 15, 2022).

work wouldn't include some partisanship."[34]

152.    After the Commission presented its plan to the Legislature on November 1, 2021, the LRC leadership told reporters that they would take the Commission's proposals "into consideration."[35] But the LRC did not do so.

153.    LRC co-chair Paul Ray admitted that he had not paid attention to the Commission's process. He instead claimed that he would later look at "how close [the LRC's maps are] to [the Commission's maps] and what their explanation of their maps" were because the LRC must "see where [the Commission's maps] fit into what we're working on."[36]

154.    Defendant Sandall faulted the Commission for presenting the Legislature with three map options instead of only one. Sandall stated that the Legislature "can't adopt their maps" because "[w]e would have to adopt one map, and they did not just bring us one map."[37] However, in SB200—the statute the Legislature passed to repeal Proposition 4 and that Defendant Sandall voted to approve—the Legislature expressly required that the Commission submit "three different maps for congressional districts." Utah Code § 20A-20-302(2)(a).

155.    The Legislature's Republican caucus received advance notice of the LRC's proposed maps in a closed-door meeting that occurred at least a week before the Commission

---

[34] Shane Burke, *Did costly public participation efforts matter in redistricting? Experts say no.*, Salt Lake Trib. (Nov. 20, 2021), https://www.sltrib.com/news/politics/2021/11/20/did-costly-public/.

[35] McKellar, *'Good luck': Independent redistricting commission pitches its maps, but decision rests with Utah lawmakers*, *supra* note 26.

[36] Bethany Rodgers, *Independent commission's proposed congressional maps would give Utah Dems a slight boost, analysis shows*, Salt Lake Trib. (Oct. 26, 2021), https://www.sltrib.com/news/politics/2021/10/26/independent-commissions/.

[37] Daniel Woodruff, *Utah redistricting co-chair defends new maps as Democrats vow to fight them*, KJZZ14 News (Nov. 7, 2021), https://kjzz.com/news/utah-redistricting-cochair-defends-new-maps-democrats-vow-to-fight.

completed its work on October 25, 2021. During this closed-door session, the Republican caucus discussed partisan voting trends, and used that information to inform its redistricting decisions.[38]

156.    On Friday, November 5, 2021, around 10:00 pm, the LRC for the first time publicly posted its own congressional map, which, with slight adjustment, would become the 2021 Congressional Plan.

157.    The LRC's posted map bore no resemblance to the impartial maps the Commission presented just four days earlier on November 1.

158.    Co-chairs Sandall and Ray issued an accompanying statement on behalf of the LRC explaining that they decided to divide voters in Salt Lake County between four districts, ostensibly because "[w]e are one Utah, and believe both urban and rural interests should be represented in Washington, D.C. by the entire federal delegation."[39]

159.    The LRC gave the public two weekend days to study the 2021 Congressional Plan that would shape the next decade of elections.

160.    The timing of the LRC's initial public release of its map late on Friday evening was incompatible with the goal of accommodating public input at a hearing that was set for the following Monday, November 8, 2021.

161.    Nonetheless, Utahns rushed to organize and prepare public testimony to confront the LRC's partisan gerrymandered 2021 Congressional Plan.

---

[38] *See, e.g.*, Robert Gehrke, *Utah's redistricting process was — as always — rigged from the start, Robert Gehrke writes*, Salt Lake Trib. (Oct. 29, 2021), https://www.sltrib.com/news/politics/2021/10/29/utahs-redistricting/; Robert Gehrke, *Born in the dark, Utah's redistricting maps are the worst in decades, Robert Gehrke writes*, Salt Lake Trib. (Nov. 9, 2021), https://www.sltrib.com/news/politics/2021/11/09/born-dark-utahs/.

[39] Katie McKellar, *Utah lawmakers released their proposed redistricting maps. Accusations of gerrymandering swiftly followed*, Deseret News (Nov. 6, 2021), https://www.deseret.com/2021/11/6/22766845/utah-lawmakers-released-their-proposed-redistricting-maps-accusations-of-gerrymandering-salt-lake.

162.    So many Utahns joined together to submit their online statements opposing the LRC's proposed electoral boundaries that they crashed the LRC's public comment website.[40]

163.    Despite the LRC's eleventh-hour notice, Utahns also gathered in large numbers on the steps of the state Capitol to protest the LRC's map and advocate in favor of the Commission's neutral maps.

164.    A group of eighty-four prominent Utah business and community leaders, including some Plaintiffs, condemned the LRC's map as a partisan gerrymander. They held a press conference at the Capitol to emphasize a letter they signed urging lawmakers and Governor Spencer Cox to adopt the Commission's proposed neutral maps.[41]

165.    During this time, the Legislature received 930 emails criticizing the LRC's partisan gerrymandered congressional plan and urging it to use one of the Commission's neutral maps. Comments advocated for the Commission's work because "[i]t provides accountability to the redistricting process;" voters had decided that they "want [the LRC] to consider and pass maps presented by the independent redistricting commission;" Utahns "need representation that understands the diversity of this area;" and "splitting [Salt Lake City] into two districts and the county into four districts is absolutely unacceptable for ensuring proper representation at the federal level. The maps created by the independent commission do a much better job at keeping communities together." [42]

---

[40] Jeff Parrott, *Legislative Redistricting website overwhelmed leaving public unable to comment online on maps*, Salt Lake Trib. (Nov. 8, 2021), https://www.sltrib.com/news/politics/2021/11/08/traffic-jams-legislative/.

[41] Carter Williams, *Utah business, community leaders call for Legislature, Cox to adopt nonpartisan voting maps*, KSL News (Nov. 8, 2021), https://www.ksl.com/article/50279002/utah-business-community-leaders-call-for-legislature-cox-to-adopt-nonpartisan-voting-maps.

[42] Kyle Dunphey & Cindy St. Clair, *Lawmakers received hundreds of emails in support of the independent redistricting commission. Why didn't they listen?*, KSL News (Jan. 19, 2022),

166. Only eleven Utahns wrote to the Legislature in support of the LRC's map.[43]

167. On Monday, November 8, 2021, the LRC held the single statutorily mandated public hearing on its proposed congressional map. Utah Code § 20A-20-303(3).

168. Shortly beforehand, the LRC made a slight adjustment to the map to move southeastern San Juan County back into proposed District 3 instead of proposed District 2. This adjusted version became the final 2021 Congressional Plan, later numbered as HB2004.

169. An overwhelming majority of the hundreds of Utahns who attended the November 8 hearing on the LRC's 2021 Congressional Plan expressed their outrage about the LRC overriding the Commission and the public will.

170. For over three hours of live and online testimony, public speakers urged the LRC to abandon its proposed partisan gerrymander and instead adopt one of the Commission's neutral maps.

171. Among other things, the public speakers praised the Commission's transparent and community-driven process that produced three impartial maps. One speaker pleaded for the Legislature to "please listen to the independent commission's recommendations and stop playing politics." Another Utahn emphasized that in 2018 "[t]he voters asked for nonpartisan redistricting," and criticized the Legislature for reversing that progress. A commenter further added that "[t]his is a blatant gerrymander with Salt Lake County divided between all four districts. Please use the IRC maps." As Salt Lake City Mayor Erin Mendenhall summarized during the

---

https://ksltv.com/481760/lawmakers-received-hundreds-of-emails-in-support-of-the-independent-redistricting-commission-why-didnt-they-listen/; Kyle Dunphey & Cindy St. Clair, *Lawmakers received hundreds of emails in support of the independent redistricting commission. Why didn't they listen?*, Deseret News (Jan. 18, 2022), https://www.deseret.com/utah/2022/1/18/22889744/utah-redistricting-why-didnt-utah-politicians-listen-to-emails-brian-king-congressional-district.

[43] *Id.*

hearing: "I have heard more unified Utah here" in opposition to the LRC's map "than I've heard in any public hearing for a very long time."[44]

172.    Ignoring these presentations, the LRC voted immediately at the conclusion of the hearing to approve the LRC's partisan gerrymandered map and advance HB2004 to the full Legislature for a vote. The committee's vote was along party lines, with 15 Republicans voting in favor of the map and five Democrats voting against it.

173.    The next day, on November 9, 2021, the Utah State House voted 50-22 to approve the 2021 Congressional Plan. Five House Republicans joined all House Democrats in voting against the Legislature's partisan gerrymandered 2021 Congressional Plan.

174.    In total, the House allowed only approximately 10 minutes of debate. Nonetheless, numerous legislators managed to briefly express their opposition to the 2021 Congressional Plan.[45]

175.    A Republican representative, Raymond Ward, first spoke out against the 2021 Congressional Plan. He emphasized that it eliminated Utah's lone competitive district from the prior decade's congressional map, former District 4. The 2021 Congressional Plan instead maintains four homogenous, Republican-advantaged congressional districts. Representative Ward proposed an alternative that retained the 2011 congressional map's competitive district and met other basic redistricting criteria. The Republican House majority rejected the proposal by voice vote.

---

[44] McKellar, *Utah lawmakers released their proposed redistricting maps. Accusations of gerrymandering swiftly followed*, *supra* note 39; Ben Winslow, *Utah's legislature rejects every map proposed by independent redistricting committee*, Fox13 News (Nov. 8, 2021), https://www.fox13now.com/news/local-news/utahs-legislature-rejects-every-map-proposed-by-independent-redistricting-committee.

[45] *See House - 2021 Second Special Session - Day 1*, House Floor Debate and Vote on H.B. 2004 Congressional Boundaries Designation, Utah State Legislature at 0:06:52 – 0:17:35 (Nov. 9, 2021), https://le.utah.gov/av/floorArchive.jsp?markerID=116334 (last accessed Mar. 15, 2022).

176.    Democratic Representative Clare Collard also criticized the HB2004 map because it divides communities of interest. She proposed an alternative that would keep such communities intact. The Republican majority in the House rejected Representative Collard's alternative map.

177.    Democratic House Minority Whip Jennifer Dailey-Provost proposed adopting the Commission's Congressional SH2 map, and asked LRC co-chair Ray to explain the basis for LRC's decision to prioritize having "rural-urban mix" in all four districts. Ray acknowledged that no such requirement exists. Ensuring an "urban-rural mix" is not derived from Utah law. It is not even among the guiding principles the LRC adopted at the beginning of its redistricting process. It is not a criterion designated in Proposition 4 or SB200. And it is not among the list of traditional neutral redistricting criteria. Rather, Ray admitted that the LRC adopted the urban-rural mix rationale on an *ad hoc* basis as an unofficial policy.

178.    The Republican majority in the House voted to reject Representative Dailey-Provost's proposal of the Commission's SH2 Plan. That rejection makes clear that ensuring four districts with an urban and rural mix does not explain the 2021 Congressional Commission Plan's district lines. By any plausible measure, the Commission's SH2 Plan achieves a superior mix of urban and rural components in all four districts than the LRC's partisan gerrymandered map.

179.    The House Republican leadership cut off the floor debate before Democratic representatives supporting the Commission's other neutral redistricting plans could present them for discussion.[46]

180.    The following day, November 10, 2021, the Utah State Senate took up the 2021

---

[46] Katie McKellar, *Utah House approves new congressional map. Here's why Gov. Spencer Cox says he likely won't veto*, Deseret News (Nov. 9, 2021), https://www.deseret.com/2021/11/9/22772357/utah-legislature-special-session-lawmakers-tackle-redistricting-vaccine-mandate-dixie-state-name.

Congressional Plan. The Senate voted 21-7 to approve the 2021 Congressional Plan before transmitting it to Governor Spencer Cox. Republican Senator Daniel Thatcher, representing West Valley City, joined all Democratic Senators to vote against HB2004.

181.    Democrats in the Utah Senate were outspoken against the 2021 Congressional Plan. Many described how the map did not actually serve urban and rural interests but diluted urban voters, with one senator emphasizing that the 2021 Congressional Plan ignoring that "Utah is the seventh most urbanized state in the Nation."[47]

182.    Other senators opposing HB2004 described how the LRC drew the map for partisan advantage to carve Salt Lake County into four districts and to divide areas that tended to vote against Republicans. Democratic Senator Derek Kitchen, for example, said the 2021 Congressional Plan was "unconscionable" because "it serves no other purpose than diluting the franchise of its residents. One-third of the State's population is in Salt Lake County."[48]

183.    Senator Kitchen proposed an alternative plan that was a close variation of the Commission's Orange Congressional 3 map. The alternative map included a district centered on Salt Lake County that avoided the community, municipality, and county divides characteristic of the 2021 Congressional Plan. But the Republican-controlled Senate rejected Senator Kitchen's proposed alternative map.[49]

184.    Rebuffing one legislator's plea for the Legislature to adopt a map reflecting Utah's

---

[47] *See, e.g.*, *Senate - 2021 Second Special Session - Day 2*, Senate Floor Debate and Vote on H.B. 2004 Congressional Boundaries Designation, Utah State Legislature at 0:22:49–0:25:17 (Nov. 10, 2021), https://le.utah.gov/av/floorArchive.jsp?markerID=116361 (last accessed Mar. 15, 2022).

[48] Ben Winslow, *Redistricting maps clear legislature, ballot initiative possible*, Fox13 News (Nov. 10, 2021), https://www.fox13now.com/news/local-news/utah-senate-passes-controversial-congressional-map-heads-to-governor.

[49] *See, e.g.*, Senate Floor Debate and Vote on HB2004, *supra* note 47, at 0:35:40–0:39:44.

communities of interest, Defendant Sandall insisted that "[w]e are one Utah . . . in one combined community of interest."[50]

185.    Defendant Sandall claimed during the Senate floor debate that the LRC modeled its gerrymandered map on the Commission's draft so-called Green Map.[51] The Green Map was a working draft of a redistricting plan, championed only by former Commissioner Bishop, that the Commission considered but opted not to include among its three recommended maps.

186.    In any event, the final 2021 Congressional Plan does not reflect the Commission's draft Green Map. Unlike the 2021 Congressional Plan, for example, the draft Green Map does not split Salt Lake County four ways. The draft Green Map also keeps communities intact in areas in Salt Lake City, West Valley City, Midvale, and Murray, among other municipalities.

**H.    The 2021 Congressional Plan is an extreme partisan gerrymander.**

187.    Proponents of the 2021 Congressional Plan repeatedly claimed that the map's peculiar district lines were necessary to balance urban and rural interests in Utah. Nonetheless, the Legislature failed to explain how they measured that purported criterion or how the 2021 Congressional Plan accomplishes that goal.

188.    In any event, seeking to amplify representation of rural interests at the cost of urban interests is an illegitimate redistricting consideration. *See Reynolds*, 377 U.S. at 562.

189.    The purported need to amplify Utah's rural interests by having rural areas in all four districts was also a pretext to unduly gerrymander the 2021 Congressional Plan for partisan

---

[50] Lindsey Whitehurst, *Utah Legislature passes congressional districts over protest*, Associated Press (Nov. 10, 2021), https://apnews.com/article/congress-utah-salt-lake-city-redistricting-legislature-966ab9c764a69d8a4242013d0405af09.

[51] Utah Redistricting Staff, *Green Congressional Districts 1 Draft 9/2/2021 8:00 a.m. (a.k.a Draft 2)*, ArcGIS (Oct. 8, 2021), https://www.arcgis.com/home/item.html?id=3f64041779674b3a970399ca77c16d2f (last accessed Mar. 15, 2022).

advantage.

190.    The Legislature sought to divide urban voters in Salt Lake County in order to maximize Republican advantage in all four congressional districts, not to ensure an urban-rural mix.

191.    The Legislature used the same pretextual justification to divide Salt Lake County in the 2011 redistricting cycle in its effort to unseat Representative Jim Matheson from Congress. But, unlike the 2011 map, the 2021 Congressional Plan employed computational advancements in statistical and mapping tools to guarantee the absence of any competitive districts in Utah for the foreseeable future.

192.    The 2021 Congressional Plan cracks urban voters in Salt Lake County four ways, and through the middle of mountain communities in Summit County, because those voters tend to oppose Republican candidates. By contrast, the 2021 Congressional Plan avoids community divisions through the middle of urban and suburban voters in Davis County and Utah County, because those voters tend to support Republican candidates.

193.    The Legislature rejected the Commission's Congressional SH2 Plan, which would have achieved a superior mix of urban and rural components in all four congressional districts, because the Commission's SH2 Map did not contain a mix that would consolidate Republican advantage across the congressional map.

194.    Even rural Utahns opposed the Legislature's urban-rural mix justification. One commenter expressed to the Legislature before it voted on HB2004 that "[a]s a voter in a rural area I'm entirely uncomfortable with my vote being used to dilute the power of another." Another rural voter wrote: "As a Republican who lives in a more rural part of the state, I have the same complaint as those living in Salt Lake. Please do not dilute our vote by splitting us up between all four

districts! I'm far more interested in having everybody fairly represented than I am in electing more people from my own party."[52]

195.    Rural elected officials likewise opposed being combined with urban areas as a justification for maximizing suburban Republicans' control over all four districts in the 2021 Congressional Plan. Numerous rural mayors opposed being combined in a district with slices of urban Salt Lake County. Other elected officials from rural areas conveyed similar sentiments to the LRC.[53]

196.    All four members of Utah's current congressional delegation live in urban and suburban areas along the Wasatch Front, not in rural Utah.

197.    The 2021 Congressional Plan seeks to protect preferred Republican incumbents and draws electoral boundaries to optimize their chances of reelection.

198.    In particular, the Legislature converted the competitive 4th District into a safe Republican district to enhance Republican Representative Burgess Owens' prospects to win reelection.

## I.    Governor Cox reluctantly signed the partisan gerrymandered 2021 Congressional Plan into law.

199.    As the Legislature has done in every prior redistricting cycle, it submitted the 2021 Congressional Plan approved as HB2004 through the normal legislative process to be enacted or vetoed by the Governor.

200.    Before signing HB2004 into law, Governor Cox held a regularly scheduled Facebook Q&A on November 9, 2021, in which he received more than 500 questions focused on

---

[52] *See, e.g.*, Utah Legislative Redistricting Committee, MyRedistricting, Committee Chairs Proposal – Congressional, https://citygate.utleg.gov/legdistricting/comments/plan/132/12 (last accessed Mar. 15, 2022).

[53] Dunphey & St. Clair, *supra* note 42.

redistricting. While answering the public's questions about the 2021 Congressional Plan, Governor Cox acknowledged there was "certainly a partisan bend" in the Legislature's redistricting process and conceded that "Republicans are always going to divide counties with lots of Democrats in them, and Democrats are always going to divide counties with lots of Republicans in them" when redistricting is left in partisan hands. Governor Cox agreed that "it is a conflict of interest" for the Legislature to "draw the lines within which they'll run." Governor Cox also stated that he supports a redistricting process that focuses on preserving "communities of interest," such as the Commission's neutral undertaking, which he reaffirmed is "certainly one area where that is a good way to make maps, try to keep people similarly situated together, communities together is something that I think is positive."[54]

201.    Despite these misgivings, Governor Cox eventually signed HB2004 on November 12, 2021. *See* Utah Code §§ 20A-13-101–104.

202.    In the end, less than seven days passed between the time the Legislature disclosed its 2021 Congressional Plan to the public and enacted it into law.

203.    A post-enactment Deseret News/Hinckley Institute of Politics poll shows the outrage Utahns expressed during the redistricting process has not subsided. Only about a quarter of Utahns approve of the 2021 Congressional Plan. And less than 20% of Utahns agree with the Legislature's adoption of its own map rather than using one of the Commission's neutral maps.

204.    The Legislature has now indicated that it is considering a repeal of the watered-

---

[54] Katie McKellar, *Utah Gov. Spencer Cox signs off on controversial congressional map that 'cracks' Salt Lake County*, Deseret News (Nov. 12, 2021), https://www.deseret.com/utah/2021/11/12/22778945/utah-governor-signs-legislature-controversial-congressional-map-cracks-salt-lake-city-gerrymander; Gov. Spencer J. Cox, *Live Q&A with Utah Gov. Spencer J. Cox*, Facebook (Nov. 9, 2021), https://www.facebook.com/watch/live/?ref=watch_permalink&v=980426705869206.

down redistricting provisions remaining in SB200 and will consider the future of the Commission in the 2022 Legislative interim session. *See* Utah Code § 20A-20-103.

**J.    The 2021 Congressional Plan dilutes the vote and silences the political voice of non-Republican voters, and entrenches Republican control over all four congressional districts.**

205.    The enacted 2021 Congressional Plan "subordinate[s] adherents of one political party and entrench[es] a rival party in power." *Ariz. State Legislature*, 576 U.S. at 791.

206.    In Utah's 2020 congressional election, 1,431,777 votes were cast statewide across all four districts. Of these, 873,347, or approximately 61%, were cast for Republican candidates, while 505,946, or approximately 35%, were cast for Democratic candidates.[55] Yet the 2021 Congressional Plan ensures that 100% of Utah's four Congressional seats will be held by Republicans for a decade.

207.    The 2021 Congressional Plan achieves this extreme partisan advantage for Republicans primarily by cracking Utah's large and concentrated population of non-Republican voters, centered in Salt Lake County, and dividing them between all four of Utah's congressional districts to eliminate the strength of their voting power. The 2021 Congressional Plan takes slices of non-Republican voting areas in Salt Lake County and immerses them into sprawling districts reaching all corners of the State.

208.    The images below demonstrate the excessive partisan gerrymandering created by the 2021 Congressional Plan. The first image on the left displays the full 2021 Congressional Plan, and the image on the right shows the partisan makeup of the State, displaying data at the precinct level. The bottom two images display the same data, focused on Salt Lake County and its surrounding suburban areas.

---

[55] Election returns data are compiled from https://electionresults.utah.gov/elections/uscongress/0.



209.    As these images make clear, the 2021 Congressional Plan guarantees that reliably Republican voters living in Salt Lake City suburbs and faraway, midsized areas across Utah will account for a durable majority of the voting population in each district. This durable Republican majority will consistently outvote Utah's non-Republican minority to elect Republicans for the next decade.

210.    District 1 in the 2021 Congressional Plan emanates from the northeast quadrant of Salt Lake County and extends to cover the entire northern part of the State up to the Utah-Idaho border. The images below demonstrate District 1. The first image shows the entire district. The

54

second image displays the partisan composition of the district. The third image shows the partisan composition of the District 1 slice in Salt Lake County.







211.    As the images show, District 1 begins in the northeast section of Millcreek—a city that is split between all four districts. The District 1 line then shoots north to grab Democratic voters living along Foothill Drive in eastern Salt Lake City before breaking west to carve out historically Democratic-voting areas in northeast Salt Lake City, including cohesive neighborhoods around the University of Utah, the Avenues, Liberty Park, and Yalecrest.

212.    District 1 then turns north to split Democratic-favoring downtown Salt Lake City in half, running though Temple Square and dividing the Marmalade District and Capitol Hill areas. From there, District 1 stretches further north, covering the entire Interstate 15 corridor past Farmington, to reach the Utah-Idaho border.

213.    From Millcreek, District 1 also cuts across 3900 South to the east over Grandeur Peak and through Summit County, jaggedly dividing Democratic-voting and connected mountain communities located between Park City and Kimball Junction.

214.    In short, District 1's electoral boundaries divide Millcreek, run through residential and downtown sections of Salt Lake City, and cut above Park City before stretching to Utah's northern border to dilute the heavily Democratic-voting areas in Salt Lake and Summit Counties. District 1 submerges these disfavored voters in a district containing substantial blocks of Republican voters in northern municipalities, such as Layton, Ogden, Brigham City, and Logan— voters who will reliably vote for Republican candidates. District 1 slices Salt Lake and Summit Counties and combines voters in those areas with more numerous voters in northern Utah, ensuring the enduring Republican control of the congressional district.

215.    District 2 covers the northwest quadrant of Salt Lake County and extends over 300 miles south and west to reach most of Utah's borders with Nevada and Arizona, and nearly another 300 miles southeast to the eastern tip of Wayne County, covering parts of Canyonlands National

Park. The images below display District 2. The first image on the left is the entire district. The second image on the right shows the partisan composition of the district. The third image on the bottom displays the partisan composition of District 2's section of Salt Lake County combined with the Republican voting suburbs in Davis County from Bountiful to Farmington.



216.     District 2 begins on the other side of the District 1, splitting Democratic voters in Salt Lake City and immersing those fragments in a sweeping district. District 2 runs north from the four-way split of Millcreek mostly along 2000 East before sharply cutting west along 900 South through residential areas in Salt Lake City, dividing communities of interest. It then tracks north along Main Street through Temple Square to capture the western half of downtown Salt Lake City.

217.     From the northwestern part of Millcreek, District 2 is also drawn west along 3900 South to divide West Valley City and Kearns, before continuing to Utah's southwest corner.

218.     District 2 takes slivers of heavily Democrat-favoring areas in Salt Lake County—including halves of downtown Salt Lake City, the Marmalade District, Sugar House, Liberty Park, Yalecrest, and West Valley City—and lumps those voters in with a combined block of Republican-voting suburban areas in Bountiful, Tooele, and Farmington, as well as distant Republican-voting cities in southern Utah, such as Cedar City and St. George. District 2 thus ensures that a sufficient majority of Republican voters can overpower non-Republican voters living along the Wasatch Front to lock in Republican victories in District 2.

219.     District 3 encompasses the southeast section of Salt Lake County and then widens to include Utah's entire eastern border as well as part of the northern border in Summit and Daggett Counties and part of the Southern border in San Juan County. The images below display District 3. The first image on the left displays the entire district. The second image on the right displays the partisan composition of the district. The third image on the bottom shows the partisan composition of the district slice in Salt Lake County combined with the Republican voting cities in Utah County.



220.    District 3 meets District 1 and District 2 at the four-way split in Millcreek along 3900 South. District 3 combines burgeoning Democratic-voting areas in southeast Salt Lake County—including the southeast portion of Millcreek, all of Cottonwood Heights and Holladay, and halves of Murray and Midvale—with large reliably Republican-voting stronghold cities in Utah County, such as the highly populated Orem and Provo.

221.    District 3 also abuts District 1 in Summit County to split the Democratic-voting mountain communities, capturing Park City and eliminating the strength of its sizable non-Republican voting population. District 3 then continues east to cover the entire Utah border with Colorado and follows Lake Powell south to the southern border with Arizona.

222.    By starting in Salt Lake County and then reaching to these distant parts of the State, District 3 picks up Republican-voting areas in midsized cities, such as Heber City and Vernal, ensuring that the slices of Democratic-voting areas from Salt Lake County are subordinated to Republican-voting areas.

223.    District 4 takes the southwest quarter of Salt Lake County and combines it with a central Utah district ending at the bottom of Sanpete County. The images below depict District 4. The first image on the left shows the full district boundaries. The second on the right displays the partisan composition of the district. The third image on the bottom displays the portion of District 4 in Salt Lake County.





224.    District 4 divides Millcreek starting along the four-way split of the municipality near the 3900 South and 900 East intersection. District 4's electoral boundary moves west from the Millcreek divide to further sever West Valley City and Kearns, Utah's cities with the state's largest proportion of racial and ethnic minority communities. District 4's line then cuts south along 900 East toward Interstate 15 to grab Taylorsville and divide Democratic areas in Murray and Midvale.

225.    District 4 places these segments of Democratic-voting areas of southwest Salt Lake County in a central Utah district where heavily Republican-voting municipalities along the Wasatch Front in Utah County—such as Eagle Mountain, Spanish Fork, Payson, and Lehi—will consistently overwhelm opposing non-Republican voters.

226.    All four congressional districts contain a substantial minority of Democratic voters that will be perpetually overridden by the Republican majority of voters in each district, blocking these disfavored Utahns from electing a candidate of choice to any seat in the congressional delegation.

227.    The Legislature ensured this result by devising four districts with homogenous political demographic configurations that will secure Republican congressional victories over the

next decade.

228.    Based on preliminary estimates of election returns and population demographics data, District 1 is comprised of approximately 32.0% Democrats, while 62.8% of the district's voting population consistently supports Republicans.[56]

229.    Likewise, District 2 is made up of an estimated 34.2% Democrats, while 60.1% of the district's voting population reliably votes Republican.

230.    District 3 similarly contains an estimated 30.3% Democrats, while 64.7% of the district invariably votes Republican.

231.    District 4 is made up of an estimated 28.3% Democrats, while 66.4% of the population reliably votes Republican.

232.    The largest political demographic shift between last cycle's congressional map and the 2021 Congressional Plan is District 4. District 4, covering southwestern Salt Lake County and large swaths of Utah County, moved from the least Republican and most competitive district last decade to one of the most Republican-advantaged districts in the 2021 Congressional Plan.

233.    Even looking only at the Legislature's announced baseline criteria—contiguity, reasonable compactness, and population parity—the Legislature's 2021 Congressional Plan is an extreme outlier when compared with maps drawn without partisan bias.[57]

234.    The Legislature's partisan gerrymandered map is also not explainable by adherence to other traditional redistricting principles, such as the neutral criteria that voters adopted in

---

[56] The election returns figures are based on statewide composite election data from the 2012, 2016, and 2020 elections for U.S. President; 2016 and 2018 elections for U.S. Senate; 2016 and 2020 election for Utah Governor; and 2016 and 2020 election for Utah Attorney General. *See* Dave's Redistricting, UT 2022 Congressional, https://davesredistricting.org/maps#viewmap::b4d46a7e-4366-4f6c-ac54-ff6640d4e13f.

[57]    Utah    Legislative    Redistricting    Committee,    Criteria    (Sept.    2021), https://redistricting.utah.gov/wp-content/uploads/2021/09/How-To-Graphics-4-dragged-2.pdf.

Proposition 4. The 2021 Congressional Plan instead achieves partisan advantage for Republicans by subordinating traditional redistricting criteria.

235.    For example, the 2021 Congressional Plan divides far more counties, municipalities, and communities of interest than a map based on neutral criteria.

236.    The 2021 Congressional Plan splits five of Utah's twenty-nine counties between two or more congressional districts—even though estimates suggest that a map would have to split no more than three counties to achieve population parity among Utah's districts. The 2021 Congressional Plan fragments those five counties into 12 pieces—far more than necessary to achieve equal population among districts.

237.    The county splits affect a sizeable majority of the State's population. Based on preliminary estimates, approximately 58% of Utahns live in an area affected by the county splits in the 2021 Congressional Plan. The county splits are most striking in Salt Lake County, which is quartered between all four congressional districts. The Salt Lake County separations in the 2021 Congressional Plan crack the more heavily Democratic areas of Salt Lake City and its surrounding municipalities, diluting their voting strength and silencing their voices.

238.    The images below depict the 2021 Congressional Plan's county splits. The first shows the county divides statewide: Davis County is halved between Districts 1 and 2, Juab County is divided between Districts 2 and 4, Summit County is split between Districts 1 and 3, and Utah County is divided between Districts 3 and 4. The second image shows the four-way split in Salt Lake County. The third image shows the partisan elections data for Salt Lake County.





239.    By way of contrast, two of the Commission's maps drawn—which were drawn without regard to partisanship—split fewer counties than the 2021 Congressional Plan.[58] Both the Commission's Orange Congressional 3 and Public Congressional SH 2 maps split only four counties in just nine and eight ways, respectively.

---

[58] *See* UIRC Report, *supra* note 30, at 47.

240.    Utah's municipalities are also divided between different districts in the 2021 Congressional Plan. For example, numerous cities along the Wasatch Front—such as Salt Lake City, Millcreek, Murray, Kearns, West Valley City, Midvale, Sandy, Draper, Lehi, and American Fork—are divided between districts. In total, the 2021 Congressional Plan splits fifteen municipalities into thirty-two pieces, which far exceeds what would be expected if the redistricting plan followed a neutral process. Fourteen of the municipalities are divided in two, including through the middle of Salt Lake City. Millcreek is split four ways. The image below shows some of the 2021 Congressional Plan's divisions of municipalities between districts.



241.    Salt Lake City is split down the middle along both north-south and east-west axes, dividing the City's major metropolitan area and residential areas in half. These divisions set apart Utahns who have common characteristics, experiences, and political and social cohesion.

242.    For example, Plaintiff Condie and Plaintiff Martin live approximately a quarter mile from each other—a five-minute walk—with Plaintiff Condie living just south of Temple

Square and Plaintiff Martin living across the street to the east. But because District 1 and District 2 separate along Main Street, Plaintiff Martin is in District 1 and must vote for a congressional representative with residents in Logan—nearly eighty miles away. Plaintiff Condie is in District 2 and must vote for a representative with St. George residents located over 300 miles away.

243.    The images below show the District 1 and District 2 divisions in Salt Lake City, along with the partisan election results shading within the city's boundaries.



244.    Millcreek is divided across all four congressional districts. Depending on which side of 3900 South they reside, Millcreek residents in walking distance of each other will be voting in four different congressional districts under the 2021 Congressional Plan despite their common interests and community connection. The images below show the district configurations within Millcreek's city boundaries and the elections results data showing the city's partisan composition.



245.    Standing at the corner of 3900 South and 900 East—in the center of Millcreek—is the confluence of District 2, District 3, and District 4. If a resident lives beyond the north side of the 3900 South, such as Plaintiffs Malcolm Reid and Victoria Reid, they will be represented in District 2 by a representative whose district extends about 300 miles to Utah's southern border near St. George and western border near Wendover. By contrast, a resident living past the southeast corner of the Millcreek intersection is lumped into District 3, which then reaches over 150 miles to the far eastern border of the state to also include Vernal and then another 300 miles to the southern border past Moab and down to Blanding. And a person voting in District 4 will share

67

representation with Republican voters roughly 120 miles away in Ephraim and Gunnison at the bottom of Sanpete County. Walking a short distance east on 3900 South to the beginning of District 1, a resident living in this section of Millcreek will compete for representation with heavily Republican-favoring voters over 100 miles away along the northern Utah border.

246.    By contrast, all three of the Commission's impartial maps split fewer municipalities. The Commission's Public Congressional SH 2 map split seven municipalities into only fourteen pieces. The Commission's Purple Congressional 4 split eight into sixteen pieces. And the Commission's Orange Congressional 3 split thirteen cities into twenty-six pieces.

247.    The Commission's maps also show that other neutral traditional redistricting considerations cannot explain the Legislature's decisions for the 2021 Congressional Plan because the Commission's proposals performed as well as or better than 2021 Congressional Plan on all other metrics for measuring impartial redistricting.

248.    For instance, the Commission maps are as compact as or more compact than the Legislature's 2021 Congressional Plan based on reliable statistical measures.

249.    The Commission maps use natural and manmade geographic features, such as rivers, mountains ranges, lakes, and freeways, as district boundaries wherever possible. The 2021 Congressional Plan frequently disregards those features.

250.    The 2021 Congressional Plan cannot be explained as an effort to preserve communities of interest, because the district lines divide communities of interest having common policy and social characteristics across the State. Preserving these communities in the same congressional district, as the Commission made significant effort to do, empowers individual voters to join with their neighbors for joint advocacy to their representatives. The 2021 Congressional Plan fractures rather than maintains communities of interest.

251.    The 2021 Congressional Plan's disregard for communities of interest is apparent in its division of communities tied to school district and zoning boundaries. School communities in Utah form a key part of civic life, as the public emphasized to the Commission and the LRC during the redistricting process. While the Commission's maps frequently keep school communities together in, for example, the East High School, West High School, Highland High School, and Olympus High School boundaries, the 2021 Congressional Plan separates those communities and diminishes their ability to advocate together.

252.    As part of their map-drawing efforts, the Commission additionally conducted a study of 100,000 randomly computer-generated congressional district maps. These simulated maps were drawn at random to be contiguous, have a maximum population deviation of 0.5 percent from the ideal district size, and favor county preservation and compactness.[59]

253.    In the Commission's analysis, the overwhelming majority of randomly drawn plans among thousands included a Democratic-leaning or swing district that did not divide Democratic-voting areas in Salt Lake County.[60] The randomly drawn and impartial maps stand in a stark contrast to the four safe Republican seats in the Legislature's 2021 Congressional Plan.

254.    Locking in Republican control in all four congressional districts for the decade, the 2021 Congressional Plan abandoned traditional redistricting principles in favor of partisan advantage. It divided Salt Lake County four ways and separated numerous municipalities and communities of interest, cracking Democratic voters to subordinate their votes and voices and render them ineffective in homogenous Republican-advantaged districts.

---

[59] UIRC report, *supra* note 30, at 44.

[60] *Id.* at 60.

**K.   The Legislature rejected attempts during the 2022 legislative session to restore impartial maps to Utah's electoral process.**

255.   On February 24, 2022, Senator Derek Kitchen introduced SB252, which attempted to restore the Proposition 4 reforms and repeal SB200 by statute.

256.   SB252 failed in the Senate without receiving a single hearing.[61]

**CAUSES OF ACTION**

**Count One**

***Partisan Gerrymander in Violation of Utah Constitution's***
***Free Elections Clause — Article I, Section 17***

257.   Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

258.   Article I, Section 17 of the Utah Constitution protects Utahns' right to free elections.

259.   Article I, Section 17 states: "All elections shall be free, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage. Soldiers, in time of war, may vote at their post of duty, in or out of the State, under regulations to be prescribed by law." Utah Const. art. I, § 17.

260.   Utah's Free Elections Clause has no counterpart in the U.S. Constitution.

261.   The right to vote is a fundamental right in the Utah Constitution.

262.   The partisan gerrymandering in the 2021 Congressional Plan violates Plaintiffs' Free Elections Clause, including their fundamental right to vote.

263.    Numerous other state constitutions contain a Free Elections Clause materially indistinguishable from Article I, Section 17. State supreme courts have held that their state

---

[61] Legislative Redistricting Amendments, S.B. 252, 2022 Gen. Sess. (Utah 2022), https://le.utah.gov/~2022/bills/static/SB0252.html (last accessed Mar. 15, 2022).

constitution's Free Elections Clause prohibits partisan gerrymandering. *See, e.g.*, *Harper v. Hall*, No. 413PA21, 2022 WL 496215 (N.C. Feb. 14, 2022); *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018).

264.    For an election to be free under the Free Elections Clause, the will of the people must be fairly ascertained and accurately reflected.

265.    In the 2021 Congressional Plan, Utah's partisan mapmakers manipulated the configuration of electoral districts to unduly advantage or disadvantage certain voters and ensure single-party control of all four Congressional seats, despite a substantial population of minority party voters. This manipulation violates Utah's Free Elections Clause by diminishing and/or diluting the voting power of certain voters on the basis of partisan affiliation.

266.    The 2021 Congressional Plan denies Plaintiffs and other similarly situated voters the representation they otherwise would have received if the redistricting plan were devised in an impartial and free process using neutral redistricting criteria.

267.    Defendants have no legitimate, much less compelling, interest in denying voters and Plaintiffs substantially equal voting power on a partisan basis and frustrating the will of the people.

268.    Even if Defendants had a purported compelling interest in the 2021 Congressional Plan, the gerrymandered map is not narrowly tailored to serve any legitimate state interest.

269.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

## Count Two
### Partisan Gerrymander in Violation of Utah Constitution's Equal Protection Rights — Article I, Sections 2 and 24

270.    Plaintiffs restate and incorporate by reference all allegations above as though fully

set forth in this paragraph.

271.    The 2021 Congressional Plan violates Article I, Section 24 of the Utah Constitution because it has the purpose and effect of depriving a disfavored class of Utah voters of an equal opportunity to elect congressional representatives.

272.    Article I, Section 24 provides: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24.

273.    Article I, Section 2 states in relevant part that the government is "founded on [the people's] authority for their equal protection and benefit." Utah Const. art. I, § 2.

274.    The 2021 Congressional Plan violates Plaintiffs' rights under Article I, Section 2 and Article I, Section 24 because it arbitrarily classifies voters based on partisan affiliation and geographic location, then targets the disfavored class of voters for negative differential treatment compared to other similarly situated Utahns.

275.    The 2021 Congressional Plan intentionally cracks Plaintiffs and other likeminded voters supporting Democratic candidates living in urban areas along the Wasatch Front to prevent them from translating their votes into victories at the ballot box.

276.    The 2021 Congressional Plan dilutes Plaintiffs' fundamental right to vote and precludes their equal opportunity to elect their preferred congressional candidates. By systematically disfavoring non-Republican voters and favoring Republican voters, the 2021 Congressional Plan shifts political power from all the people and instead places it in a subset of the people.

277.    Heightened scrutiny applies because the 2021 Congressional Plan implicates Plaintiffs' fundamental rights and creates impermissible and suspect classifications. *See Gallivan*, 2002 UT 89, ¶¶ 40-42.

278.    Defendants lack a compelling, or even reasonable, justification for the adverse differential treatment of Plaintiffs in the 2021 Congressional Plan.

279.    Defendants seeking partisan advantage through redistricting is not a legitimate objective.

280.    Defendants seeking to amplify the interests of rural or suburban voters at the cost of urban voters is not a legitimate interest.

281.    In any event, the 2021 Congressional Plan does not substantially further any legitimate state interest.

282.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

## Count Three
### Partisan Gerrymander in Violation of Utah Constitution's
### Free Speech & Association Rights — Article I, Sections 1 and 15

283.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

284.    Article I, Section 1 states in full: "All persons have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1.

285.    Article I, Section 15 states in full: "No law shall be passed to abridge or restrain the freedom of speech or of the press. In all criminal prosecutions for libel the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and

was published with good motives, and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." Utah Const. art. I § 15.

286.    Article I, Sections 1 and 15 of the Utah Constitution must be "read in concert" to protect the right of Utahns to free speech and association. *See American Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 20, 140 P.3d 1235, 1241.

287.    The Utah Constitution provides greater protections against government restraint or abridgment of Utahns' free speech and association compared to the U.S. Constitution's First Amendment, which is not at issue here.

288.    The 2021 Congressional Plan violates Plaintiffs' Article I, Section 1 and Article I, Section 15 free speech and association rights because it discriminates against Plaintiffs based on their protected political views and past votes.

289.     The 2021 Congressional Plan violates Plaintiffs' Article I, Section 1 and Article I, Section 15 free speech and association rights because it restrains and mutes Plaintiffs' ability to express their viewpoints.

290.    The 2021 Congressional Plan violates Plaintiffs' Article I, Section 1 and Article I, Section 15 free speech and association rights because it abridges the ability of voters with disfavored views to effectively associate with other people holding similar viewpoints.

291.    The 2021 Congressional Plan impairs Plaintiffs' ability to recruit volunteers, secure contributions, and energize other voters to support Plaintiffs' expressed political views and associations.

292.    The 2021 Congressional Plan violates Plaintiffs' Article I, Section 1 and Article I, Section 15 free speech and association rights because it retaliates against Plaintiffs for exercising political speech that Defendants disfavor.

74

293.    The 2021 Congressional violates Plaintiffs' Article I, Section 1 and Article I, Section 15 free speech and association rights by targeting voters based upon their historical voting and expressive preferences, and by surgically drawing district lines to prevent them from being able to associate and elect their preferred candidates who share their political views.

294.    Defendants used the 2021 Congressional Plan to divide the voters of opposing political viewpoints to make their voices too diluted to be heard and guarantee they are not represented in any meaningful way because of their disfavored views.

295.    Defendants have no legitimate, much less compelling, interest in restraining, abridging, or retaliating against Plaintiffs for their political views and associations.

296.    In any event, the 2021 Congressional Plan is not narrowly tailored to serve any legitimate state interest.

297.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

### Count Four
**_Partisan Gerrymander in Violation of Utah Constitution's_**
**_Affirmative Right to Vote Protections — Article IV, Section 2_**

298.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

299.    Article IV, Section 2 states: "Every citizen of the United States, eighteen years of age or over, who makes proper proof of residence in this state for thirty days next preceding any election, or for such other period as required by law, shall be entitled to vote in the election." Utah Const. art. IV, § 2.

300.    The right to vote is a fundamental right in the Utah Constitution. The right to vote protects "the fundamental rights of citizens and upon the overall functioning of our democratic

system of government" because "[t]he foundation and structure which give [government] life depend upon participation of the citizenry in all aspects of its operation." *Shields v. Toronto*, 395 P.2d 829, 832-33 (Utah 1964).

301.   The Utah Constitution affirmatively protects citizens' right to a meaningful and effective vote.

302.   The Utah Constitution affirmatively protects citizens' right to be free from the denial, abridgment, undue impairment, and/or dilution of their vote.

303.   Utah's regulations of elections are meant to reflect, not distort, the public will.

304.   The 2021 Congressional Plan gives greater effect to the vote of some favored voters while giving lesser effect to disfavored voters.

305.   The 2021 Congressional Plan dilutes, impairs, and abridges Plaintiffs' fundamental right to vote.

306.   The 2021 Congressional Plan improperly defeats the public will by drawing district lines to predetermine winners and losers.

307.   Defendants have no legitimate regulatory interest in adopting the 2021 Congressional Plan that dilutes, impairs, and abridges Plaintiffs' fundamental right to vote and defeats the public will.

308.   Even if Defendants pursued a legitimate regulatory interest, the 2021 Congressional Plan is not tailored to achieve any legitimate state interest.

309.   Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

## Count Five

### *Unauthorized Repeal of Proposition 4 in Violation of Utah Constitution's Citizen Lawmaking Authority to Alter or Reform Government — Article I, Section 2; Article VI, Section 1*

310. Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

311. Article I, Section 2 provides: "All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require." Utah Const. art. I, § 2.

312. Article VI, Section 1 states in relevant part: "The legal voters of the State of Utah, in the numbers, under the conditions, in the manner, and within the time provided by statute, may: (A) initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute." Utah Const. art. VI, § 1(2)(a)(i)(A).

313. Article I, Section 2 and Article VI, Section 1 of the Utah Constitution guarantee that all governmental "power derives from the people, who can delegate it to representative instruments which they create," but "the people are the ultimate source of sovereign power." *Carter v. Lehi City*, 2012 UT 2, ¶¶ 25, 30, 269 P.3d 141, 149-50 (internal citation and quotation omitted).

314. Article I, Section 2 and Article VI, Section 1 establish enforceable, fundamental rights, and authorize Utah citizens to exercise their lawmaking authority to alter or reform their government.

315. In enacting Proposition 4's redistricting reforms—including shifting primary responsibility for drawing electoral maps from the Legislature to an independent commission and

establishing mandatory anti-gerrymandering standards—the people of Utah, including Plaintiffs, exercised their constitutional right to alter or reform their government.

316.    The Legislature violated the Utah Constitution when it repealed the Utah Independent Redistricting Commission and Standards Act.

317.    The Legislature exceeded its constitutionally granted power when it repealed Proposition 4 and negated the people's government reform measure.

318.    The Legislature additionally cannot unduly burden the people's authority to make laws through initiatives, or their right to reform the government. In repealing the Utah Independent Redistricting Commission and Standards Act, the Legislature engaged in a *post-hoc* nullification of the voters' initiative power that unduly burdened the people's lawmaking authority and right to alter or reform their government.

319.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

<u>**Count Six**</u>
**The Legislature Violated Procedural Requirements for the Redistricting of the Congressional Plan Under the Utah Independent Redistricting Commission and Standards Act, Utah Code §§ 20A-19-204(2)(a), (5)(a), and (4)**

320.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

321.    Section 20A-19-204(2)(a) of the Utah Independent Redistricting Commission and Standards Act required the Legislature to consider the Utah Independent Redistricting Commission's proposed congressional maps in an open public hearing and to enact without material change or reject the Commission-adopted plans. Utah Code § 20A-19-204(2)(a).

322.    If the Legislature rejects the Commission's selected congressional maps and instead enacts its own, the Utah Independent Redistricting Commission and Standards Act requires the

Legislature to issue a detailed written report explaining its decision and why the Legislature's substituted map(s) better satisfied the mandatory, neutral redistricting criteria, within seven days of enactment of the Legislature's map. *Id*. § 20A-19-204(5)(a).

323.    In addition, under § 20A-19-204(4) of the Utah Independent Redistricting Commission and Standards Act, the Legislature "may not enact a redistricting plan or modification of any redistricting plan unless the plan or modification has been made available to the public by the Legislature…for a period of no less than 10 calendar days." *Id*. § 20A-19-204(4).

324.    The Legislature did not vote to enact without material change or reject the Commission-adopted 2021 congressional plans in violation of § 20-A-19-204(2)(a) of the Utah Independent Redistricting Commission and Standards Act.

325.    The Legislature violated § 20A-19-204(5)(a) of the Utah Independent Redistricting Commission and Standards Act, because although it did not adopt any of the Commission's proposed congressional plans, the Legislature did not issue a detailed written report explaining its decision and why its substituted map better satisfied the mandatory, neutral redistricting criteria.

326.    The Legislature also violated § 20A-19-204(4) of the Utah Independent Redistricting Commission and Standards Act because the Legislature's congressional map was not available to the public for a period of at least 10 calendar days for assessment before it was enacted.

327.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

### Count Seven
**The Legislature Violated Substantive Requirements for the Redistricting of the Congressional Plan Under the Utah Independent Redistricting Commission and Standards Act, Utah Code Utah Code §§ 20A-19-103(3), (4) and (5); § 20A-19-103(2)(b); and § 20A-19-103(2)(e)**

328.    In addition to violating the procedural requirements of the Utah Independent

Redistricting Commission and Standards Act, in enacting the 2021 Congressional Plan, Defendants violated the Act's substantive requirements, including the prohibition on partisan gerrymandering, Utah Code §§ 20-A-19-103(3), (4) and (5), unnecessary splitting of Utah's municipalities and counties, *id*. § 20A-19-103(2)(b), and the unnecessary splitting of communities of interest, *id*. § 20A-19-103(2)(e).

**A. The Congressional Plan is a partisan gerrymander in violation of the Utah Independent Redistricting Commission and Standards Act, Utah Code §§ 20A-19-103(3), (4) and (5)**

329.   Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

330.   The Utah Independent Redistricting Commission and Standards Act states that "The Legislature and the Commission may not divide districts in a manner that purposefully or unduly favors or disfavors any incumbent elected official, candidate or prospective candidate for elective office, or any political party." *Id*. § 20A-19-103(3).

331.   The Utah Independent Redistricting Commission and Standards Act also states that "partisan political data and information, such as partisan election results, voting records, political party affiliation information, and residential addresses of incumbent elected officials and candidates or prospective candidates for elective office, may not be considered by the Legislature…except as permitted" to ensure compliance with the Act's redistricting criteria, including the ban on partisan gerrymandering. *Id*. § 20A-19-103(5), (4).

332.   The 2021 Congressional Plan violates § 20A-19-103(3) because it purposefully or unduly favors the Republican Party.

333.   In the 2021 Congressional Plan, Utah's partisan mapmakers manipulated the configuration of electoral districts to unduly advantage or disadvantage certain voters based on partisanship and ensure single-party control of all four Congressional seats, despite a substantial

population of minority party voters. This manipulation violates the Utah Independent Redistricting Commission and Standards Act's ban on partisan gerrymandering by purposefully favoring one party and its candidates.

334.    The 2021 Congressional Plan intentionally cracks voters supporting Democratic candidates among multiple congressional districts to provide partisan advantage to the other major party and its candidates.

335.    Even if the gerrymandering were not intentional, the 2021 Congressional Plan unduly favors candidates of the majority party and unduly disfavors candidates of the minority party.

336.    As a result of the gerrymander, the 2021 Congressional Plan has an undue partisan skew in favor of one political party.

337.    The 2021 Congressional Plan's undue partisan skew is not necessary to comply with any other redistricting criteria.

338.    The Legislature also violated §§ 20A-19-103(4) and (5) of the Utah Independent Redistricting Commission and Standards Act when it drew the 2021 Congressional Plan, because it used partisan data to achieve a partisan gerrymander, rather than prevent one.

339.    The Legislature also violated § 20A-19-103(5) of the Utah Independent Redistricting Commission and Standards Act by considering the residential addresses of incumbent elected officials and candidates or prospective candidates for elective office in configuring the boundaries of the 2021 Congressional Plan.

340.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

**B. The Congressional Plan unnecessarily splits municipalities and counties in violation of the Utah Independent Redistricting Commission and Standards Act, Utah Code § 20A-19-103(2)(b)**

341.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

342.    The Utah Independent Redistricting Commission and Standards Act requires that the Legislature "shall abide by the following redistricting standards to the greatest extent practicable," including "minimizing the division of municipalities and counties across multiple districts, giving first priority to minimizing the division of municipalities and second priority to minimizing the division of counties." *Id*. §§ 20A-19-103(2), (2)(b).

343.    The 2021 Congressional Plan violates § 20A-19-103(2) by unnecessarily dividing numerous municipalities and counties.

344.    For example, in the 2021 Congressional Plan, the city of Millcreek is divided into all four congressional districts. Many other municipalities in Salt Lake County and other counties are also divided. Salt Lake County is also divided among all four congressional districts.

345.    The 2021 Congressional Plan divides 5 of Utah's 29 counties between two or more congressional districts and divides 15 municipalities into 32 pieces.

346.    The excessive amount of municipal and county divisions in the 2021 Congressional Plan is not necessary to comply with other redistricting criteria; it is possible to draw alternative congressional maps with fewer municipal and county divisions while complying with the Act's other redistricting criteria. Indeed, the Commission developed such plans.

347.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

### C. The Congressional Plan unnecessarily divides communities of interest in violation of the Utah Independent Redistricting Commission and Standards Act, Utah Code § 20A-19-103(2)(e)

348.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

349.    The Utah Independent Redistricting Commission and Standards Act requires that the Legislature "shall abide by the following redistricting standards to the greatest extent practicable," including "preserving traditional neighborhoods and local communities of interest." Utah Code §§ 20A-19-103(2), (2)(e).

350.    The 2021 Congressional Plan unnecessarily fractures communities of interest with common policy, cultural, economic, and other social characteristics across the State, in violation of §§ 20A-19-103(2)(e).

351.    For example, the 2021 Congressional Plan splits the Salt Lake City metropolitan area—which shares common polity, cultural, economic, and social characteristics—into four congressional districts.

352.    Likewise, the 2021 Congressional Plan frequently separates school districts and zoning boundaries, diminishing their ability to advocate together.

353.    The excessive fracturing of communities of interest in the 2021 Congressional Plan is not necessary to comply with other redistricting criteria; it is possible to draw alternative congressional maps with fewer community of interest splits while complying with the Act's other redistricting criteria.

354.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

**Count Eight**

*Malapportionment of Congressional Districts in Violation of Utah Constitution's Equal Protection Rights – Article I, Sections 2 and 24*

355.    Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph

356.    If the Court enjoins H.B. 2004, the law enacting the 2021 Congressional Plan, as violative of the Utah Constitution or the requirements of Utah Independent Commissions and Standards Act, the effect will be to make the malapportioned map enacted following the 2010 Census (the "2011 Congressional Plan") the operable map under Utah law. *See* H.B. 2004, Congressional    Boundaries    Designation,    2021    Second    Special    Session, https://le.utah.gov/~2021s2/bills/static/HB2004.html; S.B. 3002, Congressional Boundaries Designation, 2011 Third Special Session, https://le.utah.gov/~2011S3/bills/static/SB3002.html , *see also* Utah Code §§ 20A-13-101-104 (2011).

357.    The 2011 Congressional Plan is malapportioned in violation of the one-person, one-vote requirement of Article I, Sections 2 and 24 of the Utah Constitution.

358.    The ideal population for a Utah Congressional district following the 2020 Census is 817,904 people.

359.    Under the 2011 Congressional Plan, District 1 has 17,807 fewer people than ideal, District 2 has 16,268 fewer people than ideal, District 3 has 31,190 fewer people than ideal, and District 4 has 65,265 fewer people than ideal.

360.    The malapportionment of the congressional districts in the 2011 Congressional Plan, which would become the operable plan under Utah law following a permanent injunction against the 2021 Congressional Plan, violates the one-person, one-vote guarantees of the Utah Constitution.

361.    State courts have an obligation to impose an equally apportioned congressional map

in the absence of a lawful, equally apportioned map adopted through the legislative process. *See Growe v. Emison*, 507 U.S. 25, 33 (1993).

362.    Plaintiffs are therefore entitled to declaratory and injunctive relief as more fully set forth below.

## **RELIEF SOUGHT**

For the foregoing reasons, Plaintiffs request that this Court:

a.    Declare that H.B. 2004, which enacted the 2021 Congressional Plan, invalid and unconstitutional because it violates Plaintiffs' rights under the Utah Independent Redistricting Commission and Standards Act, §§ 20A-19-204(2)(a), 20A-19-204(4), 20A-19-204(5)(a), 20A-19-103(3), 20A-19-103(4), 20A-19-103(5), 20A-19-103(2)(b), and 20A-19-103(2)(e), and Article I, Section 1; Article I, Section 2; Article I, Section 15; Article I, Section 17; Article I, Section 24; and Article IV, Section 2 of the Utah Constitution;

b.    Enjoin Defendants and their agents, officers, and employees from administering, preparing for, or moving forward with Utah's 2026 primary and general elections for Congress using the 2021 Congressional Plan;

c.    Compel Defendants and their agents, officers, and employees to perform their official redistricting duties in a manner that comports with the Utah Independent Redistricting Commission and Standards Act and Utah Constitution;

d.   Set a deadline by which a new redistricting plan that complies with the Utah Independent Redistricting Commission and Standards Act and the Utah Constitution shall be enacted, and failing such enactment or failing the enactment of a plan that satisfactorily remedies the violations, order a Court-imposed plan that complies with the Utah Independent Redistricting Commission and Standards Act and Utah Constitution;

e.   Declare that the Legislature's 2020 repeal of the Utah Independent Redistricting Commission and Standards Act enacting the citizen-initiated Proposition 4 redistricting reforms exceeded the Legislature's constitutional authority and violated Plaintiffs' rights under Article I, Section 2 and Article IV, Section 1 of the Utah Constitution;

f.   Enjoin Defendants and their agents, officers, and employees from administering SB200, the law that repealed and replaced the voters' Proposition 4 redistricting reforms, to the extent of its unconstitutionality and order that the Utah Independent Redistricting Commission and Standards Act be reinstated consistent with the Court's ruling on the unconstitutionality of the repeal;

g.   Retain jurisdiction of this action to render any further orders that this Court may deem appropriate, including determining the legality and constitutionality of any new congressional redistricting plans adopted by the Legislature to remedy the violations of law alleged herein and the entry of an Order imposing a congressional plan that complies with Utah Independent Redistricting Commission and Standards Act requirements and the requirements of the Utah Constitution, as necessary;

h.   Award Plaintiffs their reasonable attorneys' fees and costs as available, including pursuant

to Section 9 of the Utah Independent Redistricting Commission and Standards Act; and

i.      Grant such other and further relief as the Court deems just and appropriate.

Date: August 30, 2024                                                    Respectfully submitted,

**PARR BROWN GEE & LOVELESS**                 **CAMPAIGN LEGAL CENTER**

/s/ David C. Reymann                                          /s/ Mark Gaber
David C. Reymann                                              Mark Gaber*
Kade N. Olsen                                                 Annabelle Harless*
Tammy M. Frisby                                               Aseem Mulji*
                                                              Benjamin Phillips*

**ZIMMERMAN BOOHER**

/s/ Troy L. Booher
Troy L. Booher
J. Frederic Voros, Jr.
Caroline Olsen                                                *Attorneys for Plaintiffs*

                                                              *\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of August 2024, I filed the foregoing **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** via electronic filing, which served all counsel of record.

/s/ David C. Reymann