**PARR BROWN GEE & LOVELESS**
David C. Reymann (Utah Bar No. 8495)
Cheylynn Hayman (Utah Bar No. 9793)
Kade N. Olsen (Utah Bar No. 17775)
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 532-7840
dreymann@parrbrown.com
chayman@parrbrown.com
kolsen@parrbrown.com

**ZIMMERMAN BOOHER**
Troy L. Booher (Utah Bar No. 9419)
J. Frederic Voros, Jr. (Utah Bar No. 3340)
Caroline Olsen (Utah Bar No. 18070)
341 South Main Street
Salt Lake City, UT 84111
(801) 924-0200
tbooher@zbappeals.com
fvoros@zbappeals.com
colsen@zbappeals.com

**CAMPAIGN LEGAL CENTER**
Mark P. Gaber*
Aseem Mulji**
Benjamin Phillips*
Isaac DeSanto*
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
amulji@campaignlegalcenter.org
bphillips@campaignlegalcenter.org
idesanto@campaignlegalcenter.org

Annabelle Harless*
55 W. Monroe Street, Ste. 1925
Chicago, IL 60603
aharless@campaignlegalcenter.org

*Attorneys for Proposed Intervenors*

* Admitted Pro Hac Vice
**Pro Hac Vice Forthcoming

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMELIA POWERS GARDNER, *et al*., | **PROPOSED INTERVENORS' MOTION TO DISMISS OR STAY** |
| Plaintiffs, | |
| v. | Case No. 2:26-cv-84-RJS-JCB |
| LIEUTENANT GOVERNOR DEIDRE HENDERSON, in her official capacity, | Judge Timothy M. Tymkovich |
| | Judge Robert J. Shelby |
| Defendant. | Judge Holly L. Teeter |
| | Magistrate Judge Jared C. Bennett |
| LEAGUE OF WOMEN VOTERS OF UTAH, *et al*., | |
| Proposed Intervenors. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT .................................................................................................................. 2

   I.   Plaintiffs lack standing. ......................................................................................... 2

   II.  Issue preclusion bars this suit. ........................................................................... 7

   III.  The case should be dismissed under Rule 12(b)(6) because the Elections Clause does not prohibit court-imposed remedial maps ......................................................... 10

      A. The Supreme Court has held that federal courts may not interfere with state courts' power to impose remedial congressional maps ................................. 11

      B. The Supreme Court has held that Congress's Elections Clause statutes require courts to impose congressional maps in the absence of lawful, legislatively enacted maps ........................................................................................... 13

      C. The state court did not exceed the bounds of ordinary judicial review by imposing a remedial congressional map ..................................................................... 17

   IV.  If it is not dismissed under Rules 12(b)(1) or 12(b)(6), then the case should be stayed pending resolution of the state court litigation .................................................. 22

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Pages**

*Abrams v. Johnson*, 521 U.S. 74 (1997)...........................................................................18

*Arizona State Legislature v. Arizona Independent Redistricting Comm'n*,

    576 U.S. 787 (2015) ...........................................................................16, 17, 20, 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................2

*Bost v. Illinois State Board of Elections*, 607 U.S. --, -- S. Ct. --, No. 24-568, 2026 WL 96707

    (Jan. 14, 2026)...........................................................................1, 6, 7

*Branch v. Smith*, 538 U.S. 254 (2003) .....................................13, 14, 15, 16, 17, 20, 21

*Burns v. Richardson*, 384 U.S. 73 (1966) ...........................................................................18

*Carter v. Chapman*, 270 A.3d 444 (Pa. 2022) ...........................................................................19

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................................................5

*Connor v. Finch*, 431 U.S. 407 (1977)...........................................................................18

*Daz Management, LLC v. Honnen Equipment Company*, 2022 UT 15, 508 P.3d 84 ................8, 9

*Fox v. Maulding*, 16 F.3d 1079 (10th Cir. 1994)...........................................................................23

*Growe v. Emison*, 507 U.S. 25 (1993)...........................................11, 13, 17, 21, 22, 23, 25

*Harkenrider v. Hochul*, 197 N.E.3d 437 (N.Y. 2022) ...................................................................19

*Health Care & Retirement Corp. of America v. Heartland Home Care, Inc.*,

    324 F. Supp. 2d 1202 (D. Kan. 2004) ...........................................................................24

*In re Apportionment Comm'n*, 268 A.3d 1185 (Conn. 2022) (per curiam)...................................19

*In re Decennial Redistricting*, (Va. Dec. 28, 2021)...........................................................................19

*In re Robertson*, 570 B.R. 352 (Bankr. D. Utah 2017) ...................................................................10

*Johnson v. Wisconsin. Elections Commission*, 971 N.W.2d 402 (Wis. 2022)...............................18

*Lance v. Coffman*, 549 U.S. 437 (2007)...........................................................................2, 3, 7, 8

*Lance v. Dennis*, 444 F. Supp. 2d 1149 (D. Colo. 2006)...........................................................8, 9

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006)...................................18

*League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, 554 P.3d 872 ...............6

*League of Women Voters of Utah v. Utah State Legislature*, 2025 UT 39, 579 P.3d 287 ........19, 20

*League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 3145894, (Utah D. Ct. Nov. 10, 2025) ................................................................ 20, 21

*League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292 (Utah Dist. Ct. Aug. 25, 2025) ...................................................................... 9, 19

*Lumen Const., Inc. v. Brant Const. Co., Inc.*, 780 F.2d 691 (7th Cir. 1985) ................................ 24

*Mahan v. Howell*, 410 U.S. 315 (1973) ................................................................................ 18

*Moore v. Harper*, 600 U.S. 1 (2023) .................................................................................... 17

*Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, 285 P.3d 1157 ............................. 7

*Norelli v. Secretary of State*, 292 A.3d 458 (N.H. 2022) ......................................................... 18

*North Carolina v. Covington*, 585 U.S. 969 (2018) ................................................................. 17

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) ...................................... 21

*Perry v. Perez*, 565 U.S. 388 (2012) ................................................................................... 18

*Press Publishing, Ltd. v. Matol Botanical International, Ltd.*, 2001 UT 106, 37 P.3d 1121 .......... 7

*Rucho v. Common Cause*, 588 U.S. 684 (2019) ..................................................................... 16

*Scott v. Germano*, 381 U.S. 407 (1965) ...................................................................... 11, 12, 21

*Searle Bros. v. Searle*, 588 P.2d 689 (Utah 1978) ................................................................... 7

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) ............................. 5

*Singleton v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023) ..................................................... 19

*State v. Environmental Protection Agency*, 989 F.3d 874 (10th Cir. 2021) .................................. 5

*Stuart v. Colorado Interstate Gas Company*, 271 F.3d 1221 (10th Cir. 2001) .............................. 2

*United States v. City of Las Cruces*, 289 F.3d 1170 (10th Cir. 2002) ........................................ 24

*Wattson v. Simon*, 970 N.W.2d 56 (Minn. 2022) .................................................................. 19

*Wise v. Lipscomb*, 437 U.S. 535 (1978) ............................................................................... 18

*Youren v. Tintic School District*, 2004 UT App 33, 86 P.3d 771 ............................................... 10

**Rules and Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ................................................................................................ 13

Minn. Const. art. IV, § 3 .................................................................................................... 13

Fed. R. Civ. P. 12(b)(1) ................................................................................................. 2, 22

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 2, 10, 22

Fed. R. Civ. P. 54(b) ...........................................................................................................1, 10, 23

**Statutes**

Utah Code § 20A-19-103 ............................................................................................................20

**Other Authorities**

Utah Legislative Redistricting Committee, Map C, https://perma.cc/K9U4-LDA6 ......................4

Utah Legislature, S.B. 2001, 2025 2nd Spec. Sess. (Utah 2025), https://perma.cc/A524-KBKJ....5

## INTRODUCTION

A mountain of Supreme Court precedent over the past 60 years directly forecloses Plaintiffs' claim that state courts are powerless to remedy unlawful congressional redistricting maps. For at least four reasons, this Court should dismiss with prejudice or stay Plaintiffs' eleventh-hour attempt to collaterally challenge, in this federal forum, the decision of a state district court based on state law in a state case.

First, this Court lacks subject matter jurisdiction because Plaintiffs lack Article III standing. The U.S. Supreme Court ruled unanimously in 2007 that private citizens who do not sue as relators on behalf of the State have no standing to claim that the Elections Clause is violated when a state court imposes a congressional map. The Supreme Court's recent *Bost* decision—which was expressly limited to candidates' standing to challenge vote-counting rules—does not change that.

Second, issue preclusion bars this suit. The same issue has been litigated by the Utah Legislature, with whom Plaintiffs have privity under Utah law, in a full and fair manner to the point of final judgment[1] in Utah state court. Plaintiffs cannot relitigate the issue here a second time.

Third, Plaintiffs fail to state a claim upon which relief can be granted because the Supreme Court has *repeatedly* held that state courts have not only the power, but the duty, to impose congressional redistricting maps in the absence of a lawful, legislatively enacted map. In doing so, the Court has held that statutes enacted by Congress pursuant to its Elections Clause power— which is superior to that of state legislatures—*require* state courts to impose congressional maps

---

[1] LWV Intervenors contend that the Rule 54(b) final judgment was erroneously entered and filed a motion with the Utah Supreme Court to dismiss the Legislature's currently pending appeal on that basis. Nevertheless, under Utah law, the final judgment exists and is preclusive unless and until it is reversed.

in that scenario. States across the country are currently conducting congressional elections under maps imposed by courts—something that has happened every redistricting cycle since the 1960s. The Supreme Court has reiterated this power and duty of courts over and over. The Court's precedent dooms this lawsuit.

Finally, even if the Court does not dismiss Plaintiffs' suit, it should stay this case pending resolution of the state court litigation.

## LEGAL STANDARD

Rule 12(b)(1) requires the Court to dismiss cases over which the Court lacks subject matter jurisdiction. A party "may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based," and "a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion." *Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). "Federal courts must determine that they have jurisdiction before proceeding to the merits." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam). A suit must be dismissed under Rule 12(b)(6) when it fails to state a claim upon which relief may be granted. Although courts must accept factual allegations as true, that rule is "inapplicable to legal conclusions" and "legal conclusions couched as factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

## ARGUMENT

### I.    Plaintiffs lack standing.

First, Plaintiffs lack standing. Article III of the Constitution requires plaintiffs to show "injury in fact, causation, and redressability." *Lance*, 549 U.S. at 439. The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—

claiming only harm to his and every citizen's interest in proper application of the Constitution and laws"—lacks standing. *Id.*

In *Lance*, four Colorado voters filed suit in federal court alleging that Colorado's implementation of a congressional map imposed by a state court "violated [the Elections Clause] of the U.S. Constitution by depriving the state legislature of its responsibility to draw congressional districts." 549 U.S. at 441. "The problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed." *Id.* at 442. Rejecting the same argument Plaintiffs make here, the Court explained that "[t]his injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Id.* Such a purported injury, the Court observed, is "quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where [the Court] ha[s] found standing," citing its one-person, one-vote precedent. *Id.* The Court distinguished its two prior cases construing the Elections Clause's reference to "Legislature," explaining that "[e]ach of these cases was filed by a relator on behalf of the State rather than private citizens acting on their own behalf." *Id.*

*Lance* compels the dismissal of this suit for lack of standing. Plaintiffs are thirteen Utah voters, including two members of Congress. However, none of them is a "a relator on behalf of the State." *Id.* Nor is the Utah Legislature a plaintiff. Plaintiffs allege that "Map 1 deprives [them] of [their] right to representatives chosen in accord with the U.S. and Utah Constitutions." ECF No. 1 ¶¶ 6-19. But alleging that "the law—specifically the Elections Clause—has not been followed" is insufficient to support standing. *Lance*, 549 U.S. at 442.

3

Plaintiffs' standing allegations are rife with generalized grievances. They allege that a map passed by the Legislature would be subject to input from the public and public records requests after the fact. ECF No. 1 ¶ 29. They allege that "the People"—apparently all Utahns—have knowledge of their communities and relationships with their members of Congress. *Id.* ¶ 30. They allege that "[t]he Utah Voters also now stand to lose their chosen representatives by unconstitutional means." *Id.* ¶ 32. These allegations all merely restate their overarching complaint that they believe the Elections Clause was not followed.

Their substantive allegations about the map's configuration—displeasure with the number of counties in a certain district, the combination of cities in another district, the potential future population of districts following the 2030 Census, the minimization of the number of districts into which it splits Salt Lake County, and its placement of Juab County, *id.* ¶¶ 33-36—are not particularized, concrete, legally cognizable injuries. Indeed, Plaintiffs acknowledge that the same map could be adopted by the Legislature and they would have no legal claim, *see* Mot. for Prelim. Inj. at 15, ECF No. 19, which only illustrates how untethered these purported injuries are to their legal claim.[2]

Plaintiffs Maloy's and Owens's status as members of Congress does not confer standing. To begin, they affirmatively allege that they are "more than happy to represent any group of Utahns," *id.* ¶ 43, pleading away any concrete, particularized injury in fact stemming from Map 1. A state of affairs that leaves a plaintiff "happy," but nevertheless causes them to file suit seeking

---

[2] Plaintiff Powers Gardner's allegation that Map 1 disrupts her relationship working on a pedestrian bridge in Provo with District 3 Congressman Mike Kennedy, ECF No. 1 ¶ 38, is particularly ironic given that the Legislature itself removed Provo from Representative Kennedy's district when it enacted Map C. Utah Legislative Redistricting Committee, Map C, https://perma.cc/K9U4-LDA6.

to vindicate "their rights and the rights of their constituents and all other Utah Voters to vote and to have the Legislature regulate congressional elections," *id.*, is a quintessential generalized grievance insufficient to trigger this Court's Article III jurisdiction. Moreover, their objection to the January candidate filing period being moved to March and thus causing uncertainty regarding their reelection campaign, *id.* ¶ 45, is not attributable to Map 1, but rather the Legislature's enactment of a law changing the filing period.[3] *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976) (holding that an injury that "results from the independent action of some third party not before the court" does not confer standing). Plaintiffs can hardly allege that they have experienced an Elections Clause harm on account of the Legislature enacting a law regulating the time, place, and manner of congressional elections. Indeed, all their alleged campaign-related harms stem from the Legislature's decision to shift the candidate filing period from January to March. *See id.* ¶¶ 46-49. They also purport to be confused about whether Map 1 or some other map will govern the 2026 election. *Id.* ¶¶ 44-49. But Map 1 is in place and nothing else needs to be done for it to be used in the 2026 election. To the extent that their belief in the possibility of their own success in this lawsuit causes their confusion about which map will govern, that is not a cognizable harm. For obvious reasons, a plaintiff cannot manufacture the conditions that they contend cause them Article III harm. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) ("[R]espondents' self-inflicted injuries are not fairly traceable to [defendants] . . . ."); *State v. Env't Prot. Agency*, 989 F.3d 874, 888 (10th Cir. 2021) (holding that an "injury is not legally cognizable" when it is "self-inflicted").

---

[3] Utah Legislature, S.B. 2001, 2025 2nd Spec. Sess. (Utah 2025), https://perma.cc/A524-KBKJ.

The Supreme Court's recent decision in *Bost v. Illinois State Board of Elections*, 607 U.S. --, -- S. Ct. --, No. 24-568, 2026 WL 96707 (Jan. 14, 2026), does not remedy Reps. Maloy's and Owens's lack of standing. In *Bost*, the Court held that an Illinois congressman had standing to challenge a state statute allowing mail-in ballots post-marked or certified no later than election day to be counted if received within two weeks of the election. *Id.* at *2, *6. The Court emphasized that its holding was limited: "we address today only candidates' standing to challenge rules that, like Illinois's, govern the *counting of votes* in their election." *Id.* at *5 n.7 (emphasis added). The reason for this express limitation is that the standing theory the Court recognized turned on the harms that flow to candidates from "[t]he counting of unlawful votes—or discarding of lawful ones," which "erodes public confidence that the election results reflect the people's will" and thus lessens "public confidence in the elected representative." *Id.* at *4.

Reps. Maloy and Owens do not challenge any "rule[] that . . . govern[s] the counting of votes in their elections." *id.* at *5 n.7. Rather, they challenge Map 1 on the theory contradicted by decades of Supreme Court precedent that courts have no power to impose remedial congressional maps—while simultaneously asking this Court to judicially impose the unlawful 2021 Map. None of the harms endorsed by the *Bost* Court flow from such a claim. And to the extent they believe they suffer a public confidence harm on account of Map 1's use, their purported injury is hardly redressed by the relief they seek—*i.e.*, imposition of the 2021 Map, which has been permanently enjoined by the state court as violating the Utah Constitution and failing to comply with Proposition 4's requirements, and which the Utah Supreme Court has previewed it is likely to uphold on appeal. *See League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶ 222, 554 P.3d 872 ("And under Proposition 4 . . . it is likely that the [2021] Congressional Map

cannot stand."). A requested remedy that would *worsen* the alleged public confidence injury is not one that redresses an Article III injury.

*Lance* compels the conclusion that Plaintiffs lack standing. Plaintiffs are not "relator[s] on behalf of the State," but rather "private citizens acting on their own behalf" advancing the same legal theory the U.S. Supreme Court held was not supported by Article III standing. *Lance*, 549 U.S. at 442. *Bost* did nothing to change that.

## II.      Issue preclusion bars this suit.

Second, issue preclusion bars this suit because Plaintiffs seek to relitigate issues already decided in the state court litigation. Under Utah law, issue preclusion applies when (1) "the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior adjudication," (2) "the issue decided in the prior adjudication was identical to the one presented in the instant action," (3) "the issue in the first action was completely, fully, and fairly litigated," and (4) "the first suit resulted in a final judgment on the merits." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 23, 285 P.3d 1157. These elements are satisfied here and require dismissal of Plaintiffs' suit.

***Privity***. Plaintiffs are in privity with the Legislative Defendants in the state court litigation. "The legal definition of a person in privity with another is a person so identified in interest with another that he represents the same legal right." *Press Pub., Ltd. v. Matol Botanical Int'l, Ltd.*, 2001 UT 106, ¶ 20, 37 P.3d 1121 (quoting *Searle Bros. v. Searle*, 588 P.2d 689, 691 (Utah 1978)). "Thus, privity depends mostly on the parties' relationship to the subject matter of the litigation." *Id.* (internal quotation marks and brackets omitted). It applies where "other parties [hold] similar legal interests." *Id.* The Utah Supreme Court has further explained that it has "embraced the more

functional concept of privity" rather than a "formalistic, relationship-based approach," and that the "central inquiry in determining whether parties are in privity depends on a comparison of the legal interests and rights of the parties alleged to be in privity." *Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶¶ 44-45, 508 P.3d 84. Privity thus attaches where the parties' "legal interests and rights [are] substantially aligned when considered in relation to the subject matter of the litigation." *Id.* ¶ 47.

As explained above, in *Lance*, the United States Supreme Court held that voters lack Article III standing to challenge a state court's adoption of a congressional map on Elections Clause grounds. 549 U.S. at 442. The three-judge district court, however, had premised its ruling dismissing the complaint on issue preclusion grounds. *See Lance v. Dennis*, 444 F. Supp. 2d 1149, 1156 (D. Colo. 2006), *aff'd in part, vacated in part, Lance v. Coffman*, 549 U.S. 437 (2007).[4] The *Lance* district court concluded that the federal court plaintiffs were in privity with the Secretary of State and Colorado General Assembly, who were parties to the state court litigation. "Where the party to an earlier action is an official or agency invested by law with authority to represent the person's interest, then a sufficiently close relationship exists to permit a finding of privity between the parties." *Id.* at 1158; *see also id.* (citing Restatement (Second) of Judgments § 41(1)(d)) (finding "a person is represented by a party who is '[a]n official or agency invested by law with authority to represent the person's interests'")). The *Lance* district court reasoned that "any

---

[4] The district court's issue preclusion ruling was ultimately vacated because the Supreme Court held that the court lacked Article III jurisdiction over the suit. If this Court were to conclude Plaintiffs had standing here, the *Lance* district court's issue preclusion ruling applies with equal force here.

individual rights of the Plaintiffs under the Elections Clause cannot be greater than the legislature's rights under that Clause." *Id.* at 1160.

The same is true here. Plaintiffs—Utah voters and two members of Congress—have no greater interest in the issue of whether the federal Constitution's Elections Clause grants the Utah Legislature the exclusive power to redistrict than does the Utah Legislature. Indeed, Plaintiffs emphasize in their Complaint the representational relationship they have with the Legislature. *See, e.g.*, ECF No. 1 ¶ 30. The Utah Legislature's interest in its Elections Clause power, which it has litigated in the state court, more than satisfies the requirement under Utah law that interests be "substantially aligned" to establish privity. *Daz Mgmt.*, 2022 UT 15, ¶ 47.

***Identical Issue.*** Plaintiffs allege that the Elections Clause gives the Legislature "the exclusive constitutional authority to determine the apportionment of the People's representatives in the U.S. Congress." ECF No. 1 ¶ 1. As a remedy, they ask this Court to order that the 2021 Map will govern Utah's congressional election. ECF No. 1, Prayer for Relief (d). In its August 25, 2025 order, the state court rejected the Legislative Defendants' contention that the Elections Clause gave the Legislature the exclusive constitutional authority over congressional redistricting and permanently enjoined further use of the 2021 Map. *League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292, at *12-15, 58 (Utah Dist. Ct. Aug. 25, 2025). Consequently, the precise issue Plaintiffs advance here was advanced by the Legislative Defendants in the state court case.

***Completely, fully, and fairly litigated.*** The question of whether the Legislature has exclusive redistricting authority under the Elections Clause has been completely, fully, and fairly litigated in the state court litigation. It was the subject of rounds of extensive briefing leading to

the state district court's summary judgment ruling on Count V in August 2025 and its permanent injunction against further use of the 2021 Map.

> *Final judgment was entered on the merits.* The state district court has entered a Rule 54(b) final judgment on the merits of its August 25, 2025 summary judgment ruling, in which the court held that the Legislature does not have exclusive redistricting authority under the Elections Clause and in which the court permanently enjoined further use of the 2021 Map because it violates the Utah Constitution and Proposition 4.[5] The pendency of the Legislature's appeal does not change that fact. *See Youren v. Tintic Sch. Dist.*, 2004 UT App 33, ¶ 3, 86 P.3d 771 ("The fact that a portion of the final judgment in the prior suit is pending appeal does not affect the finality of the judgment for purposes of res judicata.").

## III.    The case should be dismissed under Rule 12(b)(6) because the Elections Clause does not prohibit court-imposed remedial maps.

Third, Plaintiffs' Complaint should be dismissed under Rule 12(b)(6) because the Elections Clause does not prohibit courts—whether state or federal—from imposing remedial congressional maps. Plaintiffs' contention that "[c]ourts have no authority to draw a congressional map," ECF No. 1 ¶ 94, is foreclosed by decades of binding Supreme Court precedent.[6] Indeed, the U.S.

---

[5] While LWV Intervenors are challenging that certification before the Utah Supreme Court, what matters for purposes of the analysis here is that the Rule 54(b) final judgment certification order is currently in effect. *See In re Robertson*, 570 B.R. 352, 364 n.56 (Bankr. D. Utah 2017), *subsequently dismissed*, 774 F. App'x 453 (10th Cir. 2019) (issue preclusion applied to state court judgment even though it was currently pending on appeal on the basis that more recent Utah cases "hold that a rendered judgment is final for purposes of res judicata until reversed on appeal, modified by the rendering court, or set aside by the rendering court"); *see also* Fed. R. Civ. P. 60(b) (suggesting final judgment or order has preclusive effect unless court orders relief from a final judgment).

[6] Plaintiffs do not claim that the Elections Clause was violated by the state court's orders reinstating Proposition 4, permanently enjoining the 2021 Map, preliminarily enjoining Map C, or any

Supreme Court has held that statutes enacted by Congress pursuant to its superseding Elections Clause power actually *require* courts—especially state courts—to impose congressional maps in the absence of a lawful, legislatively-enacted map.

### A.    The Supreme Court has held that federal courts may not interfere with state courts' power to impose remedial congressional maps.

The Supreme Court has held that federal courts may not interfere with state courts' power to impose remedial congressional maps. In *Growe v. Emison*, the Court explained in a unanimous decision that "state courts have a significant role in redistricting. 'The power of the judiciary of a State to require valid reapportionment or to *formulate a valid redistricting plan* has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.'" 507 U.S. 25, 33 (1993) (quoting *Scott v. Germano*, 381 U.S. 407, 409 (1965) (per curiam)) (emphasis added). In *Growe*, the Court reiterated its rule from *Germano* that "[i]n the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task." *Id.* at 33 (emphasis in original). "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Id.* at 34.

*Growe* arose from competing litigation over Minnesota's state legislative and congressional maps following the 1990 Census. After the legislature failed to enact lawful legislative and congressional maps, three lawsuits were filed—the first in state court followed by two in federal

---

substantive feature of Map 1's configuration. Rather, they limit their claim to challenging the state court's authority to impose a remedial congressional map at all.

court. *Id.* at 27-28. On January 30, 1992, the state court issued an order adopting its legislative plan and two weeks later held a hearing to select a congressional map from among those submitted by the parties. *Id.* at 30. "Two days later," the federal court "issued an order adopting its own legislative and congressional districting plans and permanently enjoining interference with state implementation of those plans." *Id.* at 31. The Supreme Court held that the federal court erred by not deferring to the state court, which was in the process of adopting maps. The Court observed that the district court "seems to have been [of the] mistaken view that federal judges need defer only to the Minnesota Legislature and not at all to the State's courts, . . . . ignoring the possibility and legitimacy of state *judicial* redistricting." *Id.* at 34 (emphasis in original). "But the doctrine of *Germano* prefers *both* state branches to federal courts as agents of apportionment." *Id.* (emphasis in original). The Court further rejected the federal court's concern that there was insufficient time for appellate review of the state court's order imposing maps. "We fail to see the relevance of the speed of appellate review. . . . [*Germano*] does not require appellate review of the plan prior to the election, and such a requirement would ignore the reality that States must often redistrict in the most exigent circumstances." *Id.* at 35.

The Supreme Court specifically applied its holding to a state court's imposition of *congressional* maps. It held that the federal court "actively prevented" the state court from selecting among the "parties['] . . . submission[s] of congressional plans." *Id.* at 36. Observing that "the state court was fully prepared to adopt a congressional plan in as timely a manner as the

[federal court]," the Court held that the federal court "erred in not deferring to the state court's timely consideration of congressional reapportionment." *Id.* at 37.[7]

The legal theory Plaintiffs advance is incoherent in light of *Growe*. If federal courts must stay their hands and not impede a state court's imposition of congressional maps, how can it possibly be unconstitutional for state courts to impose congressional maps? That would be a particularly silly—and inefficient—exercise of "defer then automatically enjoin" devised by Justice Scalia on behalf of a unanimous Supreme Court. The very premise of *Growe* is the opposite of Plaintiffs' legal theory. *Growe* compels the rejection of Plaintiffs' claim as a matter of law.

**B.    The Supreme Court has held that Congress's Elections Clause statutes require courts to impose congressional maps in the absence of lawful, legislatively enacted maps.**

The Supreme Court has held that Congress's Elections Clause statutes require courts—including specifically state courts—to impose congressional maps in the absence of lawful, legislatively enacted maps.[8] The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. In *Branch v. Smith*, the Court considered the interplay among the Elections Clause, statutes enacted by Congress pursuant

---

[7] Notably, Minnesota's Constitution provides that "[a]t its first session after each enumeration . . . the legislature shall have the power to prescribe the bounds of congressional and legislative districts." Minn. Const. art. IV, § 3.

[8] Congress's Elections Clause power supersedes that of state legislatures. *See* U.S. Const. art. I, § 4, cl. 1

to its Elections Clause authority, and the power of state and federal courts to impose congressional redistricting maps.

The Court noted that Congress had several times exercised its power to regulate congressional elections under the Elections Clause. *Branch*, 538 U.S. at 266-67 (citing 2 U.S.C. § 2a(c)(1)-(5), enacted in 1941, which provides that "[u]ntil a State is redistricted in the manner provided by the law thereof after any apportionment," its congressional representatives are to be elected either by the prior decade's districts or at large depending on whether their congressional seat allotment has changed); *id*. at 267 (citing 2 U.S.C. § 2c, enacted in 1967, which provides that "there shall be established by law a number of districts" to which the state is entitled and representatives can be elected "only" from those districts).[9] In doing so, the *Branch* Court expressly rejected the idea that these laws "refer[red] exclusively to *legislative* redistricting," because the argument improperly excluded judicial redistricting from § 2c's ambit. *Id*. at 268 (emphasis in original); *id*. at 272 (noting that "while § 2c assuredly envisions legislative action, it also embraces action by state and federal courts when the prescribed legislative action has not been forthcoming.").

The Court cited several reasons for its holding. First, it noted that Congress enacted § 2c specifically to respond to "the involvement of the courts in fashioning electoral plans," which had come about because of the passage of the Voting Rights Act of 1965 and the Supreme Court's one-person one-vote decisions in the early 1960s. *Id.* "In a world in which the role of federal courts in

---

[9] The Supreme Court has since acknowledged that four of the five scenarios envisioned by § 2a(c)—those that rely upon using the prior decade's malapportioned map—are unconstitutional. *See infra.*

14

redistricting disputes has been transformed from spectating to directing, the risk arose that judges forced to fashion remedies would simply order at-large elections." *Id.* at 268-69 (citation omitted). Second, the Court highlighted that "every court that has addressed the issue has held that § 2c requires courts, when they are remedying a failure to redistrict constitutionally, to draw single-member districts whenever possible." *Id.* at 270. Third, the Court reasoned, citing precedent from other contexts, that the most common understanding of the phrase "by law" in § 2c "encompasses judicial decisions" as well as legislative action. *Id.* at 271-72.

The Court also explained that it was necessary to interpret § 2c to apply to judicial redistricting because four of the five fallback options Congress adopted in 1941, § 2a(c)(1)-(4), were no longer constitutional because they envisioned using a prior decade's malapportioned map. *Id.* at 272. Because § 2c limits members to being elected "only from districts *so established*" under it, *id.* (quoting 2 U.S.C. § 2c (emphasis in original)), construing § 2c to apply only to legislatures and not courts would mean "courts would (despite *Baker v. Carr*) be congressionally forbidden to act when the state legislature has not redistricted. Only when it is utterly unavoidable should we interpret a statute to require an unconstitutional result—and that is far from the situation here." *Id.* "In sum," the Court held, "§ 2c is as readily enforced by courts as it is by state legislatures, and is just as binding on courts—federal or state—as it is on legislatures." *Id.*

The Court also examined the meaning of § 2a(c). A plurality[10] of the Court explained that in enacting § 2a(c), Congress required federal and state courts to comply with a state's substantive

---

[10] The seven justices in the *Branch* majority split four to three on the question of whether § 2a(c)(1)-(5) remained in effect or had been impliedly repealed by the enactment of § 2c. *See id.* at 273-76; *id.* at 285 (Stevens, J., concurring in part and concurring in judgment).

redistricting law when imposing a congressional map. Justice Scalia explained that "the word 'manner' [in § 2a(c)] refers to the State's substantive 'policies and preferences' for redistricting, as expressed in a State's statutes, constitution, proposed apportionment plans, or a State's 'traditional districting principles.'" *Id.* at 277-78 (quoting *White v. Weiser*, 412 U.S. 783, 795 (1973)); *see also Rucho v. Common Cause*, 588 U.S. 684, 719 (2019) (explaining that "[p]rovisions in state statutes and state constitutions can provide standards and guidance for state courts to apply" in redistricting litigation); *id.* at 720 (approvingly citing state statutes, such as from Iowa and Delaware, mandating "traditional districting criteria" and those that "prohibit[] partisan favoritism in redistricting" as governing judicial review). And a majority of the Court subsequently held that § 2a(c)'s reference to redistricting "in the manner provided by [state] law" includes redistricting done "whether by the legislature, *court decree*, or a commission established by the people's exercise of the initiative" and that "the resulting districts are the ones that presumptively will be used to elect Representatives" absent a violation of the substantive redistricting requirements of federal law, such as the Voting Rights Act. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 811-12 & n.20 (2015) ("*AIRC*") (emphasis added).

In other words, the *Branch* Court held that Congress exercised its Elections Clause powers to authorize—and indeed *require*—state and federal courts to impose congressional maps pursuant to 2 U.S.C. § 2c when a state has not yet been "redistricted in the manner provided by the law thereof after any apportionment," 2 U.S.C. § 2a(c), and where the absence of court action would leave either a malapportioned map or no map at all.[11]

---

[11] In *Branch*, the federal district court was required to step in when it became apparent that the map imposed by the Mississippi state court would not receive preclearance under Section 5 of the Voting Rights Act in sufficient time to be implemented. *Id.* at 262. But the federal district court

Plaintiffs' claim does not survive *Branch* and *AIRC*. If Congress exercised its Elections Clause power to require state courts to impose congressional maps in the absence of a lawful, legislatively enacted map, how can doing so simultaneously violate the Elections Clause? If statutes Congress passed pursuant to the Elections Clause make congressional maps imposed by "court decree" ones that "presumptively will be used to elect Representatives," *AIRC*, 576 U.S. at 812, how can a court decree imposing a congressional map possibly violate the Elections Clause? The answer to both questions is that it cannot. A court order compelled by Elections Clause statutes cannot conceivably offend the Elections Clause—particularly when Congress, who holds the superseding Elections Clause power, is the source of the statutory command.

### C.   The state court did not exceed the bounds of ordinary judicial review by imposing a remedial congressional map.

The state court could not possibly have "exceed[ed] the bounds of ordinary judicial review," *Moore v. Harper*, 600 U.S. 1, 37 (2023), by following *Growe* and *Branch* in imposing a remedial congressional map in the absence of an equally apportioned, lawful map passed by the Legislature. Indeed, consistent with *Growe* and *Branch*, the Supreme Court has repeatedly affirmed the judicial power to impose maps. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969,

---

had also suggested an "alternative holding" to support its action: that the federal Constitution's Elections Clause precluded the state court from imposing a congressional map absent express legislative authorization.

Critical here, the Supreme Court did not let that reasoning stand. The Court "vacate[d] it as a basis for the injunction" and specified that it was not to be followed in subsequent proceedings: "The District Court's alternative holding is not to be regarded as supporting the injunction we have affirmed on the principal ground, or as binding upon state and federal officials should Mississippi seek in the future to administer a redistricting plan adopted by the Chancery Court." *Id.* at 265-66. The Supreme Court's adamance in this regard is telling, particularly coming in the same decision in which it held that state courts are *required* by Congress's Elections Clause statutes to impose congressional maps.

977 (2018) (affirming district court's order declining to give legislature "second bite at the apple" after proposing unlawful remedial map and instead imposing map); *Perry v. Perez*, 565 U.S. 388, 392-97 (2012) (per curiam) (outlining how federal courts should draw maps in the absence of maps precleared under Section 5 of the Voting Rights Act); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415 (2006) (explaining that the Elections Clause gives "the legislative branch [] the primary role in congressional redistricting" but that "precedents recognize an important role for the courts"); *Abrams v. Johnson*, 521 U.S. 74, 101 (1997) (affirming order imposing congressional map when "legislative process was first distorted and then unable to reach a solution"); *Mahan v. Howell*, 410 U.S. 315, 333 (1973) (affirming court-imposed map); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (explaining that it becomes the "unwelcome obligation" of courts to impose redistricting maps "when those with legislative responsibilities do not respond, or the imminence of a state elections makes it impractical for them to do so"); *Connor v. Finch*, 431 U.S. 407, 414 (1977) (holding that "a court will be held to stricter standards" in achieving population equality when "confronted with the need to devise a legislative reapportionment plan"); *Burns v. Richardson*, 384 U.S. 73, 97-98 (1966) (remanding to district court with instructions to retain jurisdiction and engage in "judicial apportionment if . . . no acceptable substitute is forthcoming").

Every decade, courts impose congressional maps in the absence of lawful, legislatively enacted maps. Several states either currently or recently have had court-imposed congressional maps. *See, e.g.*, *Norelli v. Sec'y of State*, 292 A.3d 458, 463-64, 468-69 (N.H. 2022) (rejecting argument that Elections Clause precludes state court from adjudicating redistricting case and imposing congressional map); *Johnson v. Wis. Elections Comm'n*, 971 N.W.2d 402 (Wis. 2022) (imposing congressional map), *stay denied sub nom. Grothman v. Wis. Elections Comm'n*, 142 S.

Ct. 1410 (Mem); *Carter v. Chapman*, 270 A.3d 444 (Pa. 2022) (imposing congressional map); *Wattson v. Simon*, 970 N.W.2d 56 (Minn. 2022) (imposing congressional map); *In re Apportionment Comm'n*, 268 A.3d 1185 (2022) (per curiam) (imposing congressional map); *In re Decennial Redistricting*, (Va. Dec. 28, 2021)[12] (imposing congressional map); *Harkenrider v. Hochul*, 197 N.E.3d 437, 456 (N.Y. 2022) (remanding for district court to appoint special master to draw congressional map following determination that legislatively-enacted map violated state law prohibition on partisan gerrymandering); *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1320-21 (N.D. Ala. 2023) (enjoining legislatively enacted remedial map and ruling that court would impose map), *stay denied sub nom.*, *Allen v. Milligan*, 144 S. Ct. 476 (Mem).

No court—and certainly not the Supreme Court—has adopted Plaintiffs' radical interpretation of the Elections Clause that would leave courts powerless to ensure that a lawful map governs congressional elections. And this litany of case law precludes any suggestion that courts exceed the bounds of ordinary judicial review by imposing remedial congressional maps.

Given the voluminous precedent against it, Plaintiffs' claim that the state district court acted contrary to the Elections Clause is foreclosed as a matter of law. The state court explained at length why the 2021 Map violated Article I, Section 2 of the Utah Constitution *and* the requirements of Proposition 4 when permanently enjoining its further use. *See League of Women Voters of Utah*, 2025 WL 2644292, at *53-58; *see also League of Women Voters of Utah v. Utah State Legislature*, 2025 UT 39, ¶ 1, 579 P.3d 287. The state district court "developed a remedial process to put in place a congressional map that complies with Proposition 4 in time for the 2026 election," and the

---

[12] The Virginia Supreme Court's decision imposing the congressional map is available at https://www.vacourts.gov/courts/scv/districting/redistricting_final.pdf.

Legislature "agreed to participate in the remedial process." *League of Women Voters*, 2025 UT 39, ¶¶ 2-3. Nevertheless, the Legislature sought a stay of the injunction from the Utah Supreme Court, which it denied. *Id.* ¶ 5.[13]

The state district court's remedial process provided the Legislature an opportunity to adopt a remedial map, allowed the plaintiffs (LWV Intervenors in this Court) to propose alternative maps, and scheduled an evidentiary remedial hearing in advance of the November 10, 2025, deadline the Lieutenant Governor—the state's chief election officer—had communicated for map finalization. *Id.* ¶ 11. On November 10, 2025, the state district court ruled that the Legislature's remedial proposal, known as Map C, was "an 'extreme partisan outlier' drawn with partisan political data and noncompliant with Proposition 4's criteria." ECF No. 1 ¶ 78; *see* Utah Code § 20A-19-103 (prohibiting use of partisan data in redistricting, prohibiting maps that have purpose or effect of unduly favoring or disfavoring political parties, and imposing neutral redistricting criteria); *League of Women Voters*, 2025 WL 3145894, at *48-58 (explaining how Map C violates numerous provisions of Proposition 4).

With both the 2021 Map and Map C having been enjoined as violating the Utah Constitution and/or Proposition 4, the result was that the State had not yet "redistricted in the manner provided by [Utah] law" following the 2020 Census. 2 U.S.C. § 2a(c); *Branch*, 538 U.S. at 278 (plurality); *AIRC*, 576 U.S. at 812. The state district court observed that the effect of its injunctions against the 2021 Map and Map C might, as a matter of law, be to revive the 2011 map,

---

[13] The Legislature has since sought another stay of the district court's injunction against the 2021 Map and that motion is currently pending before the Utah Supreme Court. *League of Women Voters of Utah v. Utah State Legislature*, No. 20260019-SC (Utah Supreme Court).

but that the Legislature "agree[d] the 2011 map is malapportioned and they are not asking that the 2011 map be revived." *League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 3145894, at *59 (Utah D. Ct. Nov. 10, 2025); *see AIRC*, 576 U.S. at 811 (noting that it would be "plainly unconstitutional" to revert to a prior decade's malapportioned map under 2 U.S.C. § 2a(c)(1)). Stating that the "2011 map is unconstitutionally malapportioned under both the federal and Utah constitutions," reasoning that 2 U.S.C. § 2c prohibited the "*absence* of a lawful congressional map . . . [with] single-member congressional districts," citing *Germano*, *Growe*, and a host of other cases, and citing the Utah Constitution's guarantee that parties have "a remedy by due course of law" for all injuries, the state district court concluded it had the "unwelcome obligation" to adopt a judicial remedy map. *League of Women Voters of Utah*, 2025 WL 3145894, at *59 (emphasis in original).[14]

In other words, the state district court did *exactly* what the U.S. Supreme Court has repeatedly held that state courts must do in the absence of a lawful, legislatively enacted map and faced with a deadline to ensure the election can proceed. Given the court's injunction, there was no operative map beyond the malapportioned 2011 map, which the Legislative Defendants contended was likewise not in effect. The state district court did what the *Branch* Court held it

---

[14] The district court also rejected the argument that Plaintiffs advance in their complaint, *e.g.*, ECF No. 1 ¶¶ 84, 94, 100, that Article IX of the Utah Constitution and provisions of Proposition 4 preclude court-imposed remedial maps, *id.* at *59, but in any event correctly observed that "the Court is not remedying only a violation of Proposition 4 at this point" because of the malapportionment of the 2011 map in violation of the federal and state constitutions and/or the absence of a map in violation of 2 U.S.C. § 2c, *id.* at *59. Regardless, Plaintiffs cannot challenge the state court's interpretation of state law, or Defendant Henderson's compliance with a state court order based on its interpretation of state law, in this collateral federal lawsuit. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

must do—impose a congressional map compliant with state and federal law with single-member districts, as 2 U.S.C. § 2c requires. By adhering to the Supreme Court's interpretation of Congress's Elections Clause statutes, the state district court could not possibly have contravened the Elections Clause. Rather, it instead fulfilled a duty imposed on state courts by Congress pursuant to its Elections Clause power. Decades of settled Supreme Court precedent compel the dismissal of Plaintiffs' claim under Rule 12(b)(6) and preclude this Court from accepting Plaintiffs' invitation to "impede a state court's timely development of a plan." *Growe*, 507 U.S. at 36.

## IV.     If it is not dismissed under Rules 12(b)(1) or 12(b)(6), then the case should be stayed pending resolution of the state court litigation.

Finally, if the Court does not dismiss this suit under Rules 12(b)(1) or 12(b)(6), then it should stay the case pending resolution of the state court litigation. This suit implicates several related doctrines that counsel in favor of staying this case until the parallel state court proceedings regarding Utah's congressional redistricting conclude. As discussed above, *Growe* requires federal courts to defer acting on redistricting litigation to allow state courts to impose congressional maps. That is because Supreme Court precedent recognizes the "legitimacy of state *judicial* redistricting" which it "prefers . . . to federal courts as agents of apportionment." *Growe*, 507 U.S. at 34 (emphasis in original). Because here the state court has acted, there is nothing more for this Court to do but dismiss this suit.

While the *Growe* Court noted that federal courts can entertain "claims challeng[ing] the *state court's* plan," *id.* (emphasis in original), that observation applies to substantive federal legal challenges to the manner in which the map configures the districts (*e.g.*, under the Voting Rights Act or Equal Protection Clause), not a challenge like Plaintiffs' that questions the *authority* of the state court to impose a congressional map. There is no sensible way to understand *Growe* to

envision a federal court ruling that state courts are disempowered from adopting congressional maps. That power is the very premise of *Growe*'s holding.

In any event, *Growe* is not the only doctrine counseling deferral. "[T]he *Colorado River* doctrine applies to 'situations involving the contemporaneous exercise of concurrent jurisdictions . . . by state and federal courts." *Fox v. Maulding*, 16 F.3d 1079, 1080 (10th Cir. 1994) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). To apply, the federal and state court actions must be parallel such that "substantially the same parties litigate substantially the same issues in different forums." *Id.* at 1081 (quoting *New Beckley Mining Corp. v. Int'l Union, UMWA*, 946 F.2d 1072, 1073 (4th Cir. 1991)). The purpose of the assessment is to ensure that "the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issue between the parties." *Id.* (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 28 (1983)). In determining whether to defer under *Colorado River*, courts consider (1) "whether either court has assumed jurisdiction over property," (2) "the inconvenience of the federal forum," (3) "the desirability of avoiding piecemeal litigation," and (4) "the order in which the courts obtained jurisdiction." *Id.* at 1082. No factor is dispositive and they should not be applied as a "mechanical checklist." *Id.* If the court finds the *Colorado River* doctrine applicable, the action should be stayed "pending the outcome of the state proceedings." *Id.* at 1083.

The *Colorado River* doctrine counsels in favor of deferring pending resolution of the state court litigation. *League of Women Voters of Utah, et al. v. Utah State Legislature*, No. 220901712 (Utah 3d Dist. Ct.); on appeal, No. 20260019-SC (Utah Supreme Court). In January, the state district court entered a Rule 54(b) partial final judgment on its August 25, 2025 order permanently

23

enjoining S.B. 200 (which had repealed Proposition 4—Utah's voter-adopted redistricting law) and H.B. 2004 (the 2021 congressional map). Legislative Defendants have appealed and their motion for a stay of the injunction against implementation of the 2021 Map is pending before the Utah Supreme Court. Legislative Defendants contend on appeal that the state district court's rulings violate the federal Constitution's Elections Clause. The Utah Supreme Court's interpretation of Utah law—particularly Article I, Section 2; Article VI, Section 1; and Article IX of the Utah Constitution as well as Proposition 4—plainly bear on the resolution of this case, including whether this case ultimately presents a live controversy.

Moreover, this litigation and the state court litigation are parallel under the *Colorado River* doctrine. The same issue—whether the Legislature has exclusive redistricting authority under the Elections Clause—has been raised by the Legislature before the state district court. And although Plaintiffs in this case are not parties to the state litigation, *Colorado River* does not require exact overlap. *See, e.g.*, *United States v. City of Las Cruces*, 289 F.3d 1170, 1182 (10th Cir. 2002) (noting that in the "*Colorado River* context, . . . exact identity of parties and issues is not required"); *Lumen Const., Inc. v. Brant Const. Co., Inc.*, 780 F.2d 691, 695 (7th Cir. 1985) (holding that absence of federal plaintiffs from state court proceeding was not dispositive under *Colorado River* where state court party's "interest in the outcome of the lawsuit is the same" and noting that the doctrine cannot be avoided "by the simple expedient of naming additional parties"); *cf. Health Care & Retirement Corp. of Am. v. Heartland Home Care, Inc.*, 324 F. Supp. 2d 1202, 1204-05 (D. Kan. 2004) (finding *Colorado River* deferral appropriate where affiliate was party in state court action).

Proposed intervenors and Defendant Henderson are parties to the state court litigation, and more importantly, the Utah Legislature is also a party there. The Legislature is better equipped to

assert its own authority under the Elections Clause than the Plaintiffs in this case, and Plaintiffs do not assert that they have some greater interest in adjudicating the Legislature's Elections Clause power than does the Legislature. Moreover, the relevant factors tip in favor of deferral—the state court litigation was filed four years before this federal suit, additional piecemeal litigation caused by duplicating an issue already under consideration in the state court proceeding is undesirable, and the state court forum is more convenient (for the parties and this three-judge federal court). The case for applying *Colorado River* deferral is accentuated here given *Growe*'s admonition that adjudication of redistricting disputes by state courts is preferrable to federal court involvement. 507 U.S. at 34.

If the Court does not dismiss Plaintiffs' suit, then it should stay the case pending resolution of the state court litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs' suit should be dismissed with prejudice or stayed without reaching or ruling on Plaintiffs' motion for a preliminary injunction.

RESPECTFULLY SUBMITTED this 11th day of February 2026.

/s/ David C. Reymann
**PARR BROWN GEE & LOVELESS**
David C. Reymann
Cheylynn Hayman
Kade N. Olsen

**CAMPAIGN LEGAL CENTER**
Mark P. Gaber*
Annabelle Harless*
Aseem Mulji*
Benjamin Phillips*
Isaac DeSanto*

**ZIMMERMAN BOOHER**
Troy L. Booher
J. Frederic Voros, Jr.
Caroline Olsen

*Attorneys for Proposed Intervenors*