**PARR BROWN GEE & LOVELESS**
David C. Reymann (Utah Bar No. 8495)
Cheylynn Hayman (Utah Bar No. 9793)
Kade N. Olsen (Utah Bar No. 17775)
101 South 200 East, Suite 700
Salt Lake City, UT 84111
(801) 532-7840
dreymann@parrbrown.com
chayman@parrbrown.com
kolsen@parrbrown.com

**ZIMMERMAN BOOHER**
Troy L. Booher (Utah Bar No. 9419)
J. Frederic Voros, Jr. (Utah Bar No. 3340)
Caroline Olsen (Utah Bar No. 18070)
341 South Main Street
Salt Lake City, UT 84111
(801) 924-0200
tbooher@zbappeals.com
fvoros@zbappeals.com
colsen@zbappeals.com

**CAMPAIGN LEGAL CENTER**
Mark P. Gaber*
Aseem Mulji**
Benjamin Phillips*
Isaac DeSanto*
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegalcenter.org
amulji@campaignlegalcenter.org
bphillips@campaignlegalcenter.org
idesanto@campaignlegalcenter.org

Annabelle Harless*
55 W. Monroe Street, Ste. 1925
Chicago, IL 60603
aharless@campaignlegalcenter.org

*Attorneys for Proposed Intervenors*

*\* Admitted Pro Hac Vice*
*\*\*Pro Hac Vice Forthcoming*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

AMELIA POWERS GARDNER, *et al.*,

        Plaintiffs,

v.

LIEUTENANT GOVERNOR DEIDRE
HENDERSON, in her official capacity,

        Defendant.

_____

LEAGUE OF WOMEN VOTERS OF
UTAH, *et al.*,

        Proposed Intervenors.

**PROPOSED LWV INTERVENORS'
OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Case No. 2:26-cv-84-RJS-JCB

Judge Timothy M. Tymkovich
Judge Robert J. Shelby
Judge Holly L. Teeter
Magistrate Judge Jared C. Bennett

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

I.   Proposition 4 is enacted by the voters in 2018 and repealed by the Legislature before the 2021 redistricting. ........................................................................................ 3

II.   LWV Intervenors challenge the repeal of Proposition 4 and the 2021 Map in state court. .................................................................................................................. 3

III.   The Legislature amends and weakens Proposition 4's partisan gerrymandering ban and passes Map C. .......................................................................................... 6

IV.   The state district court preliminarily enjoins S.B. 1011 as violating the Alter or Reform Clause and Map C as violating Proposition 4. ...................................... 7

V.   The state district court adopts Map 1 as remedial map. ..................................... 8

VI.   The Lieutenant Governor implements Map 1. .................................................. 10

VII.   The Legislature alters candidate filing period and appeals to Utah Supreme Court. ....... 10

VIII.  The primary campaign for the 2026 congressional election has been underway since November, and the party caucuses are in 4 weeks. ...................................... 11

LEGAL STANDARD ..................................................................................................... 15

ARGUMENT ................................................................................................................ 16

I.   Plaintiffs lack standing and issue preclusion bars this suit. ............................. 16

II.   Plaintiffs' requested relief is foreclosed by the *Purcell* principle. .................... 18

    A. Plaintiffs unduly delayed filing their Complaint. ......................................... 20

    B. It is not feasible to change congressional maps without significant cost, confusion, and hardship. ...................................................................................... 22

III.   Plaintiffs are not likely to succeed on the merits. ............................................ 23

IV.   This Court has no power to impose the illegal remedy Plaintiffs seek. .............. 32

V.   The remaining injunction factors compel denial of the motion. ....................... 34

    A. Plaintiffs face no irreparable harm. .......................................................... 34

    B. The balance of equities and public interest favor LWV Intervenors. ............ 35

CONCLUSION .............................................................................................................. 36

## TABLE OF AUTHORITIES

**Cases**                                                                                                              **Pages**

*Abbott v. League of United Latin American Citizens*, 146 S. Ct. 418 (2025) ..............18, 19, 22, 23

*Abrams v. Johnson*, 521 U.S. 74 (1997)........................................................................................25

*Alexander v. Taylor*, 51 P.3d 1204 (Okla. 2002) ..........................................................................28

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,

    576 U.S. 787 (2015)...................................................................................................................25

*Avalos v. Davidson*, No. 01 CV 2897, 2002 WL 1895406 (Colo. Dist. Ct. Jan. 25, 2002) ...........29

*Beauprez v. Avalos*, 42 P.3d 642 (Colo. 2002) ...............................................................................29

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ................................................................29

*Bost v. Illinois State Board of Elections*, 607 U.S. --, -- S. Ct. --, No. 24-568, 2026 WL 96707

    (Jan. 14, 2026).................................................................................................................16, 17, 18

*Branch v. Smith*, 538 U.S. 254 (2003) ....................................................................25, 26, 32, 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................................................31

*Dayton Board of Education v. Brinkman*, 433 U.S. 406 (1977) ....................................................34

*Growe v. Emison*, 507 U.S. 25 (1993).........................................................9, 20, 21, 24, 26, 28, 29

*Kansas Health Care Association v. Kansas Department of Social and Rehabilitation Services*,

    31 F.3d 1536 (10th Cir. 1994) ............................................................................................22, 35

*Lance v. Coffman*, 549 U.S. 437 (2007)..........................................................................................16

*Lawyer v. Department of Justice*, 521 U.S. 567 (1997)..................................................................27

*League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, 554 P.3d 872

    ("*League of Women Voters I*") ....................................................................................3, 4, 5, 30

*League of Women Voters of Utah v. Utah State Legislature*, 2025 UT 39, 579 P.3d 287

    ("*League of Women Voters III*").................................................................................................6

*League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292

    (Utah Dist. Ct. Aug. 25, 2025) ......................................................................................... *passim*

*League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 3145894

    (Utah Dist. Ct. Nov. 10, 2025) ......................................................................................... *passim*

*League of United Latin American Citizens v. Abbott*,

No. 3:21-cv-259, 2025 WL 3215715 (W.D. Tex. Nov. 18, 2025)....................................18, 23

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ...........................................................................18, 19

*Moore v. Harper*, 600 U.S. 1 (2023) ...................................................................................27, 29

*Purcell v. Gonzalez*, 549 U.S. 1 (2006)............................................................................19, 22, 23

*Republican National Committee v. Democratic National Committee*, 589 U.S. 423 (2020).........18

*Rucho v. Common Cause*, 588 U.S. 684 (2019)...........................................................................17

*Scott v. Germano*, 381 U.S. 407 (1965) ..............................................................9, 21, 24, 26

*State v. U.S. Environmental Protection Agency*, 989 F.3d 874 (10th Cir. 2021)...........................16

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) .................................15, 34

*White v. Weiser*, 412 U.S. 783 (1973) .......................................................................................25

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016)...............................................22

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1.........................................................................................................24

Minn. Const. art. IV, § 3.............................................................................................................28

Utah Const. art. IX §1................................................................................................................27

**Statutes and Rules**

2 U.S.C. § 2a(c)..................................................................................................................25, 32

2 U.S.C. § 2c................................................................................................................29, 32, 33

28 U.S.C. § 2284(b)(2) ..............................................................................................................20

Fed. R. Civ. P. 12(b)(1) .............................................................................................................36

Fed. R. Civ. P. 12(b)(6) .............................................................................................................36

Fed. R. Civ. P. 56......................................................................................................................31

Utah R. Civ. P. 56......................................................................................................................31

Utah Code § 20A-9-407.............................................................................................................13

Utah Code § 20A-13-101.1 ........................................................................................................33

Utah Code § 20A-13-102.2(4).....................................................................................................14

Utah Code § 20A-20-101 *et seq.*..................................................................................................3

Utah Code § 20A-19-102(3) ....................................................................................................8, 28

Utah Code § 20A-19-102(4) ................................................................................28

**Other Authorities**

Ben McAdams for Congress, Events,
https://www.mobilize.us/benmcadamsforcongressut01/?end_date=2026-02-
20T04%3A59%3A59.999Z&is_virtual_flexible=false&start_date=2026-02-
12T05%3A00%3A00.000Z ........................................................................15

Bridger Beal-Cvetko, *Republican Dave Robinson joins race for Utah's new blue-leaning congressional district*, KSL.com, Feb. 6, 2026,
https://www.ksl.com/article/51444532/republican-dave-robinson-joins-race-for-utahs-new-
blue-leaning-congressional-district ..........................................................12

Federal Election Commission, Friends of Ben McAdams,
https://www.fec.gov/data/candidate/H8UT04053/?cycle=2026&election_full=true. .............11

Federal Election Commission, Nate Blouin for Congress, Financial Summary,
https://www.fec.gov/data/candidate/H6UT01178/?cycle=2026&election_full=true. ............12

Federal Election Commission, Utah Congressional Candidates, 2026 Election,
https://www.fec.gov/data/candidates/?election_year=2026&office=H&state=UT&is_active_c
andidate=true&has_raised_funds=true. .....................................................12

Office of Utah Lieutenant Governor, Deidre M. Henderson, State of Utah 2026 Candidate
Manual, https://vote.utah.gov/wp-content/uploads/2025/12/2026-Candidate-Manual.pdf. ....13

Nate Blouin for Congress, Events, https://www.nateforutah.com/events ....................15

Salt Lake County Clerk's Office, Precinct Maps,
https://www.saltlakecounty.gov/clerk/elections/maps/precinct-maps/ ....................14

Salt Lake County Democratic Party, Caucus Night FAQs,
https://www.slcountydems.com/caucusnight/caucusnightfaqs ................................15

Salt Lake County Democratic Party, 2026 Caucus Night,
https://www.slcountydems.com/caucusnight ................................................14

Utah Legislature, S.B. 2011 Election Amendments, 2d Spec. Sess. (Utah 2025),
https://le.utah.gov/Session/2025S2/bills/static/SB2001.html. ..............................10

iv

Utah Republican Party, 2026 State Nomination Convention,

   https://www.utgop.org/2026_state_nominating_convention ....................................................14

Utah Republican Party, Precinct Portal, About Neighborhood Caucus Night,

   https://precinctportal.org/#about ................................................................................................14

# INTRODUCTION

For four years, LWV Intervenors and the Utah Legislature have litigated complicated issues of state law in Utah's state courts as LWV Intervenors have sought to vindicate the redistricting reform adopted by the people of Utah in 2018. After hundreds of pages of careful legal analysis by the state district court, and three unanimous rulings by the Utah Supreme Court, there is finally a legal congressional map set to govern the 2026 election. Now, at the eleventh hour, Plaintiffs come to federal court with an audacious request: ignore it all. But while the state court litigation has tackled complicated issues, the question before this Court is simple: did the state court's imposition of a remedial map as directed by the U.S. Supreme Court transgress the ordinary bounds of judicial review? Obviously not.

Since 2018, the voters of Utah have suffered under the Legislature's unconstitutional repeal of the redistricting reform they voted to adopt ("Proposition 4"). After the Utah Supreme Court unanimously recognized in 2024 Utahns' constitutional right to alter or reform their government through an initiative following years of state court litigation, the Legislature reacted by attempting (and failing) to trick Utahns through deceptive ballot language into voting to surrender that constitutional right, an unlawful tactic the Utah Supreme Court swiftly and unanimously rejected. Finally, in August 2025, the state district court finally overturned the Legislature's repeal of Proposition 4, enjoined the 2021 congressional map ("2021 Map") as violative of both the Utah Constitution and Proposition 4, and—respecting the Legislature's primary role in redistricting— adopted a remedial process to ensure that the 2026 election would take place in accord with the wishes Utahns' expressed at the ballot box almost a decade before.

1

Given the opportunity to go back and enact a map that complied with Proposition 4, the Legislature instead responded by amending Proposition 4 to stack the deck and implement evaluation measures that *mandated* partisan gerrymandering in favor of the current majority party. At the same time, it passed Map C—a map so extremely gerrymandered that the October evidentiary hearing revealed it to violate nearly every provision of Proposition 4, including, most astoundingly, its express prohibition on displaying partisan information on the computer screen as the map is drawn.

With both the 2021 Map and Map C enjoined, and the Lieutenant Governor's deadline for which a map must be finalized swiftly approaching, the state district court did what the U.S. Supreme Court has *repeatedly* said it must do: it imposed a lawful map. In doing so, the state district court complied with statutes passed by Congress pursuant to its Elections Clause power that *require* state courts to ensure lawful congressional districts are in place.

Now, three months later, in the middle of an active primary campaign with multiple candidates robustly campaigning under Map 1's lines, and as political party caucus-goers campaign amongst their neighbors to be elected to political party precinct offices at caucuses just four weeks away, Plaintiffs ask this Court to undo the work of the Utah state courts. They demand that this Court reinstate a congressional map the state district court has held violates Utah law despite raising no claim that the state court injunction against the 2021 Map violates any federal law. And they insist this Court do so on an impossibly short timetable occasioned by their dilatory conduct.

Plaintiffs ask this Court to far exceed its authority. The Court should decline that invitation.

# BACKGROUND

**I.    Proposition 4 is enacted by the voters in 2018 and repealed by the Legislature before the 2021 redistricting.**

In 2018, Utah voters passed Proposition 4 to end the practice of partisan gerrymandering and to reform redistricting. The law banned the use of partisan information when redistricting maps are drawn, prohibited the Legislature from enacting redistricting maps with the purpose or effect of favoring political parties, required maps to follow a hierarchy of neutral redistricting criteria (including minimizing municipal and county divisions), established a redistricting commission to propose maps for the Legislature's consideration, and created a private right of action to enforce its provisions. *See League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶¶ 29-33, 554 P.3d 872 ("*League of Women Voters I*").

Before the 2020 redistricting cycle began, however, the Legislature enacted S.B. 200, which repealed Proposition 4 and replaced it with a new law that, *inter alia*, made its redistricting criteria and partisan gerrymandering ban inapplicable to the Legislature and eliminated the civil enforcement provision. *Id.* ¶ 34; *see* Utah Code § 20A-20-101 *et seq.* In November 2021, the Legislature enacted H.B. 2004 ("2021 Map"), reconfiguring the congressional map. In doing so, the Legislature rejected the maps proposed by the independent commission and instead drew a map that sliced Salt Lake County into four districts, centering on the city of Millcreek, which it also fractured into all four districts. *League of Women Voters I*, 2024 UT 21, ¶¶ 41-43.

**II.    LWV Intervenors challenge the repeal of Proposition 4 and the 2021 Map in state court.**

In March 2022, the League of Women Voters of Utah, Mormon Women for Ethical Government, and a group of both registered Republican and Democratic voters (plaintiffs in the

state court action, "LWV Intervenors" in this case)[1] filed suit in Utah state court challenging both S.B. 200 (which repealed Proposition 4) and the 2021 Map as violating several provisions of the Utah Constitution. *See League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292 (Utah 3d Dist. Ct.).

In July 2024, the Utah Supreme Court held that LWV Intervenors stated a valid claim under Article I, Section 2 of the Utah Constitution, which guarantees Utahns' right to alter or reform their government. *See League of Women Voters I*, 2024 UT 21, ¶¶ 61-62. The court explained that LWV Intervenors' Alter or Reform Clause claim (Count V)

> encompass[es] both matters at issue in this case: [LWV Intervenors'] challenge to the redistricting process that led to the Congressional Map and their challenge to the Congressional Map itself. Specifically, Count V involves the parties' dispute over whether the citizen reform initiative, Proposition 4, or the Legislature's replacement of the initiative, S.B. 200, should govern the redistricting process. And consequently, it also encompasses the constitutionality of the Congressional Map that resulted from S.B. 200 and was not subject to Proposition 4's requirements.

*Id.* ¶ 61. The court held that "legislation that impairs government reform enacted through initiative must be subject to strict scrutiny." *Id.* ¶ 209. The court explained that if, on remand, LWV Intervenors proved that S.B. 200 was unconstitutional under this framework, "Proposition 4 would become controlling law." *Id.* ¶ 222 (citation omitted). Citing Proposition 4's various procedural and substantive requirements that LWV Intervenors alleged the 2021 Map violated, the court also observed that "it is likely that the Congressional Map cannot stand." *Id.* With this direction, the court remanded the case to the district court to adjudicate the claim.

---

[1] Plaintiffs in the state court action are referred to as "LWV Intervenors" throughout this brief in light of their posture here and to avoid confusion with the plaintiffs in this case.

On August 25, 2025, the state district court granted summary judgment in favor of LWV Intervenors on their Alter or Reform Clause claim. *League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292, at *58 (Utah 3d Dist. Ct. Aug. 25, 2025) ("*League of Women Voters August 2025 Order*"). The district court ruled that S.B. 200 impaired Proposition 4's key reforms and was neither narrowly tailored nor supported by any compelling state interest, and on that basis permanently enjoined its further use as void *ab initio*. *Id.* at *47, 52. Accordingly, the court declared that "[b]ecause Proposition 4 was not effectively repealed, it stands as the only valid law on redistricting." *Id.* at *53.

The court also permanently enjoined further implementation of the 2021 Map, which was relief LWV Intervenors had requested in moving for summary judgment. *Id.* at *57-58. The court explained at length why the 2021 Map violated both the Utah Constitution and Proposition 4 and had to be permanently enjoined. First, the court explained that the 2021 Map

> cannot be separated from the Legislature's unconstitutional repeal of Proposition 4. By stripping away the core redistricting reforms passed by the people . . . the Legislature cleared the path for a map drawn independent of the mandatory redistricting standards and procedures imposed on the Legislature by Proposition 4. [The 2021 Map] is therefore not a fresh or independent act—it is the fruit of that unlawful repeal, an extension of the very constitutional violation that tainted the process from the start.

*Id.* at *54. The court explained that "[t]he extent of the constitutional violation goes beyond simply the repeal of Proposition 4. [The 2021 Map] is the product of an unconstitutional process. The Legislature's unconstitutional act, if left unremedied, will be compounded with each election cycle." *Id.* The court's ruling that the 2021 Map was a product of the Alter or Reform Clause violation proven by LWV Intervenors is drawn directly from the Utah Supreme Court's prior decision. *See League of Women Voters I*, 2024 UT 21, ¶ 61 (explaining that the claim "also

encompasses the constitutionality of the [2021 Map] that resulted from S.B. 200 and was not subject to Proposition 4's requirements").

The district court also found that a permanent injunction was necessary because the 2021 Map independently violated Proposition 4's requirements—an argument LWV Intervenors asserted when moving for summary judgment. *League of Women Voters August 2025 Order*, 2025 WL 2644292, at *56. Specifically, the court found that "[t]here is no dispute that certain Proposition 4 procedures were not complied with," including failing to vote on the commission's proposals, failing to follow the public comment period requirement, and failure to issue a report regarding the map. *Id.* The Utah Supreme Court then denied Legislative Defendants' petition seeking a stay of the district court's injunctions. *League of Women Voters of Utah v. Utah State Legislature*, 2025 UT 39, 579 P.3d 287 ("*League of Women Voters III*").

### III.    The Legislature amends and weakens Proposition 4's partisan gerrymandering ban and passes Map C.

Legislative Defendants stipulated to a remedial process that afforded the Legislature until October 6, 2025, to enact a new map (if it so chose), provided LWV Intervenors the opportunity to submit alternative remedial maps, and set an October 23-24, 2025 evidentiary hearing so that a ruling could be issued by November 10, 2025, the date by which the Lieutenant Governor indicated she needed a final decision on the governing map. *See League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 3145894, at *1 (Utah 3d Dist. Ct. Nov. 10, 2025) ("*League of Women Voters November 2025 Order*"). The Legislature responded to the opportunity to enact a new, legally-compliant map by passing two bills on October 6, 2025—one (S.B. 1011) that "substantially redefined and narrowed Proposition 4's prohibition on partisan

gerrymandering" and another (S.B. 1012) that "enacted Map C, one of five congressional map options considered by the Legislature." *Id.*

IV.    **The state district court preliminarily enjoins S.B. 1011 as violating the Alter or Reform Clause and Map C as violating Proposition 4.**

The district court preliminarily enjoined implementation of both S.B. 1011 as violating the Alter or Reform Clause and Map C as violating Proposition 4. The court found that S.B. 1011 adopted metrics that "directly contravene[] Proposition 4's neutral redistricting criteria," including but not limited to avoiding municipal and county splits and maximizing compactness, because the metrics would "fail[] maps that perform best on those criteria and pass[] maps th[at] perform worst on them." *Id.* at *2. Likewise, the court found that the S.B. 1011 "acts to structurally *mandate* partisan favoritism, by disqualifying most maps that create a single Democratic congressional district" and "nearly universally approv[ing] congressional maps that give the majority party, here the Republican party, a 4-0 district advantage." *Id.* Thus, the court found, "S.B. 1011 effectively mandates the very partisan favoritism that Proposition 4 was enacted to stop." *Id.*

With respect to Map C, the district court found many violations of Proposition 4, including that partisan political data was displayed precinct-by-precinct as the map was drawn, that it was a partisan gerrymander in purpose and effect, and that it failed to minimize divisions of counties and municipalities. *Id.* at *49, 54, 55-56. Specifically, the district court noted that the Legislature's map drawer "testified that the starting point for Map C was now enjoined 2021 [Map], which did not comply with the procedural or substantive requirements of Prop[osition] 4. Map C nevertheless perpetuated many of the existing dividing lines and problems with the [2021 Map] that appear to be designed to favor the Republican Party and disfavor the Democratic Party." *Id.* at *56; *see also id.* at *40 (finding that the 2021 Map's four-way divide of Salt Lake County "impairs the minority

party's ability to translate its statewide support into representation, enabling the favored party to entrench its advantage by winning every seat."). Notably, the Legislature's map drawer—who also served as a litigation expert for Legislative Defendants at the remedial hearing—testified on cross examination that the 2021 Map's four-way division of Salt Lake County and its quantity of municipal splits violated Proposition 4, and he endeavored to fix that violation with Map C.[2]

## V.    The state district court adopts Map 1 as remedial map.

Because the 2021 Map was already permanently enjoined as violating both the Alter or Reform Clause of the Utah Constitution and Proposition 4, and because Map C was now preliminarily enjoined as violating Proposition 4, the court explained that it had "the unwelcome obligation to order the use of a lawful congressional map for use in the 2026 election." *Id.* at *58-59. In doing so, the court first observed that Proposition 4 permitted redistricting to occur "upon the issuance of a permanent injunction or to conform with the final decision of a court" and "does so without limiting that function to the Legislature." *Id.* at *59 (citing Utah Code § 20A-19-102(3) & (4)). Second, the court made clear that it "is not remedying only a violation of Proposition 4 at this point." *Id.* Because of the injunctions, the court noted, the 2011 map "could necessarily be revived by operation of law, without action by this Court, and by default become the operative map governing the forthcoming 2026 election." *Id.* The court continued:

> It is undisputed that the 2011 map is unconstitutionally malapportioned under both the federal and Utah constitutions. It is likewise indisputable that the *absence* of a lawful congressional map is unsustainable. *See* 2 U.S.C. § 2c (requiring states to create single-member congressional districts). Even if Legislative Defendants were

---

[2] Ex. 1, Oct. 24, 2025 Hr'g Tr. at 188:11-21 ("Q: [You wrote in your report that] '[t]he first problem to resolve was obviously the four-way split of Salt Lake County and the accompanying city splits in the 2021 map.' Is that right?" A: "Right." Q. "And you viewed that as a violation of Prop 4's criteria, right?" A. "Right.").

> correct (they are not) that Proposition 4 does not authorize a court-imposed map, no one disputes that state courts are empowered—and in fact on many occasions have the "unwelcome obligation"—to remedy an unconstitutionally malapportioned map or the absence of a legal one.

*Id.* In so reasoning, the court cited the U.S. Supreme Court's decision in *Scott v. Germano*, 381 U.S. 407, 409 (1965) and *Growe v. Emison*, 507 U.S. 25 (1993), and other federal and state court decisions. The court also cited Article I, Section 11 of the Utah Constitution, which guarantees a "remedy by due course of law" for all injuries. "[W]here the legislature has failed to adopt a redistricting map that complies with Proposition 4, no other legally valid map is in place, and the Lt. Governor has stated that a map must be in place by November 10, 2025," the court found itself obligated to act. *League of Women Voters November 2025 Order*, 2025 WL 3145894, at *60.

The court ordered the implementation of Map 1, which LWV Intervenors had submitted. *Id.* at *60-61. The court explained that "Plaintiffs' Map 1 abides by Proposition 4's neutral redistricting criteria to the greatest extent practicable. Among other features, it is equally populated, divides only 1 municipality (which is divided into just 2 pieces), has the fewest necessary county divisions (3), and has geographically compact districts." *Id.* at *61. Likewise, the court found that Map 1 "has neither the purpose nor effect of unduly favoring or disfavoring a political party," having been "configured by a reliable computer algorithm programmed to closely adhere to Proposition 4's neutral redistricting criteria without any partisan data." *Id.* In ordering the implementation of a new map, the court noted that Map 1 "falls comfortably in the distribution of expected partisan outcomes under th[e] ensemble of Proposition 4 compliant maps" and "accords with Utah's natural political geography and electoral conditions." *Id.*

## VI.    The Lieutenant Governor implements Map 1.

Complying with the state district court's order, the Lieutenant Governor began implementing Map 1. The map was submitted to the Utah Geospatial Research Center for review and the Lieutenant Governor notified the court of eight issues for guidance, observing that these issues (e.g., Census blocks that bisect homes, single-home precincts, etc.) commonly arise. Ex. 2 at 4 (Lt. Gov. Utah Supreme Court filing).  The state district court entered an order on November 21, 2025, explaining that seven of the eight issues required no changes but made a minor adjustment to Map 1 "to account for a potential single-home precinct." *Id.* at 4. The district court noted that "Legislative Defendants . . . offered no recommendation or guidance to address the boundary issues, and instead effectively deferred to Plaintiffs, stating: 'Plaintiffs' counsel can instruct the Lieutenant Governor how to resolve those issues.'" Ex. 3 at 1 (11/21/25 Order).[3]

Map 1 has since been implemented, and county clerks are prepared to conduct the 2026 election under it. *See* ECF No. 44.

## VII.   The Legislature alters candidate filing period and appeals to Utah Supreme Court.

In a December special session, the Legislature passed a bill changing the candidate filing period for congressional candidates from January 2-8, 2026, to March 9-13, 2026.[4] On December 26, 2025, the state district court granted Legislative Defendants' motion to certify the court's August 2025 order permanently enjoining S.B. 200 and the 2021 Map as final under Rule 54(b). The court observed that Legislative Defendants had a statutory right to appeal within 30 days of

---

[3] *Contra* ECF No. 19 at 3 (falsely claiming that Map 1 was "later repeatedly altered by that state judge as she saw fit").

[4] *See* Utah Legislature, S.B. 2011 Election Amendments, 2d Spec. Sess. (Utah 2025), https://le.utah.gov/Session/2025S2/bills/static/SB2001.html.

both the August 2025 order and the November 10 order but failed to do so. Ex. 4 at 2 (12/26 Order). Nevertheless, the court granted Rule 54(b) certification and entered final judgment with respect to the August 2025 order to allow Legislative Defendants' belated appeal to commence. *Id.*

Legislative Defendants have filed a motion for a stay of the state district court's August 2025 order permanently enjoining S.B. 200 and the 2021 Map with the Utah Supreme Court, and LWV Intervenors have moved for summary dismissal on the grounds that the Rule 54(b) certification was in error. Both motions are pending before the Utah Supreme Court.

**VIII.    The primary campaign for the 2026 congressional election has been underway since November, and the party caucuses are in 4 weeks.**

The primary campaign for the 2026 congressional election began in earnest following the state district court's November 2025 order, with candidates announcing campaigns, raising money, and spending money based on Map 1 governing the boundaries of their districts. On November 12, 2025, Democratic State Senator Kathleen Riebe announced her campaign for congressional district 1 ("CD1").[5] The following day, former Democratic Congressman Ben McAdams announced his candidacy for CD1, noting in a press release that he raised $500,000 within the first 24 hours of launching his campaign.[6] According to his most recent campaign finance report, as of December 31, 2025, McAdams had raised $955,730.21 for his campaign and spent $206,022.32.[7]

---

[5]Cami Mondeaux, *State Sen. Kathleen Riebe launches campaign for new Utah House district*, Deseret News, Nov. 12, 2025, https://www.deseret.com/politics/2025/11/12/kathleen-riebe-first-to-announce-campaign/.

[6]Abigail Jones, *Ben McAdams announces $500,000 raised towards campaign, endorsements*, ABC4 News, Nov. 14, 2025, https://www.abc4.com/news/politics/inside-utah-politics/ben-mcadams-fundraising-campaign-endorsements/ .

[7]Federal Election Commission, Friends of Ben McAdams, https://www.fec.gov/data/candidate/H8UT04053/?cycle=2026&election_full=true.

On November 20, former Democratic State Senator Derek Kitchen launched his candidacy for CD1.[8] On November 23, Democratic State Senator Nate Blouin launched his campaign candidacy for CD1.[9] As of December 31, 2025, he reported raising $203,109.27 for his campaign and spending $23,248.22.[10] Eva Lopez Chavez and Anthony Tomkins have also declared their candidacies for CD1 with the Federal Election Commission.[11] On February 6, 2026, Republican Dave Robinson, a former volunteer spokesperson for the Salt Lake County Republican Party, announced his campaign for CD1.[12] Primary campaigns are also underway under Map 1 in CD2, where Democrats Steven Merrill and Peter Crosby have filed declarations of candidacy with the Federal Election Commission.[13]

Imposing a new map and changing the existing congressional boundaries under which these many candidates have been actively campaigning for months—mere weeks before the March 9-13, 2026 candidate filing deadline—would be highly disruptive to ongoing campaign efforts.[14]

---

[8] Abigail Jones, *Former state senator Derek Kitchen announces congressional campaign*, ABC4 News, Nov. 20, 2025, https://www.abc4.com/news/derek-kitchen-congressional-campaign.

[9] Lindsay Aerts, *State Senator Nate Blouin latest Democrat to announce run for Congress*, ABC4 News, Nov. 23, 2025, https://www.abc4.com/news/politics/utah-democrat-nate-blouin-congress/.

[10] Federal Election Commission, Nate Blouin for Congress, Financial Summary, https://www.fec.gov/data/candidate/H6UT01178/?cycle=2026&election_full=true.

[11] Federal Election Commission, Utah Congressional Candidates, 2026 Election, https://www.fec.gov/data/candidates/?election_year=2026&office=H&state=UT&is_active_cand idate=true&has_raised_funds=true.

[12] Bridger Beal-Cvetko, *Republican Dave Robinson joins race for Utah's new blue-leaning congressional district*, KSL.com, Feb. 6, 2026, https://www.ksl.com/article/51444532/republican-dave-robinson-joins-race-for-utahs-new-blue-leaning-congressional-district.

[13] *See supra* note 11.

[14] Declaration of Timothy Chambless in Support of Proposed LWV Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Chambless Dec."), Ex. 6, ¶ 9.

Indeed, since the Utah state district court ordered implementation of Map 1, candidates who have announced (or who may yet plan to announce) their candidacy undoubtedly have devoted and expended resources and time and developed campaign strategies in reliance on the existing congressional map ordered by the state court, and on the Lieutenant Governor's agreement that she will implement Map 1. To change the congressional map at this late date would be highly disruptive to candidates and cause confusion for voters.[15]

Imposing a new map would also be highly disruptive to the caucus system process.[16] Utah has a two-track system that ultimately leads to a candidate securing a spot on the ballot for their primary election. As the Lieutenant Governor has explained in the official State of Utah 2026 Candidate Manual, candidates have three options: (1) participate in the party caucus and convention system, (2) gather signatures from voters, or (3) do both.[17] Caucuses are neighborhood meetings in which delegates are elected to represent the caucus at the party's county and/or or state convention. *Id.* at 7. Delegates then gather at the conventions and nominate candidates. *Id.* "Candidates who receive a certain percentage of delegates' votes will be nominated and their name will be placed on the primary ballot." *Id.* at 7. Additionally (or alternatively), candidates can gather a requisite number of signatures from voters to secure a spot on a party's primary ballot. *Id.* at 12-

---

[15] *Id.* Ex. 6, ¶¶ 10-11.

[16] *Id.* Ex. 6, ¶ 12.

[17] *See* Office of Utah Lieutenant Governor, Deidre M. Henderson, State of Utah 2026 Candidate Manual at 6, https://vote.utah.gov/wp-content/uploads/2025/12/2026-Candidate-Manual.pdf; *see also* Utah Code § 20A-9-407 (describing the convention process for members of a qualified political party seeking the party's nomination for candidacy); *id.* § 20A-9-408 (describing an alternative signature gathering process for members of a qualified political party to qualify as the party's candidate for elective office).

18. The state's primary election occurs on June 23, 2026, *id.* at 7, but the party-led caucus and convention events—at which party convention nominated candidates for the primary ballot are selected—are much sooner.

This year, the Democratic and Republican Party caucuses are occurring on March 17, 2026, and the State Conventions (at which congressional nominees are selected) will occur on April 25, 2026.[18] In addition to selecting delegates to the county and state conventions, the parties elect precinct officers at the March 17 caucuses.[19] Utah's voting precincts are drawn by county clerks, approved by county legislative bodies, and ultimately approved by the Lieutenant Governor following congressional redistricting. *See* Utah Code § 20A-13-102.2(4).

The state's voting precincts form the basis of the political party's organizational system, and the basis for the precinct officer elections that will occur at the upcoming March 17 neighborhood caucuses.  For example, the Salt Lake County Democratic Party encourages people to run for precinct chairs and vice chairs, and links to maps of Salt Lake County's precincts maintained by the Salt Lake County Clerk.[20] Those precinct maps are the maps updated as of January 2026 to reflect the state's implementation of Map 1. *Id.* The Salt Lake County Democratic Party is actively encouraging those who wish to run for precinct officer or delegate to announce

---

[18]    *See, e.g.*, Salt Lake County Democratic Party, 2026 Caucus Night, https://www.slcountydems.com/caucusnight; Utah Republican Party, Precinct Portal, About Neighborhood Caucus Night, https://precinctportal.org/#about; Utah Republican Party, 2026 State Nomination Convention, https://www.utgop.org/2026_state_nominating_convention; *see also* Chambless Dec., Ex. 6, ¶ 12.

[19] *See supra* note 17.

[20]    *See, e.g.*, Salt Lake County Democratic Party, 2026 Caucus Night, https://www.slcountydems.com/caucusnight; Salt Lake County Clerk's Office, Precinct Maps, https://www.saltlakecounty.gov/clerk/elections/maps/precinct-maps/.

their candidacy and campaign to friends and neighbors within the precinct to garner support in advance of the March 17 caucus.[21]

Congressional campaigns are currently engaging with voters and supporters to encourage their attendance and precinct officer candidacy at the caucuses and to become delegates based on Map 1's boundaries (and corresponding precinct boundaries). For example, Sen. Blouin's campaign website states that his campaign is hosting delegate trainings on February 18, February 23, February 24, and March 5.[22] Former Congressman McAdams's campaign is hosting a training session for caucus night and delegates today (February 12), and an online session on February 17.[23]

## LEGAL STANDARD

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). For a preliminary injunction to be granted, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. When a preliminary injunction would "alter the status quo" or "afford the movant all the relief that it could recover" at the end of

---

[21]    *See* Salt Lake County Democratic Party, Caucus Night FAQs, https://www.slcountydems.com/caucusnight/caucusnightfaqs; *see also* Chambless Dec., Ex. 6, ¶¶ 13-14 (recognizing disruption a new congressional map would cause to the caucus campaigning process).

[22] *See* Nate Blouin for Congress, Events, https://www.nateforutah.com/events.

[23]    *See* Ben McAdams for Congress, Events, https://www.mobilize.us/benmcadamsforcongressut01/?end_date=2026-02-20T04%3A59%3A59.999Z&is_virtual_flexible=false&start_date=2026-02-12T05%3A00%3A00.000Z.

trial, it is "disfavored and require[s] a movant to satisfy a heightened standard." *State v. U.S. Environmental Protection Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021).

## ARGUMENT

### I.    Plaintiffs lack standing and issue preclusion bars this suit.

Plaintiffs lack standing, and issue preclusion bars their claim. LWV Intervenors have raised these arguments in their pending motion to dismiss and so do not repeat them here. But the declarations Plaintiffs submitted with their preliminary injunction motion do nothing to bolster their failure to plead facts sufficient to show standing. *See Lance v. Coffman*, 549 U.S. 437 (2007) (holding that plaintiffs who were not relators on behalf of the State had no Article III standing to challenge a state court-imposed congressional map Elections Clause theory).

Both Reps. Maloy and Owens testify: "I am more than happy to represent any group of Utahns. I joined this lawsuit to uphold my oath to support the Constitution of the United States and to protect the rights of all Utah voters to vote and to have the Legislature regulate congressional elections." ECF No. 19-12 ¶ 18 (Maloy Dec.); ECF No. 19-13 ¶ 17 (Owens Dec.). The Supreme Court's recognition of candidate standing to challenge vote-counting rules, *see Bost v. Ill. State Bd. of Elections*, 607 U.S. --, -- S. Ct. --, No. 24-568, 2026 WL 96707 (Jan. 14, 2026), does not extend to a candidate who is happy to run anywhere in the state but who thinks the law has not been followed (a generalized grievance). *See Lance*, 549 U.S. at 442. Moreover, both Reps. Maloy and Owens confirm in their declarations that their principal claimed harm is from the candidate filing deadline moving from January to March. ECF No. 19-12 ¶¶ 4-9 (Maloy Dec.); ECF No. 19-13 ¶¶ 4-9 (Owens Dec.). Map 1 did not change that deadline; the Legislature did.

They also assert their displeasure with aspects of Map 1's geography, county combinations, and changes from the prior map. ECF No. 19-12 ¶¶ 10-13 (Maloy Dec.); ECF No. 19-13 ¶ 12 (Owens Dec.). But those statements are belied by their repeated contention that their lawsuit is not about the substance of Map 1. *See, e.g.*, ECF No. 19 at 1 ("This redistricting case is not about the '*what*' but about the '*who*.'") (emphasis in original); *id.* ("This suit does not challenge the content of Map 1 . . . ."); *id.* at 15 ("[T]he suit here is a challenge to *who* created a redistricting map rather than a challenge to the substance of that map.") (emphasis in original).

Both similarly assert that they are injured by the partisan composition of the districts. ECF No. 19-12 ¶¶ 14-15 (Maloy Dec.); ECF No. 19-13 ¶¶ 10-11, 13 (Owens Dec.). But even if a law's potential effect on a candidate's electoral prospects constitutes a cognizable injury within the limited scope of *Bost*—*i.e.*, candidates' standing to challenge rules affecting the "counting of votes in their elections," 2026 WL 96707, at *5 n.7—it most certainly is not a cognizable Article III injury for redistricting claims, *see Rucho v. Common Cause*, 588 U.S. 684, 721 (2019) (holding that federal courts have no Article III jurisdiction to adjudicate disputes about the partisan composition of districts).

That leaves the bare assertion that the law has been violated and that Map 1 will harm their reputations. While reputational risk to a candidate whose vote share is decreased on account of vote-counting rules may be concrete and particularized, *see Bost*, 2026 WL 96707, at *3, the same can hardly be said about a candidate who runs for election under a court-ordered map and receives an accurate vote count. There is no plausible link to a concrete and particularized reputational injury in that scenario.

17

**II.    Plaintiffs' requested relief is foreclosed by the *Purcell* principle.**

Plaintiffs' motion for a preliminary injunction is also foreclosed by the *Purcell* principle. The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Bost*, 2026 WL 96707, at *4 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)). "Such late-breaking, court-ordered rule changes can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the '[c]onfidence in the integrity of our electoral processes . . . essential to the functioning of our participatory democracy.'" *Id.* (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam)).

The U.S. Supreme Court has repeatedly applied this principle to cases challenging redistricting maps. Most recently, on December 4, 2025, the Supreme Court granted a stay of a district court's order preliminarily enjoining Texas from using its new congressional map in the 2026 election. *See Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418 (2025). In doing so, the Court cited its *Purcell* principle and held that "[t]he District Court violated that rule here. The District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections." *Id.* at 419 (internal quotation marks omitted). In that case, the district court issued its injunction approximately four months before the primary election and eleven months before the November 2026 general election. *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2025 WL 3215715 (W.D. Tex. Nov. 18, 2025).

In *Merrill v. Milligan*, the Court granted a stay of a lower court's preliminary injunction against Alabama's use of its congressional map. 142 S. Ct. 879 (2002) (Mem.). Justice Kavanaugh,

joined by Justice Alito, issued a concurring opinion discussing the *Purcell* principle. "Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Id.* at 881 (Kavanaugh, J., concurring). "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Id.* Justice Kavanaugh set forth a test to determine whether a federal court plaintiff had overcome the *Purcell* principle:

> I would think that the *Purcell* principle [] might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are *entirely clearcut* in favor of the plaintiff, (ii) the plaintiff would suffer irreparable harm absent the injunction, (iii) the plaintiff has not *unduly delayed bringing the complaint to court*; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* at 881 (emphasis added). Justice Kavanaugh also highlighted the "preliminary juncture" as counseling in favor of applying *Purcell*. *Id.*  As the Court made clear in *Abbott*, and as Justice Kavanaugh explains, *Purcell* is a principle uniquely applicable to *federal courts* because of "the delicate federal-state balance in elections." *Abbott*, 146 S. Ct. at 419.[24]

LWV Intervenors address the merits below, *see infra* Part III, but far from being "clearcut" in Plaintiffs' favor, they are clearcut *against* them, *see also* LWV Intervenors' Mot. to Dismiss, ECF No. 50 at 10-22. And as LWV Intervenors explain above, *see supra* Part I; *see also* LWV Intervenors' Mot. to Dismiss, ECF No. 50 at 2-7, Plaintiffs have not demonstrated any injuries

---

[24] The federalism principle underlying *Purcell* does not apply in the state court context. For example, a late-breaking adoption of an illegal state election law or map would not preclude a state court from granting relief based on *Purcell*.

sufficient to support Article III standing and so assuredly have not shown irreparable harm. The final two factors outlined by Justice Kavanaugh are overwhelmingly against Plaintiffs—(1) they unduly delayed filing their Complaint, and (2) a switch from Map 1 to the 2021 Map is not feasible without significant cost, confusion, or hardship. Indeed, as LWV Intervenors explain below, *see infra* Part IV, Plaintiffs' requested relief is actually unlawful.

### A.    Plaintiffs unduly delayed filing their Complaint.

Plaintiffs unduly delayed filing their Complaint. The state district court issued its order adopting Map 1 on November 10, 2025. Plaintiffs waited until February 2, 2026—84 days—to file their Complaint, and they waited until February 7—89 days—to file their Preliminary Injunction Motion. After dragging their feet to file, Plaintiffs then asked the Court—which did not yet have a full complement of judges—to order that the motion be briefed, a hearing held, and decided by the Court in *one week*.[25] There is no possible excuse for this dilatory conduct, especially when what they ask is for a federal court to enjoin—in the midst of an active primary campaign—a state court's remedial map.

Plaintiffs contend, citing the Supreme Court's decision in *Growe v. Emison*, 507 U.S. 25, 30, 36 (1993), that they could not file suit until the state district court entered its Rule 54(b) final judgment on January 6, 2026. *See* ECF No. 49 at 7. That is not true. *Growe* held that state courts are best suited to judicially impose redistricting maps—including congressional maps—and that federal courts asked to do so must first defer to state courts and provide those state courts with a chance to act. 507 U.S. at 33-36. The *Growe* Court noted that the Minnesota state court had issued

---

[25] This request would have violated 28 U.S.C. § 2284(b)(2), which requires certified mail notice to the Governor and Attorney General at least 5 days prior to a hearing on the action.

a "final order adopting its legislative plan" on January 30, 1991, *id.* at 30, and held that the federal court erred by imposing its own contrary plan three weeks later, *id.* at 35. The Court explained that "*Germano* requires deferral, not abstention," *id.* at 37, and federal courts facing a plaintiffs' request to impose a map *can* "establish a deadline by which, [if the state court does not act], the federal court would proceed." *Id.* at 36.

Plaintiffs entirely misconceive *Growe*. To begin, they somehow miss the central point of *Growe*—that state courts are empowered to impose congressional maps. Their takeaway? Federal courts must allow state courts to impose congressional maps, must await a "judgment"—even if the state court already issued its order imposing the map—and then are required by the Constitution to immediately enjoin that map because state courts have no power to impose maps. This is nonsensical and not what *Growe* says.

In any event, the *Growe* Court was merely *describing* the type of order that the state court in Minnesota had entered (a "final order"). What mattered was not its *label*, but the fact that the state court had imposed a map. Here, that event occurred on November 10, 2025. Moreover, even if their interpretation of the "final order" language had merit (it does not), nothing stopped them from *filing* either their Complaint or preliminary injunction motion earlier so that interested parties, the Court, and the public could be on notice and able to respond to their claim under more reasonable circumstances that the current sprint. Federal courts are not stripped of jurisdiction under *Growe*. They simply are required to provide state courts with a reasonable opportunity to impose maps before the federal court imposes one itself. *Id.* at 37 ("*Germano* requires deferral,

21

not abstention."). Moreover, Plaintiffs offer no explanation for why they waited yet another month after the state district court's Rule 54(b) judgment was entered to file suit.[26]

Given that the election is underway—and Plaintiffs (two of whom are candidates)—*knew* that was so, their delay in filing this lawsuit is inexcusable and forecloses their motion under either *Purcell* or a traditional irreparable harm analysis. *See Kansas Health Care Ass'n v. Kansas Dep't of Soc. and Rehab. Servs.*, 31 F.3d 1536, 1453-44 (10th Cir. 1994) ("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm.").

### B.    It is not feasible to change congressional maps without significant cost, confusion, and hardship.

It is not feasible to change congressional maps without significant cost, confusion, and hardship. *See Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). As the Supreme Court held in *Abbott* two months ago—when Texas's primary elections were four months away and the general election eleven months away—there is currently an active primary campaign underway in Utah. *See supra* Background, Part VIII. Utah's June primary election is four months away, just as Texas's was when the Supreme Court stayed a district court's injunction. Candidates are campaigning, raising money, and spending money based upon Map 1's boundaries. *Id.* They are training their supporters to participate in the caucuses and conventions. *Id.* The caucuses—the

---

[26] Nor do they explain how the Rule 54(b) judgment with regard to the state district court's August 25 order somehow was the necessary trigger for their challenge to the November 10 order imposing Map 1.

functioning of which depends upon a stable identity of the State's voting precincts—are just *four weeks* away. A change in the precinct boundaries occasioned by a late-breaking federal court order would upend the party precinct officer campaigns as well as the congressional campaigns.

The Lieutenant Governor's notice, stating that at a "minimum" her office needs to know by February 23 if the Court is granting relief, is solely about the time needed to reassign voters to precincts and districts in the State's election management database. ECF No. 51 at 4. But the Supreme Court has not limited its *Purcell* doctrine to just the period needed to hurriedly rework the data file assigning voters. In *Abbott*, the district court's injunction against Texas's mid-decade congressional map ordered the State to implement the map it had used in 2022 and 2024—the same relief Plaintiffs seek here. *See League of United Latin Am. Citizens*, 2025 WL 3215715, at *69. At that time, the State was still implementing the old map for ongoing congressional special elections, *id.* at *63, unlike here, where Map 1 is already fully implemented. Yet the Supreme Court held nonetheless that the injunction violated *Purcell* because "[t]he District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections." *Abbott*, 146 S. Ct. at 419. That is precisely what Plaintiffs ask this Court to do.

Put simply, it is too late for a federal court to upend Utah's congressional map.

## III.    Plaintiffs are not likely to succeed on the merits.

Plaintiffs are neither likely to succeed on the merits nor are the merits anywhere close to "entirely clearcut in favor of the plaintiff." *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Rather, as LWV Intervenors explain at length in their motion to dismiss, ECF No. 50 at 10, Plaintiffs' claim is foreclosed by decades of Supreme Court precedent, and thus Plaintiffs'

Complaint should be dismissed without the Court ever reaching or ruling on Plaintiffs' preliminary injunction motion.

The state district court had both the power and obligation to impose a congressional map after enjoining both the 2021 Map and Map C. The Supreme Court has repeatedly said so. In *Growe*, the Court reiterated precedent dating to 1965: "The power of the judiciary of a State to require valid reapportionment or to *formulate a valid redistricting plan* has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged." 507 U.S. at 33 (quoting *Scott v. Germano*, 381 U.S. 407, 409 (1965) (per curiam)) (emphasis added). Federal courts, *Growe* held, may not "permit federal litigation to be used to impede" state courts that are in the process of imposing congressional maps. *Id.* at 34.

*Germano* and *Growe* adhere not just to basic principles of federalism and respect for the equitable remedial powers of state courts, but also to Congress's Elections Clause statutes. The Elections Clause confers superior authority on Congress over state legislatures in regulating congressional elections. *See* U.S. Const. art. I, § 4, cl. 1 (providing that "Congress may at any time by Law make or alter" state laws regulating congressional elections). In 1967, Congress passed 2 U.S.C. § 2c, which provides that "there shall be established by law a number of districts" and requires members of Congress to be elected from those districts, not from a state at large. 2 U.S.C. § 2c. By doing so, as the Supreme Court has held, Congress exercised its Elections Clause power to *require* courts—both federal and state—to impose single member congressional districts when situations arise in which a state's map is enjoined as unlawful and a legislative fix is either not forthcoming or there is insufficient time for one.

In *Branch v. Smith*, the Court held that the phrase "by law" in § 2c "embraces action by state and federal courts" to ensure a lawful congressional map is in place. 538 U.S. 254, 272 (2003). Congress passed this law, the Court reasoned, for the specific purpose of responding to the possibility that after enjoining unlawful congressional maps, courts might feel compelled by 2 U.S.C. § 2a(c) to impose at-large elections. *Id.* at 268-69. *That* statute—which had been passed a quarter century before § 2c—created fallback scenarios to govern congressional elections "[u]ntil a State is redistricted in the manner provided by the law thereof after any [Census]." 2 U.S.C. § 2a(c); *Branch*, 538 U.S. at 267. Among the possibilities were either using the prior-decade's map (*i.e.*, "the districts then prescribed by the law of such State"), electing representatives at large, or a combination of both. 2 U.S.C. § 2a(c)(1)-(5).

Congress did not want court-imposed at large elections, the *Branch* Court explained, and so it enacted 2 U.S.C. § 2c to ensure that when a court found that the state had not been "redistricted in the manner provided by the law thereof," 2 U.S.C. § 2a(c), it would be obligated to impose a congressional map with single-member districts, 2 U.S.C. § 2c; *Branch*, 538 U.S. at 268-72. And when it did so, the court would likewise be obligated to ensure its remedial map followed the "manner" of "the State's substantive 'policies and preferences' for redistricting, as expressed in a State's statutes, constitution, proposed reapportionment plans, or a State's 'traditional districting principles'" *Id.* at 277-78 (plurality) (quoting *White v. Weiser*, 412 U.S. 783, 795 (1973) and *Abrams v. Johnson*, 521 U.S. 74, 86 (1997)); *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 811-12 & n.20 (2015) ("*AIRC*") (explaining that, under § 2a(c), congressional maps are presumptively lawful when enacted "whether by the legislature, *court decree*, or a commission established by the people's exercise of the initiative." (emphasis

25

added)). "In sum," the *Branch* Court held, "§ 2c is as readily enforced by courts as it is by state legislatures, and is just as binding on courts—federal or state—as it is on legislatures." 538 U.S. at 272.

Here, the state district court first permanently enjoined the 2021 Map and preliminarily enjoined Map C. *See League of Women Voters August 2025 Order*, 2025 WL 2644292, at *53-58. It provided the Legislature with an opportunity to pass a map compliant with Proposition 4, and after a two-day evidentiary hearing concluded that it failed to do so with respect to nearly every requirement of the law. *See League of Women Voters November 2025 Order*, 2025 WL 3145894, at *48-58. The Lieutenant Governor's November 10 deadline for a map was upon the state district court. So the court did *precisely* what *Germano*, *Growe*, *Branch*, and 2 U.S.C. §§ 2a(c) & 2c require—it imposed a single-member district congressional map that complied with Utah's substantive redistricting law, Proposition 4.

In fact, the *exact* scenario in which the state district court found itself was described by the *Branch* court as a hypothetical supporting its holding. The *Branch* Court observed that if § 2c were interpreted *not* to apply to judicial redistricting, then the following could occur: a state may have failed to enact a lawful redistricting map and the fallback scenario called for by § 2a(c)(1)—using the prior decade's map—would be triggered. But that fallback provision, if followed, would yield a one-person, one vote constitutional violation, one the court would be "congressionally forbidden to act" upon. 538 U.S. at 272. The Court concluded that such an outcome was not plausibly Congress's intent and thus held that § 2c requires judicial enforcement. *Id.* Here, because the Legislature failed, when given yet another chance, to enact a legally-compliant map, the state district court found itself left with no map other than the 2011 map, which the parties agreed was

unconstitutionally malapportioned. *League of Women Voters November 2025 Order*, 2025 WL 3145894, at *59. It then acted exactly as *Branch* held it must—by imposing a lawful remedial map.

Plaintiffs and the Legislature raise several arguments in support of a preliminary injunction. None has merit.

*First,* Plaintiffs contend (at 19-20, 23) that the state district court "exceed[ed] the bounds of ordinary judicial review," *Moore v. Harper*, 600 U.S. 1, 37 (2023), by imposing a remedial map based on their proffered interpretation of Article IX of the Utah Constitution and Proposition 4's provision that permits the Legislature to "enact a new or alternative redistricting plan" following an injunction. ECF No. 19 at 23 (quoting Utah Code § 20A-19-301(8)). This both misconstrues Utah law and is irrelevant.

Article IX of the Utah Constitution provides that "[n]o later than the annual general session next following the Legislature's receipt of the results of [the Census], the Legislature shall divide the state into congressional, legislative, and other districts accordingly." Utah Const. (, § 1. As the district court ruled, this is not an exclusive font of power in the Legislature, but rather a *temporal limitation* that merely requires the Legislature to act on a certain timetable. *League of Women Voters August 2025 Order*, 2025 WL 2644292, at *37. That interpretation does not "exceed the bounds of ordinary judicial review," *Moore*, 600 U.S. at 37, because that is precisely how the U.S. Supreme Court has interpreted such provision.

In *Lawyer v. Department of Justice*, the Supreme Court rejected an argument that Article III, § 16 of the Florida Constitution—nearly identical to the Utah provision—"provides the exclusive means by which redistricting can take place." 521 U.S. 567, 577 n.4 (1997). The Court

explained that "This article in terms provides only that the state legislature is bound to redistrict within a certain time after each decennial census, for which it may be required to convene." *Id.*

Similarly, in *Growe*, the Supreme Court held that Minnesota's state court must be permitted to impose a congressional maps, without concern that Minnesota's Constitution provides that "[a]t its first session after each enumeration . . . the legislature shall have the power to prescribe the bounds of congressional and legislative districts." Minn. Const. art. IV, § 3. If the Supreme Court did not exceed the ordinary bounds of judicial review in holding that the Minnesota state court should have had its power to impose a congressional map respect, then neither did the state district court here.

Moreover, the state district court correctly rejected Plaintiffs' contention that by permitting the Legislature to pass a new map after an injunction is issued, Proposition 4 somehow precludes a court from imposing a remedy in the absence of a lawful, timely-enacted map. *See League of Women Voters November 2025 Order*, 2025 WL 3145894, at \*59. The court observed that Proposition 4 permits redistricting to occur "upon the issuance of a permanent injunction or to conform with the final decision of a court . . . without limiting that function to the Legislature." *Id.* (citing Utah Code § 20A-19-102(3) & (4)). Likewise, the court reasoned that Article I, Section 11 of the Utah Constitution authorized a judicial redistricting remedy by guaranteeing a "remedy by due course of law" for an "injury done to the person." *Id.* at \*60. The court did not exceed the ordinary bounds of judicial review in reaching this conclusion because the Oklahoma Supreme Court reached the exact same conclusion about its parallel provision authorizing a court-imposed remedial map. *See Alexander v. Taylor*, 51 P.3d 1204, 1208-10 (Okla. 2002).

In any event, even if this Court thought Plaintiffs had the better interpretation of Article IX or Proposition 4, it is impossible to conclude that the state district court's interpretation of state law, for example, "impermissibly distorted" state law "beyond what a fair reading required." *Moore*, 600 U.S. at 38 (Kavanaugh, J., concurring) (quoting *Bush v. Gore*, 531 U.S. 98, 115 (2000) (Rehnquist, C.J., concurring)).

Regardless, the question about whether Utah law envisions a court-imposed map is not dispositive because, as the state district court explained, the deadline for a map to be in place had arrived, there was no lawful legislatively-enacted map, and the prior decade's map was unconstitutionally malapportioned under both the Utah and United States Constitutions. *League of Women Voters November 2025 Order*, 2025 WL 3145894, at *59. Citing its obligation to comply with 2 U.S.C. § 2c, the district court concluded it had the duty to impose a lawful congressional map. *See id.* ("[T]he Court is not remedying only a violation of Proposition 4 at this point."). That is exactly what *Branch* held that state courts are bound to do, and complying with Congress's Elections Clause statutes cannot conceivably offend the Elections Clause.

*Second*, Plaintiffs (at 8, 22) and the Legislature (at 1) object that the state district court imposed a map proposed by LWV Intervenors, rather than by the Legislature or a special master. But doing so did not exceed the bounds of ordinary judicial review because courts routinely select maps from among parties' submissions. In fact, that was the exact process the Minnesota state court had devised for selecting a congressional map in *Growe*—a process the Supreme Court held the federal court erred by not respecting. 507 U.S. at 30, 36; *see also, e.g.*, *Avaolos v. Davidson*, No. 01 CV 2897, 2002 WL 1895406, at *1 (Colo. Dist. Ct. Jan. 25, 2002), *aff'd sub nom. Beauprez v. Avalos*, 42 P.3d 642 (Colo. 2002) (ordering use of plaintiffs' proposed map); *Bone Shirt v.*

*Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (holding that a district court may "fashion its own remedy or, as here, adopt a remedial plan proposed by the plaintiffs.").

*Third*, both Plaintiffs (at 22, 26) and the Legislature (at 6, 11-13) repeatedly contend that the state district court enjoined the 2021 Map without finding that it violated the law. That is false. The state district court explained at *length* how the 2021 Map was part of the violation of LWV Intervenors' Alter or Reform Clause rights under Article I, Section 2 of the Utah Constitution *and* how it violated multiple provisions of Proposition 4. *League of Women Voters August 2025 Order*, 2025 WL 2644292, at *53-58; *see also supra* Background, Part II. The court also considered and rejected the argument the Legislature advances here (at 11-12) that Count V of LWV Intervenors' state court complaint "never encompassed a challenge to the 2021 Congressional Plan."

"This is not true," the state district court ruled. *League of Women Voters August 2025 Order*, 2025 WL 2644292, at *56. Indeed, it is remarkable that the Legislature would use the phrase "never encompassed" in its amicus brief considering that the Utah Supreme Court characterized LWV Intervenors' Count V as "encompass[ing]" exactly that. *See League of Women Voters I*, 2024 UT 21, ¶ 61 (explaining that "Count V . . . is the broadest claim, *encompassing both matters at issue in this case*: [LWV Intervenors'] challenge to the redistricting process that led to the Congressional Map *and their challenge to the Congressional Map itself.*" (emphasis added)). Plaintiffs and the Legislature cannot simply make that which is false become true by repeating it enough times.[27]

---

[27] The Legislature bizarrely contends (at 12-13) that it was "precluded . . . from litigating the merits of the 2021 Congressional Plan's validity *and* the proper remedy for any defect in the 2021 Congressional Plan." But that was a major subject of the state court summary judgment proceeding, and a major subject of the state district court's summary judgment ruling. *See League of Women Voters August 2025 Order*, 2025 WL 2644292, at *55-58. Apparently, the Legislature now contends that adjudicating a summary judgment motion exceeds the bounds of ordinary

Indeed, the Legislature's entire "Argument" section of its amicus brief has nothing to do with the sole legal claim that is the subject of Plaintiffs' preliminary injunction motion. The Legislature's Argument header (at 9) is: "The state court's order permanently enjoining the use of the Legislature's 2021 Congressional Plan exceeds the bounds of ordinary judicial review." But Plaintiffs expressly *disclaim* that their Elections Clause claim, or their motion for a preliminary injunction, attacks the propriety of the state district court's orders enjoining the Legislature's 2021 Map or Map C. *See* ECF No. 19 at 2 ("Nor is this a challenge to a state court decision. Rather, this suit challenges Defendant's acquiescence to a state court's purported *remedy* of imposing on Utah a map . . . ."); ECF No. 1 ¶ 82. The Legislature's arguments all belong where they are currently being litigated—on appeal at the Utah Supreme Court, and not before this Court.

*Fourth*, the Legislature objects (at 14) that the 2021 Map was enjoined in part because it violated Proposition 4's procedural requirements but the district court's remedial map did not undergo those procedures. Their quarrel is with Proposition 4, not the district court's adherence to the Elections Clause. The plain text of Proposition 4 applies those procedures to maps enacted by the Legislature, not when redistricting occurs in response to a court order. *See* Ex. 5 at 3-4 (Sep. 6, 2025 Amended Ruling and Order Adopting the Parties' Scheduling Order and Clarifying the Court's August 25, 2025 Ruling). They do not contend otherwise.

Plaintiffs are not likely to succeed on the merits. Indeed, the case should be dismissed without addressing their motion for a preliminary injunction.

---

judicial review. *See contra* Fed. R. Civ. P. 56; Utah R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**IV.    This Court has no power to impose the illegal remedy Plaintiffs seek.**

The Court cannot grant the relief Plaintiffs seek because it is illegal. Despite the premise of their lawsuit being that courts cannot impose maps, Plaintiffs ask this Court to order the Lieutenant Governor to impose a map that has been adjudicated to violate the Utah Constitution and Proposition 4, that is statutorily inoperative, and that is the subject of a state court injunction that *Plaintiffs do not challenge*. Accepting Plaintiffs' invitation would be egregious error.

Plaintiffs contend (at 25) that federal law requires this Court to declare the 2021 Map in effect. Not so. The statute they cite provides that "[u]ntil a State is redistricted in the manner provided by the law thereof after [the Census]," members of Congress "shall be elected from the districts then prescribed by the law of such State." 2 U.S.C. § 2a(c). There are several problems with Plaintiffs' argument.

*First*, the 2021 Map is permanently enjoined and is thus *not* the map currently "prescribed by the law of [Utah]." 2 U.S.C. § 2a(c); *see Branch*, 538 U.S. at 272 (holding that "by law" in the statute "embraces action by state and federal courts."). Plaintiffs disclaim that their lawsuit challenges the state district court's injunctions against either the 2021 Map or Map C. *See* ECF No. 19 at 2 ("Nor is this a challenge to a state court decision. Rather, this suit challenges Defendant's acquiescence to a state court's purported *remedy* of imposing on Utah a map . . . ."); ECF No. 1 ¶ 82. While the state district court reasoned that the operative legal effect of its injunctions might be to revive the 2011 map, *see League of Women Voters November 2025 Order*, 2025 WL 3145894, at *59, it correctly ruled that doing so would violate both the Utah and United States Constitution, *id.* Thus, following exactly the *Branch* Court's command, it enforced 2 U.S.C. § 2c and imposed a lawful congressional map.

*Second*, the 2021 Map is not currently "prescribed by the law of [Utah]" even if that phrase were limited to statutory law (it is not). When the Legislature enacted Map C, it expressly provided that the 2021 Map is inoperative when it is (1) enjoined by a court and (2) Proposition 4 is in effect. *See* Utah Code § 20A-13-101.1 (establishing the 2021 Map (H.B. 2004) as Utah's congressional map "except . . . during a period in which" the 2021 Map is enjoined and Proposition 4 is in effect). Both conditions that make the 2021 Map inoperative as a matter of Utah law currently exist: the 2021 Map is currently permanently enjoined and Proposition 4 is currently in effect. Map C— which *is* the congressional map that the Utah *Code* establishes as the operative map—has also been enjoined and Plaintiffs do not challenge that injunction or ask this Court to declare Map C in effect, and the Lieutenant Governor has made clear that Map C is not a viable option to be implemented at this late date. *See* ECF No. 51.

*Third*, as Justice Scalia explained in *Branch*, "redistricted in the manner provided by law" in § 2a(c) requires courts to impose maps that comply with a state's substantive redistricting law. 538 U.S. at 278 (plurality). Neither Map C nor the 2021 Map does that.[28] But as the state district court found—and as no one has disputed in this case—Map 1 complies with Proposition 4 and 2 U.S.C. § 2c. Plaintiffs offer no explanation for how this Court could legally order the State to use

---

[28] Contrary to Plaintiffs' and the Legislature's contention, the state district court found as much. Although the 2021 Map was already enjoined by the time of the remedial hearing, its contours were part of the record as a comparative matter in the court's map assessments. As LWV Intervenors explain above, *see supra* Background, Part IV, the state district court made several findings about the 2021 Map's violations of Proposition 4's substantive requirements, including its four-way split of Salt Lake County and its unlawful partisan favoritism. In fact, its violations were so obvious the Legislature's expert witness, who was also the out-of-state map drawer of Map C, admitted that the 2021 Map violated Proposition 4. *See id.*

33

a map that has been adjudicated to *violate* state law in place of one that has been adjudicated to *comply* with state law.

*Fourth*, Plaintiffs offer no explanation for how this Court could simply "declare" that the 2021 Map is in effect when doing so would contravene a state court injunction that *Plaintiffs do not claim was unlawful*. *See, e.g.*, *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.") (internal quotation marks and citation omitted). Plaintiffs cannot ask this Court to override a state court injunction prohibiting the use of a congressional map when they do not even allege that the injunction was unlawful.

## V.    The remaining injunction factors compel denial of the motion.

### A.    Plaintiffs face no irreparable harm.

Plaintiffs face no irreparable harm in the absence of an injunction. First, as LWV Intervenors explain above, Plaintiffs have not shown they suffered an Article III injury. Instead, they have pled various generalized grievances about a question of federal law. Rep. Maloy's and Owens's assertion that some voters who dislike Map 1 would actually blame *them* for its imposition, and thus view their reputation less favorably, falls far short of the standard for irreparable harm. *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Even if the attenuated harms Plaintiffs allege crossed the Article III line, they do not satisfy the standard for injunctive relief. Second, Plaintiffs' extraordinary delay in filing this suit and motion for preliminary injunction severely undercuts any claimed irreparable harm. *See*

*Kansas Health Care Ass'n*, 31 F.3d at 1453-44 ("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury.").

### B.    The balance of equities and public interest favor LWV Intervenors.

Finally, the balance of equities and public interest favor LWV Intervenors. Well past the last minute, Plaintiffs collaterally attack LWV Intervenors' state court victory and seek to force Utahns to vote under a congressional map that, after years of state court litigation, has been ruled to violate both the Utah Constitution and Proposition 4. Their request to do so would severely disrupt ongoing primary campaigns and neighborhood campaigning across the state for political party precinct offices, with the party caucuses just four weeks away.

At bottom, what Plaintiffs seek is for a federal court to command the State to disregard a state court injunction against an illegal map—despite no party to this case contesting the validity of the state court order enjoining that map—and replace a map that has been adjudicated to *comply* with the law with one that has been adjudicated to *violate* the law. Utahns voted for Proposition 4 eight years ago and are only now seeing the law they enacted be enforced. They successively suffered the Legislature repealing that law, attempting to mislead them at the ballot box into surrendering their constitutional right to alter or reform their government, and afterwards enacting a new map—Map C—that was so obviously illegal that Plaintiffs and the Legislature have entirely abandoned it.

The public interest is served by Utah voters casting their ballots under a map that complies with the law they enacted to reform redistricting in the state, not one that was the ill-gotten product of the Legislature's unconstitutional repeal of Proposition 4.

## CONCLUSION

The Court should not even address Plaintiffs' motion. Plaintiffs' lawsuit should be dismissed under Rules 12(b)(1), 12(b)(6), or at the very least stayed. Under any of those circumstances, the appropriate course is not to reach or rule upon Plaintiffs' preliminary injunction motion. But if the Court does reach the motion, it should be denied.

RESPECTFULLY SUBMITTED this 12th day of February 2026.

/s/ *David C. Reymann*

**PARR BROWN GEE & LOVELESS**
David C. Reymann
Cheylynn Hayman
Kade N. Olsen

**CAMPAIGN LEGAL CENTER**
Mark P. Gaber
Annabelle Harless
Aseem Mulji
Benjamin Phillips
Isaac DeSanto

**ZIMMERMAN BOOHER**
Troy L. Booher
J. Frederic Voros, Jr.
Caroline Olsen

*Attorneys for Proposed Intervenors*