# EXHIBIT B

**IN THE THIRD JUDICIAL DISTRICT COURT**

**IN AND FOR SALT LAKE COUNTY, STATE OF UTAH**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF UTAH, MORMON WOMEN FOR ETHICAL GOVERNMENT, STEFANIE CONDIE, MALCOLM REID, VICTORIA REID, WENDY MARTIN, ELEANOR SUNDWALL, JACK MARKMAN, and DALE COX, | **RULING AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | **AND** |
| | **DENYING LEGISLATIVE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UTAH STATE LEGISLATURE; UTAH LEGISLATIVE REDISTRICTING COMMITTEE; SENATOR SCOTT SANDALL, in his official capacity; REPRESENTATIVE BRAD WILSON, in his official capacity; SENATOR J. STUART ADAMS, in his official capacity; and LIEUTENANT GOVERNOR DEIDRE HENDERSON, in her official capacity, | Case No. 220901712 |
| | Judge Dianna M. Gibson |
| Defendants. | |

1

The Utah Supreme Court's July 11, 2024 ruling in *League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶¶ 200-219, 554 P.3d 872, 917-22, reinstated Count V, established the legal standard this Court must apply and remanded Count V back to this court with instructions. On August 28, 2024, Plaintiffs filed a Motion for Summary Judgment on Count V (*Pls.' Mot.*, Dkt. 293.), asserting that the Legislative Defendants violated article I, section 2 of the Utah Constitution by repealing the Utah Independent Redistricting Commission and Standards Act, *see* Utah Code §§ 20A-19-101 to -301 (2018) ("Proposition 4") and replacing it with S.B. 200, the Legislature's version of the Utah Independent Redistricting Commission and Standards Act, *see* Utah Code §§ 20A-20-101 to -303 (2020) ("S.B. 200"). On November 8, 2024, the Legislative Defendants filed a combined Opposition to Plaintiffs' Motion and a Cross-Motion for Summary Judgment on Count V, asserting among other things, that Proposition 4 was not a proper exercise of the people's initiative and alter-or-reform powers and that S.B. 200 does not impair or infringe the people's rights. (*Leg. Defs.' Opp'n / Cross MSJ*, Dkt. 405.) On November 22, 2024, Plaintiffs filed their Opposition to the Legislative Defendants' Cross Motion for Summary Judgment and its Reply in support of its own Motion. (*Pls' Reply*, Dkt 425.). On December 6, 2024, the Legislative Defendants filed their Reply in support of their Cross-Motion for Summary Judgment (*Leg. Defs.' Reply,* Dkt. 436.). On January 31, 2025, the Court heard oral argument on the parties' respective motions. On March 31, 2025, this Court requested supplemental briefing. Plaintiffs filed their Supplemental Brief in Support of Motion for Summary Judgment on Count V on April 4, 2025. (*Pls' Suppl. Br.*, Dkt. 455.) The Legislative Defendants filed their Response to Plaintiffs' Supplemental Remedies Brief on April 11, 2024, (*Leg. Defs.' Suppl. Resp. Br.*, Dkt. 457) and Plaintiffs filed their Supplemental Reply Brief on April 15, 2025. (*Pls' Suppl. Reply Br.*, Dkt. 459.)

The core issue before the Court is whether the Utah State Legislature's enactment of S.B. 200 unconstitutionally impaired Proposition 4, a citizen initiative designed to reform the redistricting process in Utah and prohibit partisan gerrymandering. Plaintiffs argue that S.B. 200 impaired the people's fundamental constitutional right to alter or reform their government by eliminating Proposition 4's core reform provisions. The Legislative Defendants contend that Proposition 4 and its mandatory requirements are unconstitutional, which necessitated the changes reflected in and addressed by S.B. 200.

The parties filed cross-motions for summary judgment. While they dispute the characterizations, implications and relevance of the various facts asserted by the parties, they all agree that the material facts are not in dispute and that the issues presented can be decided as a matter of law. The question before the Court: does S.B. 200 satisfy strict scrutiny under the new legal standard established by the Utah Supreme Court in *League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, 554 P.3d 872 ("LWVUT"). For the reasons stated below, the Court concludes – as a matter of law – that it does not.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." U.R.C.P. 56(a). "[T]he moving party always bears the burden of establishing the lack of a genuine issue of material fact." *Salo v. Tyler*, 2018 UT 7, ¶¶ 2, 26, 417 P.3d 581.

The purpose of summary judgment *is to eliminate the time, trouble and expense of trial when upon <u>any view taken</u> of the facts as asserted by the party ruled against, he would not be entitled to prevail*. Only when it so appears, is the court justified in refusing such a party the opportunity of presenting his evidence and attempting to persuade the fact trier to his views. And if there is any dispute as to any issue, material to the settlement of the controversy, summary judgment should not be granted.

*Holbrook Co. v. Adams*, 542 P.2d 191, 193 (Utah 1975) (emphasis added).

In considering whether summary judgment is appropriate, this Court must objectively evaluate whether a genuine issue of material fact exists. *Clegg v. Wasatch County*, 2010 UT 5, ¶ 15, 227 P.3d 1243. "A genuine issue of fact exists where, on the basis of the facts in the record, reasonable minds could differ." *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 8, 286 P.3d 301 (citation and quotations omitted). All doubts, uncertainties or inferences concerning issues of fact are resolved in a light most favorable to the party opposing summary judgment. *Mountain States Tel. & Tel. Co. v. Atkin, Wright & Miles, Chartered*, 681 P.2d 1258, 1261 (Utah 1984). Evidence cannot be weighed, credibility cannot be determined and the Court cannot "find" facts that are at issue. *Carr v. Bradshaw Chevrolet Co.*, 464 P.2d 580, 581 (Utah 1970). In addition, inadmissible evidence is not considered on summary judgment and such evidence is insufficient to create a genuine dispute of material fact. *D & L Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989).

This objective standard considers whether there is only one conclusion that can be reached, *Clegg*, 2010 UT 5, ¶ 15, that effectively precludes, as a matter of law, awarding any relief to the other party. *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 24, 70 P.3d 904 (citations omitted).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Both parties agree that there are no genuine disputes of material fact, precluding summary judgment.[1] The undisputed facts material to the Court's legal analysis focus on the statutes enacted under both Proposition 4 and S.B. 200. The following are the undisputed material facts:

---

[1] In response to Plaintiffs Motion for Summary Judgment, Defendants assert that Plaintiffs' statement of material undisputed facts is incomplete and mischaracterizes certain aspects of Proposition 4. (*Leg. Defs.' Opp'n / Cross MSJ* at 3.) They however admit that "[n]ot one of these factual disputes is material to the discrete constitutional issue before the Court." (*Id.*) In opposition to Plaintiffs' Motion for Summary Judgment and in support of their own Cross-Motion, the Legislative Defendants also provide a Statement of Undisputed Material Facts. In reviewing Plaintiffs' response, Plaintiffs assert many of the facts are irrelevant to the issues before the Court and they dispute the inclusion of what they characterize as legal assertions included as "facts." Nonetheless, Plaintiffs similarly agree that "*none of these factual disputes are material nor do they bar this Court from deciding the issue before it, which turns on questions of law.*" (*Pls.' Reply* at 2.)

1. In the November 2018 election, voters in Utah were presented with the question of whether to approve the Utah Independent Redistricting Commission and Standards Act—numbered Proposition 4 and popularly named Better Boundaries ("Proposition 4").

2. Proposition 4 was a citizen initiative that would, if supported by a majority of voters in Utah, enact a statute governing certain processes related to how the Utah Legislature creates and adopts congressional redistricting plans.

3. As stated in the impartial analysis section of Proposition 4 in the 2018 Voter Information Pamphlet:

> Proposition 4 affects redistricting in Utah in three main ways: (1) it creates a seven-member appointed commission to participate in the process of formulating redistricting plans; (2) it imposes requirements on the Legislature's redistricting process; and (3) it establishes standards with which redistricting plans must comply."

*(See 2018 Voter Information Pamphlet,* Defs.' Ex. A, Dkt. 406, p. 5.*)*

4. That section further described the status of Utah's redistricting laws in 2018 and the Legislature's historical redistricting practices:

> Under current law, the Legislature performs redistricting according to a process it defines internally, with no limitations or requirements imposed by state law. *The Legislature's past redistricting process has included opportunities for the public to submit redistricting plans, a legislative redistricting committee to adopt redistricting standards and recommend plans, the posting of plans on the Legislature's website, and public hearings around the state.*

*(Id.* at 6 (emphasis added).)

5. On November 6, 2018, a majority of Utah voters supported Proposition 4, and, upon its passage, Proposition 4 was codified at Utah Code §§ 20A-19-101 to 301 (2018).

## Proposition 4

6. Proposition 4 established the Utah Independent Redistricting Commission, a nonpartisan advisory group that would be charged with preparing and presenting congressional district redistricting plans to the Legislature. *Id.*, § 20A-19-201 (2018).

7. Proposition 4 placed certain eligibility requirements for its members that would restrict membership to individuals who, for at least four years before their appointment, have not acted as a lobbyist as defined under Utah Code § 36-11-102, been a candidate for or holder of elected office, a candidate for or holder of any position in a political party, was appointed by the Governor or Legislature for any other public office, or was employed by

the U. S. Congress or the holder of any position that reports directly to an elected official or a political appointee of the Governor or Legislative. *Id*., § 20A-19-201(6)(b)(i)-(v) (2018).

8. Proposition 4 also included the requirement that each member sign and submit to the Governor a signed statement certifying, among other things, that the member "will not engage in any effort to purposefully or unduly favor or disfavor any incumbent elected official, candidate or prospective candidate for elective office, or any political party." *Id*., § 20A-19-201(7)(a)(iv).

9. It also included a provision to fund the Commission so it could carry out its statutory duties. Section 20A-19-201(12)(a) – (c) provides:

> (12)(a) The Legislature shall appropriate adequate funds for the Commission to carry out its duties, and shall make available to the Commission such personnel, facilities, equipment, and other resources as the Commission may reasonably request.
>
> (b) The Office of Legislative Research and General Counsel shall provide technical staff, legal assistance, computer equipment, computer software, and other equipment and resources to the Commission that the Commission reasonably requests.
>
> (c) The Commission has procurement and contracting authority, and upon a majority vote, may procure the services of staff, legal counsel, consultants, and experts, and may acquire the computers, data, software, and other equipment and resources that are necessary to carry out its duties effectively.

*Id*. § 20A-19-201(12)(a)-(c).

10. Proposition 4 required *both* the Legislature and the Commission to follow the following redistricting standards "to the greatest extent practicable and in the following order of priority:

   a. adhering to the Constitution of the United States and federal laws, such as the Voting Rights Act, 52 U.S.C. Secs. 10101 through 10702, including, to the extent required, achieving equal population among districts using the most recent national decennial enumeration made by the authority of the United States;
   b. minimizing the division of municipalities and counties across multiple districts, giving first priority to minimizing the division of municipalities and second priority to minimizing the division of counties;
   c. creating districts that are geographically compact;
   d. creating districts that are contiguous and that allow for the ease of transportation throughout the district;
   e. preserving traditional neighborhoods and local communities of interest;

      f.   following natural and geographic features, boundaries, and barriers; and

      g.  maximizing boundary agreement among different types of districts.

*Id*. § 20A-19-103(2).

12. In addition, Proposition 4 included an express prohibition on partisan gerrymandering and specified the situations in which the Legislature and Commission could consider partisan information, stating:

> (3) *The Legislature and the Commission may not divide districts in a manner that purposefully or unduly favors or disfavors any incumbent elected official, candidate or prospective candidate for elective office, or any political party*.

> (4) The Legislature and the Commission shall use judicial standards and the best available data and scientific and statistical methods, including measures of partisan symmetry, to assess whether a proposed redistricting plan abides by and conforms to the redistricting standards contained in this Section, including the restrictions contained in Subsection (3).

> (5) Partisan political data and information, such as partisan election results, voting records, political party affiliation information, and residential addresses of incumbent elected officials and candidates or prospective candidates for elective office, may not be considered by the Legislature or by the Commission, except as permitted under Subsection (4).

*Id*. § 20A-19-103(3)-(5) (2018) (emphasis added).

11. Using the requirements and standards established by Proposition 4, the Commission would create and select up to three redistricting plans, for each map type, to be submitted to the Legislature for consideration. *Id*. § 20A-19-204(1)(a) (2018). The statute required that the recommended maps be submitted, to the greatest extent possible, at least 10 days prior to the date on which the Legislature votes on a redistricting plan. *Id*. § 20A-19-204(1)(b).

12. After receiving the recommended maps, "[t]he Legislature shall either enact without change or amendment, other than technical corrections such as those authorized under Section 36-12-12, or reject the Commission's recommended redistricting plans submitted to the Legislature." *Id*. § 20A-19-204(2)(a) (2018).

13. Prior to the enactment of *any* redistricting plan, whether recommended by the Commission or one of the Legislature's own making, Proposition 4 stated: "[t]he Legislature may not enact a redistricting plan or modification of any redistricting plan unless the plan or modification has been made available to the public by the Legislature, including by making it available on the Legislature's website, or other equivalent electronic platform, for a period of no less than 10 calendar days and in a manner and format that allows the public to assess the plan for adherence to the redistricting standards

and requirements contained in this chapter and that allows the public to submit comments on the plan to the Legislature." *Id.* § 20A-19-204(4) (2018).

14. If the Legislature rejects the Commission's proposed redistricting plans, Proposition 4 allows the Legislature to enact a redistricting plan of its own but requires that, "no later than seven calendar days after its enactment the Legislature shall issue to the public a detailed written report setting forth the reasons for rejecting the plan or plans submitted to the Legislature …[including] a detailed explanation of why the redistricting plan enacted by the Legislature better satisfies the redistricting standards and requirements contained in this chapter." *Id.* § 20A-19-204(5)(a).

15. Proposition 4 also stated that redistricting is permitted "no later than the first annual general legislative session after the Legislature's receipt of the results of a national decennial enumeration made by the authority of the United States." *Id.* § 20A-19-102(1).[2]

16. Finally, Proposition 4 included a private right of action that would allow Utah residents to challenge any redistricting plans enacted by the Legislature as noncompliant with Proposition 4's requirements. *Id.* § 20A-19-301 (2018).

17. Proposition 4's enforcement mechanism provided:

> if a court of competent jurisdiction determines in any action brought under this Section that a redistricting plan enacted by the Legislature fails to abide by or conform to the redistricting standards, procedures, and requirements set forth in this chapter, the court shall issue a permanent injunction barring enforcement or implementation of the redistricting plan. In addition, the court may issue a temporary restraining order or preliminary injunction that temporarily stays enforcement or implementation of the redistricting plan at issue if the court determines that:
> (a) the plaintiff is likely to show by a preponderance of the evidence that a permanent injunction under this Subsection should issue, and
> (b) issuing a temporary restraining order or preliminary injunction is in the public interest.

*Id.* § 20A-19-301(2)(a)-(b) (2018).

18. If a plaintiff is successful in obtaining relief under this section, Proposition 4 provides that

> the court shall order the defendant in the action to promptly pay reasonable compensation for actual, necessary services rendered by an attorney, consulting or testifying expert, or other professional, or any corporation, association, or other entity or group of other persons, employed or engaged by

---

[2] Of note, Section 20A-19-102 is titled "Permitted Times and Circumstances for Redistricting." It also lists four other circumstances when redistricting may occur. Those four other circumstances have not been challenged.

the plaintiff, and to promptly reimburse the attorney, consulting or testifying expert, or other professional, or any corporation, association, or other entity or group of other persons, employed or engaged by the plaintiff for actual, necessary expenses. If there is more than one defendant in the action, each of the defendants is jointly and severally liable for the compensation and expenses awarded by the court.

*Id.*, § 20A-19-301(5) (2018).

19. If the court determines that a plaintiff's suit under this section was brought for an improper purpose, the claims are frivolous or not warranted under the law, or the plaintiff's factual claims lack evidentiary support (and such evidence is not likely to result after further discovery or investigation ), Proposition 4 permits the Court to order that the plaintiff pay the "actual, necessary services" and the "actual, necessary expenses" for attorneys, consulting or testifying experts, or other entities employed or engaged by the defendant in defending the suit. *Id.*, § 20A-19-301(6)(a)-(c) (2018).

## S.B. 200

20. In March 2020, the Legislature enacted S.B. 200,[3] which repealed Proposition 4 in its entirety and replaced it with a new law, codified at Utah Code §§ 20A-20-101 to 303 (2020) and available online at *https://le.utah.gov/~2020/bills/static/SB0200.html.*

21. Like Proposition 4, S.B. 200 created an advisory independent redistricting Commission, but it altered the structure of the commission, membership requirements, and the redistricting plan selection process. *Id.*, § 20A-20-201 (2020).

22. S.B. 200 included the membership requirements set forth in paragraph 7 above but removed the requirement that appointees must have met those requirements for at least four years prior to appointment on the commission. *Id.*, § 20A-20-201(5)(a)-(g) (2020).

23. S.B. 200 also removed the requirement that commission members submit a signed statement to the Governor stating that the member will not engage in partisan gerrymandering. *Id*., § 20A-20-201(7) (2020).

---

[3] Based on representations made by the Legislative Defendants, they assert S.B. 200 was an attempt to strike a compromise between the "spirit" of Proposition 4 and what the Legislature viewed to be an unconstitutional intrusion into their exclusive redistricting authority. The Legislative Defendants include numerous quotes of statements made by several people regarding Proposition 4 and S.B. 200, including what people thought or believed about each and what they believed each were intended to accomplish. To the extent that the statements are offered for the truth of the matter, those statements are inadmissible as hearsay, which cannot be used to create a dispute of material fact on summary judgment. *D & L Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989). Further, these various representations made regarding what others think or believe about S.B. 200 and Proposition 4 are irrelevant to the Court's legal analysis here.

24. S.B. 200 contemplates that three different maps for congressional districts, Senate districts, state House of Representative districts, and state School Board districts could be created and submitted for consideration, to the extent that each map can be approved by at least five members of the commission. *See generally* § 20A-20-302(1)-(3) (2020).

25. S.B. 200 Section 20A-20-302(4) states: "The commission shall ensure that:

   (a) each map recommended by the commission:
      (i) is drawn using the official population enumeration of the most recent decennial census;
      (ii) for congressional districts, has a total population deviation that does not exceed 1%;
      (iii) for Senate, House of Representatives, and State School Board districts, has a total population deviation of less than 10%;
      (iv) does not use race as a predominant factor in drawing district lines; and
      (v) complies with the United States Constitution and all applicable federal laws, including Section 2 of the Voting Rights Act; and
   (b) each district in each map is:
      (i) drawn based on total population;
      (ii) a single member district; and
      (iii) contiguous and reasonably compact.

   *Id.* § 20A-20-302(4).

26. With regard to the substantive redistricting standards, section 20A-20-302(5) states: "*The commission shall define and adopt redistricting standards for use by the commission* that require that maps adopted by the commission, to the extent practicable, comply with the following, *as defined by the commission:*

   (a) preserving communities of interest;
   (b) following natural, geographic, or man-made features, boundaries, or barriers;
   (c) preserving cores of prior districts;
   (d) minimizing the division of municipalities and counties across multiple districts;
   (e) achieving boundary agreement among different types of districts; and
   (f) prohibiting the purposeful or undue favoring or disfavoring of:
      (i) an incumbent elected official;
      (ii) a candidate or prospective candidate for elected office; or
      (iii) a political party.

   *Id.* § 20A-20-302(5) (emphasis added).

27. In addition, section 20A-20-302(6) states: "The commission *may* adopt a standard that prohibits the commission from using any of the following, except for the purpose of conducting an assessment described in Subsection (8):

(a)   partisan political data;
(b)   political party affiliation information;
(c)   voting records;
(d)   partisan election results; or
(e)   residential addresses of incumbents, candidates, or prospective candidates.

28. Section 20A-20-302(7) and (8) states as follows:

(7)   The commission may adopt redistricting standards for use by the commission that require a smaller total population deviation than the total population deviation described in Subsection (4)(a)(iii) if the committee or the Legislature adopts a smaller total population deviation than 10% for Senate, House of Representatives, or State School Board districts.

(8)   (a) Three members of the commission may, by affirmative vote, require that commission staff evaluate any map drawn by, or presented to, the commission as a possible map for recommendation by the commission to determine whether the map complies with the redistricting standards adopted by the commission.

(b) In conducting an evaluation described in Subsection (8)(a), commission staff shall use judicial standards and, as determined by the commission, the best available data and scientific methods.

*Id.* § 20A-20-302(7), (8).

29. Section 20A-20-303 title "Submission of maps to Legislature – Consideration by Legislature" states:

(1)   The commission shall, within 10 days after the day on which the commission complies with Subsection 20A-20-302(2), submit to the director of the Office of Legislative Research and General Counsel, for distribution to the committee, and make available to the public, the redistricting maps recommended under Section 20A-20-302 and a detailed written report describing each map's adherence to the commission's redistricting standards and requirements.

(2)   The commission shall submit the maps recommended under Section 20A-20-302 to the [Legislature's redistricting] committee[4] in a public meeting of the committee as described in this section.

(3)   The [Legislature's redistricting] committee shall:
        (a)  hold the public meeting described in Subsection (2):

---

[4] Utah Code section 20A-20-102(2) defines "Committee" as the "Legislature's redistricting committee."

      (i)  for the sole purpose of considering each map recommended under Section 20A-20-302; and

      (ii) for a year immediately following a decennial year, no later than 15 days after the day on which the commission complies with Subsection (1); and

   (b) at the public meeting described in Subsection (2), provide reasonable time for:

      (i) the commission to present and explain the maps described in Subsection (1);

      (ii) the public to comment on the maps; and

      (iii) the committee to discuss the maps.

(4)  The Legislature may not enact a redistricting plan before complying with Subsections (2) and (3).

(5)  *The committee or the Legislature may, but is not required to, vote on or adopt a map submitted to the committee or the Legislature by the commission.*

*Id.* § 20A-20-303 (emphasis added)

30. S.B. 200 expressly states that *neither* the Legislature's redistricting committee nor the Legislature is required to vote on or adopt a map submitted by the commission. *Id.* § 20A-20-303(5).

31. Under S.B. 200, the Legislature is not bound to comply with any provision, except it "may not enact a redistricting plan before" the commission submits its recommended map(s) to the Legislature's redistricting committee and that committee holds public hearings on those maps. *Id.* § 20A-20-303(4).

32. S.B. 200 does not require the Legislature to comply with any redistricting standards in Proposition 4 or in S.B. 200.

33. S.B. 200 does not require the Legislature hold public hearings on its proposed redistricting plan or to provide for any public comment at all.

34. S.B. 200 eliminated the private right of action to enforce Proposition 4's redistricting reform, including mandatory compliance with standards and procedures and removed the explicit waiver of governmental immunity, precluding any challenge to redistricting plans enacted by the Legislature.

35. S.B. 200 eliminated the requirement that the Legislature appropriate "adequate" funds for the commission to fulfill its duties. Instead, it states:

(12) *Within appropriations from the Legislature*, the commission may, to fulfill the duties of the commission: (a) contract with or employ an attorney

licensed in Utah, an executive director, and other staff; and (b) purchase equipment and other resources, in accordance with [Utah's Procurement Code], to fulfill the duties of the commission.

*Id*. § 20A-20-201(12)(a)-(b) (2020).

36. On March 17, 2021, H.B. 413 was enacted, making some revisions to Sections 20A-20-301, -302 and -303. *See* https://le.utah.gov/~2021/bills/static/HB0413.html. The changes revised certain provisions related to timing and deadlines.

## 2020 Census and HB 2004

37. The U.S. Census Bureau delayed the release of the 2020 Census data by five months due to Covid-19. The data was released on August 12, 2021. (*Leg. Defs.' Opp'n / Cross MSJ,* p. 23, ¶ 86.)

38. Between August 16, 2021 and November 1, 2021, the Legislative Redistricting Committee held some public hearings. The parties dispute the number of hearings and when they occurred. (*Id.* ¶ 89; *Pls.' Con. Reply*, p. 10, ¶ 89.)

39. On November 1, 2021, the Commission presented its recommendations to the Legislative Redistricting Committee in a public hearing. (*Leg. Defs.' Opp'n / Cross MSJ,* p. 24, ¶ 90.)

40. The Legislative Defendants do not deny that the House did not vote on all three redistricting plans submitted by the Commission. It disputes only that the Legislature was required to vote on the Commission's plans. (*Id.* p. 9, ¶ 19.) They do admit that the House voted on and rejected "the Purple Map, which was considered as a fourth substitute bill." (*Id.*)

41. On November 5, 2021, the Legislative Redistricting Committee publicly released "its proposed maps and made them available for public view and comments (in person and online) around 10:00 p.m. on Friday, November 5, 2021, and scheduled a public meeting on November 8, 2021. (*Id.* p. 8-9, ¶ 18; p. 24, ¶ 92.*)

42. On November 8, 2021, the Legislative Redistricting Committee held the public hearing on its proposed maps, and it unanimously voted to adopt its proposed maps that same day. (*Id.* p. 24, ¶ 93; *Pls.' Con. Reply*, p. 11, ¶ 93.)

43. On November 9, 2021, the House considered the Committee's proposed maps, including the congressional map, H.B. 2004, and passed H.B.2004 that day. On November 10, the Senate considered and passed H.B. 2004. (*Leg. Defs.' Opp'n / Cross MSJ,* p. 25, ¶¶ 94-95.)

44. On November 12, 2021, the Legislature passed H.B. 2004, which established new United States Congressional district boundaries for Utah and enacted the new Congressional Map. *See https://le.utah.gov/~2021s2/bills/static/HB2004.html*.

45. The Legislative Defendants do not dispute that the Legislature did not "issue to the public a detailed written report setting forth the reasons for rejecting the plan or plans submitted" by the Commission and "a detailed explanation of why the redistricting plan enacted by the Legislature better satisfies the redistricting standards and requirements contained" in Proposition 4. (*Leg. Defs.' Opp'n / Cross MSJ*, p. 10, ¶ 22.)

46. The Legislative Defendants state that they "do not concede that 'the Commission performed its duties under S.B. 200,'" asserting "it is not clear that the commission's maps did not 'unduly favor' a political party because it is not clear what that standard means [in] Utah." (*Id.* p. 8, ¶ 17.)

47. Proposition 4 was repealed in 2020. Its standards and procedures were not in place in 2021, when the Legislature enacted H.B. 2004, the current 2021 Congressional Map, which has been used for the 2022 and 2024 election cycles.

## ANALYSIS

Plaintiffs move for summary judgment under Count V of their Complaint arguing that the Legislature's repeal of Proposition 4 violated the People of Utah's fundamental constitutional right to alter or reform their government, under article I, section 2 and article VI, section 1 of the Utah Constitution. The Legislative Defendants filed an opposition and a cross-motion for summary judgment arguing that Proposition 4 was not a proper exercise of the citizen initiative power and that repealing Proposition 4 and enacting S.B. 200 did not infringe the people's rights and that S.B. 200 was narrowly tailored to advance a compelling government interest.

On remand back to this Court, the Utah Supreme Court in *League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, 554 P.3d 872 ("*LWVUT*"), clearly articulated the standard this Court must apply in addressing Count V. The court determined that strict scrutiny applied when considering whether the Legislature infringed on the people's fundamental constitutional right to alter or reform their government through their initiative power. To prevail on summary judgment, Plaintiffs must establish that the material undisputed facts establish as a matter of law that the Legislature's enactment of SB200 violated the people's right to reform their government through initiative. In order to do so, Plaintiffs must establish the following:

> (1) that the people exercised, or attempted to exercise, their initiative power, and the subject matter of the initiative contained government reforms or alterations within the meaning of the Alter or Reform Clause; and

> (2) the Legislature infringed the exercise of these rights because it amended, repealed, or replaced the initiative in a manner that impaired the reform contained in the initiative.

*Id.* ¶ 74. If Plaintiffs successfully establish these two elements, then the legislative action that impairs the reform is unconstitutional *unless* the Legislative Defendants show that the legislative action "is narrowly tailored to advance a compelling government interest." *Id.* ¶ 75 (emphasis added).

The Utah Supreme Court also made clear that citizen initiatives, "including those that reform the government," are limited to enacting "legislation." *Id.* ¶ 161. Initiatives cannot "amend the Utah Constitution" or "violate any other provision of the constitution." *Id.* "[T]he people's right to reform the government must be exercised within the bounds of the constitution itself, so the people must exercise the right through a constitutionally-recognized mechanism— like the constitutional amendment process or the initiative power—and when they use their initiative power, the initiative can accomplish only those reforms that can be achieved by statute and cannot violate other constitutional provisions." *Id.* ¶ 63 n.15  And any such enacted legislation must be "in harmony with the rest of the constitution" and "within the bounds of the constitution itself." *Id.* ¶¶ 157, 160; *see also Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 17, 144 P.3d 1109, 1114 (stating courts must "harmonize constitutional provisions with one another and with the meaning and function of the constitution as a whole.").

### The Parties' Cross-Motions for Summary Judgment

The parties each filed a motion for summary judgment on Count V. Plaintiffs assert that they satisfy the first two requirements set forth in *LWVUT*, 2024 UT 21, ¶ 74. They argue that the people of Utah properly exercised their initiative power to alter or reform their government by reforming the current redistricting process, and establishing standards and procedures, binding on both the newly created independent redistricting commission ("Commission") and the Legislature. They also assert that the Legislature infringed the people's exercise of that right by repealing Proposition 4 entirely and replacing it with S.B. 200, which eliminated Proposition 4's core redistricting standards and procedures and effectively made the modified redistricting process non-binding on both the Commission and the Legislature. They assert S.B. 200 impaired the reform, violated the people's fundamental constitutional right to alter or reform redistricting in Utah and is unconstitutional. They also argue that the Legislature cannot show that completely repealing Proposition 4 and replacing it with S.B. 200 was narrowly tailored to advance a compelling government interest.

The Legislative Defendants argue the exact opposite. They argue that Proposition 4 was unconstitutional, and that redistricting reform is not a proper exercise of the citizen's initiative. They assert that the Legislature has sole and exclusive authority over redistricting under the Federal Elections Clause and under various provisions in the Utah Constitution. They argue that several Proposition 4 provisions both unconstitutionally limit the Legislature's redistricting authority and its discretion to make redistricting decisions and delegates it to the Commission and the chief justice. In addition, they argue that S.B. 200 did not impair Proposition 4's core redistricting reform because it retains the Commission's advisory function, provides adequate funding for the Commission, provides greater flexibility over substantive redistricting standards, allows public input and comment and, most important, preserves the Legislature's discretion over redistricting standards, policy decisions and when to redistrict. Finally, they argue that the

repeal of Proposition 4 and the enactment of S.B. 200 was narrowly tailored to advance a compelling state interest.

Each of the three factors set forth in *LWVUT* are addressed in turn.

## I.        *First LWVUT Factor*

Did Plaintiffs meet their burden to prove that the people exercised their initiative power through Proposition 4, and the subject matter of Proposition 4 contained government reforms or alterations within the meaning of the Alter or Reform Clause? *Yes.*

Proposition 4 proposed substantive binding redistricting legislation to address partisan gerrymandering and to reform how redistricting is accomplished in Utah. Redistricting currently is and historically has been the topic of great debate in our state and throughout our country. Redistricting is not a mere exercise in political line-drawing; it strikes at the very heart of our democracy. The way district boundaries are drawn determines whether the right to vote is meaningful, whether equal protection is honored, and whether the fundamental promises of our state and federal constitutions are upheld. How district lines are drawn can either safeguard representation and ensure accountability by elected representatives or erode public trust, silence voices and weaken the rule of law. Redistricting is among the most critical responsibilities of our government because it ultimately defines how fully people's voices are heard in the institutions that govern them. Partisan gerrymandering is the intentional manipulation of electoral district boundaries purely for partisan or political advantage. This practice calls into question whether votes are meaningful and it distorts how votes translate into representation. When successfully accomplished, as it has been around the United States, it is the politicians who win because they choose their voters to ensure they or their party remain in control.

Redistricting impacts voting. Our Utah Supreme Court has recognized that the right to vote is fundamental; it recognized as a fundamental principle of law "[t]hat no legal voter should be deprived of that privilege by an illegal act of the election authorities." *Ferguson v. Allen,* 7 Utah 263, 573, 26 P. 570, 574 (1891) (discussing the right to vote in the context of voter fraud allegations). The *Ferguson* court stated: "[a]ll other rights, civil or political, depend on the *free* exercise of this one, and *any material impairment* of it is, to that extent, a subversion of our political system." *Id.* at 574 (emphasis added). It further reasoned that the "rights and wishes of all people are too sacred to be cast aside and nullified by the illegal and wrongful acts of their servants, no matter under what guise or pretense such acts are sought to be justified." *Id.*

Through Proposition 4, the people of Utah used their legislative power to pass legislation establishing a standard and more objective and transparent process for redistricting. "The 'right to alter or reform the government' refers to a right retained by the people themselves to correct the government they created." *LWVUT*, 2024 UT 21, ¶ 192. The term "alter" means to "change some of the elements or ingredients or details." *Alter,* BLACK'S LAW DICTIONARY 64 (1ST ed. 1891). "Reform" means to "correct, rectify, amend, remodel." *Reform,* BLACK'S LAW DICTIONARY 1011 (1ST ed. 1891). And "government" is defined as "the framework of political institutions, departments and offices." *Government,* BLACK'S LAW DICTIONARY 544 (1ST ed. 1891). When

Proposition 4 became law, it both altered and reformed our government by changing how
redistricting would be accomplished in Utah. It reformed redistricting by establishing a standard
process, adopting both redistricting standards and procedures, including but not limited to
establishing an independent redistricting commission, ensuring state-wide representation,
codifying traditional redistricting standards, providing for public notice and input, requiring the
legislature to consider the work done by the commission, re-affirming redistricting occurs once
every ten years after receipt of the decennial census, and ensuring the redistricting process was
enforceable by the people of Utah. Essential to Proposition 4's core reforms is that this process,
including the redistricting standards and the procedures were both mandatory and binding on the
commission and the legislature, while preserving the legislature's core legislative function to
decide whether to accept or reject any map *recommended* by the commission or to enact its own,
but with an explanation to the people regarding how the legislature's chosen redistricting plan
better satisfied the mandatory redistricting standards.

Proposition 4 was passed by a majority of Utah voters in the 2018 election, and it became
law binding on the people of Utah, the Independent Redistricting Commission and the Utah
Legislature. Plaintiffs assert the people properly exercised their right, "within the bounds of the
constitution and the legislative power" and therefore Proposition 4 is "constitutionally protected
from government infringement, including legislative action that impairs the government reform."
*LWVUT*, 2024 UT 21, ¶ 104

The Legislative Defendants make numerous arguments asserting that redistricting reform
is not a proper exercise of the people's initiative power. The arguments can be divided into three
general categories. First, the Legislative Defendants contend that Proposition 4 is
unconstitutional because it attempts to do through "legislation" what can only be done through a
constitutional amendment. *See LWVUT*, 2024 UT 21, ¶ 161 (ruling that a citizen initiative cannot
amend the Utah constitution). They assert that the Legislature has sole and exclusive
constitutional authority over redistricting under both the U.S. and the Utah Constitutions.
Therefore, the people have no authority to alter or reform the redistricting process through a
citizen initiative.

Second, they contend that Proposition 4 unconstitutionally interferes with the
Legislature's core legislative power and functions. They contend the mandatory provisions in
Proposition 4, including the express prohibition on partisan gerrymandering, eliminates the
Legislature's ability to exercise discretion in redistricting and in particular to determine "whether
and how to redistrict across political subdivisions." (*Leg. Defs.' Opp'n / Cross MSJ,* p. 34.) Each
of these arguments is premised primarily on the argument that the Legislature has exclusive
authority under the U.S. and Utah Constitutions over redistricting.

Finally, the Legislative Defendants also contend that other Proposition 4 provisions are
not "in harmony with the rest of the constitution" nor "within the bounds of the constitution."
*LWVUT*, 2024 UT 21, ¶¶ 157, 160. Specifically, they assert that Proposition 4 interferes with the
Legislature's authority and discretion over appropriations, supplants the legislature's core
legislative redistricting function by delegating it to a commission and to the chief justice of the
Supreme Court, and it unconstitutionally invades the legislature's sole authority to establish its
own internal procedural rules. (*See generally id.,* p. 41-56.)

The Court addresses each of the three categories of arguments.

## A.  **The Legislature does not have sole and exclusive authority over redistricting.**

The Legislative Defendants contend that the U.S. Constitution and the Utah Constitution grants sole and exclusive authority over redistricting to the legislature. Therefore, they assert the people's attempt to "legislate" redistricting is unconstitutional. Plaintiffs argue that neither constitution grants the legislature sole and exclusive authority over redistricting. Rather, they argue redistricting is a legislative function, shared co-equally with the people of Utah. The Court agrees with Plaintiffs.

### 1.  **The Federal Elections Clause - Article 1, Section 4 of the U.S. Constitution**

The Legislative Defendants argue the federal Elections Clause, article 1, section 4, of the U.S. Constitution, grants the "Legislature" exclusive control over redistricting. The Court disagrees. The federal Elections Clause does not vest the elected Legislature with unfettered authority to redistrict, without any constraints or restrictions imposed by the Utah Constitution. The Elections Clause states: that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, *shall be prescribed in each State by the Legislature thereof.*" U.S. Const., art. I, § 4 (emphasis added). In a series of decisions, the United States Supreme Court has consistently recognized that state legislatures, even when exercising their lawmaking power under the federal Elections Clause, must abide by restrictions imposed by state constitutions and are subject to their state's ordinary law-making process when redistricting.

In *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 36 S. Ct. 708 (1916), the U.S. Supreme Court first considered the constitutionality of the people's referendum power to reject a redistricting plan. In *Hildebrant*, the Ohio Legislature passed a congressional redistricting law. Under the Ohio Constitution, the people reserved the right "by way of referendum to approve or disprove by popular vote any law enacted by the general assembly." *Id.* at 566. The voters held a referendum on the redistricting law and rejected it. The plaintiff sued on behalf of the State, contending that the referendum "was not and could not be a part of the legislative authority of the State and therefore could have no influence on ... the law creating congressional districts" under the Elections Clause. *Id.* at 567. The *Hildebrant* Court rejected arguments that Ohio's use of the referendum violated the Elections Clause. *Id.; see also id.* at 569 (rejecting argument that the referendum "causes a State ... to be not republican" in violation of the Guarantee Clause of the Constitution.). The Court's analysis relied on the Apportionment Act of 1911, in which Congress left to "each State full authority to employ in the creation of congressional districts its own laws and regulations," noting "If they include initiative, it is included." *See also id.* at 568 (citing 47 Cong. Rec. 3437 (statement of Sen. Burton)); *see also Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 809, 135 S. Ct. 2652, 2668-69 (noting, "[i]n drafting the 1911 Act, Congress focused on the fact that several States had supplemented the representative legislature mode of lawmaking with a direct lawmaking role for the people," through the processes of initiative and referendum, intentionally removed the reference to the "state legislature" and provided that states "should use the Act's default procedures for redistricting until such State shall be redistricted in the manner provided by the laws thereof."

(cleaned).) Based on the 1911 Act and the Ohio Constitution, the Court reasoned that the referendum was part of the state's legislative power, which was vested both in the "senate and house of representatives" and "in the people," and it upheld the people's right to use their referendum power to reject the Ohio Legislature's proposed redistricting plan. *Id.* at 566-67.

Then, in *Smiley v. Holm*, 285 U.S. 355, 369, 52 S. Ct. 397 (1932), the Supreme Court considered the constitutionality of a governor's veto of a redistricting plan. In *Smiley*, the Minnesota Legislature passed a law adopting new congressional districts and the governor exercised his veto power under the state constitution to veto the law. The *Smiley* Court affirmed the governor's veto of the proposed congressional map. In addressing arguments like those presented by the Legislative Defendants, that Court reasoned:

> The Legislature in districting the state is not strictly in the discharge of legislative duties as a lawmaking body, acting in its sovereign capacity, but is acting *as representative of the people of the state under the power granted by said article 1, s 4*. It merely gives expression as to district lines in aid of the election of certain federal officials; prescribing one of the essential details *serving primarily the federal government and secondly the people of the state. The Legislature is designated as a mere agency to discharge the particular duty.*

*Id.* at 364. (emphasis added). The *Smiley* Court considered the legislative history of the Elections Clause and concluded that "there is no intimation, either in the debates in the Federal Convention or in contemporaneous exposition, of a purpose to exclude a similar restriction imposed by state Constitutions upon state Legislatures when exercising the lawmaking power." *Id. at 369.* The Court went on to hold that the Elections Clause did not prevent a state from applying the usual rules of its legislative process—including a gubernatorial veto—in the redistricting process. *Id.* at 373. The Court also recognized that if a state constitution and or laws treats a veto or referendum as part of the legislative power, "*the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law*." *Id.* at 371 (emphasis added).

Then, the U.S. Supreme Court in *Arizona State Legis. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 813, 135 S. Ct. 2652 (2015), upheld the people of Arizona's initiative to amend the Arizona Constitution to create an independent redistricting commission, which removed the state legislature entirely from the redistricting process. In addressing the constitutionality of the wholly independent redistricting commission established by the people, the Court reasoned "the Legislature" to which the Elections Clause confers authority means not only the state's representative body, but any entity empowered to legislate under the state constitution, including the people by initiative. *Id*. at 813–14. Because the Arizona Constitution vests power in the people to legislate "on equal footing with the representative legislative body," *id.* at 795, the Court ruled that the people's legislation, by constitutional amendment, delegating redistricting to an independent commission was a valid exercise of the Federal Elections Clause authority. *Id*. at 814 (*citing* Ariz. Const. art. IV, pt. 1, § 1). That ruling made clear that whatever authority was responsible for redistricting, *i.e.*, also remained subject to constraints set forth in the Arizona state constitution.

The *Arizona State Leg.* Court recognized the core principle "that redistricting is a *legislative function*, to be *performed in accordance with the State's prescriptions for lawmaking*, which it recognized may include the referendum, the governor's veto and the initiative process. *Arizona State Leg.*, 576 U.S. at 808, 135 S. Ct. 2652 (emphasis added) (reaffirming the core principles previously espoused in *Hildebrant* and *Smiley*). The Court dismissed the argument that the Elections Clause divests state constitutions of the power to enforce checks against the exercise of legislative power, noting: "Nothing in [the Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections *in defiance of provisions of the State's constitution*." *Id.* at 817–818, 135 S. Ct. 2652 (emphasis added). The Court also clarified that "the Federal Elections Clause does not give state legislatures *carte blanche* to act in a manner contrary to the state constitution. *Id.*

The dissent, authored by Chief Justice John Roberts, argued that the term "Legislature" as used in the U.S. Constitution and in the federal Elections Clause (as opposed to state constitutions) means only the representative legislature and never included nor intended to include the legislative power of the people. *Id.* at 826, 135 S. Ct. 2677 (J. Roberts, dissenting). Notwithstanding this position, the dissent does not challenge and, in fact, recognizes that the Legislature in fulfilling its duties under the Elections Clause is required to comply with the "ordinary lawmaking process," under the state Constitution. *Id.* at 841–42, 135 S. Ct. at 2687. Justice Roberts writes: "Under the Elections Clause, 'the Legislature' is a representative body that, when it prescribes election regulations, may be required to do so within the ordinary lawmaking process, but may not be cut out of that process. Put simply, *the state legislature need not be exclusive in congressional districting, but neither may it be excluded. Id.* (emphasis added). "There is a critical difference between allowing a State to *supplement* the legislature's role in the legislative process and permitting the State to *supplant* the legislature altogether." *Id.* at 841 (emphasis added) (challenging the "State's ability to define lawmaking by excluding the legislature itself").

The Legislative Defendants argue that the *Arizona State Legis.* decision is distinguishable from this case because the Arizona Constitution reserved for the people the right both to legislate and to amend their constitution, which the people then used to wholly delegate the redistricting power to an entirely independent commission. (*Leg. Defs.' Opp'n Mot. Summ. J.*, p. 40.) Here, the Legislative Defendants argue that the people of Utah are limited to "legislating," i.e., lawmaking, and therefore the people of Utah have no authority to "legislate" to effectively amend the constitution to give the people power over redistricting. The Court agrees in part. Because the people of Utah do not have the power to amend the Constitution, they cannot amend the Utah Constitution to exclude the legislature entirely from participating in redistricting. However, the Court disagrees to the extent the Legislative Defendants argue that redistricting is exclusive to the Legislature. As discussed herein, Utah law makes clear that the Legislature and the people of Utah equally share the law-making power. And the U.S. Supreme Court has expressly recognized: "redistricting is a *legislative function*, to be *performed in accordance with the State's prescriptions for lawmaking*," *Arizona State Leg.*, 576 U.S. at 808, 135 S. Ct. 2652 (emphasis added). Utah's ordinary lawmaking includes the people's initiative and referendum

powers and the gubernatorial veto. And, as more fully explained herein, Proposition 4 supplements, and does not supplant, the legislature's role in redistricting.

Finally, and more recently, in *Moore v. Harper*, 600 U.S. 1, 143 S. Ct. 2065 (2023), the U.S. Supreme Court re-affirmed its prior decisions in *Smiley* and *Arizona State Legislature,* stating: "Our precedents have long rejected the view that legislative action under the Elections Clause is purely federal in character, governed only by restraints found in the Federal Constitution." *Id.* at 29-30, 37. The *Moore* Court confirmed that the federal "Elections Clause does not insulate state legislatures from the ordinary exercise of state judicial review" or from ordinary constraints in state constitutions. *Id.* at 29-30, 37, 143 S. Ct. 2065. In reaching its decision, the *Moore* Court expressly recognized that:

> [e]lections are complex affairs, demanding rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots. Legislatures must "provide a complete code for congressional elections," including regulations "relati[ng] to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U.S. at 366, 52 S. Ct. 397. . . . But fashioning regulations governing federal elections "*unquestionably calls for the exercise of lawmaking authority.*" *Arizona State Legislature*, 576 U.S. at 808, n. 17, 135 S. Ct. 2652. *And the exercise of such authority in the context of the Elections Clause is subject to the ordinary constraints on lawmaking in the state constitution.*

*Id.* at 29-30 (emphasis added)*.*

The *Moore* Court re-affirmed long-standing precedent that "[a] state legislature may not 'create congressional districts independently of' requirements imposed 'by the state constitution with respect to the enactment of laws.' " *Id*. at 26 (quoting *Smiley,* 285 U.S. at 373). Notably, the *Moore* Court explains:

> [I]n *Smiley*, we addressed whether "the conditions which attach to the making of state laws" apply to legislatures exercising authority under the Elections Clause. 285 U.S. at 365, 52 S. Ct. 397. We held that they do. "Much that is urged in argument with regard to the meaning of the term 'Legislature,' " we explained, "is beside the point." *Ibid.* And we concluded in straightforward terms that legislatures must abide by "restriction[s] imposed by state constitutions ... when exercising the lawmaking power" under the Elections Clause. *Id.*, at 369, 52 S. Ct. 397. *Arizona State Legislature* said much the same, emphasizing that, by its text, nothing in the Elections Clause offers state legislatures *carte blanche* to act "in defiance of provisions of the State's constitution." 576 U.S. at 818, 135 S. Ct. 2652.

*Moore*, 600 U.S. at 31.

The United States Supreme Court has concluded repeatedly that the Federal Elections Clause does not trump state constitutional restrictions over the "time, place and manner" of elections. Rather, the Court reaffirms that state legislatures in fulfilling their duties under the Elections Clause are still subject to state constitutional restraints and must comply with the state's ordinary law-making process.

### 2. **Article IX, Section 1 of the Utah Constitution**

Turning to the Utah Constitution, the Legislative Defendants argue that article IX, section 1 of the Utah Constitution (Dividing the State into Districts) expressly vests the "Legislature" with sole and exclusive responsibility, authority and complete discretion over redistricting, to the exclusion of the legislative power of the people. They argue that excerpts from the Constitutional Convention debates support that redistricting is wholly within the province of the legislature. Plaintiffs disagree and argue that article IX, section 1 does not grant the "Legislature" redistricting authority but rather limits it. They argue, consistent with federal case law interpreting the Federal Elections Clause, that redistricting – which is a legislative function – is subject to the state's ordinary law-making process, which includes, not excludes, the people's exercise of their legislative powers. The Court agrees with Plaintiffs.

Some principles of constitutional interpretation guide the Court's analysis. When interpreting state constitutional provisions, it is a "well-recognized principle" that because the legislature is the representative of the people, "wherein lies the residuum of governmental power, constitutional provisions are limitations, rather than grants of power." *Parkinson v. Watson*, 4 Utah 2d 191, 199, 291 P.2d 400, 405 (1955) (emphasis added). It is presumed that the legislature has full legislative power, "except as to restrictions as the [Utah] Constitution should specifically prescribe." *Id.* [5] In addition, we consider "the meaning of the text as understood when it was

---

[5] The California Court of Appeal, Third District, in *People's Advoc., Inc. v. Superior Ct.*, 181 Cal. App. 3d 316, 322–23, 226 Cal. Rptr. 640 (Ct. App. 1986) explained the basis for the principle that state constitutions are not grants of authority, rather, they are limitations. That court explained:

> The fundamental charter of our state government was enacted by the people against a history of parliamentary common law. That law is implicit in the Constitution's structure and its separation of powers. As was said by the California Supreme Court over 100 years ago: "A legislative assembly, when established, becomes vested with all the powers and privileges which are necessary and incidental to a free and unobstructed exercise of its appropriate functions. These powers and privileges are derived not from the Constitution; on the contrary, they arise from the very creation of a legislative body, and are founded upon the principle of self preservation. *The Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms*. A legislative assembly has, therefore, all the powers and privileges which are necessary to enable it to exercise in all respects, in a free, intelligent, and impartial manner, its appropriate functions, except so far as it may be restrained by

adopted," with a focus "on the objective original public meaning of the text, not the intent of those who wrote it." *LWVUT*, 2024 UT 21, ¶ 101 (stating we "interpret the [c]onstitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment."). [6] And constitutional provisions "must be read in harmony with the rest of the constitution and exercised within the bounds of the constitution itself." *LWVUT*, 2024 UT 21, ¶ 9.

Starting with the text of article IX, section 1 of the Utah Constitution, both parties cite the current version of this provision, which was amended in 2008. That provision states:

> No later than the annual general session next following the Legislature's receipt of the results of an enumeration made by the authority of the United States, the Legislature shall divide the state into congressional, legislative, and other districts accordingly.

Utah Const. art. IX, § 1 (2008). The proposed amendment appeared on the ballot in 2008 as "Utah Amendment D,"[7] and it described to voters that the purpose of the amendment was to establish the *timing* for redistricting, not assigning exclusivity for the task. The ballot read:

---

> the express provisions of the Constitution, or by some express law made unto itself, regulating and limiting the same."

*Id.* (emphasis added).

[6] When interpreting constitutional language, the Utah Supreme Court recently stated:

> [W]e start with the meaning of the text as understood when it was adopted. Our focus is on the objective original public meaning of the text, not the intent of those who wrote it. Although evidence of the framers' intent can help with this endeavor, when we use such material—for example, transcripts from the constitutional convention on a particular topic—we have clarified that this is only a means to this end, not an end in itself. So, we interpret the constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment. And we have clarified that when we interpret language from early statehood, we do so according to the "general public understanding" at the time.

*LWVUT*, 2024 UT 21, ¶ 101, 554 P.3d 872, 896–97 (quoting *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 19.n6, 21 n.7, 450 P.3d 1092) (cleaned up). "There is no magic formula for this analysis – different sources will be more or less persuasive." *Maese*, 2019 UT 59, ¶ 19. Courts start the analysis with the text and considers it in light of historical evidence of the state of the law and Utah's particular traditions at the time of drafting. *Id.* ¶ 18.

[7] Rule 201 of the Utah Rules of Evidence governs judicial notice of "adjudicative" facts, not legislative facts. Utah R. Evid. 201(a). As the Utah Supreme Court has previously recognized, courts may "take judicial notice of the facts from [] publicly available government websites because they are not subject to reasonable dispute and can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *State v. Cordova*, 2023 UT App 99, 536 P.3d 666, 670, *cert. denied*, 540 P.3d 81 (Utah 2023) (citing Utah R. Evid. 201).

A "**yes**" vote <u>supported</u> amending the constitution to require the legislature to make redistricting divisions by no later than the annual general legislative session following the receipt of the federal census results.

A "**no**" vote <u>opposed</u> amending the constitution, maintaining the requirement that redistricting divisions are decided in the legislative session immediately following the federal census.

https://ballotpedia.org/Utah_Amendment_D,_Change_the_Time_Frame_for_Redistricting_Requirements_Measure_(2008). The proposed amendment – as described to the voters – successfully passed. Interestingly, this provision was amended once before in 1988. The proposed amendment similarly focused on clarifying when redistricting would occur, i.e., "after every U.S. census." [8]

When Utah's Constitution was signed following the Constitutional Convention Debates in May 1895 and then ratified by the people of Utah in November 1895, article IX, section 1, stated:

One Representative in the Congress of the United States shall be elected from the State at large on the Tuesday next after the first Monday in November, AD 1895, and thereafter at such times and places, and in such manner as may be prescribed by law. *When a new apportionment shall be made by Congress, the Legislature shall divide the State into congressional districts accordingly.*

Utah Const. art. IX, § 1 (1895) (emphasis added). Both the original and current versions of article IX, section 1, designate the "Legislature" for the task of redistricting. This is not disputed. Article IX, section 1, however, does not grant redistricting authority to the "Legislature." Rather,

---

[8] Article IX, section 1 of the Utah Constitution has been amended twice since 1895; once in 1988 and then in 2008. In 1988, the proposed amendment was placed on the ballot by the legislature as Proposition 2. The ballot title dealing with reapportionment stated as follows: "Shall the Utah Constitution be amended to . . . clarify the Legislature's duty to reapportion the state after each United States census into congressional, legislative, and other districts, and clarify the number of senators and representatives." The proposed amendment was described as follows:

A "**yes**" vote <u>supported</u> amending the constitution to:
- require that the legislature divide the state into congressional and legislative districts after every US census;

A "**no**" vote <u>opposed</u> amending the constitution to:
- require that the legislature divide the state into congressional and legislative districts after every US census.

https://ballotpedia.org/Utah_Proposition_2,_Require_Reapportionment_After_US_Census_and_Adjust_Constitutional_Language_Amendment_(1988).

Proposition 2 successfully passed and was amended to state: "At the session next following an enumeration made by the authority of the United States, the Legislature shall divide the state into congressional, legislative, and other districts accordingly." *See* https://50constitutions.org/ut/constitution?date=2025-08-09. The proposed 1988 amendment also focused on the timing of redistricting, not the exclusivity of it.

in accordance with long-standing Utah law, this provision limits the Legislature's authority. Specifically, it limits when redistricting shall occur. The original provision states that the "Legislature" shall redistrict "[w]hen a new apportionment shall be made by Congress." The current version states the "Legislature" "shall" redistrict "[n]o later than the annual general session next following the Legislature's receipt of the results of an enumeration made by the authority of the United States." Utah Const. art. IX, § 1 (emphasis added). As supported by the legislative history, this provision is a limitation on when redistricting shall occur.

Article IX's reference to the term "Legislature" does not exclude the legislative power of the people. The plain language of article IX, section 1 – in both the original and current versions – does not expressly exclude the people from exercising their direct legislative power. Article IX, section 1 does not include any limiting terms such as "exclusive" or "sole" to support an intent to exclude the people's co-equal legislative power under this provision, unlike other Utah Constitutional provisions that do make clear when authority is exclusively granted to a particular body. For example, article VI, § 17(1) states: "The House of Representatives shall have the *sole* power of impeachment." (emphasis added). Absent specific language in this provision or elsewhere in the Utah Constitution limiting the people's legislative power, there is no basis to conclude that the people are prohibited from participating in redistricting legislation. *Matheson v. Ferry,*[9] 641 P.2d 674, 676–77 (Utah 1982) (recognizing that absent specific language in the Constitution prohibiting the Legislature from participating in judicial selection and appointment procedures in any degree, it has the authority to "provide by law" the procedure for judicial appointment); *see also People's Advoc., Inc. v. Superior Ct.,* 181 Cal. App. 3d 316, 322, 226 Cal. Rptr. 640, 642 (Ct. App. 1986) ("The [California] Constitution is not a grant, but a restriction upon the power of the Legislature, and hence an express enumeration of legislative powers and privileges in the Constitution cannot be considered as the exclusion of others not named unless accompanied by negative terms."). In addition, persuasive authority from both federal and state courts have held that the term "Legislature" means "any lawmaking entity," and not just the elected legislature. *Arizona State Legis.*, 576 U.S. at 813-14; *People ex. Rel. Salazar v. Davidson,* 79 P.3d 1221, 1236 (Colo. 2003) (interpreting a similar provision under the Colorado Constitution, holding the term "General Assembly," like the term "legislature" "encompasses the entire legislative process," including voter initiatives).

---

[9] In *Matheson,* the court discussed the separation of powers between the executive and the legislative branches in the context of judicial appointments. While recognizing that the executive branch traditionally has exclusive responsibility to appoint judges to the bench, the Utah Constitution establishes the legislature's power to "provide by law" for the selection of judges. *Matheson*, 641 P.2d at 677. In explaining the legislature's role, the *Matheson* court held that the legislature's power to "provide by law" is not unlimited, but is in fact proscribed "by all other applicable provisions of the Constitution, including the separation of powers requirement of Article V, s 1. In other words, while the Legislature has the exclusive constitutional power to provide by law for the selection of judges, the law, which in its wisdom it so provides, must comport with and must not offend against other applicable provisions of the Constitution." *Id.* Importantly, that court recognized that absent specific language in the Constitution prohibiting the Legislature from participating in judicial selection and appointment procedures in any degree, it has the authority to "provide by law" the procedure for judicial appointment. *Id.* 676–77.

The Legislative Defendants assert that discussions from the Constitutional Convention Debates from March to May 1895 support their position that the "Founder's [chose] in Article IX to vest the responsibility for redistricting exclusively in the Legislature (and not in the people)." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 31.). The Legislative Defendants cite several statements made during the Constitutional Convention Debates discussing concerns about redistricting and a desire to establish "an apportionment system that would ensure each voter had a representative who would properly represent local interests," given the tension between rural and urban areas. (*Id.* at 32-33 (citing Proceedings & Debates of the Convention, Days 37-38)); *see also Parkinson v. Watson,* 4 Utah 2d 191, 200, 291 P.2d 400, 405 (1955) (noting "question as to how urban—rural interests could be properly balanced and protected was among the most thoroughly discussed and considered by the convention"). The statements quoted by the Legislative Defendants, however, contain no discussion or commentary about the involvement of the people of Utah in redistricting, then, or in the future. The discussions certainly do not support an intent to exclude the people's soon to be established direct legislative power.[10] No other legal authority or legislative history has been presented to the Court, post-1900, to support that the Utah Constitution precludes the people from exercising their direct legislative power to initiate redistricting legislation.

3. **Redistricting is a legislative function; the Legislature and the People equally share legislative power.**

Redistricting is a quintessential legislative function, subject to a state's "ordinary constraints on law-making" including the gubernatorial veto, citizen referendum and citizen initiatives.[11] *Ariz. State Legislature*, 576 U.S. at 808; *Moore,* 600 U.S. at 29. Redistricting under the Utah Constitution is subject to the same lawmaking constraints. Redistricting is specifically addressed in article IX, section 1, which states the "Legislature" shall redistrict "[w]hen a new apportionment shall be made by Congress." Utah const. art. IX, § 1. Reading this provision "in harmony with the rest of the constitution," *LWVUT,* 2024 UT 21, ¶ 9, the Utah Constitution also provides that redistricting is subject to approval or veto by the governor, under article VII, section 8. *Id.* art. VII, § 8. It is subject to the people's initiative and referendum rights under article VI, section 1. *Id.* art. IV, § 1. And it is subject to the people's fundamental constitutional right to right "alter or reform" the government, under article 1, section 2. *Id.* art. 1, § 2.

Article I, section 2 has been in the Utah constitution, in the same form, since Utah became a state in 1896. *LWVUT*, 2024 UT 21, ¶ 105. This provision states: "All political power

---

[10] In 1895, when the Utah Constitution was ratified by the people, power within the state was divided between three branches of government: the executive, legislative and judicial. Utah Const. art. V, section 1. At that time, the people of Utah had not yet reclaimed for themselves the power of direct legislation. *See generally LWVUT,* 2024 UT 2, ¶¶ 138-156. From 1895 to 1900, all "legislative power" was vested in only the representative "legislature." However, the people had the constitutional right to alter or reform their government.

[11] The responsibility for redistricting and the limitations set forth under article IX of the Utah Constitution cannot be considered or interpreted in isolation from the rest of the Utah Constitution. Article IX, section 1, "must be read in harmony with the rest of the constitution and exercised within the bounds of the constitution itself." *LWVUT*, 2024 UT 21, ¶ 9.

is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require." Utah Const. art. I, § 2 (emphasis added). Our constitution makes clear that the people "are the font of political power," and it is "the people" who "hold the power of the sovereign in a constitutional republic." *LWVUT*, 2024 UT 21, ¶¶ 67, 106. The Utah Supreme Court has recognized that this provision enshrines principles that are so foundational and fundamental to our system of government that "[i]t is the very essence of true republicanism, the vital breath of pure democracy." *LWVUT*, 2024 UT 21, ¶ 128 (quoting *The Constitutional Convention: The Body Organizes and Begins Work*, Deseret News, July 6, 1887, at 4 (stating "the men who occupy the position of rulers are but the servants of the sovereign people. They govern in that capacity and therefore the people are really self-governed."). Given the historical review provided in *LWVUT*, 2024 UT 21, there is no doubt that the framers "made a conscious choice to include" and "separately described" these important principles and rights within the Utah Constitution. *Id.* ¶ 135. Article 1, section 2 makes clear that " 'the people themselves are not creatures or creations of the Legislature. They are the father of the Legislature, its creator, and in the act [of] creating the Legislature the people provided that its voice should never silence or control the voice of the people in whom is inherent all political power.' " *Id.* ¶ 132 (quoting *Utah Power & Light Co. v. Provo City*, 94 Utah 203, 74 P.2d 1191, 1205 (1937) (Larson, J., concurring)). It follows that "'the Legislature, the child of the people, cannot limit or control its parent, its creator, the source of all power.'" *Id.*

Article VI, section 1(1) of the Utah Constitution provides that the legislative power of the state is vested in both the Legislature and the people. U.S. Const. art. VI, § 1. The Utah Constitution was amended in 1900 specifically to reclaim and reserve for the people of Utah the right to exercise direct legislative power. *LWVUT*, 2024 UT 21, ¶ 158. Article VI, section 1, states that the people of Utah, through the "legal voters of the State of Utah," have the power both to "initiate any desired legislation" and to "require any law passed by the Utah Legislature to be submitted to the voters of the State" through a referendum, if statutory requirements are met. Utah const. art. VI, § 1. "The original public understanding of the right was that it would be meaningful and effective and would provide the people with their own legislative power, which was especially important in times of disagreement with the Legislature on particular issues." *LWVUT*, 2024 UT 21, ¶ 158. "The right to initiative embodies the principle that the people should have the opportunity to govern themselves, 'unfettered by the distortions of representative legislatures.'" *Count My Vote, Inc. v. Cox*, 2019 UT 60, ¶ 81, 452 P.3d 1109, 1125 (Himonas, J., concurring) (quoting *Carter*, 2012 UT 2, ¶ 23, 269 P.3d 141); *Gallivan v. Walker*, 2002 UT 89, ¶ 25, 54 P.3d 1069 (recognizing the initiative process as "democracy in its most direct and quintessential form"). Functionally, the initiative process acts as the people's check on the legislature's otherwise exclusive power to legislate. *Count My Vote, Inc.*, 2019 UT 60, ¶ 81.

Utah law makes clear that the "legislative power" of the state is vested, *equally*, in both the Utah State Legislature and the people of Utah. *Carter v. Lehi City*, 2012 UT 2, ¶ 22, 269 P.3d 141, 148, *abrogated by League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶ 22, 554 P.3d 872 ("On its face, article VI recognizes a single, undifferentiated 'legislative power, vested both in the people and in the legislature."). The people's right to exercise their legislative power is a fundamental constitutional right, and "[t]he power of the legislature and the power of the people to legislate through initiative and referenda are *coequal, coextensive, and*

*concurrent and share equal dignity*." *Gallivan v. Walker,* 2002 UT 89, ¶¶ 23–24, 54 P.3d 1069 (cleaned up). The people may initiate "*any desired legislation,*" on "*any substantive topic"* and involving "*any legislative act,"* as long as the initiative complies with all "conditions, manner and time restrictions imposed by law" and is not "otherwise forbidden by the constitution." *Sevier Power Co., LLC v. Bd. Of Sevier Cnty. Comm'rs,* 2008 UT 72, ¶ 10, 196 P.3d 583, 586 (emphasis added) (rejecting the Legislature's attempt to prohibit the subject of an initiative but recognizing that "the exercise of the initiative power by the people must be read in coordination with the other rights of the people expressed and reserved in the constitution"). The scope of the initiative power is not lesser than the legislature's power and it is not derived from or delegated by the legislature. *Carter*, 2012 UT 2, ¶ 30.

When the people initiate and pass legislation through article VI, they act as a body "charged with the exercise of powers properly belonging to the Legislative Department." *Carter,* 2012 UT 2, ¶ 18. "Legislative power generally (a) involves the promulgation of laws of general applicability; and (b) is based on the weighing of broad, competing policy considerations." *Id.* ¶ 34. "[L]egislative powers are policy making powers," *id.* ¶ 38, which are not beyond the reach of the people. *See Mawhinney v. City of Draper*, 2014 UT 54, ¶ 12, 342 P.3d 262, 266 (holding local tax levy subject to the referendum power because it is a traditionally legislative function and the people's legislative power is co-equal to that of the legislature). "The people's initiative power reaches to the full extent of the legislative power, but no further." *Carter*, 2012 UT 2, ¶ 31. Simply put, if the state legislature can enact it, then so can the people. *Id.* ¶ 20. The true limit on voter initiatives "is that they must be a valid exercise of legislative rather than executive or judicial power." *Id.* ¶ 18.

Together, article VI, section 1(1) and article I, section 2 provide the people with a direct, legislative means of exercising their right to reform the government. *LWVUT*, 2024 UT 21, ¶ 104. Because redistricting is a legislative function, and the people have equal legislative power, the people have the fundamental constitutional right to propose legislation to alter or reform redistricting in Utah. They have the right to pass law prohibiting partisan gerrymandering and establishing mandatory redistricting standards and procedures binding on the legislature.

B. **Proposition 4 does not unconstitutionally interfere with the Legislature's core legislative redistricting power, its functions or discretion.**

The Legislative Defendants argue that the mandatory provisions in Proposition 4 unconstitutionally encroach on the Legislature's core legislative power, function and its ability to exercise discretion in redistricting and, in particular, to determine "whether and how to redistrict across political subdivisions." (*Leg. Defs.' Opp'n / Cross MSJ,* p. 34.) They specifically challenge the mandatory provisions as unconstitutional interference, specifically those provisions requiring the Legislature to, among other things: (1) give first priority to minimizing the division of counties, *see* Utah Code Ann. §20A-19-103(2)(b); (2) require that substantive redistricting standards be applied in a particular order of priority, *see* Utah Code Ann. §20A-19-103(2); (3) prohibit "purposefully or unduly favor[ing] or disfavor[ing] incumbents, candidates, or political parties, *see* Utah Code Ann. §20A-19-103(3), which it asserts it can elect to do; (4) require application of "'judicial standards and the best available data and scientific and statistical methods . . . to assess whether a proposed redistricting plan abides by and conforms' to

27

Proposition 4's 'redistricting standards,'" *see* Utah Code Ann. §20A-19-103(4); and (5) provide an avenue to enforce the mandatory provisions through a private cause of action, *see* Utah Code Ann. §20A-19-301. (*See generally Leg. Defs.' Opp'n / Cross MSJ*, p. 33-39.).

These challenges to specific mandatory provisions in Proposition 4 are based primarily on the argument that the Legislature has the sole and exclusive authority to redistrict, under the U.S. and Utah Constitutions, which argument this Court rejected. Redistricting, along with determining the specific standards and procedures that will apply, is a legislative function, subject to the "[s]tate's prescriptions for lawmaking." *Arizona State Leg.*, 576 U.S. at 808. The people have the right – just like the Legislature – to establish redistricting standards and procedures, and to mandate compliance with substantive redistricting standards, establish priorities, prohibit partisan gerrymandering, require an assessment of compliance with Proposition 4's redistricting standards by applying judicial standards, the best available data, and scientific and statistical methods, and provide a mechanism for enforcement of Proposition 4's standards and procedures.

The Legislative Defendants make other specific arguments regarding proposition 4's mandatory provisions, which are addressed separately.

### 1. **Order of Priority**

The Legislative Defendants argue that Proposition 4 "impermissibly cabined legislative discretion with a rigid priority list." They assert that discretion may be required to balance competing interests in the redistricting process. Notably, Proposition 4 requires both the Legislature and the Commission to abide by the prioritized list of redistricting standards "to the greatest extent practicable." *See* Utah Code Ann. § 20A-19-103(2) (2018). The statute itself provides some discretion in balancing competing interests and in making policy considerations, but Proposition 4's redistricting standards cannot be disregarded or ignored merely because the legislature disagrees with them.

### 2. **Express prohibition on partisan gerrymandering**

The Legislative Defendants challenge Proposition 4's express prohibition on gerrymandering on two grounds. Neither are persuasive.

First, they argue that they have the discretion to consider partisan advantage and incumbency protection in redistricting, as it is an "important" and "proper" factor. (*Leg. Defs.' Opp'n / Cross MSJ*, p. 37 (citing *Vieth*, 541 U.S. at 299 (plurality op.); *Harper v. Hall*, S.E.2d 393, 420-21 (N.C. 2023); *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 6 (2024) (stating "redistricting is an inescapably political enterprise")). The people of Utah, however, in passing Proposition 4 determined that partisan advantage and incumbency protection are not "important" nor "proper" considerations for redistricting. The people hold the power of the sovereign. They have properly exercised their fundamental constitutional right to reform redistricting through legislation. Because the legislature is "but the agents of the people," they are bound to comply with duly proposed and enacted legislation under Proposition 4 which prohibits partisan gerrymandering.

Second, the Legislative Defendants raise concerns that prohibiting the Commission and Legislature from "purposefully or unduly favoring or disfavoring incumbents, candidates, or political parties" is difficult to implement. They raise the hypothetical that a map could be drawn that has the "effect" of favoring or disfavoring incumbents, candidates and political parties, regardless of the intent or purpose. In addition, the Legislative Defendants assert that prohibiting partisan gerrymandering implicates "fairness," something that is not justiciable. Hence, the importance of and need for the mandatory, neutral, prioritized redistricting standards and procedures enacted under Proposition 4. The obvious defense against challenges of partisan motivation and "unfairness" is compliance with the codified standards and the procedures. Compliance with Proposition 4's mandatory redistricting standards and procedures establish a justiciable standard that can be reasonably evaluated. *See Rucho v. Common Cause*, 588 U.S. 684, 718, 139 S. Ct. 2484, 2506–07, 204 L. Ed. 2d 931 (2019) ('[J]udicial action must be governed by *standard*, by *rule*,' and must be 'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws." (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278, 279, 124 S. Ct. 1769 (plurality opinion)). The *Rucho* Court expressly recognized that the solution to partisan gerrymandering lies in legislation with the states and specifically recognized that "provisions in state statutes and state constitutions can provide standards and guidance for state courts to apply." *Rucho v. Common Cause*, 139 S. Ct. at 2507. Proposition 4 is that solution for Utah.

### 3. **Application of judicial standards and scientific and statistical methods**

The Legislative Defendants argue that section 20A-19-103(4), which requires evaluation of a plan's compliance with redistricting criteria using "judicial standards and the best available data and scientific and statistical methods, including measures of partisan symmetry . . . to assess whether a proposed redistricting plan abides by and conforms to" Proposition 4's redistricting standards" violates article IX by replacing the legislature's legislative and political redistricting function with a "judicial" one. (*Leg. Defs.' Opp'n / Cross MSJ*, p. 37.) The Court disagrees that this provision is unconstitutional or that it displaces or supplants any legislative function. Notably, S.B. 200 also provides for the same review using the same standards. S.B. 200 states that if the commission conducts a review "to determine whether the map complies with the redistricting standards adopted by the commission, . . . the commission shall use judicial standards and, as determined by the commission, the best available data and scientific methods." Utah Code Ann. §20A-20-302(8)(a), (b) (2020). The language enacted by the legislature in S.B. 200 says virtually the same thing. In addition, as Plaintiffs noted, the legislature must consider judicial standards (e.g., U.S. Supreme Court rulings, Utah Supreme Court rulings, and both the Utah and U.S. Constitutions), use available data (e.g., population data, voting patterns, demographics, communities of interest data, etc.) and apply various scientific methods (e.g., tools, methods, computer-based algorithms and simulations) to ensure electoral maps comply with both federal and state laws (e.g., Equal Protection Clause and the Voting Rights Act or 1965), and to confirm that race is not a predominate factor in drawing district lines. Further, given the general, non-specific nature of the language, the legislature retains discretion in determining what judicial standards are applicable and they retain discretion to determine the "best available data and scientific and statistical methods" to use in evaluating redistricting plans for compliance with state and federal law and the Proposition 4 redistricting

standards. This provision does not impair the legislature's authority under article IX and does not displace the legislature's legislative redistricting authority.

### 4. Private cause of action

Finally, the Legislative Defendants assert Proposition 4's private cause of action, making Proposition 4's redistricting standards and procedures mandatory on the legislature and enforceable by the courts also impairs the legislature's power under article IX. As discussed above, the people of Utah hold the power in this state. They exercised their fundamental constitutional right to pass a law establishing redistricting standards and procedures binding on the legislature. They also have the right to provide a mechanism for the people to enforce that law.

### C. Proposition 4 does not unconstitutionally intrude on or supplant the Legislature's core legislative function.

The Legislative Defendants contend that certain Proposition 4 provisions cannot be harmonized with the rest of the constitution or with the legislature's core legislative functions. *LWVUT*, 2024 UT 21, ¶ 9 ("[C]ourts must 'harmonize constitutional provisions with one another and with the meaning and function of the constitution as a whole.'" (quoting *Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 17, 144 P.3d 1109, 1114). Specifically, they assert that Proposition 4 interferes with the legislature's authority and discretion over appropriations. They assert that it delegates the legislature's core legislative redistricting function to an independent commission and to the chief justice of the Supreme Court. And they assert that certain provisions violate article VI, section 12 of the Utah Constitution by modifying the legislature's internal procedural rules, over which it has exclusive authority. (*See generally Leg. Defs.' Opp'n / Cross MSJ*, p. 41-56.). Each argument is addressed in turn.

### 1. Appropriations

The Legislative Defendants argue that Proposition 4's mandatory funding provision "was not a proper exercise of the initiative power" because it "restricted the Legislature's discretion over appropriations." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 41.) They argue that this funding provision unconstitutionally intrudes on the Legislature's fiscal responsibilities. They argue that article XIII, section 5 of the Utah Constitution requires the Legislature to balance the budget each fiscal year and that the legislature is prohibited from establishing appropriations that "bind" future legislatures. (*Id.* p. 41-42.) They explain that budgeting decisions affect the allocation of public resources, level of service provided and the costs of government, all of which are "legislative-political" decisions wholly within the Legislature's discretion. (*Id.* p. 42-43.) In addition, they argue Proposition 4's funding provision imposes a funding obligation without any conceivable limit or any check on what constitutes "adequate funds for the Commission to carry out its duties." (*Id.* p. 43.) And because lawsuits are authorized for noncompliance, Proposition 4 "could" make state courts the arbiter of what constitutes "adequate" funding, which is a violation of separation of powers. (*Id.*) While several arguments are presented, none of them are persuasive.

The Legislative Defendants' arguments presume that the people do not have the legislative power to enact law that requires and necessarily relies on funding. This is not supported by Utah law. As previously explained, the legislative power of the State is vested in *both* the Legislature and the people of the State of Utah. Utah Const. art. VI, § 1(1)(a)-(b). The people's power to legislate, through initiative, is equal to that of the Legislature. *Sevier Power Co., LLC.*, 2008 UT 72, ¶ 7. If the topic of legislation is appropriate for the Legislature, it is also appropriate for the people. *Carter,* 2012 UT 2, ¶22, 30-31. For these reasons, Proposition 4's funding provision is an appropriate subject for and use of the people's legislative power via initiative. For this Court to hold that a citizen initiative cannot propose any legislation that requires funding would effectively render the people's reservation of their right to directly legislate and to directly legislate to reform their government a nullity.

The Legislative Defendants' argument also presumes that the Commission may be entitled to an unlimited amount of funding. Proposition 4 plainly provided that "[t]he Legislature shall appropriate *adequate funds* for the Commission to carry out its duties, and shall make available to the Commission such personnel, facilities, equipment, and other resources as the Commission may reasonably request." Utah Code § 20A-19-201(12)(a) (2018) (emphasis added). This provision does not require the Legislature to fund any specific amount. Rather, the Legislature has both the ability and discretion to determine what is "adequate" funding for the Commission to carry out its duties. It also has discretion to consider the "reasonableness" of the resources requested by the Commission.

The Legislative Defendants seem to suggest that the Legislature's ability to balance the annual budget is jeopardized by Proposition 4. The Court agrees that the Legislature is required under article XIII, section 5 of the Utah Constitution to balance the annual budget each fiscal year. However, it is not clear how Proposition 4 jeopardizes the Legislature's ability to do that. The Legislative Defendants do not allege any specific fact and offer no evidence supporting the statement that Proposition 4 will jeopardize Utah's annual budget.

In addition, the Legislative Defendants take the position that Proposition 4's funding provision is unconstitutional because it establishes appropriations that bind future legislatures. The Court is unclear what specific language in Proposition 4 is offensive and how funding for the Commission would be materially different than what the Legislature enacted in S.B. 200. In S.B. 200, the Legislature appropriated / committed one million dollars to fund the Commission under S.B. 200 and ensured that the funding will "not lapse" for at least the next fiscal year. *See* Utah Code Ann. § 20A-20-13(1)-(2) (2020). This specific language appears to undercut the Legislative Defendants' argument that a legislature "cannot bind a future legislature's hands . . . when it comes to budgetary decisions." (*Leg. Defs.' Opp'n / Cross-MSJ,* p. 42.). In addition, there are examples where, by law, future legislatures are bound to honor financial commitments made by prior legislatures. *See, e.g.,* Utah Code § 63J-1-205.1 (2020) (effective as of 2020 and requiring the Legislature to "appropriate money each fiscal year sufficient to pay the principal, premium, and interest due on the state's outstanding general obligation bonds before making any other appropriation in the fiscal year."). While the Court recognizes that the legislature is entrusted with and plays a crucial role in overseeing the State's budget, spending, appropriations and its debt, it is unclear how requiring "adequate" funding for the Proposition 4 Commission is unconstitutional while committing one million dollars for the S.B. 200 Commission, which funding will "not lapse" is not.

In addition, given that Proposition 4 passed by a majority vote and was enacted as law,
the Legislature simply is not free to reject or decline to follow the law, simply because it
disagrees. The Supreme Court has recognized that the legislature cannot impose "overly
burdensome restrictions, on the initiative power when the constitutional responsibility and duty
of the legislature in enacting initiative enabling legislation is to facilitate the initiative process."
*Gallivan*, 2002 UT 89, ¶59 n. 11.[12] This principle should also apply when the initiative passes
and becomes law.

The Legislative Defendants cite *People's Advocates, Inc. v. Superior Court,* 226 Cal.
Rptr. 640, 647, 181 Cal. App. 3d 316, 329 (Ct. App. 1986), arguing that the people's initiative
was invalid to the extent it "displaced the process (budget and budget bill) by which [the
constitution] command[ed] the adoption and enforcement of budget" and attempted to bind
future legislatures. (*Leg. Defs.' Opp'n / Cross-MSJ*, p. 42.) The *People's Advocates* case,
however, is not applicable here. In *People's Advocates*, the initiative in question restricted the
operating budget of the legislature in perpetuity using a specific numerical formula and, in so
doing, that court concluded that it "divest[ed the Legislature] of the power to enact legislation in
violation of the California Constitution. *People's Advocates,* 226 Cal. Rptr. at 647. By limiting
the Legislature's budget, it necessarily limited the Legislature's core legislative function. That is
not the case here.

Under Proposition 4, the Commission is a public body, appointed by elected officials,
that will make *advisory* recommendations in an effort to increase the accountability of the
Legislature during the redistricting process. *Cf Salt Lake City v. International Association of
Firefighters,* 563 P.2d 786, 789-90 (Utah 1977) (holding legislature could not surrender
legislative authority to an unaccountable private commission, appointed by private actors, that
issued binding determinations). Given the advisory nature of the Commission under Proposition
4, the Legislature retains the authority and discretion to determine the "adequate funding" that
will be appropriated and arguably the reasonableness of the resources requested by the
Commission to fulfill its duties.

## 2. **Delegating Core Legislative Functions**

The Legislative Defendants assert that Proposition 4 unconstitutionally delegates the
Legislature's redistricting responsibilities to the commission and the chief justice. The
Legislative Defendants' delegation argument relies primarily on the premise that the Legislature
has sole and exclusive authority over redistricting, a premise rejected as a matter of federal and
Utah law above. They also contend that Proposition 4 has so limited and circumscribed the
Legislature's core legislative redistricting functions that they have essentially been delegated to

---

[12] The *Gallivan* court stated: "The Legislature is not free to enact restrictions on constitutionally
established and guaranteed rights and powers whenever it perceives that the system of checks and
balances is misaligned or out of equilibrium. Such a purpose is not a legitimate legislative purpose.
Furthermore, it is not a legitimate legislative purpose to impose checks and balances, i.e., overly
burdensome restrictions, on the initiative power when the constitutional responsibility and duty of the
legislature in enacting initiative enabling legislation is to facilitate the initiative process." *Gallivan v.
Walker,* 2002 UT 89, ¶59 n. 11. "[T]he representative legislative process, while coequal and coextensive
with the direct initiative legislative process, has a different character in our constitutional system than the
direct legislative process in that the direct initiative legislative process may be considered a constitutional
check on the representative legislature if it fails to enact widely supported legislation." *Id.*

the Commission (and to some extent, if involved, the chief justice) because the Commission has primary responsibility for creating redistricting plans. Plaintiffs, on the other hand, argue that both the Commission and the chief justice serve solely in an advisory role, are bound to follow statutorily required redistricting standards and procedures, and offer only non-binding recommendations for consideration by the Legislature. The Court agrees with Plaintiffs.

Reviewing the provisions of Proposition 4, it is clear that the Legislature retains the ultimate decision-making authority when it comes to redistricting. It is free to reject or adopt any recommended redistricting plan or to create its own, subject to Proposition 4's redistricting standards and procedures. Proposition 4 creates an Independent Redistricting Commission and empowers it to create and "recommend" redistricting plans, which would be presented to the Legislature for consideration. Utah Code § 20A-19-204(2)(a) (2018). Proposition 4 does not require the Legislature to enact any of the recommended plans. *See* Utah Code Ann. §20A-19-204(2)(a) ("[t]he Legislature shall either enact without change or amendment ... or reject the Commission's recommended redistricting plans submitted to the Legislature ...." (emphasis added)). Instead, the Legislature has the option to "either enact [one of the proposed redistricting plans] without change or amendment . . . or reject" all three of them. *Id.* If it rejects the recommended plans, it can design its own, but the Legislature's plan – like those recommended by the Commission – must comply with the statutorily required redistricting standards, comply with the procedure (timing, notice, etc.), and the general prohibition on partisan gerrymandering. *See id.* § 20A-19-204(5)(a), § 20A-19-103(1). If the Legislature elects to design and enact its own redistricting plan, it is obligated to issue a report, explaining why it rejected the recommended plans and why it's redistricting plan "better satisfies the redistricting standards and requirements." *Id.* § 20A-19-204(5)(a).

The Commission and the chief justice's role in redistricting is advisory. Under Proposition 4, the Legislature remains free to reject or adopt a recommended plan or to design and enact its own. Proposition 4 does not "delegate" the Legislature's "core function" or authority to "divide the state into congressional, legislative, and other districts" to the Commission or to the chief justice. Rather, the Commission, in compliance with the mandatory redistricting standards, designs redistricting plans and makes recommendations. The ultimate decision as to which redistricting plan to enact remains with the Legislature. It has the discretion to adopt or reject any redistricting plan proposed by the Commission, or if called upon the chief justice, or it can design and enact its own. *Salt Lake City v. Int'l Ass'n of Firefighters, Locs. 1645, 593, 1654 & 2064*, 563 P.2d 786, 790 (Utah 1977) (stating, to "retain the power to make ultimate policy decisions," the Legislature must be free to "override decisions made by others.")

The Utah Supreme Court also reviewed Proposition 4 in ruling that Plaintiff's Count V stated a viable claim. It also recognized that under Proposition 4, the Legislature still retains the "ultimate responsibility" for "dividing the state into congressional, legislative, and other districts" and enacting the congressional and legislative maps. *LWVUT*, 2024 UT 21, ¶ 198. It also rejected the argument that the Commission's role was more than advisory. *Id.* Notably, the Legislative Defendants do not address or challenge the *LWVUT* court's analysis. They do not discuss how the Legislature's retention of the ultimate decision-making responsibility supports or impacts their delegation argument. Instead, the Legislative Defendants cite specific language from three cases to support their argument that Proposition 4 unconstitutionally delegated the

Legislature's core legislative redistricting function to the Commission. Plaintiffs do not disagree with the law cited in those cases. Rather, the cases are factually distinguishable because Proposition 4 does not delegate the Legislature's core legislative function to the Commission or the chief justice. Each case is discussed in turn.

The Legislative Defendants cite *W. Leather & Finding Co. v. State Tax Comm'n of Utah,* 87 Utah 227, 48 P.2d 526, 528 (1935), stating: "The Legislature is not permitted to abdicate or transfer to others the essential legislative function with which it is thus vested." *Id.* In that case, the Utah Supreme Court reversed a tax commission decision that imposed a tax and then determined who was required to pay the tax. *Id.* The court reasoned that "the imposition of a tax and the designation of those who must pay the same is an essential legislative function that may not be transferred to others." *Id.* In contrast, it recognized that "[t]he power vested in the commission to prescribe rules and regulations for making [tax] returns for ascertaining assessment and collection of the tax imposed by the act does not vest in the commission any discretion whatsoever in the matter of requiring the payment of a sales tax by anyone other than such as are designated in the act." *Id.* at 527–28. In contrast, Proposition 4 authorizes the Commission and the chief justice to only *recommend* redistricting plans. They have no decision-making authority; that authority remains with the Legislature.

They also cite *Int'l Ass'n of Firefighters,* 563 P.2d 786, 790 (Utah 1977) for the proposition that the Legislature's legislative and redistricting power must "be exercised by persons responsible and accountable to the people – not independent of them." In *Int'l Ass'n of Firefighters,* the Utah Supreme Court concluded that the legislature could not "delegate *unlimited discretion"* to "an ad hoc panel of private persons to make basic governmental policy" and make binding decisions. *Id.* at 789 (emphasis added). For context, the legislature passed an act that authorized the appointment of arbitrators, comprised of private citizens to make "binding determinations affecting the quantity, quality and cost of essential public service." *Id.* The arbitrators would ultimately make decisions on "conditions of employment," including retirement plans, workloads, work rules, management-right clauses and safety," including the number of men on duty at a particular time, the number assigned to equipment, and type of equipment used. *Id.* The arbitrator's decisions were final and binding on all matters in dispute, with the exception of salary and wage matters. *Id.* The court concluded that the legislature, who is accountable to the public, must "retain the power to make the *ultimate* policy decisions and override decisions made by others." *Id.* at 790. In support of its decision, the *Int'l Association of Firefighters'* court explained:

> It is the unique method of appointment, requiring independent decision makers without accountability to a governmental appointing authority, and the unique dispersal of *decision-making power* among numerous ad hoc decision makers, only temporarily in office, precluding assessment of responsibility for the consequences of their decisions on the level of public services, the allocation of public resources and the cost of government, which renders invalid this particular delegation of legislative power.

*Id.* (emphasis added) (quoting *Dearborn Fire Fighters Union v. City of Dearborn*, 394 Mich. 229, 231 N.W.2d 226, 241 (1975)).

Under Proposition 4, the Commission does not have unlimited discretion. Rather, it must comply with the redistricting process set forth in Proposition 4, which includes designing redistricting plans in compliance with federal law and Proposition 4's mandatory redistricting standards and complying with redistricting procedures. The Commission does not have final decision-making authority. And it does not make binding decisions. The Commission merely recommends proposed redistricting plans drawn in accordance with Proposition 4's standards and procedures. The Legislature has the option to adopt, reject or design its own redistricting plans. Unlike the arbitration panel in *Int'l Ass'n of Firefighters*, the Legislature is the ultimate decision-maker.

Finally, they rely on *Matheson v. Ferry,* 641 P.2d 674 (Utah 1982). In *Matheson*, the legislature amended a statute that established the legal process for the appointment of judges by the governor. The governor at the time challenged the constitutionality of the statute, arguing that it violated separation of powers by unconstitutionally controlling the appointment process and (1) limiting the governor's options to "one of two or three candidates nominated by the judicial nominating commission, on which two legislators sat, and (2) subjecting the governor's nominees to advice and consent by the Senate. *Id.* at 678-79. The *Matheson* court analyzed each restriction individually and collectively. It concluded that the legislators' participation on the nominating commission and the requirement that the governor choose from a "severely narrow[]" field of candidates was not unconstitutional and did not violate separation of powers. *Id.* at 679. However, it did conclude that the "advice and consent" provision, which effectively gave the senate a veto over the governor's choice, was unconstitutional by violating the separation of powers. *Id.* at 679-80.  The Court reasoned that with these statutory restrictions, "the Governor's discretion and power . . . bec[a]me severely curtailed to a point where his participation in the appointment process could become ineffective, subvervient, and perfunctory, amounting to effective control by the Legislature." *Id.* at 679.

Unlike the statute in *Matheson*, Proposition 4 authorizes the Commission and, when involved, the chief justice only to *recommend* redistricting plans. They have no decision-making authority and no veto. To the extent that the Legislature is required to consider and vote on recommended plans, without amendment and with an up / down vote, the Legislature still remains free to reject all the plans and instead create its own. Contrary to reasoning in *Matheson*, the Legislature's role in redistricting under Proposition 4 is not "subservient," "perfunctory," or controlled by the Commission or the chief justice in any way.

Proposition 4 does not delegate to the Commission or the chief justice or to any other body the Legislature's core legislative redistricting function. The Legislature retains the ultimate decision-making authority regarding which redistricting plan to enact and it has the authority to adopt or reject any recommended plan and the discretion to create its own in compliance with Proposition 4's redistricting standards and procedures.

### 3.  **The Chief Justice of the Utah Supreme Court**

Plaintiffs argue that giving the chief justice a role in the redistricting process does not violate the separation of powers under article V of the Utah Constitution and does not amount to

an advisory opinion. While the Legislative Defendants challenge generally and collectively the Commission's and the chief's justice's redistricting roles under Proposition 4 (as discussed above), they do not respond to or oppose these specific arguments. However, they do highlight that Plaintiffs do not challenge S.B. 200's removal of the chief justice's role from the redistricting process. The Court agrees with Plaintiffs.

Article V, section 1 of the Utah Constitution establishes three branches of government and states that "no person charged with the exercise of powers properly belonging to one of [the] departments, shall exercise any functions appertaining to either of the others." Utah Const. art. V, § 1. To violate this constitutional provision, the Utah Supreme Court has stated that the role undertaken "must be so inherently legislative, executive or judicial in character that they must be exercised exclusively by their respective departments" *In re Young*, 1999 UT 6, ¶ 14, 976 P.2d 581 (cleaned up). The Young court clarified that the power or function exercised by one member of one branch must "appertain[] to" another branch, specifically it "must be one that is essential, core, or inherent in the very concept of one of the three branches of a constitutional government." *Id.* ¶ 26. In so doing, the Court also recognized that there are "powers and functions which may, in appearance, have characteristics of an inherent function of one branch but which may be permissibly exercised by another branch." *Id.* ¶ 14; *see, e.g., Matheson v. Ferry*, 641 P.2d at 679 (holding legislators' participation on judicial nominating commission was not unconstitutional and did not violate separation of powers). The *Young* court was asked to reconsider its initial ruling in the case. After analyzing prior rulings and considering that members from all three branches provide some amount of cross-branch support, the Court reversed its initial ruling and held that statutes providing for service by four legislators on the Judicial Conduct Commission and for their appointment by house and senate leaders did not violate separation of powers clause of Utah Constitution. *Id.* ¶ 28.

The legal and factual analysis in *Young* is instructive in this case. Here, Proposition 4 tasks the chief justice to play a contingency role, if certain events occur. Section 20A-19-201(10) directs the chief justice to appoint commissioners to the Commission *if* the designated appointing authority fails to do so. Section 20A-19-203(2) directs the chief justice to select at least one compliant plan (from the two submitted to him or her from the Commission) *if* the Commission fails to agree upon a plan to recommend to the Legislature. In this case, like in *Young,* the chief justice's limited role in redistricting is not inherently or exclusively legislative. If called to participate, the chief justice could appoint commissioners to the Commission or would be asked to tie break by selecting a redistricting plan that complies with Proposition 4's redistricting standards to recommend to the Legislature, but only if the Commission fails to or cannot do so. The chief justice makes only nonbinding recommendations, does not decide which redistricting plans to enact and is not lawmaking. For these reasons, the chief justice's limited cross-branch service does not violate separation of powers because the role is a limited, contingent function and not a core legislative power. [13]

---

[13] Plaintiffs cite several examples where the chief justice or other members of the judiciary are called upon to recommend the adoption of legislation or participate in cross-branch activities. (*Pls.' Mot.* at 19, n. 2.) Plaintiffs cite for example Utah Code § 78A-2-104(5)(c)(ii) (requiring the Judicial Council to provide "recommendations for legislation"); Utah Code § 26B-5-803(3) (requiring Utah Behavioral Health Commission, including members of judiciary appointed by the Chief Justice to report

In addition, the chief justice's role in redistricting is not tantamount to issuing an advisory opinion. The Judicial Power Clause of article VIII, section 1 of the Utah Constitution "implies a prohibition on the issuance of advisory opinions by our *courts*." *Utah Transit Authority v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 23, 289 P.3d 582 (emphasis added). The chief justice of the Utah Supreme Court is but one member of that court. While he or she is tasked to fulfill a limited role under Proposition 4, fulfilling that role and recommending a redistricting plan is not an opinion, advisory or otherwise, by the Utah Supreme Court. In this limited role, the chief justice is not exercising a judicial power. He or she would essentially be making a recommendation based on work done by the Commission, if the Commission is unable to do so. The recommendation is not a "judgment" nor a legal ruling by a "court." While the chief justice's participation under Proposition 4 is not unconstitutional and any recommendation made is not an advisory opinion from a "court," any challenge to the plan the chief recommends or the plan ultimately enacted by the Legislature could lead to the chief justice's recusal from that case. Voluntary recusals are not uncommon.

### 4.  The Legislature's Discretion

The Legislative Defendants argue that the Legislature's exercise of "discretion" inherent in redistricting cannot be limited by statute (i.e., by enacting law) and that Proposition 4 unconstitutionally restrains the Legislature's discretionary redistricting authority. They challenge all Proposition 4 provisions that require the Legislature to comply with any *mandatory* redistricting process, standards and procedures.[14] The crux of their argument is that the Legislature, alone, has exclusive, constitutionally vested redistricting authority and with that, the unfettered discretion to exercise that authority. This Court has already rejected this argument. The Legislature's redistricting authority is subject to the state's ordinary law-making constraints, which include the people's equal right to propose redistricting legislation. Post-Proposition 4, the Legislature does not have unrestricted or unfettered "discretion" to redistrict as it pleases. Rather, the Legislature is subject to and required to comply with the mandatory redistricting standards and procedures under Proposition 4. The people have the legislative authority to enact redistricting legislation, and it did. Proposition 4 – which was state law – is exactly what was envisioned by the majority in *Rucho* to address issues of partisan gerrymandering.

---

recommendations to the Legislature); Utah Code § 63O-2-301(1)(c) (requiring State Capitol Preservation Board, which includes the chief justice or a designee to submit a budget request to the Legislature and the Governor).

[14] The mandatory redistricting standards include the specified order of priorities, the requirement to minimize municipality and county splits, the ban on partisan considerations, the requirement to use judicial standards, and the private right of action. They challenge the timing limitations, specifically that the Legislature must allow the Commission and/or the chief justice to fulfill their statutory responsibilities before the Legislature can create its own plan. They challenge the requirement that the Legislature must consider the plans recommended by the Commission, by voting on the plans, without amendment, and with an up or down vote. And, if the Legislature elects to create its own plan, they challenge the requirement to issue a public explanation. They assert that Proposition 4 unconstitutionally limits the Legislature's redistricting authority and eliminates its discretion in creating a redistricting plan.

Nonetheless, the Legislative Defendants cite select excepts from *Evans & Sutherland Computer Corp. v. Utah State Tax Comm'n*, 953 P.2d 435, 442 (Utah 1997) and *Salt Lake City v. Ohms*, 881 P.2d 844 (Utah 1994) asserting that the Legislature's constitutionally-granted redistricting authority, under article IX, section 1, cannot be limited by statute and that it must retain "*discretion*" to discharge its responsibilities under the Utah Constitution and make policy decisions. (*See e.g.,* Leg. Defs.' Reply at 3-8.) Neither *Evans* nor *Ohms* stand for nor support the argument that a citizen's initiative, containing provisions binding on the legislature, is unconstitutional because it limits legislative discretion by statute. Rather, these cases stand for the proposition that the Legislature cannot transfer power constitutionally granted to one legislative body to another nor delegate its core-legislative functions to an independent body, respectively.

In *Evans*, the Utah Supreme Court addressed the constitutionality of a statute that vested district courts with the ability to review Tax Commission decisions "*de novo*," giving no deference to the State Tax Commission's decision. *Evans & Sutherland Computer Corp.*, 953 P.2d at 440. Article XIII, section 11 of the Utah Constitution[15] establishes the State Tax Commission and specifically defines the makeup of the commission and its constitutionally established duties. *Id.* at 441. The *Evans* Court held that "this constitutional provision is more than a grant of power to the Commission. It also limits the power of the legislature to confer the Commission's powers on other governmental entities." *Id.* at 442. It ultimately concluded that the *de novo* judicial review standard, under these circumstances, was unconstitutional because it effectively removed the Tax Commission's constitutionally bestowed *power* to decide how to adjust and equalize the valuation and assessment of property and vested that power with the district courts, whenever the Tax Commission's decision was challenged. *Id.* at 442-43. The court concluded that the statute did not actually provide for review of the Commission decision; rather, it effectively removed a core function from the Commission and effectively placed the Tax Commission's decision-making with the courts to decide "afresh." *Id.* at 441, 443. The *Evans* Court held the legislature violated article XIII, section 11 by establishing *de novo* review of the Tax Commission's decisions. *Id.* at 442.

---

[15] Article XIII, section 11 states:

> There shall be a State Tax Commission consisting of four members, not more than two of whom shall belong to the same political party. The members of the Commission shall be appointed by the Governor, by and with the consent of the Senate, for such terms of office as may be provided by law. The State Tax Commission shall administer and supervise the tax laws of the State. It shall assess mines and public utilities and adjust and equalize the valuation and assessment of property among the several counties. It shall have such other powers of original assessment as the Legislature may provide. Under such regulations in such cases and within such limitations as the Legislature may prescribe, it shall review proposed bond issues, revise the tax levies of local governmental units, and equalize the assessment and valuation of property within the counties. The duties imposed upon the State Board of Equalization by the Constitution and Laws of this State shall be performed by the State Tax Commission.

Utah Const. art. XIII, § 11.

In *Ohms,* the Court considered the constitutionality of a statute that delegated the "ultimate judicial power" to a commissioner, upon a criminal defendant's waiver of the right to a trial before district court judge with or without jury and consent to have the cased tried and final judgment entered by a court commissioner. *Ohms*, 881 P.2d at 846. The *Ohms* Court considered the constitutional power granted to courts under article VIII of the Utah Constitution. It held "[c]ore functions or powers of the various branches of government are clearly nondelegable under the Utah Constitution." *Id.* at 848. The court explained that while "a legislator can utilize assistants for various purposes, *these assistants cannot exercise the legislator's voting power since such is a core legislative function.* It is the legislator, not his or her staff, who is elected for that purpose, and it is the legislator who is accountable to the people." *Id.* (emphasis added). Similarly, the court concluded that "a judge cannot appoint another person to enter final judgments and orders or impose sentence." *Id.* The *Ohms* court acknowledged that judges can rely on referees, court commissioners and other assistants in supporting roles, but they cannot exercise a judge's ultimate judicial power because that "core function" is "nondelegable." *Id.* It also concluded that the legislature's attempt to grant commissioners judicial authority to perform a "core function" by statute, violated article VIII, section 8's judicial selection process and separation of powers. *Id.* at 851-52.

*Evans* and *Ohms* do not apply here. There is no separation of powers issue. The legislature and the people are not separate. Together, they make up the "Legislative Department" and have co-equal law-making authority. Redistricting is a quintessentially legislative function. There is no unconstitutional delegation of core legislative functions. Proposition 4 does not delegate the Legislature's core legislative function to the Commission or the chief justice. The Commission and, if called upon, the chief justice serve in purely advisory roles. The Legislature does in fact retain discretion in fulfilling its redistricting responsibilities; however, it must do so in compliance with Proposition 4. It also retains the ultimate decision-making authority and the discretion to decide which redistricting plan to enact.

5. **Legislature's Internal Rule Making Authority, under Article VI, Section 12 of the Utah Constitution.**

The Legislative Defendants argue that certain provisions in Proposition 4 invade the Legislature's constitutional authority to determine its own procedural rules under the Utah Constitution.[16] Article VI, section 12: "Each house shall determine the rules of its proceedings and choose its own officers and employees." Utah Const. art. VI, § 12. They claim that certain Proposition 4 provisions violate the constitution by placing procedural and mandatory

---

[16] The Legislative Defendants also assert that Proposition 4 transgresses the Legislature's constitutional law-making procedure. They argue that the Utah Constitution requires "[e]very bill shall be read by title three separate times in each house," and every bill shall pass "with the assent of the majority of all the members elected to each house." Utah Const. art. VI, § 22. That "[t]he presiding officer of each house, not later than five days following adjournment, shall sign all bills . . . passed by the Legislature." *Id.* § 24. And it requires the Legislature to "present" each bill passed "to the Governor" for approval. Utah Const. art. VII, § 8(1). The Legislative Defendants, however, do not explain how Proposition 4 prevents them from complying with these provisions of the Utah Constitution. (*See Leg. Defs.' Opp'n / Cross MSJ,* p. 43-44.)

restrictions on the Legislature, specifically: (1) that the Legislature take a mandatory up-or-down vote on the plans recommended by the Commission or the chief justice, Utah Code §20A-19-204(2)(a) (2018); (2) that, if the Legislature were to adopt its own plans, it must issue a report and explain how its plan "better satisfies" Proposition 4's substantive standards, §20A-19-204(5)(a) (2018); (3) that the Legislature accept public comments on the proposed redistricting plan for at least 10 calendar days, §20A-19-204(4) (2018); (4) that the Legislature redistrict only once a decade unless ordered by a court, §20A-19-102 (2018); and (5) that the Legislature only adopt a map after receiving the maps from the Commission or the chief justice, §20A-19-204(3) (2018). (*See generally Leg. Defs.' Opp'n / Cross MSJ*, p. 43-56.) They contend that the Legislature should not be required to comply with any mandatory procedural provision in Proposition 4 that differs from its internal rules of proceeding.

Plaintiffs assert that article VI, section 12, cannot prohibit or limit a citizen's initiative to alter or reform the government. They argue article VI, section 12, must be interpreted and applied in light of and in harmony with other constitutional provisions. *See Berry by and through Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675 (Utah 1985). The other relevant provisions are article 1, section 2 and article VI, section 1, which provide that "[a]ll political power is inherent in the people," that they have the power and the right to "initiate any desired legislation," and "to alter or reform their government as the public welfare may require." Utah Const. art 1, § 2; Utah Const. VI, § 1(2)(a)(i)(A). They assert the people's right to initiate legislation is co-equal with and "reaches to the full extent of that of the Legislature." *Carter v. Lehi City,* 2012 UT 2, ¶ 22, 30-31. And, while they appear to accept that the five challenged provisions are procedural, they assert that the "line between procedural and substantive law is hazy." *Moore,* 600 U.S. at 31 (citations and quotations omitted). Based on all of these principles, Plaintiffs contend that the Legislature's constitutional authority to determine its rules of internal proceeding cannot trump the people's fundamental constitutional right to exercise their co-equal and co-extensive legislative power to enact substantive redistricting reform.

The Court agrees, to some extent, with both sides. This Court recognizes the breadth of the people's legislative power to initiate legislation to alter or reform their government. The Utah Supreme Court's decisions in *Carter, Gallivan,* and recently in *LWVUT,* make clear that the people's right to enact *law* is fundamental and it is co-equal and co-extensive with the Legislature. Article VI, section 12 of the Utah constitution also expressly grants the Legislature the power to establish and determine its internal rules of operation. This grant of internal rule-making authority ensures that the legislative branch can function independent of the other two branches and is a core aspect of the separation of powers. Utah const. art. V, section 1; *see also People's Advoc.,* 226 Cal. Rptr. at 642 ("[T]he power of a legislative body to govern its own internal workings has been viewed as essential to its functioning except as it may have been expressly constrained by the California Constitution."). While the people have co-equal legislative power and the right to initiate legislation to "alter or reform" the government, the Court agrees that the initiative power cannot be used to enact laws *solely* to displace the Legislature's internal *rule-making* authority under article IV, section 12 of the Utah Constitution. *See, e.g., Paisner v. Att'y Gen.*, 390 Mass. 593, 603, 458 N.E.2d 734, 740 (1983) (declining to certify an initiative with the principal purpose of proposing changes "to the organization and operation of the House and Senate"). But the Court disagrees that that is what Proposition 4 did.

As discussed fully herein, whether the five challenged provisions violate the Legislature's exclusive rule-making authority[17] requires analysis of the subject of and purpose behind the initiative itself. The subject of Proposition 4 was redistricting reform. The purpose was to create an independent redistricting process, including mandatory standards and procedures, applicable to both the newly created commission and the legislature and enforceable through a private right of action. There is no dispute that redistricting is a purely legislative function. The five challenged provisions do not unconstitutionally invade the Legislature's exclusive rule-making authority. While they are procedural in nature, they are not "internal rules" passed under the guise of legislation. Rather, these procedural requirements are inextricably intertwined with Proposition 4's substantive, legislative redistricting reform. But, to the extent that these procedural requirements contradict the Legislatures' "internal rules" that apply generally to all proceedings, any incidental infringement on the Legislature's internal rules was both appropriate and necessary to facilitate Proposition 4's substantive redistricting reform.

### a.  **Rules versus Laws**

To determine if the challenged provisions in Proposition 4 are unconstitutional invasions into the Legislature's exclusive rule-making authority, the Court must determine if Proposition 4 is enacting *law* or if it is making *rules,* through legislation. The case *Paisner v. Att'y Gen.*, 390 Mass. 593, 599-602, 458 N.E.2d 734, 738-740 (1983) is instructive in explaining the difference between the two.

In *Paisner,* the Massachusetts Supreme Court affirmed a decision, declining to certify a proposed citizen initiative because it exceeded legislative authority. The initiative plainly proposed changes "to the organization and operation of the House and Senate." *Id.* at 736. It proposed sweeping changes to all internal functions, including processes for nominating and appointing presiding officers, majority and minority floor leadership, legislative committee chairs, and committee members. *Id.* at 737. It prescribed committee procedures, including reporting, recording committee votes, notice of committee sessions, and public hearings on every bill. *Id.* It also included provisions covering daily calendars, printing bills, roll calls, and it established a committee on legislative administration and budget, and proposed limitations on salary differentials of legislative leaders. *Id.*

The *Paisner* court concluded that the initiative exceeded the scope of legislative power because it proposed to establish "rules" rather than enact "law." *Id.* at 739. The court distinguished the two explaining that "laws govern conduct external to the legislative body, while rules govern internal procedures." *Id.* A law is binding, but a rule is not because the legislature's internal rules are subject to change by current and future legislatures. *Id.* (stating "future legislative sessions cannot be bound" and the "discretion to determine the method of

---

[17] Notably, Utah courts have not interpreted article VI, section 12 of the Utah Constitution and have not considered any challenges – via citizen initiative or otherwise – to the Legislature's internal rule-making processes. Utah courts have not addressed how the people's fundamental constitutional right to "alter or reform" their government may impact the Legislature's constitutional authority to determine their internal proceedings, if at all. And Utah courts have never addressed if any "incidental" impact on the Legislature's rule-making authority is unconstitutional. This presents yet another issue of first impression.

procedure cannot under the Constitution . . .be abrogated by action taken by an earlier
Legislature."). And, in that case, given the nature of pure rule-making, "[e]ven if the proposed
initiative were to be enacted, the continuing power of the individual branches to ignore its
provisions and to determine their own procedures would render the proposal a nullity." *Id.*

In reaching its decision, the *Paisner* court considered the "principal purpose" of the
initiative, which was to change the internal operations of the legislature. *Id*. It ruled that such
"[l]egislative rule-making authority is a continuous power absolute and beyond the challenge of
any other tribunal." *Id.* (citing *United States v. Ballin,*[18] 144 U.S. 1, 12 S. Ct. 507, 36 L.Ed. 321
(1892)). It also ruled that the legislature's internal rule-making was beyond the reach of the
people's initiative power, notwithstanding the co-equal and co-extensive power the people and
the legislature shared. *Id.* (holding "the plaintiffs, in their initiative petition which seeks to
establish rules for future legislative sessions, claim for the people a power greater than that of the
[legislature].").

The Legislative Defendants cite *People's Advocates, Inc.,* 226 Cal. Rptr. 640, for the
same proposition that citizen initiatives cannot control the legislature's internal rule-making
processes.[19] Notably, the *People's Advocates* case is factually similar to *Paisner.* In *People's
Advocates,* the people passed a statutory initiative measure titled the "Legislative Reform Act of
1983" (the Act), which proposed "sweeping changes in the organization and operation of the
Assembly and Senate and limit[ed] the content of future legislation which appropriates money

---

[18] The U.S. Constitution contains a provision similar to article VI, section 12 of the Utah Constitution. It
states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. In
*United States v. Ballin*, 144 U.S. 1 (1892), the U.S. Supreme Court considered whether an act was legally
passed by a "quorum" of voting members, as that term was defined by the internal rules of the house. *Id.*
at 3. In interpreting this provision, the *Ballin* Court confirmed that "[t]he constitution empowers each
house to determine its rules of proceeding[,]" but recognized that this rule-making power is not unlimited
and that such "rules" cannot be used to "ignore constitutional restraints or violate fundamental rights."
*United States v. Ballin*, 144 U.S. 1, 5 (1892). (recognizing "there should be a reasonable relation between
the mode or method of proceeding, established by the rule and the result which is sought to be attained.")

[19] The Legislative Defendants also cite *Alaskans for Efficient Government, Inc. v. State of Alaska,* 153
P.3d 296 (Alaska 2007). In that case, the Alaskan Supreme Court considered, pre-election, whether a
proposed initiative that would require a supermajority vote in the Alaska legislature or a majority vote of
the people to pass any tax-related bills was the proper subject matter for a citizen initiative. The State
argued that the initiative was unlawful because the Alaska Constitution authorized the legislature to pass
most laws by simple majority vote. The Alaska Supreme Court addressed the pre-election challenge and
affirmed the refusal of state officials to place the initiative on the ballot. *Id.* at 298. (allowing limited
challenges pre-election only when "the initiative is challenged on the basis that it does not comply with
the state constitutional and statutory provisions regulating initiatives") (cleaned up). The *Alaska* Supreme
Court treated the state constitution's majority vote requirement as a "constitutionally based subject-matter
restriction, prohibiting the enactment of any law that proposes to modify the majority-vote standard." *Id.*
at 302. It then held that state officials properly rejected the initiative at the preelection stage "for failing to
comply with constitutional provisions regulating initiatives." *Id.* This case is consistent with the Utah
Supreme Court's ruling in *LWVUT*, recognizing that a citizen initiative cannot amend the Utah
Constitution. And this Court has rejected the argument that Proposition 4 attempted to amend the Utah
Constitution.

for their operations." *Id.* at 642. The proponents of the initiative argued that their constitutional initiative power was superior to and could supersede the legislature's constitutional rule-making authority and that a statute is superior to a rule. *Id.* at 643-44. They reasoned that the people have the power "to propose statutes ... and to adopt or reject them," a power shared with its state legislature and the governor. *Id.* In contrast, they argued that an "internal rule is merely a product of the house or houses that created it," and because the legislature adopted rules by statute, the Act did not violate the California Constitution. *Id.*

The *People's Advocates* court disagreed. It rejected the argument that a statute is superior to a rule and could supersede and control the subject matter of the legislature's rule making powers. *Id.* at 644-46. The Court held that "the *form* (statute or rule or resolution) chosen by a house to exercise its rule-making power cannot preempt or estop a house from employing its *substantive* powers under" the constitution and confirmed that a rule of internal proceeding "made in the guise of a statute is nonetheless a *rule* 'adopted' by the house and may be changed by an internal rule." *Id.* at 645. The Court held: "It is not the form by which the rule is adopted but its substance which measures its place in the constitutional scheme." *Id.* at 646. The *People's Advocates* court concluded that the Act attempted to enact "law" that effectively replaced the state legislature's internal "rules" regarding everything from "the selection of the officers of the houses" to "their rules of proceeding," which, under the California Constitution was within "the exclusive prerogative of each house of the Legislature or the combined houses." *See id. generally,* at 644-46. For those reasons, the California Court of Appeals concluded that half of the Act violated the California Constitution and was not the proper subject matter for a citizen's initiative.

Proposition 4 is distinguishable from the legislation proposed in both *Paisner* and *People's Advocates*. In each of those cases, the principal purpose of the initiative was rule-making through legislation *solely* to govern the internal proceedings of the respective state legislatures. In this case, the "fundamental and overriding purpose" of Proposition 4 was to enact redistricting legislation. *See Coppernoll v. Reed*, 155 Wash. 2d 290, 302, 119 P.3d 318, 324 (2005) (rejecting initiative, pre-election, because it was not within either the state's or the people's power to enact). Any intrusion on the Utah Legislature's internal procedures here is merely "incidental" to fulfilling the purpose of the legislation. *Id.* In evaluating if legislation is properly proposed as an initiative, consideration should be given to the *"fundamental and overriding purpose"* of the initiative, rather than mere "incidental[s]" to the overriding purpose. *Futurewise v. Reed*, 161 Wash. 2d 407, 412–13, 166 P.3d 708, 711 (2007) (rejecting challenge to the constitutionality of an initiative, pre-election)

Redistricting is a legislative function. Proposition 4 both altered how redistricting would be accomplished in Utah and enacted redistricting reform that was binding on the Legislature, the Commission, the chief justice, the people and the courts. Proposition 4 enacted substantive *law* establishing a redistricting process, which includes mandatory standards and procedures. Consistent with the analysis in *Paisner*, Proposition 4 and its redistricting legislation was law-making, not rule-making. Unlike the Act proposed in *Paisner*, which attempted to reform the legislature's internal procedures and turn "rules" into "laws," the purpose behind Proposition 4 was to eliminate the opportunity for partisan gerrymandering and to create neutral standards and

procedures for redistricting, which provide, through legislation, manageable and justiciable standards to address partisan gerrymandering.[20] Unlike the initiatives challenged in *Paisner* and *People's Advocates,* Proposition 4 does not invade the Legislature's internal rule-making authority or dictate how the Legislature should govern its general internal proceedings.

### b.  Limitations on the Legislature's internal rule-making authority

This Court respects the Legislature's constitutional authority to determine the rules of its internal proceedings. The Utah Constitution clearly empowers each house and the entire Legislature to do so. Utah Const. art. VI, § 12. And this Court agrees, the form the rule takes, whether it be a "rule" or a "statute," does not limit that power. *People's Advoc., Inc,* 226 Cal. Rptr. at 642. But that power is not unlimited. The Legislature's internal rule-making power cannot be used to "ignore constitutional restraints or violate fundamental rights." *See United States v. Ballin*, 144 U.S. 1, 5 (1892) (interpreting similar U.S. Constitution provision,[21] recognizing "there should be a reasonable relation between the mode or method of proceeding, established by the rule and the result which is sought to be attained."); *see also Burt v. Speaker of the House of Representatives*, 173 N.H. 522, 528, 243 A.3d 609, 614 (2020) ("The legislature may not, even in the exercise of its absolute internal rulemaking authority, violate constitutional limitations."). It also should not be used to disregard the legislation enacted by the people through the exercise of fundamental constitutional rights merely because the legislature disagrees with it.

The Legislature's reliance on its internal rule-making authority to reject the substantive procedural requirements of Proposition 4's redistricting reform must be evaluated in light of the people's constitutional right and the Legislature's corresponding constitutional duty. The people have the fundamental constitutional right to exercise their legislative initiative power to alter or reform their government to enact substantive redistricting reform. *LWVUT*, 2024 UT 21, ¶¶ 9-11. The Legislature also has a recognized "constitutional responsibility and duty" to facilitate the citizen initiative process by "enact[ing] initiative enabling legislation." *Gallivan,* 2002 UT 89, ¶ 59 n. 11. The Legislature cannot add barriers to the initiative process "whenever it perceives that the system of checks and balances is misaligned or out of equilibrium." *Id.* That is not a "legitimate legislative purpose." *Id.* It logically follows then, that once a citizen-initiative passes and becomes substantive law, the Legislature also has a similar duty to facilitate the legislation.

---

[20] The U.S. Supreme Court, in various decisions, has discussed the challenges with redistricting and applicable standards to evaluate partisan gerrymandering claims. That Court noted: "Indeed, the multitude of "granular" decisions that are made during redistricting was part of why the *Vieth* plurality concluded, in the context of a statewide challenge to a redistricting plan promulgated in response to a legal obligation to redistrict, that there are no manageable standards to govern whether the predominant motivation underlying the entire redistricting map was partisan." *League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 457, 126 S. Ct. 2594, 2632 (2006). This is also why Chief Justice Roberts – writing for the majority – concludes that partisan gerrymandering claims are non-justiciable in federal court in *Rucho v. Commoncause, 588 U.S. 684, 718, 139 S. Ct. 2484, 2506–07, 204 L. Ed. 2d 931 (2019)*. *Rucho* then clearly states that this is an issue that must be resolved by the states.

[21] It states that "[e]ach House may determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2.

It simply cannot decline to implement it because it does not agree with it or because implementing the substantive legislation may necessitate modification to the Legislature's non-binding internal "rules" in order to facilitate this specific new law.

    c.  **Internal procedure rules vs. substantive law integral to redistricting reform.**

    The Legislative Defendants challenge five of Proposition 4's provisions, asserting each one "doesn't fit with" the Legislature's standard, internal rules and therefore invades its internal rule-making authority. The five challenged provisions, however, do not actually change or govern the general internal operations of the Legislature. Rather, as discussed further herein, these provisions only apply when the Legislature is involved in redistricting, which is generally once every ten years. These provisions are legal requirements forming the procedural foundation for the substantive redistricting legislation.[22] Each provision challenged is integral to the redistricting legislation as passed by a majority of the voters in 2018. This Court's analysis is limited to whether these five challenged provisions violate article VI, section 12 and are therefore unconstitutional "rule-making." They are not.

    (i)  **The mandatory up / down vote**

    The Legislative Defendants first argue that requiring the legislature to vote on the Commission's or the Chief Justice's proposed redistricting plan, with an up or down vote, and without changes or amendments, does not "fit" with the Legislature's internal process. They specifically raise the concern that there may be no legislator to sponsor any specific recommended plan presented for a vote. *See* Utah Code § 20A-19-203, -204(2)(a). The provisions requiring the legislature to vote on, and not merely disregard, recommended redistricting plans is a substantive requirement of the legislation. It ensures that the work performed by the Commission is at least considered by the legislature and doesn't die in or get tabled by the redistricting committee. Further, the recommended redistricting plans, even if not adopted, provide a basis for the legislature to consider options in designing its own plan in accordance with the statutory redistricting standards. Under the circumstances, this substantive requirement that in fact alters and reforms redistricting should not be rejected just because it does not fit into the legislature's internal rules that apply in all circumstances. Redistricting will occur once every ten years. The Legislature is duty bound to facilitate the implementation of the law passed by the people, which may include determining if and/or how to modify internal rules to facilitate substantive redistricting law and procedure.

    (ii)  **The mandatory report**

    The Legislative Defendants argue it is both impractical and difficult to issue a report "ascertaining the will of 104 individual legislators" to explain why the legislature rejected the recommended plans and why the Legislature's redistricting plan better complies with the statutory redistricting standards. *See* Utah Code § 20A-19-301(5)(a). Assuming the preparation of such a report would be difficult and impractical, that argument does not make the requirement

---

[22] The Legislature's internal rules are largely procedural. Substantive law may also be procedural. Just because the Legislature is legally required to comply with a "procedure" does not make it an internal rule.

unconstitutional. As Plaintiffs point out, the Legislature has a adopted a process to provide counsel or reporting to United States Senators representing Utah, when requested. *See* Utah Code § 36-27-103. This counsel or reporting takes the form of either a joint resolution of the Legislature or a written statement that contains signatures of a majority of the members. *Id.* § 36-27-103(1)( a), (b). Capturing the collective views of legislators is not impractical nor unconstitutional. Requiring some explanation regarding the basis for the Legislature's decision to reject all recommended plans in favor of its own is a substantive requirement of the redistricting legislation. It ensures the Commission's work is considered and ensures that enacted maps comply with Proposition 4's mandatory redistricting standards. It also provides transparency into the redistricting process.

### (iii) **10-day notice period**

The Legislative Defendants also take issue with the requirement prohibiting the Legislature from enacting any redistricting plan without first "making [it] available on the Legislature's website . . . for a period of no less than 10 calendar days" and accepting public comments during that time. *See* Utah Code § 20A-19-204(4). They claim it invades their general rule-making authority to decide what they do, when to do it and how. They also argue that it is not necessary because, by virtue of the position, legislators must make themselves available to their constituents anyway. None of these arguments are persuasive. The 10-day notice requirement – as it specifically pertains to the redistricting map the Legislature proposes to enact – is another substantive redistricting requirement, ensuring transparency and public involvement in the redistricting process.

### (iv) **Requiring the Legislature to wait to enact a redistricting plan until after the Commission / Chief Justice completes statutory duties**

The Legislative Defendants challenge the provision prohibiting the Legislature from "enact[ing] any redistricting plan . . . until adequate time [has been] afforded to the Commission and to the chief justice to satisfy their duties . . .". Utah Code § 20A-19-102, -204(3). They contend this displaces the Legislature's ability to set procedural rules. To the contrary, it is a substantive procedural requirement of the redistricting legislation. It ensures that the Commission and to the extent necessary, the chief justice, have sufficient time to fulfill their legal obligations and perform the work required by the statute. It also ensures that the Legislature has the opportunity to benefit from the work performed by the Commission, and if necessary the chief justice, before the Legislature selects a recommended plan or elects to design its own. This provision ensures that the Commission actually plays the contemplated advisory role.

### (v) **Limiting redistricting to once every 10 years**

The Legislative Defendants argue that Proposition 4 "intrudes on the Legislature's constitutional prerogatives." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 49.) They argue that article IX of the Utah Constitution grants the Legislature "discretion to decide whether to conduct mid-decade redistricting," and if there is any limitation on when redistricting should be accomplished, they argue that limitation can only be established by the Legislature through the "rules of [e]ach house," *see* Utah Const. art. VI, § 12, or by a constitutional amendment. (*Id.* p. 49-50.) The

Legislative Defendants essentially argue that the Legislature can redistrict at any time because they can change their own internal rules to allow redistricting. In addition, they appear to argue that subsection (1)'s limitation on redistricting to once every ten years is an attempt to amend the Utah Constitution by statute, which cannot be accomplished through a citizen initiative. *LWVUT*, 2024 UT 2, ¶ 161. The Court disagrees.

First, as discussed above, the Legislature cannot use their internal rule-making authority to disregard constitutional rights or limitations. *Burt v. Speaker of the House of Representatives*, 173 N.H. 522, 528, 243 A.3d 609, 614 (2020) ("The legislature may not, even in the exercise of its absolute internal rulemaking authority, violate constitutional limitations.").

Second, Article IX, section 1 of the Utah Constitution expressly limits the Legislature's authority to redistrict once every ten years. Proposition 4, section 20A-19-102(1), does not amend the constitution, rather it is consistent with article IX, section 1 of the Utah Constitution. Section 20A-19-102, is titled "Permitted Times and Circumstances for Redistricting." Utah Code Ann. § 20A-19-102 (2018). The statute contains five subsections (1) – (5), each addressing different times and circumstances justifying redistricting. The Legislative Defendants challenge only one, specifically section 20A-19-102(1).[23] That challenged provision, section 20A-19-102(1), states:

> Division of the state into congressional, legislative, and other districts, and modification of existing divisions, is permitted only at the following times or under the following circumstances: (1) no later than the first annual general legislative session after the Legislature's receipt of the results of a national decennial enumeration made by the authority of the United States.

Utah Code Ann. § 20A-19-102(1).

The Legislative Defendant's correctly assert that the Utah Constitution contains limitations and not "grants" of authority. With this in mind, article IX, section 1 states:

> *No later than the annual general session next following the Legislature's receipt of the results of an enumeration[24] made by the authority of the*

---

[23] While section 20A-19-102 recognizes five circumstances that may trigger redistricting, the Legislative Defendants only challenge one, the express limit of redistricting once a decade under section 20A-19-102(1). Notably, Proposition 4 also substantively *adds* by statute the authorization to redistrict "after a change in the number of congressional, legislative or other districts resulting from an event other than a national decennial enumeration." *Id.* § 20A-19-102(2). The Legislative Defendants do not challenge subsection (2). Because the other provisions in section 20A-19-102 are not challenged, the Court does not address them here.

[24] Notably, the Legislative Defendants' references to the "results of an enumeration made by the authority of the United States" generally refers to the "U.S. Census." (*See Leg. Defs.' Opp'n / Cross MSJ*, p. at 49 (quoting article IX, section 1 but inserting "U..S. Census".)

> *United States*, the Legislature shall divide the state into congressional,
> legislative, and other districts accordingly.

Utah Const. art. IX, § 1 (2008) (emphasis added). As discussed earlier, this provision was
amended in 2008. The proposed amendment, which passed, reworded the provision to establish
the *timing* for redistricting, specifically amending it to say that redistricting shall occur "no later
than the annual general session next following . . . the results of an enumeration made by the
authority of the United States."

The Enumeration Clause, under Article I, Section 2, Clause 3, of the United States
Constitution, states:

> Representatives and direct Taxes shall be apportioned among the several
> States which may be included within this Union, according to their
> respective Numbers.... The *actual Enumeration shall be made* within
> three Years after the first Meeting of the Congress of the United States,
> and *within every subsequent Term of ten Years*, in such Manner as they
> shall by Law direct.

U.S. Const. art. I, § 2, cl. 3 (emphasis added). This clause established the decennial census as a
fundamental part of the American system of government.[25]

Under Utah's Constitution, the "annual general session" refers to Utah's annual
legislative session. It is common knowledge that our annual legislative session begins in January
of each year. Interpreting article IX, section 1, of the Utah Constitution as a limitation of

---

[25] The Colorado Supreme Court in *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1237-1243  (Colo.
2003) interpreted the Colorado Constitution and concluded that redistricting under Colorado law was
limited to once every ten years. The Court considered its constitution, statutes, other state and federal
caselaw and the policy behind limiting redistricting to every ten years. That Court persuasively reasoned:

> ***The framers knew that to achieve accountability, there must be stability in
> representation***. During the debates over the frequency of congressional elections,
> James Madison said: "Instability is one of the great vices of our republics, to be
> remedied." *1787: Drafting the U.S. Constitution* 212 (Wilbourn E. Benton ed., 1986)
> (notes of Mr. Madison). At the same time, the framers recognized that as the new union
> evolved, the population of the states would shift and grow and require changes in the
> distribution of congressional seats. *Id.* at 376. This fundamental tension between
> stability and equal representation led the framers to require ten years between
> apportionments. *Armstrong v. Mitten,* 95 Colo. 425, 433–34, 37 P.2d 757, 761 (1934)
> (citing with approval *People ex rel. Snowball v. Pendegast,* 96 Cal. 289, 31 P. 103, 105
> (1892), which says the framers of the state constitution must have consciously balanced
> the upheaval associated with redistricting with the need for equal representation). This
> ten-year interval was short enough to achieve fair representation yet long enough to
> provide some stability.

*Id.* at 1242 (emphasis added).

authority, and in light of the Enumeration Clause, redistricting "shall" occur "no later than" the "annual general" legislative session immediately following the receipt of the federal census, which occurs every "ten years." Under the plain language of the Utah Constitution, redistricting is triggered when the legislature receives the decennial census and it is limited to occur once every ten years.

The Legislative Defendants point to article IX, section 2, asserting they can change the number of senators and representatives, at any time, and therefore the Legislature has the discretion to redistrict whenever they decide to change those numbers. But article IX, section 2, does not say that. Article IX, section 2, states only that "[t]he Senate shall consist of a membership not to exceed twenty-nine in number, and the number of representatives shall never be less than twice nor greater than three times, the number of senators." Utah Const. art. IX, § 2. It does not expressly authorize redistricting at any time or from time to time merely because the Legislature changes the number of members. *Compare* Wyo. Const. art. III, § 49 ("Congressional districts may be altered from *time to time* as public convenience may require." (emphasis added)). Rather, this provision establishes the membership, which is required to be complied with during the process of redistricting.

The Legislative Defendants also cite *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418–19, 126 S. Ct. 2594, 2610 (2006), asserting that " 'there is nothing inherently suspect about a legislature's decision" to enact a mid-decade plan." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 50.) That quote and the holding in the *Perry* case is not so straightforward. The complete quote states: "there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own." *Perry*, 548 U.S. at 419. *Perry* involved a challenge to the state legislature's mid-decade congressional redistricting plan, which had been implemented to replace a judicially created plan. The *Perry* Court concluded only that "the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders." *Id.* (holding the proposed mid-decade redistricting plan violated the Voting Rights Act's dilution provisions). The *Perry* case, however, does not stand for the proposition that the Legislature has the unfettered discretion to redistrict whenever it chooses.

Persuasive authority from other state courts support that when the constitution establishes a time for a task, by implication, it limits the task from being done at another time. For instance, as it pertains to redistricting, the Colorado Supreme Court stated: "[w]hen the constitution specifies a timeframe for redistricting, then, by implication, it forbids performing that task at other times." *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1238 (Colo. 2003) (interpreting the Colorado Constitution to limit redistricting to once every ten years); *see also People ex rel. Mooney v. Hutchinson*, 172 Ill. 486, 50 N.E. 599, 601 (1898) ("Where there are provisions inserted by the people as to the time when a power shall be exercised, there is at least a strong presumption that it should be exercised at that time, and in the designated mode only; and such provisions must be regarded as limitations upon the power"); *Denney v. State ex rel. Basler*, 144 Ind. 503, 42 N.E. 929, 931–32 (1896) ("The fixing, too, by the constitution, of a time or a mode for the doing of an act, is, by necessary implication, a forbidding of any other time or mode for the doing of such act.").

The people of Utah enacted 20A-19-102(1). Utah law provides:

[i]t is a basic principle that legislative enactments are endowed with a
strong presumption of validity." *State v. Mohi,* 901 P.2d 991, 1009 (Utah
1995) (quotations and citations omitted). We should not strike a statute
"unless there is no reasonable basis upon which [it] can be construed as
conforming to constitutional requirements." *Id.* When one interpretation
results in constitutional conflict, we may adopt another construction, if
possible, "so long as the resulting construction does not conflict with the
reasonable or actual legislative purposes of the statute." *Id.* Hence, we need
not determine whether there is a single correct interpretation; we need only
determine whether there exists a reasonable interpretation that avoids
inconsistency.

*State v. Ansari*, 2004 UT App 326, ¶ 10, 100 P.3d 231, 235–36. The plain language of Section
20A-19-102(1) – limiting redistricting by the "Legislature" to once every ten years, after receipt
of the decennial census – is consistent with and does not conflict with nor amend article IX,
section 1 of the Utah Constitution. It is a reasonable interpretation. The clarification achieved by
adding "decennial" to describe "enumeration" does not result in a constitutional conflict.

Section 20A-19-102(1) is part of the core redistricting reform. It is substantive law, and
not an internal rule. It is consistent with the Utah Constitution. It furthers the goal to ensure a
transparent process and to ensure that partisan motivation does not drive redistricting. "As one
author put it, politicians understand that a census is a necessary prerequisite for redistricting:
[T]here is no denying that when a new party gains a legislative majority in mid-decade it does
not redistrict the state's congressional delegation right away but waits until the next Census. This
is another of the "rules of the game" in legislative life, for everyone wants to avoid violent
seesaws in policy. *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1240 (Colo. 2003) (Andrew
Hacker, *Congressional Districting: The Issue of Equal Representation,* p. 66 (1963).

### d.  **Incidental infringements on the Legislature's constitutional authority**

For the sake of argument, even if the Court assumes that the five challenged procedural
requirements are intrusions on the legislature's constitutional authority to determine its internal
proceedings, these five provisions in Proposition 4 are merely incidental infringements,
necessary for the substantive legislation enacted by the people to be fully implemented.

The Utah Supreme Court has recently discussed the interplay between substantive laws
and procedural rules.[26] In *State v. Rippey*, 2024 UT 45, the court addressed the separation of
power between the legislature's power to enact substantive laws and the judiciary's authority to
adopt procedural rules as applied to the Plea Waiver Statute. *Id.* ¶ 23. The court explained:
"[s]ubstantive laws are laws that create, destroy, or alter the rights and duties of parties and

---

[26] The Court notes that neither party discussed *State v. Rippey*. This decision was issued in December
2024, just after briefing was completed. Nonetheless, because this Court's ruling is based on the law, the
Court determined that additional briefing on this issue was unnecessary. The ruling and the application to
the undisputed facts here is straightforward.

which may give rise to a cause of action." *Id.* (cleaned up). "Procedural rules prescribe the practice and procedure or the legal machinery by which the substantive law is made effective." *Id.* The *Rippey* court acknowledged: "We have previously held that a procedural provision in a statute does not violate separation-of-powers principles when it is attached to a substantive right and 'cannot be stripped away without leaving the right or duty created meaningless.' Said another way, 'a procedural rule may be so intertwined with a substantive right that the court must view it as substantive.'" *Id.* ¶ 41 (quoting *State v. Drej*,[27] 2010 UT 35, ¶ 31, 233 P.3d 476, 486). The takeaway – when a statute is enacted that is "*overwhelmingly substantive*, aside from a small procedural component," any "*incidental infringement*" upon the judiciary's authority to adopt procedural rules may be "*appropriate*" and "*necessary for the legislature to define the right that it had created*." *Id.* ¶¶ 45-46 (emphasis added).[28]

The *Rippey* analysis is helpful here. Although there is no separation of powers issue between the legislature and the people because they are both within the legislative department, the Court is analyzing two competing constitutional rights asserted by the legislature and the people. In the context of redistricting, there is some tension between the Legislature's internal rule-making authority and certain statutory redistricting procedure. Resolving this tension requires striking a balance between the Legislature's right to create rules for its internal proceedings and the people's right to initiate (and pass) substantive legislation to reform their government. Here, there is no question that Proposition 4 is overwhelmingly substantive legislation to reform and establish a statutory redistricting process. And the five challenged provisions are applicable *only* in the context of redistricting, which arguably will only take place once every ten years. These procedural requirements are so intertwined with the substantive redistricting legislation that they must be viewed as "substantive." Courts have recognized that "the line between procedural and substantive law is hazy," and that many rules "are rationally capable of classification as either." *See, e.g., Moore v. Harper,* 600 U.S. 1, 31–32 (2023) (cleaned up). And, in the redistricting context, procedure is often "used as a vehicle to achieve substantive ends." *Id.*

---

[27] In *Drej*, the Court reasoned: "There will be times when the legislature enacts laws that confer substantive rights. At times, the procedures attached to the substantive right cannot be stripped away without leaving the right or duty created meaningless. The burden of proof associated with special mitigation is one of those instances. Utah's special mitigation statute creates a substantive right, which the legislature generally has the authority to enact. But the procedural portion of the statute that requires the defendant to prove special mitigation by a preponderance of the evidence is inextricably connected to the right to plead special mitigation in the first place. Thus, the legislature did not act contrary to Utah's separation of powers provision when it enacted the special mitigation statute by simple majority, as opposed to the super-majority that is required of procedural rules." *Drej,* 2010 UT 25, ¶ 31.

[28] In *Rippey*, the court balanced the "substantive law and procedural infringement," concluding that the statute was overwhelming procedural and was not inextricably intertwined with the substantive law of the plea withdrawal statute. *Rippey*, 2024 UT 45, ¶ 46.

Here, Proposition 4's redistricting reform is overwhelmingly substantive. Even
Proposition 4's procedural components are part of the substantive redistricting law. To the extent
that the five procedures (up/down vote, reporting, ten-day notice period, waiting period, and
decennial redistricting), mandatory on the Legislature, are in fact infringements on its internal
rule-making authority, they are incidental infringements. These requirements apply only in the
context of redistricting and, likely, will arise only once every ten years. Further, these substantive
procedural requirements are appropriate and necessary for the people to establish and define
redistricting standards and procedures. These mandatory procedures are not only inextricably
intertwined with Proposition 4's substantive redistricting reform, but they are also core to the
reform.

## II.     *Second LWVUT Factor*

Did Plaintiff's prove, as a matter of law, that the Legislature impaired the people's
initiative to alter or reform redistricting in Utah when the Legislature repealed Proposition 4 and
enacted S.B. 200? *Yes*.

Proposition 4 was a citizen-initiative that was passed by the majority[29] of Utah voters in
2018. Proposition 4 was placed on the ballot in the 2018 election. The Voter Pamphlet describing
Proposition 4 explained that prohibiting partisan gerrymandering was its "most important"
provision. (*See 2018 Voter Information Pamphlet*, *Leg. Defs.*' Ex. A, Dkt. 406, p. 5.) Proposition
4 created the "Utah Independent Redistricting Commisison and Standards Act." The statutes
enacting Proposition 4's reforms, codified under Utah Code sections 20A-19-101 to -301 (2018),
became Utah law and specifically prohibited the practice of "divid[ing] districts in a manner that
purposefully or unduly favors any incumbent elected official, candidate or prospective candidate
for elective office, or any political party." *Id.* § 20A-19-103(3). To further the reform, a new
governmental body—the Utah Independent Redistricting Commission—was created; the seven-
member commission was required to conduct their activities and prepare redistricting plans in an
"independent, honest, transparent and impartial manner." *Id.* §§ 20A-19-201(1), (2), and -202(2).

Proposition 4 established standards and procedures for the redistricting process, binding
on both the Commission and the Legislature. The redistricting standards were required to be
applied "to the greatest extent practicable" in the following order: (a) adhering to federal law and
achieving equal population between districts; (b) minimizing the division of municipalities and
counties in the formation of districts, (c) creating geographically compact districts; (d) making
districts contiguous and allow for efficient transportation throughout the district; (e) preserving
traditional neighborhoods and communities of interest, (f) following natural and geographic
features, and (g) maximizing boundary agreement among different types of electoral and
government districts. *Id.* §20A-19-103(2)(a) – (g). The Commission would design and adopt at
least one and as many as three redistricting plans, and then conduct public hearings throughout
the state, providing an opportunity for public input. *Id.* §§ 20A-19-203(1) and -202(5)(b), (7),
(9)(a).

---

[29] The Legislative Defendants point out numerous times that Proposition 4 passed by a small
margin. (*Leg. Defs.' Opp'n / Cross MSJ.*, pp. 1, 10, 12, 67.) But a law passed by a small margin
is still a law.

Proposition 4 also established the procedure by which the recommended redistricting plans would be submitted to and considered by the Legislature. *Id.* § 20A-19-204. The Commission was required to submit *recommended* redistricting plans to the Legislature, and then the Legislature was required to vote on the plans "without change or amendment," or to reject them and propose its own plan. *Id.* § 20A-19-204(2)(a), (5)(a). If it chose to create its own plan, the Legislature would be required to apply the redistricting standards and requirements set forth in section 20A-19-103, and it would be prohibited from enacting any plan until the Commission and chief justice of the Supreme Court had adequate time to satisfy their duties, including designing plans, holding public hearings and selecting one or more plans to recommend. *Id.* § 20A-19-204(3). The legislature was required to make any plan it chooses to enact available to the public on its website or other equivalent electronic platform for no less than 10 calendar days and in a format that allows the public to assess compliance with Proposition 4's redistricting standards and in a manner that allows for public comment. *Id.* § 20A-19-204(3). And, if the legislature enacts a redistricting plan other than one recommended by the Commission, then, within seven days of enactment, it was required to explain in writing to the people how its redistricting plan better satisfied the statutory redistricting requirements. *Id.* § 20A-19-204(5)(a).

Proposition 4 also expressly states that redistricting is limited to once a decade, occurring no later than the first annual general legislative session after the Legislature's receipt of the federal decennial census. *Id.* § 20A-19-102. And it provided for a private right of action, ensuring that citizens could enforce the statutory provisions, and provided for injunctive relief if a redistricting plan "fails to abide by or conform to the redistricting standards, procedures, and requirements" of the Act. *Id.* § 20A-19-301(1), (2).

When compared to Utah's prior redistricting process, it is clear that Proposition 4 substantively reformed the redistricting process in Utah. It established an independent redistricting Commission. It codified a redistricting process, which included mandatory standards and procedures for creating redistricting plans that were binding on the Commission and the Legislature. Proposition 4 required transparency in the creation of the maps and provided a mechanism for state-wide public hearings and input. And it provided a mechanism for enforcement, by providing a private right of action. When Proposition 4 was passed by a majority of Utah voters in the 2018 election, it became law that was binding on the people of Utah, the independent Commission, the Chief Justice and the Legislature. The people properly exercised their right, "within the bounds of the constitution and the legislative power." *LWVUT*, 2024 UT 21, ¶ 104. Therefore Proposition 4 is "constitutionally protected from government infringement, including legislative action that impairs the government reform." *Id.*

Citing a concern that Proposition 4 *may* be an "unconstitutional" intrusion into the Legislature's exclusive redistricting authority, the Legislature enacted S.B. 200 on March 28, 2020, titled "Redistricting Amendments." S.B. 200 did three things: (1) it repealed all nine of the statutes enacted under Proposition 4: Utah Code sections 20A-19-101 to -301; (2) it enacted nine new statutes: Utah Code sections 20A-20-101 to -303; and (3) it amended two statutes, under the Governmental Immunity Act, specifically Utah Code section 63G-7-201 and -301, thereby removing the citizen's right to enforce the redistricting process or challenge a congressional map and revoking the waiver of immunity for such claims.

53

S.B. 200 retained the independent redistricting commission and provided specific funding
for the commission. Utah Code Ann. § 20A-20-201; S.B. 200, Section 13 "Appropriation"
(authorizing a $1 million budget for the commission and providing that the funds would not
"lapse" at the end of fiscal year 2021).[30] It retained a process for public hearings and public
input. *Id.* § 20A-20-301. It also retained the requirement that the commission prepare and
recommend up to three different "maps" for each map type, including a map for congressional
districts, Senate districts, House of Representative Districts, and State School Board Districts. *Id.*
§ 20A-20-302(1), (2). SB 200 includes a list of redistricting standards, including some listed in
Proposition 4, but it gives complete discretion to the commission to define the standards used
and then to determine what standards to apply. *See generally id.* § 20A-20-302(4)-(7) ("The
commission *shall define and adopt redistricting standards* for use by the commission that
require that maps adopted by the commission, to the extent practicable, *comply with the
following, as defined by the commission*:" (emphasis added)). No standards are mandatory or
binding on either the commission or the Legislature. And while the standards that can be applied
include the prohibition on "purposeful or undue favoring or disfavoring of an incumbent elected
official, a candidate or prospective candidate for elected office; or a political party," it is not
required. *Id.* § 20A-20-302(5)(f)(i)-(iii). It is also within the commission's discretion to prohibit
the use of partisan political data, political party affiliation information, voting records, partisan
election results, or residential addresses of incumbents, candidates, or prospective candidates,
although it is not required to do so and the use of this information is not prohibited in any way.
*Id.* § 20A-20-302(6).

S.B. 200 contains no provisions binding on the Legislature, with one exception. Section
20A-20-303(4) states that the Legislature may not enact a redistricting plan before the
commission submits its recommended maps to the Legislature's redistricting committee and the
committee holds a public hearing. *Id.* The redistricting standards are not binding, and neither the
Legislature nor its redistricting committee are required to vote on or even consider any
redistricting plans created and recommended by the commission. *Id.* § 20A-20-302(4), (5). S.B.
200 also removed the enforcement mechanism and eliminated the private right of action by
amending Utah Code sections 63G-7-201 and -301 of the Utah Governmental Immunity Act. *Id.*
§ 63G-7-301 (removing the following: "(j) as to any action or suit brought under Section 20A-
19-301 and as to any compensation or expense awarded under Section 20A-19-301(5).").

Simply comparing the two bills and the statutes enacted by them, S.B. 200 is significantly
and materially different than Proposition 4. As the Legislative Defendants point out, S.B. 200
does retain some of Proposition 4's key features. It retained an independent advisory
commission, funded the 2021 commission, included a list of redistricting standards for
consideration, and allows for some public input and comment. However, it is not merely what
S.B. 200 retained, it is what it removed that is material to this analysis. S.B. 200 removed the
prohibition on partisan gerrymandering. Now, neither the Commission nor the Legislature is

---

[30]  Plaintiffs do not contend that the map selection process created by S.B. 200, under Utah Code section
20A-20-302(1)-(3) impaired the reforms under Proposition 4.

prohibited from "divid[ing] districts in a manner that purposefully or unduly favors any incumbent elected official, candidate or prospective candidate for elective office, or any political party," a key feature of Proposition 4. Utah Code Ann § 20A-19-103(3) (2020). S.B. 200 includes a list of redistricting standards, but they are no longer mandatory. Instead, the redistricting standards "may" be considered by the commission; however, the commission has the discretion to both establish and define its own redistricting standards for the plans it draws and submits. *See* Utah Code § 20A-20-302(4)-(8) (2020).

The most consequential change that impaired Proposition 4's redistricting reform is that S.B. 200 removed all mandatory requirements that were binding on the Legislature. The Legislature is no longer required to comply with or consider any redistricting standards. It is not required to comply with any procedures. It is not required to vote on or even consider any redistricting plan submitted to it by the commission. *Id.* § 20A-20-303 ("The [Legislature's redistricting] committee or the Legislature may, but is not required to, vote on or adopt a map submitted to the committee or the Legislature by the commission."). If the Legislature creates its own redistricting plan, it does not need to provide any explanation, and it is not required to present its plan to the public for input. All of Proposition 4's mandatory redistricting standards, both substantive and procedural, were removed. The enforcement provisions established under Proposition 4 were removed, and the waiver of immunity under the Governmental Immunity Act, *see id.* §§ 63G-7-201 and 63G-7-301 (2020), ensuring no state-law based legal challenge can be asserted based on a redistricting plan or an enacted congressional map. It effectively nullified the redistricting reform enacted by the people. Because the Legislature is not required to comply with any redistricting standards or procedures, and partisan gerrymandering is no longer prohibited, the redistricting "law" enacted by S.B. 200 is illusory.

When the Legislature repealed Proposition 4 and replaced it with S.B. 200, it impaired the core redistricting reform enacted under Proposition 4 and infringed the people's fundamental constitutional right to reform their government. The repeal of Proposition 4 and the enactment of S.B. 200 was unconstitutional.

After considering the parties' arguments, the Court concludes that Plaintiffs have successfully proven the first two factors set forth in *LWVUT*. First, the people properly exercised their initiative power in passing Proposition 4's redistricting reform. Redistricting is legislative, and the legislative power is shared co-equally and co-extensively between the Legislature and the people. The people were well within their right to establish redistricting standards and procedures that are both mandatory and binding on the Legislature. And the Legislature retains its core legislative function and legislative authority to adopt or reject any recommended plan or to choose to design and enact its own. Second, it is indisputable that the Legislature infringed the people's fundamental constitutional right to alter or reform their government by repealing Proposition 4 in its entirety and replacing it with S.B. 200, which removed Proposition 4's core redistricting reforms. S.B. 200 no longer prohibits partisan gerrymandering. The Legislature is not required to comply with any traditional redistricting standards. It is not required to comply with any procedures. It is not required to consider any redistricting plans submitted by the independent commission. It does not need to explain why it rejected plans submitted by the commission or why it elected to enact its own redistricting plan and it is not required to present the redistricting plan it chooses to enact to the public for comment. And it removed the

enforcement mechanism. As the Court noted before, S.B. 200 is essentially illusory. It does not change nor impact how the Legislature divides the state into congressional or other districts.

## III.    *Third LWVUT Factor*

The burden now shifts to the Legislative Defendants to show that repealing Proposition 4 in its entirety and replacing it with S.B. 200 was narrowly tailored to advance a compelling state interest. The Legislative Defendants argue that the changes made to Proposition 4 as reflected in S.B. 200 were narrowly tailored to advance compelling state interests. They argue that the state had a compelling interest in ensuring that Utah's redistricting law complied with both the U.S. and Utah Constitutions, that all Utahns are represented in redistricting, that the electoral maps were enacted in time and to safeguard the fiscal health of the state. Plaintiffs contend, *inter alia*, that the last three arguments are merely *post hoc* justifications raised solely in response to this litigation. Each of the Legislative Defendants' arguments are addressed in turn.

Was the legislative action – repealing Proposition 4 in its entirety and replacing it with S.B. 200 – narrowly tailored to advance a compelling state interest? *No.*

### A.  **Ensuring the constitutionality of redistricting laws.**

The Legislative Defendants argue that repealing Proposition 4 in its entirety and enacting S.B. 200 was necessary to ensure Utah's redistricting laws were constitutional. However, S.B. 200 specifically repealed each and every statute enacted under Proposition 4 in its entirety. The Legislature did not make selective or narrowly tailored changes to address any specific infirmity. Instead, S.B. 200 was drafted from a clean slate. "Where a statute repeals all former laws within its purview, the intention is obvious, and is readily recognized to sweep away all existing laws upon the subjects with which the repealing act deals." *Bd. of Educ. of Ogden City v. Hunter*, 48 Utah 373, 159 P. 1019, 1022 (1916). In addition, this Court addressed and rejected each of the Legislative Defendants' arguments challenging the constitutionality of Proposition 4 under the federal Elections Clause and the Utah Constitution. The people's successful initiative to reform redistricting through legislation was not unconstitutional. As a result, the Legislative Defendants cannot show, as a matter of law, that the wholesale repeal of Proposition 4 and the removal of the core redistricting reforms when the Legislature enacted S.B. 200 was narrowly tailored to advance a compelling state interest.

Nonetheless, they argue that, even if the Legislature incorrectly concluded that Proposition 4's redistricting reform and its various provisions were unconstitutional, strict scrutiny is still satisfied because the Legislature acted in good faith and had "good reason" for repealing Proposition 4 and replacing it with S.B. 200. They cite *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) asserting that strict scrutiny is satisfied if the Legislature has "good reason" to believe their actions were required and there is a "strong basis in evidence" to support the action. *Id.* (analyzing racial gerrymandering challenge in light of competing Voting Rights Act and Equal Protection obligations.). They also cite *Ricci v. DeStefano*, 557 U.S. 557, 563 (2009), asserting strict scrutiny is satisfied if the Legislature can show it had a "strong basis in evidence" that the legislative action was "necessary to comply with another statute." *Id.* ("We conclude that race-based action like the City's in this case is impermissible under Title VII unless

the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute."). Neither of these cases apply here. Both *Alabama Legis. Black Caucus* and *Ricci* articulate a specific "strong basis in evidence" standard that appears limited to cases evaluating race-conscious governmental actions taken to comply with, or avoid liability under the Voting Rights Act and Title VII, respectively. These cases address circumstances that may mitigate the dilemma faced by government entities trying to navigate potentially conflicting federal anti-discrimination mandates. This case presents a fundamentally different legal and factual landscape.

Here, the Legislature's enactment of S.B. 200 must be evaluated under the general strict scrutiny framework applicable to the impairment of fundamental rights under the Utah Constitution. This framework, as established by the *LWVUT* court, requires the Legislative Defendants show that the changes made in S.B. 200 were necessary to advance a compelling state interest, such as remedying *actual* constitutional defects in Proposition 4 not merely perceived or speculative ones. *Kitchen v. Herbert*, 755 F.3d 1193, 1196 (10th Cir. 2014) (stating compelling government interest based on "speculation and conjecture" as opposed to concrete facts "cannot carry the day."). Even if this Court agreed that the "strong basis in evidence" standard could be applied here, the Legislature's good faith legal mistake – that S.B. 200 was necessary to correct Proposition 4's perceived constitutional defects – does not satisfy the "strong basis in evidence standard." *See Cooper v. Harris*, 581 U.S. 285, 306 (2017) (holding strict scrutiny not satisfied where "North Carolina's belief that it was compelled to redraw District 1 . . . as a majority-minority district rested not on a 'strong basis in evidence,' but instead on a pure error of law."). A legal mistake cannot justify non-compliance with the law, and it cannot justify the impairment of a constitutional right. Given the Court's rulings above, the Legislature's passage of S.B. 200 was not necessary to comply with either the U.S or the Utah Constitutions or any specific federal or state statute.

### B. Ensuring that all Utahns are represented in redistricting, that electoral maps are timely enacted, and that the States's fiscal health is protected.

The Legislative Defendants also argue that repealing Proposition 4 in its entirety and replacing it with S.B. 200 was narrowly tailored to advance the state's compelling interest to ensure that all Utahn's are represented, that the electoral maps were enacted in time and to protect Utah's fiscal health. Plaintiffs contend these concerns are asserted *post hoc*, solely in response to litigation. Having considered both parties positions, the Legislative Defendants fail to prove that these interests – either individually or collectively – compelled the complete repeal of Proposition 4 and the removal of the core redistricting reforms.

### 1. All Utahns are represented in Proposition 4.

The Legislative Defendants first argue that Proposition 4 was repealed to ensure that all Utahns are represented in redistricting. The Legislative Defendants argue that not all Utahns voted in favor of Proposition 4. This is true, but Proposition 4 passed by a majority of those who voted. The actual vote margin (50.6%) and the alleged funding sources are irrelevant. When Proposition 4 passed by a majority vote in the 2018 election, it became law, passed by the people of Utah. Those voters voted against partisan gerrymandering and in favor of redistricting reform,

including establishing neutral and mandatory redistricting standards and procedures, including an independent commission, public notice and comment, transparency and enforcement. In passing S.B. 200, the Legislature ignored the majority of voters who voted in favor of Proposition 4. The Legislative Defendants do not address the voters' concerns. Instead, they assert, without any evidence, that Proposition 4's mandatory redistricting standards and order of priority essentially prohibits the Legislature from considering the concerns of all Utahns "from all corners of Utah" and it unduly favors Salt Lake City and its Democratic voters. (*Leg. Defs.' Opp'n / Cross MSJ*, p. 67.) These conclusory assertions are insufficient to prove a compelling state interest. They also assert that the Legislature must retain complete discretion to decide redistricting priorities for all voters, that it alone can make policy decisions, and that the Legislature – and not an independent commission – must remain accountable to the people. Each of these discrete issues were addressed and rejected above in this ruling.

Contrary to the Legislative Defendant's assertions, Proposition 4 does ensure representation of all Utahns through different mechanisms. Proposition 4 contemplated that the Commission would be made up of commissioners appointed by legislative leaders representing diverse areas of the state. Redistricting plans would be designed by the Commission in accordance with the mandatory neutral redistricting criteria "to the greatest extent practicable," Utah Code § 20A-19-103 (2), through a transparent and participatory process. The Legislature was required to let the Commission (or the chief justice) complete their duties and then consider and vote on redistricting plans recommended by the Commission. *Id.* §§ 20A-19-204(2)(a), (3). And before any redistricting plan would be enacted, the Legislature would be required to make the plan available to the public for "no less than 10 calendar days and in a manner and format that allows the public to assess the plan for adherence to the redistricting standards" and "that allows the public to submit comments about the plan to the legislature." *Id.* § 20A-19-204(4) (2018). Even under Proposition 4, the Legislature ultimately decides whether to adopt or reject the Commission's recommended plans or to design its own redistricting plan in accordance with Proposition 4's redistricting standards. The Legislature has the ability, even under Proposition 4, to make policy decisions and to decide which electoral map to enact.

## 2. **Enacted in Time**

The Legislative Defendants argue that the Legislature had a compelling state interest to ensure that electoral maps were enacted in time, justifying the repeal of Proposition 4 and the enactment of S.B. 200. They assert that S.B. 200 removed the strict procedural timelines, including the 10-day public comment period, to ensure that the maps were available in time for the 2022 state elections. The Legislative Defendants, however, provide no evidence that the Proposition 4 deadlines could not have been met, even after the delayed receipt of the federal census data in August and September 2021. On this point, they offer nothing more than speculation and conjecture, which cannot prove a compelling state interest. *Kitchen*, 755 F.3d at 1226. And to the extent the Legislative Defendants justify the 2020 repeal of Proposition 4 and the enactment of S.B. 200 on the late delivery of the federal census data in 2021, that argument fails as a *post hoc* justification of S.B. 200, made post-litigation. *United States v. Virginia,* 518 U.S. 515, 533 (1996).

The Legislative Defendants also assert in one conclusory sentence that had Proposition 4 been in place after the delayed delivery of the federal census data in 2021, that "its provision authorizing a lawsuit to challenge those 2021 maps would have furthered 'chaos' by risking that the maps would be tied up in court during the 2022 election cycle." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 70.) This argument is pure speculation. There is no evidence to support this bare assertion, and it is insufficient to show a compelling state interest in repealing Proposition 4 and enacting S.B. 200.

### 3.  **Protection of Public Coffers**

The Legislative Defendants argue that the Legislature has a compelling interest in protecting the fiscal health of the state. They argue that S.B. 200 made two "modest fixes" to Proposition 4 to avoid jeopardizing the state's fiscal health. (*Leg. Defs.' Opp'n / Cross MSJ*, p. 50.)

First, instead of Proposition 4's directive that the Legislature will appropriate "adequate" funding, S.B. 200 instead provides that the Commission will operate "within appropriations from the Legislature" and it specifically appropriated $1 million for the Commission. While the Court does not agree that this particular provision justified the complete repeal of Proposition 4 and the removal of the core redistricting reforms, the Court agrees that the Legislature has a compelling state interest in determining the amount of funds to appropriate for the Commission's work while taking into consideration the State's budget and fiscal health.

However, the change in wording in Proposition 4 from "shall set aside "adequate" funding for the Commission," Utah Code Ann. § 20A-19-201(12)(a) (2018), to S.B. 200's wording: "Within appropriations from the Legislature," is a material change. The Legislative Defendant's argue that this change was necessary because Proposition 4 fails to provide "any conceivable limits as to what may constitute 'adequate funding' for the commission's work or what would be a 'reasonable request' from the commission." (*Leg. Defs.' Opp'n / Cross MSJ*, p. 71.) The Legislative Defendants appear to argue that by including the term "adequate," Proposition 4 obligates the Legislature to write a blank check to allow the commission to use the state's money however it chooses. That is not the case. Not only is this argument speculative in the extreme, but it is also severely undermined by the Legislature's own actions in appropriating $1,000,000, the same amount that the state fiscal analyst had estimated the commission would need under Proposition 4, to fund the commission under S.B. 200. (*See 2018 Voter Pamphlet*, Ex. A, Dkt. 406, p. 2.) As previously discussed, the term "adequate" ensures the Legislature will fund the commission so that it can fulfill its duties under Proposition 4 while also giving the Legislature discretion to appropriate funds while taking into consideration the State's budget and fiscal health. The removal of the term "adequate," along with removing the language providing the commission with reasonably requested resources and support, provides an avenue for the Legislature to control and impact the commission's ability to fulfill its statutory duties. For this reason, this change is not narrowly tailored to advance the compelling state interest in managing the state's budget and fiscal health.

Second, the Legislative Defendants contend that the Legislature's compelling interest in protecting the fiscal health of the state justified S.B. 200's modifications to Utah's governmental

immunity statute, removing entirely Proposition 4's enforcement mechanism, which included both the private right of action to enforce Proposition 4's redistricting reform (i.e., the waiver of immunity) and the fee-shifting provision. *See* Utah Code Ann. § 63G-7-201, -301. They argue that redistricting litigation is expensive, citing various news reports and cases in which other states, specifically Texas, Pennsylvania, Alabama, North Carolina and New York, incurred litigation costs or were ordered to pay fees anywhere from $1 million to $7 million. (*Leg. Defs.' Opp'n / Cross* MSJ, p. 72.) They then assert, without any evidence, "[t]hat those potential fees could jeopardize the fiscal health of the State." (*Id.*) This statement is nothing more than pure speculation and conjecture. No actual evidence regarding Utah's budget or its current fiscal health has been presented.

Plaintiffs cite the U.S. Supreme Court's decision in *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 262, 94 S. Ct. 1076, 1084 (1974) for the proposition that "conservation of the taxpayer's purse is simply not a sufficient state interest to" impair a fundamental right. (Pls.' Reply at 51.) While this case is not factually similar, the analysis is helpful. In *Memorial Hosp.,* the Court addressed whether an Arizona statute, which required a one-year in-county residence as a condition before an indigent patient could receive nonemergency hospitalization or medical care at the county's expense impinged on the right of interstate travel and violated the equal protection clause. In analyzing the question, the Court asked: "whether the State has shown that its durational residence requirement is 'legitimately defensible,' in that it furthers a compelling state interest" and whether, in pursuing its interest, the State "has chosen means that do not unnecessarily burden constitutionally protected interests." *Id.* at 262-63; 94 S. Ct. at 1084. The Court rejected Maricopa County's budgetary arguments stating that the record was devoid of evidence that the county uses the one-year requirement to make predictions and commented that it was speculative to "estimate how many of those indigent newcomers will require medical care their first year in the jurisdiction." *Id.* at 270; 94 S. Ct. at 1088. Ultimately, the Court held the residency requirement created an "invidious classification" that impinges on the right of interstate travel and denies newcomers to the state the "basic necessities of life." *Id.*

In this case, the Legislative Defendants have failed to show that the removal of Proposition 4's enforcement mechanism, both the private right of action and the fee-shifting provision, is legitimately defensible and that it furthers the compelling state interest in protecting the state's fiscal health. As previously discussed, Proposition 4's enforcement mechanism is integral to the core redistricting reform. Without an avenue to enforce the mandatory redistricting provisions, the reform is illusory. The Legislative Defendants justify impairing the people's fundamental constitutional right to enact redistricting legislation to alter or reform their government through Proposition 4 by arguing the enforcement mechanism *could* cost the taxpayers money and *could* jeopardize the state's fiscal health. The Legislative Defendants' justification for removing the enforcement mechanism is the *possibility* of an enforcement action, the possibility that litigation costs will be incurred and the possibility the State of Utah would be required to pay prevailing party attorney's fees. Further, there is no evidence that the state's fiscal health would be jeopardized, even assuming the State was ordered to pay $7 million in prevailing party attorney's fees. The Legislative Defendants have failed to show that there is a compelling state interest because their asserted interest is based on nothing more than speculation and conjecture.

The Legislative Defendants contend that the Legislature was concerned with ensuring that all Utahns should be represented in redistricting, that maps would be enacted timely and that the state's fiscal health would be protected. However, the repeal of Proposition 4 in its entirety and the replacement with S.B. 200 was not narrowly tailored to advance these specific interests. Instead, S.B. 200 effectively nullified the core redistricting reform passed by the people. After S.B. 200, partisan gerrymandering was no longer prohibited as a matter of law. The Legislature was no longer required to comply with any mandatory redistricting standards. It was not required to comply with any specific procedures, and the private right of action was removed, ensuring that any redistricting standards and procedures that remained were not enforceable. S.B. 200 made redistricting reform illusory, allowing the Legislature to operate largely free from the constraints and accountability measures that the voters had sought to impose. These discrete concerns do not justify impairing the people's fundamental constitutional right to reform the redistricting process.

"A government based upon the will of the people must ever keep such authority within reach of the people's will. Legislatures are but the agents of the people. . . ." *United States v. Church of Jesus Christ of Latter-Day Saints*, 5 Utah 361, 15 P. 473, 477 (1887), *aff'd sub nom. Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 10 S. Ct. 792, 34 L. Ed. 478 (1890). The people's right to reform their government through legislation is fundamental and sacrosanct and should not be "effectively abrogated, severely limited, or unduly burdened.*" Gallivan, 2002 UT 89, ¶ 27.* In this case, the Legislature's repeal of Proposition 4 and its enactment of S.B. 200 unconstitutionally impaired and effectively nullified the people's redistricting reform. That legislative action was not narrowly tailored to advance a compelling state interest.

## CONCLUSION

Plaintiffs have successfully met their burden, on summary judgment, to prove as a matter of law that the Legislature's repeal of Proposition 4 and replacement with S.B. 200 failed to satisfy the *LWVUT*'s strict scrutiny analysis. Plaintiffs succeeded on all three *LWVUT* factors, as a matter of law.

First, Plaintiffs established that the people exercised their initiative power to propose redistricting legislation within the alter or reform clause in the Utah Constitution. Neither the U.S. Constitution nor the Utah Constitution grants sole and exclusive authority over redistricting to the Legislature. Because legislative power is shared co-equally and co-extensively between the Legislature and the people, and because redistricting is legislative, the people have the fundamental constitution right and authority to propose redistricting legislation that is binding on the Legislature.

Second, the Legislature infringed on the people's exercise of their right to propose and enact legislation to alter or reform their government and impaired the core redistricting reform. When the Legislature repealed Proposition 4 and replaced it with S.B. 200, the Legislature removed the core redistricting reform, the mandatory redistricting standards and procedures in Proposition 4 were eliminated, and the redistricting "law" that remains is not actually binding on the Legislature or enforceable by the people. While S.B. 200 retains some features, like the

independent redistricting committee, without mandatory and binding redistricting standards and procedures binding on the Legislature, S.B. 200 is illusory. The repeal and replacement of Proposition 4's redistricting reforms was unconstitutional.

Third, the Legislative Defendants failed to prove that the Legislature's legislative action that impairs the reform "is narrowly tailored to advance a compelling government interest." The Legislature repealed Proposition 4 in its entirety. S.B. 200 eliminated all mandatory redistricting standards and procedures binding on the commission and, most importantly, the Legislature. And the government interests offered to justify the legislative action was not compelling. In fact, each of the Legislative Defendant's arguments in support of its action fail to justify overriding the will of the people of Utah.

For these reasons, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment on Count V, and **DENIES** the Legislative Defendants' Motion for Summary Judgment on Count V.

## REMEDY

Plaintiffs have proven, as a matter of law, that the Legislature unconstitutionally repealed Proposition 4, and enacted S.B. 200, in violation of the people's fundamental right to reform redistricting in Utah and to prohibit partisan gerrymandering. Under S.B. 200, the Legislature enacted H.B. 2004, the current congressional map, which has been used in the 2022 and 2024 election cycles and will continue to be used until the next federal census data is received.

Plaintiffs are entitled to a remedy. The question is what remedy is appropriate under these circumstances. Plaintiffs request remedies to address both the unconstitutional repeal of Proposition 4's core reforms and the subsequently enacted 2021 congressional map, H.B. 2004. First, with regard to the unconstitutional repeal of Proposition 4, they request that the Court sever the unconstitutional provisions in S.B. 200, revive certain Proposition 4 provisions. They request the Court enjoin H.B. 2004 and, given the upcoming 2026 elections, Plaintiffs request this Court retain jurisdiction to ensure that a new congressional map, compliant with Proposition 4, is enacted in time for the 2026 election cycle.

As the Court addresses the requested remedy, under the circumstances here, the relationship between the elected legislature and the people is clearly articulated by Alexander Hamilton, in Federalist, no 78. He stated:

> There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act therefore contrary to the constitution can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves.

The Federalist No. 78, at 524–25 (Alexander Hamilton) (Jacob E. Cooke ed., Wesleyan Univ. Press 1961). Each requested remedy is addressed in turn.

**Proposition 4 / S.B. 200**

      To remedy the repeal of Proposition 4, Plaintiffs request the Court "enjoin the unconstitutional aspects of S.B. 200 and sever the rest," effectively reviving some of Proposition 4's provisions and leaving the remainder of S.B. 200 in effect. More specifically, Plaintiffs request the Court (1) enjoin those S.B. 200 provisions that actually repealed and removed statutes containing the core reforms enacted by Proposition 4,[31] (2) sever sections 20a-20-302(4)-(8) and § 20a-20-303[32] of S.B. 200 and leave the remainder of S.B, 200 intact, and (3) replace the severed statutes with the corresponding sections of Proposition 4.[33] (*Pls.' Mot.,* p. 25, n. 6.) In its Opposition to Plaintiff's Motion for Summary Judgment, the Legislative Defendants originally took the position that any discussion of severability is premature because "the parties cannot adequately identify what provisions of current law are severable without first understanding the nature of any constitutional violation." (*Leg. Defs.' Opp'n / Cross MSJ,* p. 74.) They offered no legal analysis regarding any possible remedy and do not discuss whether severing S.B. 200 is even appropriate. Nonetheless, they do take the position that, even if this Court finds a constitutional violation, "a judicial remedy is not the wholesale revival of Proposition 4." (*Id.*) And they contend that if the Court were to comply with Plaintiffs' request, it would be an impermissible intrusion on the legislative branch's constitutional prerogative. (*Id.*)

      The Court agrees *in part* with the Legislative Defendants. The Court cannot give Plaintiffs the specific remedy they request. Plaintiffs remedy requests that the Court remove certain provisions in S.B. 200 and replace them with specific provisions of Proposition 4. First, the doctrine of severability does not provide an avenue for this Court to provide Plaintiffs with their requested remedy. Second, granting Plaintiffs' request would result in a completely new judicially-created redistricting law, which is a clear violation of the separation of powers. As will be discussed in detail below, this Court cannot make law, even as a remedy for a constitutional violation, because to do so would usurp the legislature's (and in this case, the people's) exclusive law-making authority under the Utah Constitution. *See* <u>In re Young</u>, 1999 UT 6 ("[F]or powers or functions to fall within the reach of the second clause of article V, section 1, they must be so

---

[31] These sections include the express prohibition of partisan gerrymandering, the mandatory redistricting standards with the order of priority, the private cause of action, the requirement that the Legislature appropriate sufficient funds for the Commission, the requirement that redistricting occur only once a decade following receipt of census results, and the severability clause. The Legislature did not include any replacement for these sections after their repeal.

[32] These codified sections of S.B. 200 allowed the Commission to alter the mapping standards, removed the requirement that the Legislature adhere to the redistricting standards, removed the requirement that the Legislature vote on Commission maps, removed the requirement that the Legislature provide a statement explaining how any legislatively created and enacted maps better complied with the redistricting requirements, and removed the 10-day notice and public comment period requirement.

[33] Plaintiffs request that the Court revive Proposition 4's "core reforms" codified at § 20A-19-102, -103, -104, -201, 204, and 301. Plaintiffs assert that these provisions should replace the unconstitutional sections of S.B. 200 codified at § 20A-20-302(4)-(8) and § 20A-20-303.

inherently legislative, executive or judicial in character that they must be exercised exclusively by their respective departments."). Instead, given the Court's ruling that S.B. 200 was unconstitutionally enacted in violation of the people of Utah's fundamental constitutional rights to exercise their legislative initiative power and to reform their government, this Court concludes that S.B. 200 is void *ab initio.* As a result, Proposition 4, and the statutes originally enacted under it, are the law.

*Doctrine of Severability*

Plaintiffs' request to "sever" certain portions of S.B. 200. When presented with the question of a statute's *partial* invalidity, the doctrine of severability allows courts to preserve the constitutionality of a statute while severing any offensive provision from the whole. "It has long been settled that one section of a statute may be repugnant to the Constitution without rendering the whole act void. Because a statute bad in part is not necessarily void in its entirety, provisions within the legislative power may stand if separable from the bad." *Seila L. LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 233–34, 140 S. Ct. 2183, 2208, 207 L. Ed. 2d 494 (2020) (internal citations omitted). "Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem. [Courts] prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 328–29, 126 S. Ct. 961, 967, 163 L. Ed. 2d 812 (2006); *State v. Lopes,* 1999 UT 24, ¶ 18, 980 P.2d 191 ("[I]f a portion of the statute might be saved by severing the part that is unconstitutional, such should be done.").

S.B. 200 is unconstitutional because of what it removed from Proposition 4, not because of what is left in S.B. 200 (e.g., the independent redistricting committee). It removed the core redistricting reforms. It removed the prohibition on partisan gerrymandering. It removed the redistricting standards along with the established order of priority for those standards, which were mandatory and binding on the commission and, most importantly, the Legislature. It removed the requirement that the Legislature actually consider and vote on redistricting plans recommended by the commission. It removed the requirement that the Legislature explain how the redistricting plan that it creates and enacts better complies with Proposition 4's redistricting standards. It removed the requirement that the Legislature provide a 10-day notice and public comment period on any redistricting plans it intends to enact. It removed the enforcement provisions.

Nonetheless, the Court addresses the substance of Plaintiff's severability argument and concludes that the provisions are not severable. Plaintiffs request the Court sever section 20a-20-302(4)-(8), which set forth non-binding redistricting criteria. While the redistricting criteria are listed, they are listed solely for consideration by the commission. At best, they are suggestions, not requirements. Neither the commission nor the Legislature is required to comply with them when designing re-districting plans. Plaintiffs also request the Court sever section 20a-20-303, which describes the new procedures governing submission of the commission's plans to the Legislature's redistricting committee (not the whole Legislature, but its committee) for consideration. While this section appears to include a process, that process and the work accomplished by the independent commission is effectively rendered irrelevant under section 20a-20-303(5), by stating: "The committee or the Legislature *may, but is not required to,* vote on or adopt a map submitted to the committee or the Legislature by the commission." Utah Code Ann. 20A-20-303(5) (emphasis added). The mandatory "vote" by the Legislature ensured that

the independent commission's work was considered by the entire Legislature and that it didn't die or get tabled in the redistricting committee before the plans could be considered by the entire Legislature. Under S.B. 200, the Legislature removed any provisions, standards or processes that were binding on it under Proposition 4. The request to sever sections 20a-20-302(4)-(8) and 20a-20-303 under S.B. 200, however, does not correct the constitutional violation.

As Plaintiffs correctly recognize, legislative intent determines whether a statute is severable. *In re Gestational Agreement*, 2019 UT 40, ¶ 49, 449 P.3d 69, 83. Absent an express statement of legislative intent, courts "turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion." *Id.* "[I]f the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand." *Id*; *see also Gallivan v. Walker*, 2002 UT 89, ¶ 88, 54 P.3d 1069, 1098 ("Upon reviewing the statute as a whole and its operation absent the offending subsection, if the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand."). Legislative intent is determined by examining the plain language of the statute. *State v. Flora*, 2020 UT 2, ¶ 21, 459 P.3d 975, 980 ("When conducting statutory interpretation, [courts] focus on the statute's plain language because it is the best evidence of the legislature's intent.").

Reviewing S.B. 200, the Court concludes that the Legislature intended that if any of the nine statutes were determined to be unconstitutional or otherwise invalid, they would not be severable. Proposition 4 included a severability provision under section 20A-19-104, stating "[t]he provisions are severable," and if "any word, phrase, sentence, or section . . . is held invalid by a final decision . . . the remainder of this chapter must be given effect without the invalid word, phrase, sentence, section or application." Utah Code Ann. 20A-19-104(1), (2) (2018). S.B. 200 repealed that statute and did not replace it with another. By not including a severability clause, the Legislature communicated its intent that if one provision failed, then S.B. 200 would fail altogether. This appears consistent with the Legislative Defendants' arguments that the Legislature has sole and exclusive authority over redistricting, which would – in their their view –render the independent redistricting committee and any work done by it unnecessary.[34]

To the extent S.B. 200 was intended as a compromise[35] to Proposition 4, removing sections 20a-20-302(4)-(8) and 20a-20-303 arguably eliminates the entire purpose for even S.B. 200. After severing these provisions, there would be no suggested redistricting criteria or process to consider in designing redistricting plans and no procedure for presenting the independent redistricting commission's work to the public or the Legislature's redistricting committee. Without these provisions, the "compromise" intended to be reflected in S.B. 200 could not be achieved. Under these circumstances, "it is not within the scope of the court's function to select the valid portions of the act and make conjecture the legislature intended they should stand

---

[34] Notably, the legislature also included in S.B. 200 a provision providing for "a review of the commission and the commission's role in relation to the redistricting process." Utah Code Ann. § 20A-20-103.

[35] The Legislative Defendants have represented throughout their briefing that S.B. 200 was intended to be a compromise. The intent was to retain the "spirit" of Proposition 4 while removing those portions that the legislature claimed to be unconstitutional, which was essentially all of the core redistricting reforms and any standards and procedures that would be mandatory and binding on the legislature.

independent of the portions which are invalid." *Salt Lake City v. Int'l Ass'n of Firefighters, Locs.
1645, 593, 1654 & 2064*, 563 P.2d 786, 791 (Utah 1977) (stating legislative intent determines
"whether the remaining portions of the act can stand alone and serve a legitimate legislative
purpose.") Therefore, the Court concludes that these "unconstitutional provisions" of S.B. 200
cannot be severed from the rest of the act because to do so would not further the legislative intent
of S.B. 200.

Even assuming these provisions could be severed, this Court cannot replace any removed
provisions. They contend that the severability doctrine allows this Court to invalidate the
offending sections of S.B. 200, simultaneously revive the corresponding sections of Proposition
4 into S.B. 200's existing statutory scheme and retain those sections of SB 200 that did not
repeal Proposition 4's core reforms. Specifically, they request the Court revive six repealed
sections of Proposition 4, which reflect the core redistricting reforms, and insert them verbatim
into SB 200's statutory scheme. (*Pls.' Mot.*, p. 26.) Plaintiffs also assert that some of the changes
implemented by SB 200, such as removing any role the Chief Justice might play in the
redistricting process and changing the composition of the commission, did not affect Proposition
4's core reforms and could remain in force. (*Id.*)

The Plaintiff's request overlooks one small, but important, detail. The severability
doctrine allows courts to cut but not paste. In performing a severability analysis, courts "cannot
rewrite a statute and give it an effect altogether different from that sought by the measure viewed
as a whole." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 481–82, 138 S. Ct. 1461,
1482 (2018).[36] Given the arguments presented in this litigation, it is clear that "cutting and
replacing" is not what the Legislature would have intended in enacting S.B. 200. Granting
Plaintiffs' request would be an unconstitutional encroachment by this Court on the Legislature's,
and frankly the people's, constitutional powers to write and pass laws. Neither the people nor the
legislature arguably intended some combination of Proposition 4 and S.B. 200.

There is a necessary separation of powers between the legislature, which makes the laws,
and the courts, which interpret those laws. For the courts, the "task is to interpret the words used
by the legislature, not to correct or revise them." *State v. Wallace*, 2006 UT 86, ¶ 9, 150 P.3d
540, 542. And "*[i]n matters not affecting fundamental rights*, the prerogative of the legislative
branch is broad and must by necessity be so if government is to be by the people through their
elected representatives and not by judges." *Gottling v. P.R. Inc.*, 2002 UT 95, ¶ 23, 61 P.3d 989,

---

[36] The Court recognizes that, in certain and limited circumstances, specific provisions of a statute that
were unconstitutionally repealed could be given full force and effect. The Utah Supreme Court has
previously stated: "It is now well settled that in case it is found that an entire statute, or only a particular
provision of a statute, is invalid for any reason, and the statute so found invalid has expressly or by
necessary implication repealed another statute or provision upon the same subject, so much of the former
statute which was superseded by the invalid portion of the later one is not repealed, but continues in full
force and effect." *Bd. of Educ. of Ogden City v. Hunter*, 48 Utah 373, 159 P. 1019, 1024 (1916).
However, in this case, the legislature did not start with Proposition 4 and revise the provisions to create
S.B. 200. Rather, it repealed all of Proposition 4 and, starting with a clean slate, drafted S.B. 200. In
comparing the statutes enacted under Proposition 4 and S.B. 200 side-by-side, the subject matter in the
various sections and provisions vary and the numbering is not aligned. These are two completely different
acts, establishing vastly different redistricting processes.

998 (*citing Baker v. Matheson*, 607 P.2d 233, 237 (Utah 1979) (emphasis added)). "One often-declared difference between judicial and legislative power is that the former determines the rightfulness of acts done; the latter prescribes the rule for acts to be done. The one construes what has been; the other determines what shall be." *Mayhew v. Lab. Comm'n*, 2024 UT App 81, ¶ 41, 552 P.3d 235, 244, *cert. denied*, 554 P.3d 1097 (Utah 2024). Here, the Plaintiffs' request would not only have this court construe what has been but also determine what will be. Accordingly, the Court concludes that Plaintiffs' severability argument fails. The requested remedy – to sever S.B. 200's unconstitutional provisions and replace with repealed Proposition 4 provisions – is not relief that this Court can grant.

### S.B. 200 is void *ab initio*

When a portion of an act is unconstitutional, and severing is not possible, the remainder of the act cannot stand and is rendered invalid. *Berry By & Through Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 686 (Utah 1985) (concluding the entire Utah Product Liability Act invalid when one unconstitutional provision in the act was not severable). Therefore, S.B. 200 *could be* declared legally invalid. While this is one legal remedy, it does not perfectly fit here. This is not the situation where the Legislature enacted one statute, within a larger act, that is later deemed unconstitutional. Rather, the Legislature's act of repealing Proposition 4 entirely and enacting S.B. 200 violated the people's constitutional right to alter or reform their government through legislation.

Utah law mandates that if the legislature accomplishes what the Constitution does not permit, that act is unconstitutional and is "void and of no effect." *State v. Barker*, 50 Utah 189, 167 P. 262, 264 (1917). As the Utah Supreme Court has held: "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Egbert v. Nissan Motor Co.*, 2010 UT 8, ¶ 12, 228 P.3d 737, 739 (*citing Norton v. Shelby County*, 118 U.S. 425, 442, 6 S. Ct. 1121 (1886)). "No other conclusion is permissible if the Constitution is the supreme law…. A legislative act which is in conflict with the Constitution is stillborn and of no force or effect —impotent alike to confer rights or to afford protection." *State v. Candland*, 36 Utah 406, 104 P. 285, 290 (1909).

Persuasive authority from other jurisdictions supports this principle. The U.S. Supreme Court has stated: "We suppose it clear that no law can be changed or repealed by a subsequent act which is void because unconstitutional. . . . An act which violates the Constitution has no power and can, of course, neither build up nor tear down. It can neither create new rights nor destroy existing ones. It is an empty legislative declaration without force or vitality." *Frost v. Corp. Comm'n*, 278 U.S. 515, 527, 49 S. Ct. 235, 239–40 (1929) (holding a proviso, added to a statute by amendment, unconstitutional under the equal protection clause but capable of being severed from the original statute.)

The Kentucky Supreme Court similarly stated:

> [t]he general rule is that an unconstitutional statute, whether federal or state, though having the form and name of law, is in reality no law but is wholly void and ineffective for any purpose. *Since unconstitutionality dates from*

67

*the time of its enactment and not merely from the date of the decision so
branding it*, an unconstitutional law, in legal contemplation, is as inoperative
as if it had never been passed and never existed; that is, it is void *ab initio*

*Legislative Rsch. Comm'n v. Fischer*, 366 S.W.3d 905, 917 (Ky. 2012) (emphasis added)
(quoting <u>16A Am.Jur.2d *Constitutional Law* § 195</u> (citations omitted)) (upholding trial court
decision that redistricting plan was unconstitutional and enjoining implementation of districts
under 2012 plan and ordering 2002 redistricting plan remain in effect.).

### Proposition 4 is the Law in Utah

The Legislative Defendants argue that a judicial remedy in this case could not result in
the "wholesale revival of Proposition 4." The Legislative Defendants contend that this Court has
no power to revive Proposition 4 in its entirety because courts cannot "legislate in that way."
(*Leg. Defs.' Opp. / Cross MSJ*, p. 74.) The Court disagrees. Proposition 4 is the law in Utah by
operation of law, not by an act of legislation by this Court.

Our Utah Supreme Court stated, earlier in this case: "In the event Plaintiffs prevail on
their claim that S.B. 200 violates the people's right to alter or reform their government via citizen
initiative, the act enacted by Proposition 4, Utah Code §§ 20A-19-101 to -301 (2018), would
become controlling law." *LWVUT*, 2024 UT 21, ¶ 222. While this legal issue was not before the
*LWVUT* court, there is no other remedy appropriate under the circumstances. Moreover, this
remedy is broadly supported throughout the country. The United States Supreme Court has
recognized that if an act repealing a valid statute is "void for unconstitutionality, it cannot be
given that effect," and "the original statute must stand as the only valid expression of the
legislative intent." *Frost*, 278 U.S. at 526-27, 49 S. Ct. at 239. Other jurisdictions agree. *Conlon
v. Adamski*, 77 F.2d 397, 399 (D.C. Cir. 1935) ("The elementary rule of statutory construction is
without exception that a void act cannot operate to repeal a valid existing statute, and the law
remains in full force and operation as if the repeal had never been attempted."); *The Clark Fork
Coal. v. Tubbs*, 2016 MT 229, ¶ 40, 384 Mont. 503, 519, 380 P.3d 771, 782 ("We have explained
that an invalidated statute is in reality no law, but is wholly void, and in legal contemplation is as
inoperative as if it has never been passed. The natural effect of this rule is that the invalidity of a
statute leaves the law as it stood prior to the enactment of the invalid statute."); *State v. Neely*,
604 N.W.2d 120, 123 (Minn. Ct. App. 2000) ("[T]he rule that when a court finds a statute or
statutory amendment unconstitutional, the statute is not only inoperative—it is also deemed
never to have been enacted. This rule generates a corollary that the statute as it existed prior to
the amendment automatically revives in full force and effect." (internal citation omitted));
*Cassidy v. China Vitamins, LLC*, 2017 IL App (1st) 160933, ¶ 21, 89 N.E.3d 944, 950, *aff'd*,
2018 IL 122873, ¶ 21, 120 N.E.3d 959 ("If an act is unconstitutional in its entirety, the state of
the law is as if the act had never been enacted, and the law in force is the law as it was before the
adoption of the unconstitutional amendment." (internal citations omitted)).

The Michigan Supreme Court recently considered the appropriate remedy for the
Michigan Legislature's infringement of the people's constitutional right of initiative, in
*Mothering Justice v. Att'y Gen.*, No. 165325, 2024 WL 3610042 (Mich. July 31, 2024), *opinion
clarified*, 10 N.W.3d 845 (Mich. 2024). In *Mothering Justice,* the Michigan Legislature received
citizen initiative petitions that proposed raising Michigan's minimum wage, allowing for

compensatory time in lieu of overtime, and providing paid sick leave to employees." *Id.* at *1. Under Michigan's constitution, after an initiative is presented to the legislature, it must proceed in one of three ways: adopt the initiative without change or amendment, reject the initiative entirely, or reject the initiative and propose a replacement. *Id.* If the legislature adopts the initiative without change, it is adopted as law if it is passed by a simple majority vote of the legislature. *Id.* If the legislature rejects the initiative without a replacement, the original initiative is placed on the general election ballot. If the legislature rejects the initiative and proposes a replacement, both the replacement and the original initiative are placed on the general election ballot. *Id.*

Prior to the 2018 election, the legislature adopted both initiatives without change and because of this, neither initiative was included in the general election ballot. "After the election was over, however, the legislature voted by a simple majority to amend both laws significantly and to strip away many of their defining features." *Id.*, at *3. The Michigan Supreme Court found that the "adopt-and-amend" process employed by the legislature was a violation of the state constitution because it was not allowed under the Michigan Constitution and it "obstructed voters' ability to exercise their direct democracy rights through the initiative process." *Id.*, at *7. The court concluded that the "amendments were unconstitutional and, therefore, void [*ab initio*]. . . . Thus, the original initiatives," that were proposed by the people and "as adopted by the Legislature, remain[ed] in place." *Id.* at *14.

Here, the people of Utah have the constitutionally protected right to alter or reform their government through the initiative process. The people exercised that right through Proposition 4. The Legislature's subsequent enactment of S.B. 200, repealed all nine statutes enacted by Proposition 4. That act ensured that the people's redistricting reform was eliminated in its entirety. *See Bd. of Educ. of Ogden City*, 159 P. at 1022 ("Where a statute repeals all former laws within its purview, the intention is obvious, and is readily recognized to sweep away all existing laws upon the subjects with which the repealing act deals."). It ensured that no redistricting standards or procedures would be binding on the Legislature. It unconstitutionally impaired the people's fundamental constitutional right to pass legislation to reform how redistricting is accomplished in Utah. And it rejected the people's directive that, as a matter of Utah law, partisan gerrymandering—regardless of what party is in control—is prohibited. The complete repeal of Proposition 4 was not narrowly tailored to advance any compelling state interest. And there is no compelling state interest that justified the Legislature's refusal to recognize the will of the people.

S.B. 200 is void *ab initio.* Because Proposition 4 was not effectively repealed, it stands as the only valid law on redistricting.

## HB 2004

Plaintiffs also request the Court immediately enjoin the current congressional map, H.B. 2004. The Legislature enacted H.B. 2004, also known as the 2021 Congressional Plan, which has been used in the 2022 and 2024 election cycles. Plaintiffs assert that "the people are stuck with a map enacted in direct defiance" of their fundamental constitutional right to reform redistricting, which has and will continue to directly impact the election of our elected legislature. (*Pls' Supp. Reply*, Dkt. No. 459, p. 3.) And, it will continue to be used in all future elections, unless it is

immediately enjoined.[37] In addition, Plaintiffs request this Court retain jurisdiction to ensure that the Legislature enacts a new congressional map that complies with Proposition 4 in time for the 2026 election.

The Legislative Defendants argue that this Court cannot enjoin the enforcement of HB 2004 on summary judgment because Count V does not directly challenge the validity of HB 2004 and the parties have not litigated the legality of the map it enacted. (*Leg. Defs.' Suppl. Resp.*, p. 10.) They argue that Count V does not explicitly challenge the validity of the 2021 Congressional Plan, enacted under H.B. 2004, and therefore the parties must first litigate the map's compliance with Proposition 4's substantive requirements before that map can be enjoined. The Legislative Defendants also argue that a permanent injunction is a prospective remedy, that would not be appropriate here because it would be awarding Plaintiff's with retrospective relief. (*Id.*, p. 6.)

There is no dispute that H.B. 2004 was enacted under S.B. 200, after Proposition 4 was repealed. H.B. 2004 cannot be separated from the Legislature's unconstitutional repeal of Proposition 4. By stripping away the core redistricting reforms passed by the people, and replacing them with S.B. 200, the Legislature cleared the path for a map drawn independent of the mandatory redistricting standards and procedures imposed on the Legislature by Proposition 4. H.B. 2004 is therefore not a fresh or independent act — it is the fruit of that unlawful repeal, an extension of the very constitutional violation that tainted the process from the start."

Equitable remedies, such as injunctions, are the principal means by which Utah courts redress constitutional injuries. *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cnty. Sch. Dist.*, 2000 UT 87, ¶ 25, 16 P.3d 533, 539. In considering the appropriate remedy, several principles apply. "Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S. Ct. 1267, 1276 (1971) (addressing remedy for school authorities' failure to affirmatively eliminate state-imposed segregation, stating "[t]he task is to correct . . . the condition that offends the Constitution."). A court's equitable "powers are defined by pragmatic flexibility," allowing courts to "mold" each remedy "to the necessities of the particular case." *Mothering Justice,* 2024 WL 3610042, at *14 (Mich. July 31, 2024), *opinion clarified*, 10 N.W.3d 845 (Mich. 2024)(quoting *Hecht Co v Bowles*, 321 U.S. 321, 329-330, 64 S Ct 587 (1944) ("The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."); *see also Brown v Bd. of Ed. of Topeka*, 349 U.S. 294, 300, 75 S Ct 753 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs."). "The controlling principle consistently expounded . . . is that the scope of the remedy is determined by *the nature and extent* of the constitutional violation." *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S. Ct. 3112, 3127 (1974)

---

[37] This Court requested supplemental briefing on Plaintiffs' request to enjoin H.B. 2004, requesting the parties address the remedy requested in light of the procedural posture of Count V and Plaintiffs' newly added Counts VI – VIII.

(emphasis added). And the remedy must be designed to restore Plaintiffs to the position they would have occupied but for the violation. *Id.* at 746.

Here, the Legislature unconstitutionally repealed Proposition 4, enacted S.B. 200 and then, under that framework, enacted H.B. 2004, the 2021 Congressional Plan that has been in place for the last two election cycles and will continue to be in place until Utah receives the next U.S. census data. The nature of the violation lies in the Legislature's refusal to respect the people's exercise of their constitutional lawmaking power and to honor the people's right to reform their government by enacting redistricting legislation. By repealing Proposition 4, enacting S.B. 200, and then enacting H.B. 2004 under the S.B. 200 framework, the Legislature not only disregarded the redistricting *process* established by the people under Proposition 4, but it affirmatively ensured that Proposition 4 would not apply when it enacted H.B. 2004. The extent of the constitutional violation goes beyond the simple unconstitutional repeal of Proposition 4. H.B. 2004 is the product of an unconstitutional process. The Legislature's unconstitutional act, if left unremedied, will be compounded with each election cycle. Under these circumstances, and as a consequence of the unconstitutional repeal of Proposition 4, Plaintiffs are entitled to a permanent injunction, prohibiting the enforcement of H.B. 2004.

In evaluating the extent of the injunction, consideration must be given to the reliance on the unconstitutional law passed by the Legislature and the potential for injustice. *See Mothering Justice*, 2024 WL 3610042, *14. In certain cases, "'a more flexible approach, giving holdings limited retroactive or prospective effect,'" may be appropriate. *Id.* (citing *League of Women Voters*, 508 Mich. at 565, 975 N.W.2d 840, quoting *Lindsey v Harper Hosp*, 455 Mich. 56, 68, 564 N.W.2d 861 (1997).). In cases where "a decision establishes a new principle of law, the court considers three factors: (1) the purpose to be served by the new rule, (2) the extent of the reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." *Id.* (cleaned up) (citing *League of Women Voters*, 508 Mich. at 565-566, 975 N.W.2d 840 (quoting *Pohutski v Allen Park*, 465 Mich. 675, 696, 641 N.W.2d 219 (2002)).

Like in *Mothering Justice*, the relief granted here must be shaped "by a practical flexibility" that reconciles both the integrity of Utah's elections and the expectations associated with the people's rights to the initiative. *Id.* (citing *Brown*, 349 U.S. at 300). First, because S.B. 200 is void *ab initio*, Proposition 4 is and effectively has been the law in Utah on redistricting since 2018. Proposition 4 was passed to reform redistricting, by prohibiting partisan gerrymandering and requiring all redistricting plans be designed in accordance with traditional and mandatory redistricting standards. It was passed to ensure a transparent and standard procedure for redistricting, including requiring the Legislature to consider redistricting plans recommended by an independent redistricting commission, bound to comply with redistricting standards. It was passed to ensure an opportunity for public notice and comment, along with an explanation if the Legislature elected to design and enact its own maps. And it provided an enforcement mechanism to ensure that the people could enforce the redistricting reform. The people are entitled to have their will recognized and Proposition 4 enforced.

Second, S.B. 200 has been relied on since 2020. Under it, H.B. 2004 was enacted and the 2021 Congressional Plan has been used in the last two election cycles in 2022 and 2024. Third, approaching the remedy practically, full retroactivity of Proposition 4 and H.B. 2004, is not practical. Justice would not be served by calling into question or undoing the last to elections.

We can, however, apply Proposition 4 prospectively. As a result, H.B. 2004, and the 2021 Congressional Plan must be enjoined, and the Legislature is required to enact a new congressional plan in compliance with Proposition 4 in time for the upcoming 2026 election cycle.

The Legislative Defendants make several arguments challenging an injunction on H.B. 2004. Each of those arguments are addressed in turn. First, the Legislative Defendants argue that they did not have reasonable notice that Plaintiffs requested to enjoin H.B. 2004 under Count V. (*Leg. Defs.' Supp. Remedies Br.,* p. 3.) The Legislative Defendants' argument is not supported by the record. In Plaintiffs' original Complaint, under Count V, the last paragraph requested "declaratory and injunctive relief as more fully set forth below." (*Compl.* p. 78, ¶ 319.) The next section, "Relief Sought," follows. That section states, *inter alia*:

RELIEF SOUGHT

For the foregoing reasons, Plaintiffs request that this Court:

a. *Declare that the 2021 Congressional Plan is unconstitutional and invalid because it violates Plaintiffs' rights under* Article I, Section 1; *Article I, Section 2*; Article I, Section 15; Article I, Section 17; Article I, Section 24; and Article IV, Section 2 of the Utah Constitution;

b. *Enjoin Defendants and their agents, officers, and employees from administering, preparing for, or moving forward with* Utah's 2024 primary and general elections for Congress using *the 2021 Congressional Plan*;

(*Id.* p.78, ¶ a., b. (emphasis added).). When Plaintiffs filed their First Amended Complaint on August 30, 2024, Count V did not change and the substance of the requested relief remained the same. (*First Am. Compl.*, p. 78, ¶ 319, p. 85, ¶ a, b.) In addition, this relief was specifically requested in Plaintiffs' Motion for Summary Judgment on Count V and in Plaintiffs' Consolidated Reply. (*See Pls.' Mot. Sum. J.,* p. 26-30; *Pls.' Cons. Reply,* p. 51-60.) The Legislative Defendants had notice of this specific request for relief.

The Legislative Defendants argue that Plaintiffs did not specifically challenge H.B. 2004's compliance with Proposition 4 under Count V; rather Count V focuses solely on S.B. 200, and the repeal of Proposition 4. This is not true. While the Court explains below that Plaintiffs did not need to prove under Count V that H.B. 2004 did not comply with Proposition 4, they did. Plaintiffs' Motion for Summary Judgment on Count V, specifically alleges and the Legislative Defendants did not dispute that H.B. 2004 was not enacted in compliance with Proposition 4. First, there is no dispute that H.B. 2004 was enacted in 2021, under the framework of then existing law, S.B. 200 and not Proposition 4. There is no dispute that certain Proposition 4 procedures were not complied with. (*See* Statement of Undisputed Facts, ¶¶ 40-47.) The Legislature did not take a vote on the maps presented by the Commission in the 2021 redistricting cycle, as required by Proposition 4. *See* U.C.A. § 20A-19-204(2)(a). They do not dispute that the map enacted by H.B. 2004 did not comply with Proposition 4's requirement that the Commission's redistricting plans be available for review and comment by the public for no less than 10 calendar days. *See* U.C.A. § 20A-19-204(4). The Legislative Defendants do not deny that, after adoption of the legislatively created map through H.B. 2004, the Legislature did

72

not provide a detailed written report explaining how the Legislature's chosen plan better complied with Proposition 4's redistricting standards. *See* §20A-19-204(5)(a). There is no dispute that these substantive procedural requirements were not complied with. Plaintiffs did establish undisputed facts that H.B. 2004 did not comply with the procedural requirements of Proposition 4.

The Legislative Defendants argue that enjoining H.B. 2004 is not justified where there is a violation of "procedure" rather than substantive law and where the three procedural requirements amount to "merely trifling violations." (*Leg. Defs.' Supp. Rem. Br.*, p. 9.) This is not the case here. As recognized by the Utah Supreme Court, Proposition 4 established a comprehensive *process* for redistricting.[38] While complying with the mandatory redistricting standards in designing a map is critical, following the procedure outlined in Proposition 4 is no less important. Both are part of the core redistricting reform and both are equally important. The U.S. Supreme Court has recognized that "[t]he line between procedural and substantive law is hazy" in the context of redistricting. *Moore v. Harper*, 600 U.S. at 31, 143 S. Ct. at 2086. "Procedure, after all, is often used as a vehicle to achieve substantive ends." *Id.* Failing to comply with Proposition 4's procedural requirements is a failure to comply with the substantive requirements of Proposition 4's redistricting reform. Proposition 4's procedural requirements are so integral to the governmental reforms it put into place that any map enacted in their absence is, itself, a violation of the people's right to alter and reform their government. Accordingly, whether H.B. 2004 also violated other Proposition 4 requirements is therefore irrelevant.

The Legislative Defendants assert that enjoining H.B. 2004 is both premature and unwarranted because "additional proceedings would be required to determine whether the Legislature substantially complied" and to determine whether a "less drastic remedy is sufficient to redress Plaintiff's injury." (*Leg. Defs.' Supp. Rem. Br.*, p. 9.)  First, there can be no real dispute that H.B. 2004 was enacted under S.B. 200's redistricting framework and not Proposition 4, given Proposition 4 was repealed. Second, this is not a substantial compliance case. This is not a case where the Legislative Defendants attempted in good faith to comply with the law, i.e., Proposition 4's redistricting process, and arguably failed. Rather, the undisputed facts show that the Legislature repealed Proposition 4 and enacted S.B. 200, ensuring Proposition 4's mandatory redistricting process would not be binding on the Legislature when it enacted H.B. 2004. Third, even if substantial compliance was a legitimate defense, the Legislative Defendants have not asserted it, let alone presented any evidence to support substantial compliance with Proposition 4, on summary judgment. Instead, the Legislative Defendants merely assert that the issue of substantial compliance "must be considered" by the Court. (*Id.*) If substantial compliance had successfully been raised at any time in the briefing and had other options been presented by the Legislative Defendants, then those may have been considered. Finally, the Legislative Defendants assert that "[a]ny remedy here must be tailored to the constitutional violation." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328 (2006). The Court contends that it does. The violation in this case is not merely a failure to comply with Proposition 4. The

---

[38] The Utah Supreme stated: "Utahns used their legislative power to actively address partisan gerrymandering comprehensively, by completely prohibiting the practice, reforming the redistricting process as a whole," creating an advisory independent redistricting committee, establishing mandatory redistricting standards and procedures, and providing an enforcement mechanism to ensure compliance. *LWVUT*, 2024 UT 21, ¶ 225.

violation is the Legislature's dismissal of the people's fundamental right to establish redistricting legislation by both repealing Proposition 4 and enacting S.B. 200 and then enacting H.B. 2004 under S.B. 200.

The Legislative Defendants also argue that an injunction against H.B. 2004 is inappropriate because it provides "retrospective" relief. The Court disagrees. There has been no request to undo the 2022 and 2024 elections. Rather, an order enjoining H.B. 2004 would be prospective only.

Finally, it is both unnecessary and inconsistent with both constitutional principles and equitable remedies to require Plaintiffs to prove, on a district-by-district basis, that H.B. 2004 failed to comply with Proposition 4. The record and the Legislature's own positions throughout this litigation make clear that H.B. 2004 was designed under S.B. 200, not Proposition 4. The Legislature intentionally stripped away all of Proposition 4's core redistricting standards and procedures that were mandatory and binding on it. The Legislature has consistently maintained Proposition 4 was both unconstitutional and that it did not apply to the Legislature. It would exacerbate the constitutional violation to let the Legislative Defendants further delay any remedy by attempting to defend H.B. 2004 by claiming it complies with Proposition 4, a law they refused to follow. To permit the 2021 Congressional Plan to remain in place would reward the very constitutional violation this Court has already identified and would nullify the people's 2018 redistricting reform that they passed through Proposition 4.

### Permanent Injunction Standard – H.B. 2004

As discussed above, the appropriate remedy includes a prospective permanent injunction on the use of H.B. 2004, the 2021 Congressional Plan, in future elections. The Court also concludes that Plaintiffs satisfy the four-factors necessary to be entitled to that relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57, 130 S. Ct. 2743, 2756, 177 L. Ed. 2d 461 (2010). "The right to an equitable remedy is an exceptional one, and absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and that equitable relief will result in more perfect and complete justice." *Timber Lakes Prop. Owners Ass'n v. Cowan*, 2019 UT App 160, ¶ 22, 451 P.3d 277, 285 (citation omitted)).

Here, all four factors are met. First, Plaintiffs, and the people of Utah, will suffer irreparable harm unless the permanent injunction on H.B. 2004 is issued. Utah's courts define "irreparable injury as wrongs of a repeated and continuing character, or . . . [an injury] which cannot be adequately compensated in damages or for which damages cannot be compensable in money." *Carrier v. Lindquist*, 2001 UT 105, ¶ 26, 37 P.3d 1112, 1119. In addition, "[a]ny deprivation of any constitutional right fits that bill." *Free the Nipple-Fort Collins v. City of Fort Collins*, Colorado, 916 F.3d 792, 806 (10th Cir. 2019) (*citing Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("Furthermore, when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") "Irreparable harm is generally considered the most important of the ground[s] for injunctive relief." *Timber Lakes*,

2019 UT App 160, ¶ 24. Here, allowing H.B. 2004, the product of an unconstitutional act, to be used in the upcoming 2026 election is harm that is irreparable. There is no other remedy, monetary or otherwise, that could rectify the violation of the people's fundamental right to alter or reform their government. In fact, by not enjoining it, this Court would be sanctioning it.

Second, the harm to Plaintiffs outweighs any harm to Legislative Defendants. Without the permanent injunction, another election cycle will proceed in defiance of the will of the people, as expressed in Proposition 4. The Legislative Defendants – as the elected representatives of the people – are duty bound to honor the will of the people.

Third, the Court must "balance the harms that would result from denying the injunction against the harms that would result from granting the injunction." *Utah Env't Cong. v. U.S. Bureau of Land Mgmt.*, 119 F. App'x 218, 220 (10th Cir. 2004). Plaintiffs argue that if HB 2004 is not permanently enjoined the people of Utah will be harmed by being bound to a congressional redistricting map that was not enacted according to the requirements of Proposition 4 and that will govern every election between 2026 and 2031. Merely recognizing Proposition 4 as the law on redistricting in Utah without taking steps to ensure that all congressional plans used in future elections comply with it, violates Utah law and continues to violate the people's constitutional rights. Accordingly, the Court concludes that the balance of harms in this case tips in favor of Plaintiffs and the people of Utah.

Fourth, the injunction will not adversely affect the public interest. Generally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir.2012)). An injunction against HB 2004 is in the public interest because it is the only remedy that will enforce Proposition 4 going forward and prevent the continued violation of the people's constitutional rights. Issuing a permanent injunction against H.B. 2004 will not adversely affect the public interest.

## CONCLUSION AND ORDER

For the reasons stated herein, the **GRANTS** Plaintiffs' Motion for Summary Judgment on Count V and **DENIES** the Legislative Defendants' Motion for Summary Judgment on Count V. Proposition 4 is the law in Utah on redistricting. H.B. 2004, the 2021 Congressional Map, which was not enacted under S.B. 200 and not Proposition 4, cannot lawfully govern future elections in Utah.

IT IS HEREBY ORDERED:

1. Plaintiffs' request to enjoin H.B. 2004, the 2021 Congressional Map, is **GRANTED**.

2. Use of H.B. 2004, the 2021 Congressional Map, in any future elections is hereby **ENJOINED**.

3. Proposition 4 is the law on redistricting in Utah.

4. The Legislature is directed to design and enact a remedial congressional redistricting map in conformity with Proposition 4's mandatory redistricting standards and requirements.

5. The Court retains jurisdiction and proposes that the following timeline shall govern proceedings between now and November 1, 2025:

    a. The Legislative Defendants shall have thirty (30) days from the date of this decision, until September 24, 2025, to design and enact a remedial congressional map that complies with the mandatory redistricting standards and requirements originally established under Proposition 4. The Legislative Defendants are ordered to make their chosen remedial map available to Plaintiffs and the Court no later than 5:00 p.m. on September 24, 2025 or within 24 hours of enacting the new congressional map, whichever occurs earlier.

    b. Plaintiffs and other third parties may also submit proposed remedial maps, along with any accompanying expert reports and supportive materials, to this Court, on September 24, 2025, in the event that (i) the Legislature does not enact a remedial map that complies with Proposition 4 by 5:00 p.m. on September 24, 2025, or (ii) Plaintiffs contend that the remedial map fails to abide by and conform to Proposition 4's mandatory redistricting standards and requirements.

    c. By 11:59 p.m. on Friday, October 3, 2025, Plaintiffs and other interested parties may file briefs with objections to any congressional map enacted by the Legislature or to any map proposed by Plaintiffs or any other third party.

    d. An evidentiary hearing will be scheduled sometime between October 9 – 14, 2025. Other dates may be available, depending on the parties' availability.

    e. The Court orders the parties to discuss the proposed schedule in good faith and if possible, reach agreement on any requested modifications. The parties should be prepared to discuss the proposed schedule and the path forward during the hearing on Friday, August 29, 2025, at 10:00 a.m.

DATED August 25, 2025.

_____
DIANNA M. GIBSON
DISTRICT COURT JUDGE