David P. Billings (Utah Bar No. 11510)
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
801-531-8900
dbillings@fabianvancott.com

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
206-656-0177
akhanna@elias.law

Richard A. Medina*
Max C. Accardi*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
202-968-4490
rmedina@elias.law
maccardi@elias.law

*Attorneys for Amicus Curiae*
*National Redistricting Foundation*

*\*Pro hac vice* application forthcoming

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| COMMISSIONER AMELIA POWERS GARDNER, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LIEUTENANT GOVERNOR DEIDRE HENDERSON, in her official capacity, <br><br> Defendant. | Case No. 2:26-cv-84-RJS-JCB <br><br> Judge Timothy M. Tymkovich <br> Judge Robert J. Shelby <br> Judge Holly L. Teeter <br> Magistrate Judge Jared C. Bennett |

## AMICUS BRIEF OF NATIONAL REDISTRICTING FOUNDATION IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION AND IN SUPPORT OF PROPOSED INTERVENORS' MOTION TO DISMISS OR STAY

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENT ....................................................... 1

CONCISE STATEMENT OF NRF'S IDENTITY AND INTEREST ........................ 1

STATEMENT OF CONTRIBUTORS .................................................................. 1

INTRODUCTION ............................................................................................ 2

ARGUMENT ................................................................................................... 4

I.    Plaintiffs' claim fails on the merits. ......................................................... 4

    A.    The Elections Clause does not bar state courts from ordering remedial maps. ...... 4

    B.    The Utah district court did not "transgress the ordinary bounds of judicial review" under Utah law in ordering a remedial map. ............................... 6

    C.    Federal statutes do not support Plaintiffs' request for relief. ............................... 12

II.   The *Purcell* principle bars relief. ......................................................... 14

III.  The remaining preliminary injunction factors weigh against an injunction. ................... 17

    A.    Plaintiffs have failed to show a likelihood of irreparable harm. .......................... 17

    B.    The balance of the equities and public interest factors tip sharply against Plaintiffs. ............................................................................................. 20

IV.   Alternatively, the Court should stay its hand under the *Pullman* doctrine. ..................... 21

CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**CASES**                                                                                              **Page(s)**

*Lance v. Coffman*,
    549 U.S. 437 (2007) ................................................................................................. 17

*Abbott v. League of United Latin Am. Citizens*,
    146 S. Ct. 418 (2025)............................................................................................... 16

*Alexander v. Taylor*,
    51 P.3d 1204 (Okla. 2002) ..................................................................................8, 11

*Allen v. Milligan*,
    599 U.S. 1 (2023)..................................................................................................... 23

*Am. Const. L. Found., Inc. v. Meyer*,
    113 F.3d 1245 (10th Cir. 1997) .............................................................................. 23

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ........................................................................................*passim*

*Babb v. Wilkie*,
    589 U.S. 399 (2020) ................................................................................................ 19

*Below v. Gardner*,
    963 A.2d 785 (N.H. 2002) ...................................................................................... 10

*Benisek v. Lamone*,
    585 U.S. 155 (2018) ..............................................................................................4, 20

*Bost v. Ill. State Bd. of Elections*,
    No. 24-568, 2026 WL 96707 (U.S. Jan. 14, 2026) ......................................... 20

*Branch v. Smith*,
    538 U.S. 254 (2003) ................................................................................................ 13

*Bush v. Gore*,
    531 U.S. 98 (2000) .................................................................................................. 12

*Caldara v. City of Boulder*,
    955 F.3d 1175 (10th Cir. 2020) ........................................................................ passim

*Carter v. Chapman*,
    270 A.3d 444 (Pa. 2022)........................................................................................... 8

*Chapman v. Meier,*
    420 U.S. 1 (1975) ............................................................................................. 6

*City of Chicago v. Fieldcrest Dairies,*
    316 U.S. 168 (1942) ........................................................................................ 23

*Clajon Prod. Corp. v. Petera,*
    70 F.3d 1566 (10th Cir. 1995) ................................................................... 22, 23

*Clarke v. Wis. Elections Comm'n,*
    998 N.W.2d 370 (Wis. 2023) ........................................................................... 9

*Colorado v. DeJoy,*
    No. 20-CV-2768-WJM-STV, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ........................ 18

*Democratic Nat'l Comm. v. Wis. State Legislature,*
    141 S. Ct. 28 (2020) .................................................................................. 14, 20

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018) ........................................................................................ 14

*Fed. Home Loan Bank Bd. v. Empie,*
    778 F.2d 1447 (10th Cir. 1985) ...................................................................... 23

*Fish v. Kobach,*
    840 F.3d 710 (10th Cir. 2016) ..................................................................... 3, 14

*Growe v. Emison,*
    507 U.S. 25 (1993) ................................................................................. passim

*GTE Corp. v. Williams,*
    731 F.2d 676 (10th Cir. 1984) ........................................................................ 16

*Hippert v. Ritchie,*
    813 N.W.2d 391 (Minn. 2012) ..................................................................... 8, 9

*Hoffmann v. N.Y. State Indep. Redistricting Comm'n,*
    234 N.E.3d 1002 (N.Y. 2023) .......................................................................... 8

*Jeffs v. Stubbs,*
    970 P.2d 1234 (Utah 1998) ............................................................................ 10

*Johnson v. Wis. Elections Comm'n,*
    967 N.W.2d 469 (Wis. 2021) ........................................................................... 9

*Jud. Watch, Inc. v. Griswold*,
  No. 20-CV-02992-PAB-KMT, 2022 WL 3681986 (D. Colo. Aug. 25, 2022)...................... 19

*Large v. Fremont County*,
  670 F.3d 1133 (10th Cir. 2012) .................................................................................. 23

*Lawyer v. Dep't of Justice*,
  521 U.S. 567 (1997) .................................................................................................... 9

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
  103 F.4th 748 (10th Cir. 2024).................................................................................. 20

*League of Women Voters of Utah v. Utah State Legislature*,
  2024 UT 21, 554 P.3d 872 .................................................................................... 7, 20

*League of Women Voters of Utah v. Utah State Legislature*,
  No. 220901712, 2025 WL 2644292 (Utah Dist. Ct. Aug. 25, 2025) ........................... 2, 7, 9

*Lehman v. City of Louisville*,
  967 F.2d 1474 (10th Cir. 1992) .................................................................................. 21

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022)......................................................................................... *passim*

*Moore v. Harper*,
  600 U.S. 1 (2023)............................................................................................... *passim*

*Morrow v. Winslow*,
  94 F.3d 1386 (10th Cir. 1996) .................................................................................. 22

*Murdock v. Memphis*,
  87 U.S. (20 Wall.) 590,(1875) ..................................................................................... 5

*Norelli v. Sec'y of State*,
  292 A.3d 458 (N.H. 2022) ........................................................................................... 8

*Ohio ex rel. Davis v. Hildebrant*,
  241 U.S. 565 (1916) .................................................................................................... 5

*Perry v. Del Rio*,
  67 S.W.3d 85 (Tex. 2001) ...................................................................................... 8, 10

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)................................................................................................... 3, 14

*R.R. Comm'n of Tex. v. Pullman Co.*,
   312 U.S. 496 (1941) ...................................................................................................4, 21

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   589 U.S. 423 (2020) ......................................................................................................... 14

*Rezaq v. Nalley*,
   677 F.3d 1001 (10th Cir. 2012) ....................................................................................... 18

*S & S Pawn Shop Inc. v. City of Del City*,
   947 F.2d 432 (10th Cir. 1991) .......................................................................................... 22

*Scott v. Germano*,
   381 U.S. 407 (1965) ....................................................................................................... 2, 5

*Singleton v. Allen*,
   No. 2:21-cv-1291-AMM, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) ............................. 8

*Smiley v. Holm*,
   285 U.S. 355 (1932) ............................................................................................................ 5

*Spanish Fork Westfield Irr. Co. v. Dist. Ct. of Salt Lake Cnty.*,
   99 Utah 527, 104 P.2d 353 (1940) ................................................................................... 10

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .......................................................................................................... 18

*State of Colorado v. U.S. Env't Prot. Agency*,
   989 F.3d 874 (10th Cir. 2021)..................................................................................... 18, 20

*Thurston v. Box Elder County*,
   892 P.2d 1034 (Utah 1995) .............................................................................................. 10

*Wattson v. Simon*,
   970 N.W.2d 56 (Minn. 2022) .............................................................................................. 9

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)............................................................................................................... 13

*Wis. Voter Alliance v. Millis*,
   --- F.4th ----, No. 25-1279, 2026 WL 370269 (7th Cir. Feb. 10, 2026).............................. 17

*Wise v. Circosta*,
   978 F.3d 93 (4th Cir. 2020) .............................................................................................. 14

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. 1, § 4, cl. 1 ................................................................................. 2

Minn. Const. art. IV, § 3 .................................................................................... 9

N.H. Const. pt. 2, art. 26 ................................................................................... 10

Tex. Const. art. III, § 28 ................................................................................... 10

Utah Const. art. I, § 11 ............................................................................... 10, 11

Utah Const. art. IX, § 1 .................................................................................... 9

Wis. Const. art. IV, § 3 .................................................................................... 9

## STATUTES

2 U.S.C. § 2a(c) ...................................................................................... 4, 12, 13

2 U.S.C. § 2c ...................................................................................................... 13

Utah Code Ann. § 20A-9-201.5 ........................................................................ 16

Utah Code Ann. § 20A-19-301 ......................................................................... 11

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1(a)(1) and DUCivR 7-6(d)(1)(C), NRF states that NRF has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## CONCISE STATEMENT OF NRF'S IDENTITY AND INTEREST

The National Redistricting Foundation ("NRF") is a § 501(c)(3) nonprofit advocacy group that seeks to ensure fair redistricting maps to allow for more just and representative electoral districts. To advance this mission, NRF engages in public education and grassroots mobilization efforts to raise awareness of gerrymandering, partners with groups to develop redistricting reforms at the state and federal level, and sponsors and funds litigation to oppose unjust gerrymandering practices that discriminate on the basis of race or party affiliation or otherwise violate state or federal law to the detriment of voters and fair representation. Because NRF seeks to preserve state-court litigation as an avenue to vindicate voter rights, it has consistently and vocally opposed the independent state legislature theory that Plaintiffs advance, including in *Moore v. Harper*, 600 U.S. 1 (2023), the seminal Supreme Court case addressing the theory. NRF submits this brief to oppose Plaintiffs' legal claim and ensure that state-court litigation remains a viable avenue for vindicating voter rights.

## STATEMENT OF CONTRIBUTORS

Pursuant to DUCivR 7-6(d)(1)(B), NRF states that no party's counsel authored NRF's memorandum in whole or in part, no party or party's counsel contributed money to support preparing the memorandum, and no person or entity other than NRF contributed money to support preparing the memorandum.

# INTRODUCTION

Plaintiffs waited nearly three months after the Utah district court adopted a remedial map to bring a claim grounded in a legal theory the U.S. Supreme Court has repeatedly rejected and seek emergency relief based on the extraordinary assertion that Utah courts have no authority to remedy violations of Utah law. For a federal court to insert itself on *this* basis at *this* stage would be unprecedented, unfeasible, and wholly unwarranted.

The relief Plaintiffs seek—a federal court order countermanding a state court's remedial order on state-law grounds—is squarely foreclosed by Supreme Court precedent. Less than three years ago, the Supreme Court rejected Plaintiffs' expansive interpretation of the United States Constitution's Elections Clause, U.S. Const. art. 1, § 4, cl. 1, holding that "[s]tate courts retain the authority to apply state constitutional restraints when legislatures act under the power conferred upon them by the Elections Clause." *Moore v. Harper*, 600 U.S. 1, 37 (2023). As the Court has made clear, that authority includes the power to order the use of court-drawn plans to remedy violations of state and federal law. *See Scott v. Germano*, 381 U.S. 407, 409 (1965); *Growe v. Emison*, 507 U.S. 25, 34 (1993).

That is exactly what has happened here. Nearly six months ago, a Utah state district court held unconstitutional a state statute that repealed Proposition 4, a voter-approved initiative to restrict partisan gerrymandering in Utah. *League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292, at *52 (Utah Dist. Ct. Aug. 25, 2025) (unpublished). As a result, it concluded that Utah's congressional map, enacted under that state statute and in violation of Proposition 4, was invalid. *Id.* at *54. The court enjoined the map and gave the state Legislature another bite at the apple. *Id.* at *58–59. In response, the Legislature again

attempted to gut Proposition 4 and enacted a new map. In a thorough ruling, the Utah district court again concluded that both the attempt to weaken Proposition 4 and the reconfigured map failed to pass muster under Utah law. ECF No. 1 ("Compl.") ¶ 78. It then proceeded to do what courts around the country routinely do when a state legislature fails to remedy legal violations in a redistricting plan: it ordered the adoption of a legally compliant plan. *Id.*

None of this is remotely unusual, and it certainly does not exceed the "ordinary bounds of judicial review." *Moore*, 600 U.S. at 36. Plaintiffs base their contrary argument on provisions of state law that on their face say nothing to restrict the broad remedial power enjoyed by courts of equity in Utah. Indeed, without the ability to order the adoption of a remedial map, courts would be left to play redistricting whack-a-mole with state legislatures that repeatedly adopt non-compliant maps or, worse, refuse to propose a remedial map at all, thus insulating redistricting plans from judicial review entirely. The Utah district court rightly rejected these strained interpretations of state law.

Accordingly, binding Supreme Court precedent mandates denial of Plaintiffs' Motion and dismissal of their Complaint. But, even if that were not the case, the Motion must be denied as untimely. Plaintiffs can claim no entitlement to preliminary injunctive relief where they waited months to bring their claim on the eve of pressing election deadlines. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam); *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring). In this Circuit, preliminary injunctions that "alter the status quo" or "afford the movant all the relief that it could recover at the conclusion of a full trial on the merits" are disfavored. *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (quotation omitted). Plaintiffs' Motion seeks both, and then too without any authority in support of their widely discredited claim.

And, even if the Utah district court did err in its interpretation of state law, the *Pullman* doctrine requires this Court to abstain from adjudicating Plaintiffs' constitutional claim while those state law issues remain pending on appeal in proceedings before Utah's high court. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

This Court should reject Plaintiffs' last-minute, Hail Mary attempt to collaterally attack a state court ruling on state law. The balance of the equities and public interest factors strongly support denying an injunction, which would "work[] a needlessly chaotic and disruptive effect upon" Utah's election process. *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citation modified).

## ARGUMENT

### I.    Plaintiffs' claim fails on the merits.

Plaintiffs' Preliminary Injunction Motion must be denied, and their Complaint dismissed, because both recent and longstanding Supreme Court precedent squarely foreclose their argument that the Elections Clause forbids courts—state or federal—from ordering the adoption of remedial congressional maps. Nor have Plaintiffs demonstrated that Utah law clearly forbids courts from doing so, such that the Utah district court's decision "transgress[ed] the ordinary bounds of judicial review." *Moore*, 600 U.S. at 36. And the federal statute they cite, 2 U.S.C. § 2a(c), has no application here.

### A.  The Elections Clause does not bar state courts from ordering remedial maps.

Plaintiffs argue that under the Elections Clause, only the Utah legislature—and not a Utah court—may enact a congressional redistricting plan. They cite no court that has adopted their theory. That is unsurprising: As even Plaintiffs are forced to admit, Mot. for Prelim. Inj. at 21, ECF No. 19 ("Mot."), the Supreme Court has rejected the expansive theory of state legislative

power that they put forward here, holding that the Elections Clause "does not insulate state legislatures from the ordinary exercise of state judicial review." *Moore*, 600 U.S. at 22. Just two and a half years ago in *Moore*, the Court identified at least three of its cases—*Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), *Smiley v. Holm*, 285 U.S. 355 (1932), and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015) ("*AIRC*")— that "rejected the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections." *Moore*, 600 U.S. at 26. And it reaffirmed that "State courts are the appropriate tribunals . . . for the decision of questions arising under their local law, whether statutory or otherwise." *Id.* at 34 (quoting *Murdock v. Memphis*, 87 U.S. (20 Wall.) 590, 626 (1875)) (alteration in original).

This power of state court judicial review under the Elections Clause includes the power to order remedial maps. The Supreme Court has repeatedly held "that state courts have a significant role in redistricting," and reversed lower courts that "overlooked this . . . teaching." *Growe*, 507 U.S. at 33. Indeed, where a redistricting map violates state law, as the Utah district court found here, the Court has not only expressly "recognized" "[t]he power of the judiciary of a State to require valid reapportionment *or to formulate a valid redistricting plan*" but also "*specifically encouraged*" state courts to take up the map-drawing pen themselves to remedy redistricting violations. *Germano*, 381 U.S. at 409 (emphasis added) (citations omitted).

In *Growe v. Emison*, the Supreme Court unanimously "renew[ed its] adherence to the principles expressed in *Germano*, which derive from the recognition that the Constitution leaves with the States primary responsibility for apportionment of their *federal congressional* and state legislative districts." 507 U.S. at 34 (emphasis added). It repeated "what has been said on many

occasions: reapportionment is primarily the duty and responsibility of the State through its legislature *or other body*, rather than of a federal court." *Id.* (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). It accordingly held that the district court's "injunction of state-court proceedings" was "clear error" based on the "mistaken view that federal judges need defer only to the Minnesota Legislature and not at all to the State's courts." *Id.* It explicitly underscored the "legitimacy of state *judicial* redistricting," and explained that "the doctrine of *Germano* prefers *both* state branches to federal courts as agents of apportionment." *Id.* Indeed, the state court's "issuance of its [redistricting] plan" was "precisely the sort of state judicial supervision of redistricting we have encouraged." *Id.*

The lesson of these cases is clear: state courts possess not only the power under the Elections Clause to order remedial maps to cure violations of state law, but also the duty to do so. That is precisely what the Utah district court did here. Plaintiffs' contention that the Elections Clause forbids this is meritless.[1]

### B. The Utah district court did not "transgress the ordinary bounds of judicial review" under Utah law in ordering a remedial map.

Plaintiffs cannot escape through the narrow window left open by the Supreme Court in *Moore* for instances where state courts "transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections."

---

[1] Plaintiffs' argument that Map 1 is unconstitutional "under the reasoning of [*AIRC*]," makes little sense. Mot. at 20. *AIRC* refutes Plaintiffs' view: it observed that "Congress expressly directed that when a State has been 'redistricted in the manner provided by [state] law'—whether by the legislature, *court decree*, or a commission established by the people's exercise of the initiative— the resulting districts are the ones that presumptively will be used to elect Representatives." 576 U.S. at 812 (citation modified) (emphasis added). As the Supreme Court explained in *Moore*, *AIRC* "rejected the contention that the Elections Clause vests state legislatures with exclusive and independent authority when setting the rules governing federal elections." 600 U.S. at 26.

600 U.S. at 36; *see* Mot. at 21. Behind this limited proviso is "the concern that state courts might read state law in such a manner as to circumvent federal constitutional provisions." *Moore*, 600 U.S. at 35. That standard is extraordinarily high, and no court has ever applied *Moore*'s narrow exception to hold that a state court's application of state law violated the federal Elections Clause. This Court should not be the first.

Importantly, Plaintiffs do not challenge the Utah district court's ruling that both the 2021 Map and Map C violated state law, nor do they question that the Utah district court had the power to enjoin the use of those maps. Having failed to identify any legal error in the Utah district court's state law analysis, Plaintiffs can hardly argue that these decisions "exceeded the bounds of ordinary judicial review." *Id.* at 36. Instead, Plaintiffs contend only that the Utah district court lacked authority under the United States and Utah constitutions to order the adoption of a remedial map to cure the violations of state law that it found. *E.g.*, Compl. ¶ 94; Mot. at 22–23.[2]

---

[2] Plaintiffs argue, in a footnote, that the Utah district court "did something unheard of in redistricting litigation" by "enjoin[ing] the use of the Legislature's map without finding it unconstitutional." Mot. at 22 n.5; *see also id.* at 26 (incorrectly arguing that the Utah district court "never held unlawful" the 2021 Map). Not so. The Utah district court found that the state statutes purporting to repeal or amend Proposition 4 were unconstitutional. As a result, any maps enacted pursuant to those statutes and in violation of Proposition 4 were obviously legally infirm as "an extension of the very constitutional violation that tainted the process from the start." *League of Women Voters of Utah*, 2025 WL 2644292, at *54; *see also League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶ 61, 554 P.3d 872 ("[T]he parties' dispute over whether the citizen reform initiative, Proposition 4, or the Legislature's replacement of the initiative, S.B. 200, should govern the redistricting process . . . also encompasses the constitutionality of the Congressional Map that resulted from S.B. 200 and was not subject to Proposition 4's requirements."). In any event, this theory is nowhere pleaded in Plaintiffs' Complaint, which focuses on whether the Utah district court had authority to adopt a remedial map, not whether it properly enjoined the Legislature's map in the first place.

Although the Supreme Court in *Moore* declined to adopt any "test by which we can measure state court interpretations of state law in cases implicating the Elections Clause," nothing about the state court's remedial order here "transgress[ed] the ordinary bounds of judicial review" under any plausible standard. *Moore*, 600 U.S. at 36. Indeed, it is quite "ordinary" for a court—state or federal—to adopt a remedial redistricting plan to cure a violation of law and ensure that the upcoming election will take place under a legally compliant map. That is commonplace in redistricting litigation. *See, e.g.*, *Norelli v. Sec'y of State*, 292 A.3d 458, 464 (N.H. 2022) (holding that state courts have jurisdiction "to formulate a remedy if the current congressional districting statute is unconstitutional and no redistricting plan is timely enacted by the legislature"); *Carter v. Chapman*, 270 A.3d 444, 471 (Pa. 2022) (adopting a congressional redistricting plan); *Hippert v. Ritchie*, 813 N.W.2d 391, 403 (Minn. 2012) (adopting a congressional redistricting plan); *Alexander v. Taylor*, 51 P.3d 1204, 1209 (Okla. 2002) (affirming trial court's selection of congressional redistricting map); *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001) ("The Legislature is the department constitutionally responsible for apportioning the State into federal congressional legislative districts. When the Legislature does not act, citizens may sue and, then, it is the judiciary's role to determine the appropriate redistricting plan." (citations omitted)); *cf. Hoffmann v. N.Y. State Indep. Redistricting Comm'n*, 234 N.E.3d 1002, 1005–08 (N.Y. 2023) (recounting the long history of federal court-drawn maps in New York); *Singleton v. Allen*, No. 2:21-cv-1291-AMM, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) (unpublished) (ordering a remedial map after enjoining remedial map enacted by the state legislature).

Plaintiffs' principal basis for arguing that the Utah court transgressed its authority under Utah law is the Utah Constitution's provision that "[n]o later than the annual general session next

following the Legislature's receipt of the results of an enumeration made by the authority of the United States, the Legislature shall divide the state into congressional, legislative, and other districts accordingly." Utah Const. art. IX, § 1. That provision, by its plain terms, says nothing to limit the judicial power of the Utah courts. Instead, as the Utah district court previously explained, Article IX, Section 1, far from "grant[ing] redistricting authority to the 'Legislature,'" instead "*limits* the Legislature's authority" as to "when redistricting shall occur." *League of Women Voters of Utah*, 2025 WL 2644292, at *18; *see also Lawyer v. Dep't of Justice*, 521 U.S. 567, 577 n.4 (1997) (holding that a similar provision in Florida's constitution "in terms provides only that the state legislature is bound to redistrict within a certain time after each decennial census" and rejecting the argument that this provision "provides the exclusive means by which redistricting can take place").

The Constitutions of other states contain similar provisions to Utah's Article IX, Section 1, but courts in those states routinely order new district maps to remedy violations of state and federal law. The Minnesota Constitution, for instance, provides that "the legislature shall have the power to prescribe the bounds of congressional and legislative districts." Minn. Const. art. IV, § 3. But Minnesota courts regularly draw maps, and the Supreme Court explicitly endorsed their power to do so in *Growe*. *E.g.*, *Wattson v. Simon*, 970 N.W.2d 56, 59–66 (Minn. 2022); *Hippert*, 813 N.W.2d at 394–95; *see also Growe*, 507 U.S. at 34. Wisconsin's Constitution similarly provides that "[a]t its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly." Wis. Const. art. IV, § 3. But that provision has not stopped the Wisconsin Supreme Court from imposing remedial maps. *See Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 493 (Wis. 2021); *Clarke*

*v. Wis. Elections Comm'n*, 998 N.W.2d 370, 396 (Wis. 2023). New Hampshire's constitution provides that "the legislature shall divide the state into single-member [senate] districts," and that it "shall form the single-member districts . . . at the regular session following each decennial federal census." N.H. Const. pt. 2, art. 26. Again, that did not stop the New Hampshire Supreme Court from "undertak[ing] the 'unwelcome obligation'" of choosing a new Senate map to remedy the state legislature's failure to enact a lawful map. *Below v. Gardner*, 963 A.2d 785, 788 (N.H. 2002) (citation modified). And as the Texas Supreme Court has explained, though the "Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts," Tex. Const. art. III, § 28, "[w]hen the Legislature does not act, citizens may sue and, then, it is the judiciary's role to determine the appropriate redistricting plan." *Perry*, 67 S.W.3d at 91 (citing *Growe*, 507 U.S. at 33–34).

Utah courts, like these other state courts, "have broad authority to grant equitable relief as needed." *Jeffs v. Stubbs*, 970 P.2d 1234, 1243 (Utah 1998); *see also Spanish Fork Westfield Irr. Co. v. Dist. Ct. of Salt Lake Cnty.*, 99 Utah 527, 104 P.2d 353, 359 (1940) ("Generally speaking, courts of equity exercise a broad and flexible jurisdiction to grant remedial relief where justice and good conscience requires it."). Under Utah law, "[a] trial court is accorded considerable latitude and discretion in applying and formulating an equitable remedy." *Thurston v. Box Elder County*, 892 P.2d 1034, 1041 (Utah 1995). Moreover, the Utah Constitution provides that "[a]ll courts shall be open, and every person, for an injury done to the person in his or her person, property, or reputation, shall have remedy by due course of law." Utah Const. art. I, § 11. The Oklahoma Supreme Court, for instance, has relied on the Oklahoma Constitution's similar "open courts" provision to hold that its state courts have jurisdiction to "grant remedies for violations of

congressional redistricting disputes." *Alexander*, 51 P.3d at 1212–13 (citing Okla. Const. art. 2, § 6).

Nor do Utah statutes constrain the Utah district court's remedial power. *See* Mot. at 23. Proposition 4 *requires* state courts to enjoin unlawful redistricting plans. Utah Code Ann. § 20A-19-301(2) ("If a court of competent jurisdiction determines in any action brought under this Section that a redistricting plan enacted by the Legislature fails to abide by or conform to the redistricting standards, procedures, and requirements set forth in this chapter, the court *shall* issue a permanent injunction barring enforcement or implementation of the redistricting plan." (emphasis added)). That mandatory provision in no way *restricts* the court's broad remedial authority under the Utah constitution and common law to adopt a new map as an equitable remedy. Moreover, under Proposition 4, "[u]pon the issuance of a permanent injunction . . . the legislature *may* enact a new or alternative redistricting plan that abides by and conforms to the redistricting standards, procedures, and requirements of this chapter." *Id.* § 20A-19-301(8) (emphasis added). This permissive language further underscores that, absent a legally compliant remedial plan from the Utah legislature, the court must step in and devise a remedy. Although the legislature "may" enact a remedial plan, it is not required to do so, which would leave it to the court to remedy the violation. Any other interpretation would render an injunction under Proposition 4 entirely meaningless: the Legislature could simply refuse to avail itself of the opportunity to cure the violation, thus leaving in place a map drawn in violation of state law or one with unequally populated districts. Proposition 4 is not so toothless. *See* Utah Const. art. I, § 11 ("[E]very person, for an injury done to the person . . . shall have remedy by due course of law.").

Finally, even if the Court were to disagree with the Utah district court's interpretation of its own remedial authority under Utah law, that would not be sufficient to show that the Utah district court "transgress[ed] the ordinary bounds of judicial review." *Moore*, 600 U.S. at 36. As the persuasive authorities cited above demonstrate, the Utah district court's interpretation of Utah law—even if erroneous—certainly does not "impermissibly distort[]" Utah law "beyond what a fair reading required." *Id.* (quoting *Bush v. Gore*, 531 U.S. 98, 115 (2000) (Rehnquist, J., concurring)). Nor does it "transcend[] the limits of reasonable statutory interpretation to the point of supplanting the statute enacted by the 'legislature' within the meaning of Article II." *Id.* (quoting *Bush*, 531 U.S. at 133 (Souter, J., dissenting)). Plaintiffs' preferred interpretation of Utah law rests on inferences and implications they draw from a constitutional provision and two statutes, Mot. at 24–26—not on the express terms of those provisions, and certainly not on any precedent interpreting them as Plaintiffs press. Even if Plaintiffs could demonstrate their reading of Utah law is better than the district court's interpretation, they fall far short of the demanding standard that would warrant the extraordinary intrusion of a federal court into matters of state law.

### C.  Federal statutes do not support Plaintiffs' request for relief.

Nor does 2 U.S.C. § 2a(c) entitle Plaintiffs to relief. That statute provides that "[u]ntil a State is redistricted *in the manner provided by the law thereof* after any apportionment," then—in a state like Utah where the number of districts since the last apportionment is unchanged—Representatives "shall be elected from the districts then prescribed by the law of such State." 2 U.S.C. § 2a(c)(1) (emphasis added). In Plaintiffs' telling, this requires the Court to "apply the last lawful map produced by the Legislature." Mot. at 25. That is wrong for at least three reasons.

*First*, the "manner" referred to in Section 2a(c) *includes* redistricting by state "court decree." *AIRC*, 576 U.S. at 812. So Utah *has* been "redistricted in the manner provided" by Utah law, as explained above. *See supra* § I.B.

*Second*, even if Plaintiffs' interpretation were correct, there *are* no "lawful maps" produced by the Legislature. The 2021 Map violated state law, as the Utah district court found—a decision that Plaintiffs do not meaningfully dispute. *See supra* note 2. Such a map cannot be re-imposed under Section 2a(c). "[T]he word 'manner' refers to the State's substantive 'policies and preferences' for redistricting, as expressed in a State's statutes, constitution, proposed reapportionment plans, or a State's 'traditional districting principles.'" *Branch v. Smith*, 538 U.S. 254, 277–78 (2003) (Scalia, J., plurality opinion) (citations omitted). And the previous map in effect through 2020, though it contained the same number of districts, is now unconstitutionally malapportioned because it relies on old census data. *See Wesberry v. Sanders*, 376 U.S. 1, 7 (1964). For this reason, a majority of the Supreme Court observed that Section 2a(c)(1), originally enacted in 1941, is not "constitutionally enforceable when (as is usual) the decennial census has shown a proscribed degree of disparity in the voting population of the established districts." *Branch*, 538 U.S. at 272.

*Third*, the Supreme Court has held that another federal statute—2 U.S.C. § 2c—"embraces action by state and federal courts when the prescribed legislative action has not been forthcoming." *Id.* at 272. In particular, the Court held that Section 2c *requires* state and federal courts, when a state legislature has not acted, to draw new, equally apportioned single-member districts. *Id.* That holding cannot be squared with Plaintiffs' interpretation of Section 2a(c), which would place the two statutes in irreconcilable conflict. "It is this Court's duty to interpret Congress's statutes as a

harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018).

## II.    The *Purcell* principle bars relief.

Plaintiffs' motion for preliminary injunction comes far too late to warrant relief in time for the 2026 elections. The Supreme "Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). This admonition, "known as the *Purcell* principle," embodies "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill*, 142 S. Ct. at 880–81 (Kavanaugh, J., concurring). Not only does late-stage judicial interference in the electoral process risk "voter confusion" and "election administrator confusion," but it also requires "election administrators [to] first understand the court's injunction, then devise plans to implement that late-breaking injunction, and then determine as necessary how best to inform voters, as well as state and local election officials and volunteers, about those last-minute changes." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Given both "the imminence of the election" here and Plaintiffs' decision to bring this claim more than three months after it arose, the *Purcell* principle strongly favors "allow[ing] the election to proceed without an injunction." *Purcell*, 549 U.S. at 5–6.

There is no question that Plaintiffs' requested injunction would "alter the status quo." *Fish*, 840 F.3d at 723 (quotation omitted); *see also Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) ("[I]t is not federal court decisions, but state decisions, that establish the status quo."). The status quo is Map 1—the court-ordered map—and the 2026 primary campaign under that map is already

well underway. *See* ECF No. 56 at 11–15. Shortly after the state trial court issued its decision, the Lieutenant Governor announced that she would comply with the order and "immediately begin the process of implementing" the court's map.[3] She needed to take prompt action, she explained, because "the process of finalizing new boundary details will take weeks of meticulous work on the part of state and county officials . . . to ensure that everything is in place for candidate filing in January."[4] The Lieutenant Governor has since confirmed *in this Court* that she "and her team are currently prepared to administer the 2026 Congressional election based on Map 1." ECF No. 51 at 3. She has further indicated that, given the significant work that would be required to implement a different map at this stage, "**February 23, 2026** is the last possible day by which the Lieutenant Governor must know which map to use to administer the 2026 Congressional election." *Id.* at 4.

Plaintiffs offer nothing to overcome the "extraordinarily strong interest in avoiding [a] late, judicially imposed change[]" to Utah's congressional map. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). As set forth above, they cannot possibly demonstrate that the "underlying merits" are "clearcut" in their favor, *id.*, where binding Supreme Court precedent is clearcut *against* Plaintiffs' claim. *Supra* § I. And even if it were "feasible" for Plaintiffs' preliminary injunction motion to be resolved—in this Court and on appeal—in the next ten days, Plaintiffs' "undu[e] delay[]" in bringing their claim dooms any prospect of their obtaining such extraordinary relief, *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).. The Utah district court issued its remedial map on November 10, 2025. Plaintiffs waited nearly *three months* to sue, and now seek a

---

[3]    Deidre    Henderson    (@DeidreHenderson),    X    (Nov.    11,    2025    1:52    AM), https://x.com/DeidreHenderson/status/1988152821141958978 [https://perma.cc/GA82-43M9].

[4] Lt. Gov. Deidre M. Henderson (@LGHendersonUtah), X (Nov. 11, 2025, 9:29 AM) https://x.com/LGHendersonUtah/status/1988267731695894686 [https://perma.cc/SB2T-CQYV]

preliminary injunction less than one month before the candidate filing deadline, *see* Utah Code Ann. § 20A-9-201.5(2) (candidate filing deadline is March 13, 2025), and less than two weeks before the administrative deadline announced by the Lieutenant Governor, *see* ECF No. 51 at 4.[5] That delay is inexcusable. Indeed, even setting aside the specific timing constraints that apply in election cases,[6] Plaintiffs' decision to sit on their claim for months severely diminishes their claim of irreparable harm, a necessary element in their request for a preliminary injunction. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (party's "delay in bringing suit diminishes the significance, for purposes of a preliminary injunction, of" irreparable harm).

For the Court to "insert itself" into Utah's "active primary campaign" would "caus[e] much confusion and upset[] the delicate federal-state balance in elections." *Abbott*, 146 S. Ct. at 419. This, at bottom, is the touchstone of *Purcell*. A federal court injunction revising Utah's congressional districts at the literal eleventh hour is likely to create or compound, not ameliorate, as Plaintiffs suggest, confusion among candidates, election officials and—most importantly—

---

[5] Nor can Plaintiffs profess ignorance of the Lieutenant Governor's February 23 deadline, which was discussed in publicly filed briefing in the underlying state case that they collaterally attack here. *See* Appellees' Motion for Summary Disposition, *League of Women Voters of Utah v. Utah State Legislature*, No. 20260019-SC, at 10 (Utah Jan. 16, 2026), *available at* https://www.abc4.com/wp-content/uploads/sites/4/2026/01/2026-0116-LWVUT-Mot-Summary-Disposition.pdf ("If the remedy requested is to return to the 2021 map, then the Lt. Governor intends to notify the court that she needs a decision by February 23.").

[6] The Supreme Court has stayed federal court orders that changed or invalidated congressional maps on similar timelines, even where the plaintiffs filed their claims immediately upon enactment of the challenged map. *See, e.g., Milligan*, 142 S. Ct. at 888 (Kagan, J., dissenting) (dissenting from stay of preliminary injunction imposed two months before congressional primary early voting began, noting that plaintiffs commenced their lawsuits "within hours or days of the enactment" of the challenged maps (citation omitted)); *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 418 (2025) (staying preliminary injunction on *Purcell* grounds where congressional primary was four months away); *id.* at 428 (Kagan, J., dissenting) ("The plaintiffs could not have moved any faster[.]").

voters. "It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

### III.    The remaining preliminary injunction factors weigh against an injunction.

#### A.  Plaintiffs have failed to show a likelihood of irreparable harm.

Plaintiffs also have not demonstrated that they will likely suffer irreparable harm absent an injunction. Their topline argument is that because they are likely to succeed in showing a constitutional violation, "no further showing of irreparable injury is necessary." Mot. at 26–27 (quotation omitted). Plaintiffs thus concede that their alleged irreparable harm rises and falls with the merits—and because Plaintiffs have failed to show a likely constitutional violation, their irreparable harm argument fails too.

But even if Plaintiffs were likely to succeed in showing an Elections Clause violation, this would not, by itself, inflict a judicially cognizable (much less irreparable) injury. The Supreme Court has already held as much. In *Lance v. Coffman*, the Court considered a claim similar to Plaintiffs' (an Elections Clause challenge stemming from a state judicial decision), and found that the challengers had not asserted an injury at all. "The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed," the Court wrote, and this is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that is not concrete and personal enough to give rise to standing. 549 U.S. 437, 442–43 (2007); *see also Wis. Voter Alliance v. Millis*, --- F.4th ----, No. 25-1279, 2026 WL 370269, at *6 (7th Cir. Feb. 10, 2026), at 12–14 (similarly rejecting injury based on allegation of bare constitutional violation untethered from any concrete harm).

Perhaps recognizing that they cannot show an irreparable injury merely by alleging a "bare procedural violation," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), Plaintiffs also list a hodgepodge of other potential injuries in a solitary paragraph. *See* Mot. at 27. Unsurprisingly, none of these underdeveloped theories amount to a "clear showing" that Plaintiffs "would suffer certain, actual, and imminent harm" absent an injunction. *State of Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 887 (10th Cir. 2021) (quotation omitted).

The voter Plaintiffs contend that they cannot be "compensated for their exclusion from a constitutional redistricting process, for voter confusion, or for dilution of their votes." Mot. at 27. None of these theories amounts to an irreparable injury. As an initial matter, Plaintiffs cite no authority for their asserted right to participate in a "constitutional redistricting process," or for any injury—much less an irreparable one—arising from their "exclusion" from such a process. And while the risk of voter confusion *might* constitute irreparable injury to a *state*, *see Colorado v. DeJoy*, No. 20-CV-2768-WJM-STV, 2020 WL 5513567, at *3 n.3 (D. Colo. Sept. 14, 2020), Plaintiffs do not even *allege* that they themselves are confused. *See* Compl. ¶ 31 (vaguely alleging voter confusion, but not mentioning any specific Plaintiff); *cf. Rezaq v. Nalley*, 677 F.3d 1001, 1009 (10th Cir. 2012) (to obtain prospective relief, a plaintiff must show "personal stake in the outcome"). Far from it—Plaintiffs themselves are well aware that Map 1 is currently in place and, barring the injunction they request, will govern the 2026 elections. Compl. ¶ 44. Indeed, it is Plaintiffs' requested injunction—not the challenged state trial court order—that risks voter confusion by forcing Utah officials to alter the congressional map at the last minute. *See supra* § II; *State of Colorado*, 989 F.3d at 888 (an "injury is not legally cognizable" if it is "self-inflicted").

As for the vote dilution theory, it rests on the allegation that some Plaintiffs were "placed in a district with many of the fastest growing cities in Utah such that by the time the next census is taken . . . th[e] district will likely be heavily lopsided compared to other districts." Mot. at 13. But Plaintiffs fail to support this allegation with evidence other than Plaintiff declarations, so it depends entirely on lay conjecture about demographic trends in Utah—making Plaintiffs' injury far too "generalized" and "hypothetical" to support a preliminary injunction. *Jud. Watch, Inc. v. Griswold*, No. 20-CV-02992-PAB-KMT, 2022 WL 3681986, at \*2 (D. Colo. Aug. 25, 2022) (unpublished) (rejecting speculative vote dilution argument). And they do not contend with the fact that the 2021 Map they seek to impose, which like Map 1 is apportioned based on the 2020 census, is just as likely to be malapportioned when measured by the actual 2025 Utah population.

The candidate Plaintiffs contend that they will suffer irreparable injury absent an injunction because "[t]he changed rules, especially the changed boundaries, burden their campaigns and leave them uncertain where to file for office or begin campaigning." Mot. at 27. But the requested injunction would only *compound* that uncertainty. Currently, Lieutenant Governor Henderson has stated that, absent a court order, she will administer the 2026 election according to the Utah state trial court's order. *See* ECF No. 44 at 2. Plaintiffs ask the Court to enjoin her from doing so, remand the issue to the Utah state legislature, and, if the Legislature fails to promptly enact a new, unknown map, direct Lieutenant Governor Henderson to revert to the 2021 map. Mot. at 30. Thus, if the Court grants Plaintiffs' request, it will only compound the "burden" on their campaigns and prolong the "uncertain[ty]" they face about "where to file for office." Mot. at 27; *see Babb v.*

*Wilkie*, 589 U.S. 399, 413 (2020) (requested relief must remedy asserted injury); *State of Colorado*, 989 F.3d at 888 (plaintiffs cannot rely on "self-inflicted" injuries).[7]

### B. The balance of the equities and public interest factors tip sharply against Plaintiffs.

The balance of the equities and the public interest strongly counsel against Plaintiffs' requested injunction. *First*, an injunction would be devastating for Utah voters and election officials—it would risk "voter confusion," and "election administrator confusion," and require herculean efforts by election officials to accommodate the Court's "late-breaking" interference in state election processes. *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring); *supra*, § II. This would "work[] a needlessly chaotic and disruptive effect upon the electoral process," *Benisek*, 585 U.S. at 161 (citation omitted), harming Utahns, candidates, and election officials. *Second*, an injunction would interfere with ongoing state judicial processes—an act inconsistent with bedrock principles of comity and federalism—risking "premature constitutional adjudication" of critical issues with wide-ranging implications. *Caldara v. City of Boulder*, 955 F.3d 1175, 1178 (10th Cir. 2020) (citations omitted); *infra*, § IV. *Third*, restoring a map enacted in violation of Proposition 4 would run afoul of "[t]he history and purpose of the [Elections Clause]" as well as "the animating principle of our Constitution that the people themselves are the originating source of all the powers of government." *AIRC*, 576 U.S. at 813; *see also League of Women Voters of Utah*, 2024 UT 21, ¶ 131 ("[W]hen our constitution was ratified, it was widely

---

[7] Plaintiffs also suggest in passing that the candidate Plaintiffs will be injured through the denial of a "fair process," Mot. at 27, but the only authority they cite to support this argument is *Bost v. Ill. State Bd. of Elections*, No. 24-568, 2026 WL 96707 (U.S. Jan. 14, 2026)—a case which concerned *Article III standing*, not irreparable injury for purposes of extraordinary preliminary relief. *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 759 (10th Cir. 2024) (highlighting differences between injuries in Article III and preliminary injunction contexts).

understood that the people are the source of all political power, and that the individuals who occupy the position of rulers are but servants of the sovereign people." (citation modified)). In 2018, Utah voters approved Proposition 4 "to restore the core principle that voters should choose their representatives, not the other way around." *AIRC*, 576 U.S. at 824 (citation modified). For a federal court to re-impose a map that flouts this principle in violation of state law would do grave harm to the public interest.

## IV.    Alternatively, the Court should stay its hand under the *Pullman* doctrine.

For all the reasons set forth above, this Court should dismiss Plaintiffs' claim on the merits and deny Plaintiffs' preliminary injunction motion. In the alternative—and at the very least—the Court should defer ruling on Plaintiffs' motion until after resolution of the state court proceedings. *See Pullman Co.*, 312 U.S. at 496. "The policy underlying *Pullman* abstention is that federal courts should avoid premature constitutional adjudication and the risk of rendering advisory opinions." *Caldara*, 955 F.3d at 1178 (citation modified). Accordingly, the Court should abstain under *Pullman* where: (1) "an uncertain issue of state law underlies the federal constitutional claim"; (2) "the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim" and (3) "an incorrect decision of state law . . . would hinder important state law policies." *Id.* (quoting *Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992)).

This case plainly satisfies all three elements. *First*, there are multiple issues of state law that precede any federal constitutional question. Plaintiffs challenge a state trial court order that rests on a determination of state law—namely, that the 2021 map violates Proposition 4, a Utah statute that the Legislature attempted to unconstitutionally repeal. Compl. ¶ 2. Plaintiffs contend

that the state court order is unlawful because (1) the Utah constitution allegedly "vest[s]" congressional apportionment authority exclusively in the state" legislature and (2) Utah statutes do not "grant any authority to adopt or impose a map" to state courts—both state law arguments. *Id*. ¶¶ 63, 84; *see also* ¶ 85. These "threshold state law issue[s]" necessarily precede the federal constitutional issue Plaintiffs present, which depends on whether the Utah district court's interpretation of state law is so erroneous as to violate the United States Constitution. *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1576 (10th Cir. 1995); *see also Moore*, 600 U.S. at 36. As set forth above, *supra* § I.B, state law is clearly against Plaintiffs—thus warranting dismissal and denial of their preliminary injunction motion. But, *at best* (for Plaintiffs), the law is uncertain, thus requiring abstention under *Pullman*.

*Second*, the state law issues are not only "amenable to interpretation" in the abstract, *Caldara,* 955 F.3d at 1179 (citation omitted), but in fact are the subject of ongoing litigation before the Utah Supreme Court. *Pullman* abstention applies even when resolution of threshold state-law issues is merely hypothetical—when those issues "*might be* . . . presented in a different posture by a state court determination of pertinent state law." *S & S Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 442 (10th Cir. 1991) (emphasis added) (citation omitted) (affirming *Pullman* abstention over ambiguous Oklahoma statute). These facts present an even stronger case for abstention, because the state law questions are pending on appeal in proceedings before Utah's high court. *Cf. Morrow v. Winslow*, 94 F.3d 1386, 1393 (10th Cir. 1996) (noting, in the context of another abstention doctrine, the "strong federal policy against federal court interference with pending state judicial proceedings" (citation omitted)).

And, importantly, resolution of any of the state-law issues Plaintiffs present could "make [this court's] constitutional ruling unnecessary." *Clajon Prod. Corp.*, 70 F.3d at 1576. In their Complaint, Plaintiffs appear to suggest that the Utah Supreme Court could decide that the trial court (1) mis-applied Proposition 4 in invalidating the 2021 map, (2) violated separation-of-powers principles in the Utah constitution, or (3) violated Utah statutes limiting the court's remedial authority, *see* Compl. ¶¶ 2, 63, 84–86—all questions of state law. Should the Utah Supreme Court rule that the trial court erred on any of these issues, "there would be no need for [this Court] to resolve the federal constitutional questions." *Caldara*, 955 F.3d at 1181 (applying *Pullman* abstention given uncertain issue of Colorado state law); *see also City of Chicago v. Fieldcrest Dairies*, 316 U.S. 168, 173 (1942) (applying *Pullman* abstention where federal constitutional "issue may not survive [parallel] litigation in the state courts"); *Am. Const. L. Found., Inc. v. Meyer*, 113 F.3d 1245 (10th Cir. 1997) (per curiam) (*declining* to apply *Pullman* abstention when "no possible state court ruling . . . would obviate the need for a determination" of the federal constitutional question); *Fed. Home Loan Bank Bd. v. Empie*, 778 F.2d 1447, 1451 (10th Cir. 1985) (similarly declining to abstain because "no foreseeable state court ruling on the scope of existing state law . . . will render moot the [federal constitutional] question").

*Third*, any disposition of this case plainly touches on important state policies. "Reapportionment [of congressional districts] . . . is primarily the duty and responsibility of the States, not the federal courts." *Allen v. Milligan*, 599 U.S. 1, 29 (2023) (citation modified); *see Large v. Fremont County*, 670 F.3d 1133, 1146 (10th Cir. 2012) (highlighting federalism concerns when federal courts become involved in state redistricting efforts); *Caldara*, 955 F.3d at 1181–82 (applying *Pullman* abstention where "federalism interests [we]re salient"). Among other issues,

23

Plaintiffs' arguments here implicate the balance of power between the Utah legislature and Utah courts, and the meaning of several constitutional and statutory provisions of Utah law. *See Caldara*, 955 F.3d at 1182 (*Pullman* abstention was appropriate to avoid "balanc[ing] two competing state policy choices").

In short, Plaintiffs ask the Court to wade into important questions of Utah law that are the subject of ongoing litigation in the state's highest court. A preliminary ruling in their favor would deprive the Utah Supreme Court of even the opportunity to opine on these issues and evaluate the Utah district court's interpretation of state law. Such intrusions on the comity between state and federal courts are exactly what abstention doctrines are meant to avoid.

## CONCLUSION

The Court should deny the Preliminary Injunction Motion and dismiss Plaintiffs' Complaint or, at the very least, defer pending the Utah Supreme Court's adjudication of the underlying state court action.

Dated: February 13, 2026                    Respectfully submitted,

                                            /s/ *David P. Billings*

                                            David P. Billings
                                            **FABIAN VANCOTT**
                                            95 South State Street, Suite 2300
                                            Salt Lake City, Utah 84111
                                            801-323-2205
                                            dbillings@fabianvancott.com

                                            Abha Khanna*
                                            **ELIAS LAW GROUP LLP**
                                            1700 Seventh Ave, Suite 2100
                                            Seattle, WA 98101
                                            Telephone: 206-656-0177
                                            akhanna@elias.law

                                            Richard A. Medina*
                                            Max C. Accardi*
                                            **ELIAS LAW GROUP LLP**
                                            250 Massachusetts Ave. NW, Suite 400
                                            Washington, D.C. 20001
                                            Telephone: 202-968-4490
                                            rmedina@elias.law
                                            maccardi@elias.law

                                            *Attorneys for Amicus Curiae National*
                                            *Redistricting Foundation*

                                            *\* Pro hac vice application forthcoming*