Gene C. Schaerr (*pro hac vice*)
D.C. Bar No. 416368
Justin A. Miller (*pro hac vice*)
D.C. Bar No. 90022870
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
jmiller@schaerr-jaffe.com

James C. Phillips (17302)
Tyler B. Lindley (18635)
SCHAERR | JAFFE LLP 299 S. Main Street,
Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 918-5529

jphillips@schaerr-jaffe.com
tlindley@schaerr-jaffe.com

*Counsel for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| COMMISSIONER AMELIA POWERS GARDNER, a registered Utah voter and elected official, et al., | **PLAINTIFFS' OPPOSITION TO FIRST ATTEMPTED INTERVENORS' MOTIONS TO DISMISS** |
| Plaintiffs,<br><br>v. | Case No. 2:26-cv-00084-RJS-JCB |
| LIEUTENANT GOVERNOR DEIDRE HENDERSON, in her official capacity, | Circuit Judge Timothy M. Tymkovich<br>District Judge Robert J. Shelby<br>District Judge Holly L. Teeter |
| Defendant. | Magistrate Judge Jared C. Bennett |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................ 1

ADDITIONAL BACKGROUND ....................................................................... 3

LEGAL STANDARD....................................................................................... 6

ARGUMENT ................................................................................................. 7

    I.    Plaintiffs Have Standing. ................................................................... 7

        A.    *Bost* leaves no doubt the Representatives have standing. ............... 8

        B.    The remaining Plaintiffs have standing. ........................................ 13

    II.    Under the Elections Clause, Defendant has Acquiesced to a State
Court's Unconstitutionally Intruding Upon the Role of the State
Legislature. ................................................................................... 14

        A.    *Growe* does not apply here................................................. 16

        B.    *Branch* does not apply here. ............................................... 20

        C.    Rather than requiring dismissal, *Moore* supports Plaintiffs'
claim. ...................................................................................... 21

            1.    The state court's naked attempt to hitch statutory law
onto state constitutional law and failure to give a "fair
reading" to Utah law violates the Elections Clause
under *Moore*........................................................................ 22

            2.    The examples the SCP's and NRF Amicus provide of
state courts drawing redistricting maps are
inapplicable here and largely pre-date *Moore*..................... 27

    III.    There Is No Reason for This Court to Abstain. ............................. 30

        A.    Issue preclusion does not bar Plaintiffs' suit. ................................ 31

        B.    There is no basis for abstention. ................................................. 34

        C.    No stay is warranted................................................................ 37

CONCLUSION.............................................................................................. 40

CERTIFICATE OF COMPLIANCE .................................................................. 42

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Abbott v. Perez,*
   585 U.S. 579 (2018) .................................................................................... 13

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
   576 U.S. 787 (2015) .................................................................................... 23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................... 7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................................... 7

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ...................................................................................... 7

*Bost v. Ill. State Bd. of Elections,*
   607 U.S.--, 2026 WL 96707 (2026) ................................................ *passim*

*Branch v. Smith,*
   538 U.S. 254 (2003) .................................................................................... 20

*Caldara v. City of Boulder,*
   955 F.3d 1175 (10th Cir. 2020) ........................................................... 35, 37

*Colo. River Water Conservation Dist. v. United States,*
   424 U.S. 800 (1976) .................................................................................... 38

*Daz Mgmt., LLC v. Honnen Equip. Co.,*
   2022 UT 15, 508 P.3d 84 (Utah 2022) ..................................................... 32

*Diamond Alternative Energy, LLC v. EPA,*
   606 U.S. 100 (2025) ...................................................................................... 9

*Drake v. Obama,*
   664 F.3d 774 (9th Cir. 2011) ..................................................................... 11

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ...................................................................................... 7

*Fox v. Maulding,*
   16 F.3d 1079 (10th Cir. 1994) ....................................................... 38, 39, 40

*Growe v. Emison,*
   507 U.S. 25 (1993) ........................................................... 16, 17, 37, 38

*Health Care & Ret. Corp. of Am. v. Heartland Home Care, Inc.,*
   324 F.Supp.2d 1202 (D. Kan. 2004) ......................................................... 39

*Johnson v. City of Cheyenne,*
  99 F.4th 1206 (10th Cir. 2024) ............................................................................ 6

*Jones v. Addictive Behav. Change Health Grp., LLC,*
  364 F.Supp.3d 1257, 1262 (D. Kan. 2019) .......................................................... 6

*Jones v. Great S. Life Ins. Co.,*
  232 F.3d 901 (10th Cir. 2000) ............................................................................ 40

*Kan. Jud. Review v. Stout,*
  519 F.3d 1107 (10th Cir. 2008) .......................................................................... 35

*Lance v. Coffman,*
  549 U.S. 437 (2007) ................................................................................. 7, 13, 14

*Lance v. Dennis,*
  444 F.Supp.2d 1149 (D. Colo. 2006) .................................................................. 32

*Lance v. Dennis,*
  546 U.S. 459 (2006) ............................................................................................ 32

*League of Women Voters of Utah v. Utah State Legislature,*
  554 P.3d 872 (Utah 2024) ...................................................................... 24, 26, 36

*League of Women Voters of Utah v. Utah State Legislature,*
  No. 220901712, 2025 WL 2644292 (Utah Dist.Ct. Aug. 25, 2025) ................... 33

*Lehman v. City of Louisville,*
  967 F.2d 1474 (10th Cir. 1992) .......................................................................... 35

*Lumen Constr., Inc. v. Brant Constr. Co., Inc.,*
  780 F.2d 691 (7th Cir. 1985) .............................................................................. 39

*Mauldin v. Branch,*
  866 So.2d 429 (Miss. 2003) ................................................................................ 21

*Moore v. Harper,*
  600 U.S. 1 (2023) ........................................................................................ passim

*Moss v. Parr Waddoups Brown Gee & Loveless,*
  2012 UT 42, 285 P.3d 1157 ................................................................................ 31

*Ohio ex rel. Davis v. Hildebrant,*
  241 U.S. 565 (1916) ............................................................................................ 24

*Parsons Steel, Inc. v. First Ala. Bank,*
  474 U.S. 518 (1986) ............................................................................................ 31

*R.R. Comm'n of Tex. v. Pullman Co.,*
  312 U.S. 496 (1941) ............................................................................................ 34

*Ruiz v. McDonnell,*
   299 F.3d 1173 (10th Cir. 2002) .................................................................. 6

*Schwartz v. Booker,*
   702 F.3d 573 (10th Cir. 2012) .................................................................... 6

*Smith v. Clark,*
   189 F.Supp.2d 503 (S.D. Miss. 2002) ................................................. 17, 20

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) ................................................................................... 7

*Taylor v. Sturgell,*
   553 U.S. 880 (2008) ................................................................................. 33

*Thompson v. Smith,*
   52 F. Supp.2d 1364 (M.D. Ala. 1999) ............................................ 17, 18, 38

*TransUnion v. Ramirez,*
   594 U.S. 413 (2021) ................................................................................. 12

*United States v. City of Las Cruces,*
   289 F.3d 1170 (10th Cir. 2002) ................................................................ 39

*Uzuegbunam v. Preczewski,*
   592 U.S. 279 (2021) ................................................................................. 13

*Vinyard v. King,*
   655 F.2d 1016 (10th Cir. 1981) ................................................................ 35

*Wise v. Circosta,*
   978 F.3d 93 (4th Cir. 2020) ................................................................. 3, 14

*Youren v. Tintic Sch. Dist.,*
   2004 UT App 33, 86 P.3d 771 ................................................................. 34

**Constitutional Provisions**

U.S. Const. art. I, §4 .................................................................... 1, 14, 15, 23

Utah Const. art. IX, §1 ..................................................................... 23, 26, 27

Utah Const. art. VI, §1 .............................................................................. 24

**Statutes**

2 U.S.C. §2a ......................................................................................... 3, 27

Utah Code §20A-19-301 .......................................................................... 27

Utah Independent Redistricting Commission and
   Standards Act, Utah Code §§20A-19-101 to -301 (2018) .......................... 24

**Rule**

Fed. R. Civ. P. 12 ............................................................................................... 6

**Treatise**

The Federalist No. 59 (Alexander Hamilton) ........................................... 15

**Other Authority**

William Baude & Michael McConnell,
   *The Supreme Court Has a Perfectly Good Option in Its
   Most Divisive Case*, The Atlantic (Oct. 11, 2022) ................................... 2, 15, 28, 29

## INTRODUCTION

To read Attempted Intervenors' filings is to read a different case. Those filings are peppered with allegations of how Plaintiffs' legal theory is "fringe," "extreme," or "dangerous." If Attempted Intervenors sincerely believe this, then they badly misunderstand Plaintiffs' claim, which is both straightforward and mainstream.

The claim begins with the text of the Constitution's Elections Clause, which commits redistricting to "the Legislature" of each state. U.S. Const. art. I, §4. The only textual exception is in that same clause: Congress may make its own election regulations or alter the Legislature's. *Id*. Thus, with rare exceptions not present here, the Defendant can no more impose her own redistricting map than impose a map drafted by some other state actor besides the Legislature.

Granted, the Supreme Court has noted that state Legislatures must redistrict consistent with state constitutional law regarding the enactment of laws, such as allowing gubernatorial vetoes. *See Moore v. Harper*, 600 U.S. 1, 22-25 (2023). And state courts may play a circumscribed role of exercising "ordinary judicial review" in assessing that compliance. *Id*. at 37.

But as two constitutional law scholars, one a former Tenth Circuit judge, have observed, under the Elections Clause, "[state] courts do not have independent constitutional power to adopt their own map … just as when the courts declare a law unconstitutional, they do not write a new one to replace it." William Baude & Michael McConnell, *The Supreme Court Has a Perfectly Good Option in Its Most Divisive Case*,

The Atlantic (Oct. 11, 2022), https://tinyurl.com/3d54k7ny. And that is especially true here where, unlike normal state cases involving redistricting, the state court enjoined a map drawn by the Legislature merely because it was promulgated under a statute the judge found unlawful rather—than finding the map itself violated the state constitution or any other law. And then the state court imposed a map drawn by the state-court plaintiffs' out-of-state expert, which map the state judge subsequently altered on her own, without giving the Legislature a fair opportunity to respond to the judge's concerns with a new map of its own. Thus, the state judge "so exceed[ed] the bounds of ordinary judicial review" as to violate the Elections Clause. *Moore*, 600 U.S. at 37. And Defendant is furthering this unconstitutional act by deeming herself bound to foist it upon the state.

Given the egregious Election Clause violation here, this Court can leave for another day determining exactly what the scope of a state court's equitable authority might be when there is a constitutional defect in existing districts—since no such defect was ever found here. Hence, this Court need only decide that the state court violates the Elections Clause when it replaces legislatively enacted districts with those of its own choosing without any finding that those legislatively enacted districts were substantively unlawful. There is nothing "ordinary" about imposing a redistricting remedy before ever identifying a problem with the districts themselves.

And Plaintiffs' requested remedy here is simple—to return to "[t]he status quo[,] [which] is the election law enacted by the [state legislature]." *Wise v. Circosta*,

978 F.3d 93, 105 (4th Cir. 2020) (en banc) (Wilkinson & Agee, JJ., dissenting). First, this Court enjoins Defendant from using the state-court's map. Second, if necessary, consistent with 2 U.S.C. §2a(c), this Court directs Defendant (unless she agrees on her own) to implement for the 2026 primary and general elections the last map drawn by the Legislature that has never been found to be unlawful: the 2021 map. And using the 2021 map will not harm Defendant, who has already conducted elections with that map and has acknowledged she can easily do so again in a matter of days. And using the 2021 map will not harm Plaintiffs, who have campaigned, served, and voted under that map's congressional districts for the past few elections.

In short, the constitutional violation could not be clearer and the remedy could not be easier.

## ADDITIONAL BACKGROUND

Plaintiffs note the thorough discussion of the timeline of events in the state-court litigation explained by in the Legislature's Amicus Brief (at 2-9) ("Legis.Am.Br.", Doc.57), and highlight here a few key points.

The state suit was filed nearly four years ago in March 2022. *Id.* at 4. The only claim moving forward in the litigation was a challenge to a state law (SB 200) that amended the initiative statute (Proposition 4) that created the state's independent redistricting commission. *See* Legis.Am.Br. 6. Thus, there was no active litigation on whether the statute that created the Legislature's 2021 redistricting map (HB 2001), or the map itself, was unconstitutional. *See id.* at 3, 7-8, 13-14.

3

The hearing on cross-motions for summary judgment and the Legislature defendants' motion to dismiss was held in late January 2025. State Dkt. at 15 (Ex.A). The court issued a ruling on August 25, 2025 (Ex.B), finding one law unconstitutional (the post-initiative statute) and enjoining another (the Legislature's map) on which there had not yet been any litigation or determination of unlawfulness. Doc. 57 at 3, 7-8, 13-14. And it ordered parties to propose new maps. Doc.17-3 at 76.

Defendant here, also a defendant in the state-court litigation, informed the state court that she needed a decision by November 1, 2025, to implement a new map with the 2021 map now enjoined from use. As that deadline approached, the state court asked for more time, so Defendant found ten more days and bumped the deadline to November 10, 2025. Five minutes before midnight that day, and the day before a holiday, the state judge issued a ruling. In that ruling, the court rejected the Legislature's new map and accepted the state-court plaintiffs' proposed map, drawn by an out-of-state expert, which she enjoined for use in the 2026 elections. But the court still did not find the 2021 legislatively drawn redistricting map violated the Utah or federal Constitutions.

Despite her ruling barely making Defendant's extended deadline, more importantly, the state judge did not provide the new map to Defendant for three more days until November 13, 2025. *See* Ex.A at 22. Five days later, Defendant, having noticed that the map violated state law in some of its boundaries, provided notice to the state court and sought clarification of some of the map's boundaries. *Id.* at 23. A

hearing was held and, on November 21, the state judge issued a revised map that she had altered to fix the problems Defendant had identified. *See id.* at 24. And not until two weeks later, on December 5, did the state judge issue a ruling on her order providing the revised map. *Id.*[1]

In response, the Legislature defendants (Amicus here) filed a motion for entry of final judgment or certification for interlocutory appeal (and a request for expedited consideration) so that they could quickly appeal to the Utah Supreme Court. *Id.* The plaintiffs there (Attempted Intervenors here) opposed that motion. *Id.* The court held a hearing and seventeen days after the Legislature's motion on December 26, 2025, the court denied the motion for a final judgment but granted an interlocutory appeal. *Id.* at 25. However, it was not for another eleven days, on January 6, 2026, that the court finally entered a certified judgment enabling that appeal. *Id.*

With that final judgment in place, Plaintiffs here filed this suit less than four weeks later. *See* Complaint (Doc.1). Yet despite that speedy suit, Attempted Intervenors claim Plaintiffs delayed bringing this case. Doc.56 at 26-28. All while Attempted Intervenors in this case, by opposing expedited consideration and seeking a stay, have sought to slow down this suit just as they did in state court. *See* Docs.18 & 50. If irony were money, they would be rich.

---

[1] Furthermore, at least one state county clerk, responsible for administering the 2026 election in his county, has notified Defendant of additional problems with the map under state law—on November 25, and December 3, 2025—but has been ignored. Motion to Intervene, *League of Women Voters of Utah v. Utah State Legislature*, No. 20260019 (Utah Jan. 21, 2026).

## LEGAL STANDARD

The Attempted Intervenors (the state-court plaintiffs, "SCP's") moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as well as raising issue preclusion. Doc.50. Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally are either facial or factual attacks. *Jones v. Addictive Behav. Change Health Grp., LLC*, 364 F.Supp.3d 1257, 1262 (D. Kan. 2019). "A facial attack questions the sufficiency of the allegations as to subject matter jurisdiction." *Id.* "In reviewing a facial attack on subject matter jurisdiction, the district court accepts the jurisdictional allegations as true." *Id.* However, "[a] factual attack exists where a party goes beyond the allegations and challenges the facts upon which jurisdiction depends." *Id.* Here SCP'S are mounting a facial attack—treating Plaintiffs' allegations as true and arguing they do not satisfy standing. Doc.50 at 8-10. Thus, this Court must accept the complaint's factual allegations as true, making this Court's analysis one of pure law. *See Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).

For Rule 12(b)(6), "[o]n a motion to dismiss, 'all well-pleaded allegations of the complaint are accepted as true and viewed in a light most favorable'" to the plaintiffs. *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1217 (10th Cir. 2024) (quoting *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012)). A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

6

678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court's interpretation of the complaint is a "context specific task" upon which the court may apply "its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.    Plaintiffs Have Standing.

Far from merely a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam), Plaintiffs all "have a 'personal stake' in [this] case," *Bost v. Ill. State Bd. of Elections*, 607 U.S.--, 2026 WL 96707, *3 (2026) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024)). Though all Plaintiffs suffer a redressable injury traceable to the Defendant, "only one plaintiff needs standing for a suit to proceed." *Bost*, 2026 WL 96707, *3 n.3 (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)). Congressional candidates Maloy and Owens clearly qualify.

Plaintiffs must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Rather than "mere conclusory statements" and fears of hypothetical future harm, plaintiffs must show their threatened injuries are certainly impending, as Plaintiffs have here. *Iqbal*, 556 U.S. at 678.

### A. *Bost* leaves no doubt the Representatives have standing.

Just one month ago, the U.S. Supreme Court held that electoral candidates have standing to challenge state election laws when they have "a personal stake in the rules that govern" their election specifically. *Bost*, 2026 WL 96707, *3. Here, in response to the "basic [standing] question: 'What's it to you?'" the Plaintiff Representatives have "an obvious answer: [They are] candidate[s] for office." *Id.* (citation omitted)

Because Map 1 unconstitutionally reapportions the districts where the Representatives Maloy and Owens hold U.S. congressional office and are running for reelection, it is an "unlawful election rule[]" that "departs from the law" and deprives them of their "interest in a fair process." *Id.* at *3. They also show further that this unlawful election rule (1) "damage[es] [their] reputation[s]," (2) requires them "to expend additional resources," (3) potentially decreases their "vote share" and could cause them "to lose the election." *Id.*

1. The Representatives are not "common competitors in the economic marketplace," they are "candidates" who "have an interest in a fair process." *Id.* Hence, "[w]in or lose," and "[w]hether [election-related regulations] help, hurt, or have no effect on a candidate's electoral prospects," "candidates suffer when the process departs from the law" because unlawful state action in the context of an election "deprive the candidate of a fair process and an accurate result." *Id.* Nothing further is required for standing here.

The Representatives are also harmed when "the integrity of the electoral process … undermine[s] the winner's political legitimacy." *Id.* at *4 (citation omitted). Thus, a candidate can still lose even when he wins—if "public confidence in the election results falters, public confidence in the elected representative follows." *Id.* And "[t]o the representative, that loss of legitimacy—or its diminution—is a concrete harm" presenting a "classic Article III injur[y]." *Id.* (citation omitted). That reputational injury is "particularly concrete for those whose very jobs depend on the support of the people." *Id.*

Thus, even if Map 1 would "have no effect on [Plaintiffs'] electoral prospects," moreover, the Representatives "are not 'mere bystanders' in their own elections." *Id.* at *3-4 (quoting *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025)); Maloy Decl. ¶14 (Doc.19-12); Owens Decl. ¶13 (Doc.19-13). They "have an obvious personal stake in how the result is determined and regarded." *Bost*, 2026 WL 96707, *4. Any "[d]epartures from the preordained rules cause them particularized and concrete harm" and "erode[] public confidence that the election results reflect the people's will." *Id.*

The state court's actions, and Defendant's plans to countenance those actions by implementing Map 1, all undermine the integrity of the 2026 election, and thus Plaintiffs' political legitimacy, inflicting reputational harm regardless of whether they win or lose. *Id.*; Maloy Decl. ¶16; Owens Decl. ¶15. This reputational injury under *Bost* is essentially per se for any candidate in an election departing from the

9

"preordained rules," as is the case here where the state court is imposing a new map. Nothing more needs to be shown but candidacy and normal rule departure, which the Representatives easily demonstrate here. And this alone is sufficient injury for standing.

2. But Representatives Maloy and Owens can show additional injuries. Since the 2024 election, the Representatives have been spending time, energy, and resources preparing for the 2026 election based on the Legislature's 2021 map. Under Map 1, the Representatives need to spend substantial time and money campaigning in new areas that have not previously been part of their districts. *Bost*, 2026 WL 96707, *3; Maloy Decl. ¶15; Owens Decl. ¶14. For example, to keep her seat in the district where she lives, Representative Maloy under Map 1 needs to campaign in most of Utah's 29 counties, compared to her incumbent district with only 3 (Salt Lake, Davis, and Tooele). Maloy Decl. ¶¶11-13. Representative Owens faces similarly difficult decisions that divide his money, time, and resources because his new district under Map 1 has become so much more politically hostile. Owens Decl. ¶¶10-12. And it is true for both candidates because they will have to introduce themselves to new voters, having lost the familiarity of incumbency in new areas. Maloy Decl. ¶¶9-13; Owens Decl. ¶¶9, 12.

Moreover, the Representatives do not know where they should file to run and continue spending money, time, and resources campaigning, and they will face a variety of logistical and political challenges to reelection if the Map 1 goes into effect.

Normally, the Representatives would file to run for re-election early in an election year and through the April convention, June primary, and November general election. But under the unconstitutional Map 1, the Representatives do not know which district to choose and cannot file until they do. That is not attributable to the Legislature's enactment of S.B. 2001 (changing the filing deadline from January to March), Doc.50 at 5, but to Defendant's being forced to implement an unconstitutional and therefore invalid Map 1.

3. Finally, the "potential loss of an election" constitutes an injury sufficient to confer standing to candidates and party officials supporting candidates. *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011). And like the *Bost* plaintiff, Map 1 "might decrease [the Representatives'] vote share." *Bost*, 2026 WL 96707, *3; Owens Decl. ¶¶10-12; Maloy Decl. ¶17; Doc.1 ¶42; Doc.19 at 11-12.

4. When the Plaintiffs clarified that they would be happy to represent any group of Utahns, Doc.1 ¶43, they were expressing that this lawsuit is not merely for the benefit of partisan politics or saving a particular map—not pleading away their concrete injury as Attempted Intervenors allege, Doc.50 at 4-5. Additionally, Plaintiffs were saying that they would have endured their Article III injury happily were the injury inflicted through the lawful process, but they would have still suffered an injury. Being "happy to" do something does not mean being uninjured.

Attempted Intervenors similarly mischaracterize *Bost*. Doc.50 at 6. *Bost* is not limited to rules that "govern the counting of votes in their election," as they allege.

2026 WL 96707, *5 n.7. The Court included this limitation to ward off accusations that the Court decided the substance of the law in that case—not to narrow its holding to only the substance of the law in that case. *Id.*

And the Court laid down a broader principle than just mere vote counting rules, declaring more generally that candidates "have an obvious personal stake in how the result is determined and regarded." *Id.* at *4. Thus, "[d]epartures from the preordained rules cause [candidates] particularized and concrete harm." *Id.* And the Court analogized to "competitors in other contests" that do not have vote counting *Id.* These standing principles are exactly what we have here: How the 2026 Utah elections will be "determined and regarded" depends on which redistricting map is in use. And rejecting the current map and imposing a new one, and doing so unconstitutionally, is a clear example of a "[d]eparture[] from the preordained rules." *Id.*

Even if the Court in *Bost* had limited its standing holding to only vote counting, the Representatives still have established concrete injury because "unlawful votes"— unlawful because they are counted in an unlawful district drawn by a state court judge rather than the Legislature—could make them lose the election or harm their reputation. *Id.* And having to spend additional time and resources to campaign in a new district is a classic injury for standing purposes even without *Bost*. *See TransUnion v. Ramirez*, 594 U.S. 413, 425 (2021) ("[C]ertain harms readily quality

as concrete injuries under Article III[,] … such as … monetary harms."); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (even a single dollar satisfies redressability).

### B.    The remaining Plaintiffs have standing.

The remaining Plaintiffs, as elected officials, are likewise more than "common competitors in the economic marketplace." *Bost*, 2026 WL 96707, *3. Theirs is not an "undifferentiated, generalized grievance" that "the Elections Clause[] has not been followed," and Plaintiffs do not merely "seek[] relief that no more directly and tangibly benefits [them] than it does the public at large." *Lance*, 549 U.S. at 439-42 (collecting cases). Perhaps a class of all Utah voters would fall prey to that standing deficiency, but that does not describe these Plaintiffs for at least two reasons.

First, State Official Plaintiffs seek declaratory relief that will prevent them from violating their oath to uphold the U.S. Constitution and thus, without this Court's action, will "suffer when the process departs from the law." *Bost,* 2026 WL 96707, *1. As the Supreme Court has explained, the government's "inability to enforce its duly enacted plans clearly inflicts irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

Second, this electoral limbo has harmed Plaintiffs' ability to screen and vet candidates for the upcoming primaries and continue their working relationships as state officials with their current congressional representatives. Maloy Decl. ¶10; Powers Gardner Decl. ¶¶5-6 (Doc.19-1); Doc.1 ¶¶37-40. These relationships are necessary for them to campaign on and to do their jobs as elected officials—"[s]uch

13

harm … is in no sense 'common to all members of the public.'" *Bost*, 2026 WL 96707, *3 (quoting *Lance*, 549 U.S. at 440).

Finally, all Plaintiffs' injuries are both traceable to and redressable by the Lieutenant Governor. Their injuries directly stem from Defendant's plan to implement Map 1, which she says she will do as the statewide election official unless stopped by a court. But she can be prevented by so doing through declaratory and injunctive relief from this Court. Since Defendant's proposed action creates the alleged harm and an injunction would eliminate injury to Plaintiffs by returning redistricting to the status quo, the traceability and redressability prongs of standing are satisfied.

Thus, all Plaintiffs have standing—even though one of Plaintiff's having standing is enough. *See id.* at *3 n.3.

## II. Under the Elections Clause, Defendant has Acquiesced to a State Court's Unconstitutionally Intruding Upon the Role of the State Legislature.

Moving to the substance of Plaintiffs' claim: The Elections Clause delegates authority to redistrict federal congressional maps to "the Legislature" of each state— not to a state generally, and certainly not to state courts. U.S. Const. art. 1, §4; s*ee also Wise v. Circosta*, 978 F.3d 93, 104 (4th Cir. 2020) (en banc) (Wilkinson & Agee, JJ., dissenting) (U.S. Constitution "clearly and explicitly delegates the power" to govern elections to "elected state legislatures" rather than "holistically to the state governments" (cleaned up)). That reading is supported not just by the Constitution's

plain text, but by its original understanding. *See* The Federalist No. 59 (Alexander Hamilton) (discussing division of power between the state legislatures and Congress to make federal election rules but mentioning no other branches of government); Baude & McConnell, *supra* ("[T]he Framers of the Constitution appear to have believed that a power [regulating elections] so central to democratic governance should be vested in the branch of state government that is most representative of its people."). The only exception in the Constitution's text is that Congress may make its own regulations or "alter" a state legislature's handiwork. *See* U.S. Const. art. 1, §4.

Despite SCP's' attempts to frame this dispute to their advantage, Plaintiffs here do not argue that state courts are universally barred from handling redistricting suits, interpreting state constitutional law in such cases, or imposing appropriate remedies when doing so. Plaintiffs' argument is that the state judge here so exceeded the appropriate role of a judge that she violated the Elections Clause under Supreme Court precedent. Specifically, that state court (1) enjoined a legislatively drawn map she never found substantively unlawful, and (2) imposed a map not drawn by the only entity with authority to do so under the federal and state constitutions—i.e., the Utah Legislature. And Defendant perpetuates this violation by imposing the state court's map on Plaintiffs. SCP's attempts to get around the Constitution by arguing that several Supreme Court cases authorize the state court to do what it did here, but those cases are all inapposite or misread.

15

### A. *Growe* does not apply here.

SCP's first argues, that under *Growe v. Emison*, 507 U.S. 25 (1993), "federal courts may not interfere with state courts' power to impose remedial congressional maps." Doc.50 at 11. Notwithstanding broad *dicta* in *Growe*, SCP's reliance on the case here is wrong for at least three reasons.

First, *Growe* raises an entirely different question than here: When there is no new redistricting legislation post-census and the pre-census districts are unconstitutionally malapportioned, must federal courts defer to state courts to remedy that malapportionment?

In *Growe*, the parties stipulated that the redistricting plans challenged in state court were unconstitutional following the 1990 census, 507 U.S. at 27-28, but the political branches were at an impasse after the governor vetoed the congressional redistricting plan adopted by the state legislature. *Id.* at 30. A divided three-judge panel of the federal district court issued an order staying parallel state court proceedings, and later adopted districting plans prepared by special masters. *Id.* at 30-31. The Supreme Court held that the district court erred in enjoining the state proceedings. *Id.* at 34.

The facts here present a sharp contrast to *Growe*. For one thing, Plaintiffs are not seeking to enjoin any state proceeding. And equally important, the 2021 legislatively drawn redistricting map has not been held unconstitutional, there is no impasse between the political branches, and no state proceedings have been enjoined.

Additionally, *Growe* did not involve an Elections Clause challenge. *See Smith v. Clark*, 189 F.Supp.2d 503 (S.D. Miss. 2002) (questioning *Growe*'s relevance to the Election Clause context since that clause was not at issue there and the precedent *Growe* dealt with state legislative redistricting rather than federal congressional redistricting). Given these significant differences here, *Growe* simply does not apply.

Second, in any event *Growe* does not stand for the proposition SCP's read into it. The problem in *Growe* was not concurrent litigation—it was the premature timing of federal court action. *See Thompson v. Smith*, 52 F. Supp.2d 1364, 1368 (M.D. Ala. 1999) ("*Growe* made clear that federal courts and state courts have concurrent jurisdiction to entertain challenges to redistricting plans and that, as a result, both courts are open to such claims."). In *Growe*, the Court held that the three-judge panel's order was "clear error" the technical ground that "[t]he state court was never given a time by which it should decide on reapportionment … if it wished to avoid federal intervention." 507 U.S. at 28, 34, 36. Once "the state court issued a final order adopting its legislative plan and requiring that plan to be used for [that year's] primary and general elections," *id*. at 30, however, the Supreme Court determined that "federal court was empowered to entertain the … plaintiffs' claims relating to … redistricting … to the extent those claims challenged the *state court's* plan." *Id*. at 36. Thus, under *Growe,* federal courts may intervene, just not before a state court can produce a map. Thus, *Growe* is about initial deferral, not permanent abstention.

17

Applying *Growe* here, the state court has *already* issued a map, which Defendant says she will implement unless prevented by court order, and the state court has entered a certified judgment. *Growe* thus does not support the proposition that this Court must stay its hand always, much less here, especially where Plaintiffs are seeking relief only against the Lieutenant Governor, not against the state court. S*ee also Thompson*, 52 F.Supp.2d at 1368 (M.D. Ala. 1999) ("[I]n *Growe*, the Supreme Court acknowledged that, after the state court had completed its proceeding, the federal court later rightfully took up the remaining [federal] claim."). In fact, properly read, *Growe* supports the validity of this litigation—given the timing of this suit after the state court had issued a final order requiring the implementing of its map.

Third, to read *Growe* as SCP's do would place it in conflict with *Moore* when the two should be read in harmony with each other. In *Moore*, decided thirty years after *Growe*, the Supreme Court clearly held that "state courts do not have free rein" in the Elections Clause context. 600 U.S. at 34. That is due to "the Elections Clause expressly vest[ing] power to carry out its provisions in 'the Legislature' of each State, a deliberate choice that [federal] Court[s] must respect." *Id*. Thus, "we have tempered … deference [to state courts] when required by our duty to safeguard limits imposed by the Federal Constitution." *Id*. at 35. That is because, "[a]s in other areas where the exercise of federal authority or the vindication of federal rights implicates questions of state law, [federal courts] have an obligation to ensure that state court interpretations of that law do not evade federal law." *Id*. at 34. Otherwise, "state

18

courts might read state law in such a manner as to circumvent federal constitutional provisions." *Id*. at 35. Thus, "federal courts must not abandon their own duty to exercise judicial review." *Id*. at 37.

Furthermore, it is telling that *Moore* never once discusses, much less cites, *Growe*. Thus, if *Moore* has not overtaken *Growe*, then the two cases must be—and can be—read in harmony. *Growe* stands for the principle that in a case involving an impasse between the Legislature and the Governor, federal courts should initially defer to state courts (but even then, do not have to abandon judicial review). By contrast, *Moore* stands for the principle that Elections Clause issues are ultimately issues of federal law that can be decided by a federal court. These two rules are harmonious—state courts are better to *initially* step in when there are no legislatively enacted districts; but where there are legislatively enacted districts, state courts do not have free rein, and federal courts must not abandon judicial review.[2]

In short, *Growe* does not mean what SCP's think it means and provides no obstacle to this Court's review here. It certainly provides no basis to dismiss the complaint.

---

[2] Even if somehow the two cases were read to be in conflict, given that this is an Election Clause dispute, the specific case (*Moore*) should control over the general case (*Growe*).

### B. *Branch* does not apply here.

SCP's next contend that *Branch v. Smith,* 538 U.S. 254 (2003), "adaman[tly]" rejects Plaintiffs' Elections Clause claim. Doc.50 at 18-22 & n.11. That is surprising given that the Supreme Court expressly left that issue open.

To be sure, *Branch* is remarkably similar to this case. There, state court plaintiffs obtained an injunction adopting a state-court approved congressional redistricting plan. *Smith v. Clark*, 189 F.Supp.2d 503, 505 (S.D. Miss. 2002). Federal plaintiffs filed a case before a three-judge panel, and the state court plaintiffs intervened. *Id.* The federal plaintiffs argued that the state-court redistricting plan had not been precleared under the Voting Rights Act *and* that it violated the Elections Clause because a state court is not part of the Legislature. *Id.* at 506-07. The three-judge panel agreed, declaring the state-court plan unconstitutional and enjoining the defendants from implementing it. *Id.* at 549, 559. The three-judge panel then decided to draw its own map so that it could be in place in time for the election. *Id.* at 511.

On appeal, the Supreme Court "affirm[ed] the injunction" because "the state-court plan had not been precleared." *Branch*, 538 U.S. at 265. But the Supreme Court expressly left open the question at issue here: "[W]e have no occasion to address the [three-judge panel's] alternative holding that the [state court's] redistricting plan was unconstitutional" under the Elections Clause. *Id.* The Supreme Court then turned to "the propriety of the redistricting plan that the [three-judge panel] itself adopted." *Id.* at 266. In other words, the Supreme Court affirmed the three-judge panel's holding

that the state court had improperly created its own map, and then it turned to the three-judge panel's remedy.

Every quotation in SCP's' argument comes from this remedy portion of the Court's opinion that, again, applied only to the *federal* remedy following the state court's unlawful redistricting plan. *See* Doc.50 at 13-17. Because the Supreme Court expressly left for another day whether a state court is a proper redistricting entity under the Elections Clause, SCP's' argument here fundamentally misrepresents *Branch*, a case that actually provides a roadmap for this Court to rectify unlawful state court redistricting.

What is more, on remand from *Branch*, the Mississippi Supreme Court held "that *no* Mississippi court has jurisdiction to draw plans for congressional redistricting." *Mauldin v. Branch*, 866 So.2d 429, 434 (Miss. 2003). So too here. This Court should hold that the state court's redistricting plan is procedurally unconstitutional under the Elections Clause and enjoin the Lieutenant Governor from implementing it. *Then*, if necessary, this Court can turn to determining the proper remedy from this Court, which is what *Branch* is actually about.

In any event, nothing in *Branch* requires dismissal of Plaintiffs' claim.

## C.    Rather than requiring dismissal, *Moore* supports Plaintiffs' claim.

Invoking *Moore,* SCP's further claim that [t]he state court could not possibly have "exceed[ed] the bounds of ordinary judicial review." Doc.50 at 17 (quoting *Moore*, 600 U.S. at 37). Furthermore, NRF Amicus contends that "it is quite 'ordinary' for a

21

court—state or federal—to adopt a remedial redistricting plan to cure a violation of law and ensure that the upcoming election will take place under a legally compliant map." NRF Amicus Brief 8 (Doc.64) ("NRF Am.Br.") (quoting cases). NRF Amicus likewise points to cases where state courts have implemented redistricting plans in lieu of the state legislature. *Id*. at 8-10. Finally, NRF amicus argues that Utah state courts have broad equitable power, which the state court was within its "ordinary judicial review" to exercise, and even if not, the state court did not so "transgress[] the ordinary bounds of judicial review" as to violate the Elections Clause. *Id*. at 10-12 (quoting *Moore*, 600 U.S. at 36).

While they might have a bearing on the ultimate resolution of Plaintiff's claim, none of these points provides any basis for dismissal. And in any event, each of these arguments fails.

> **1. The state court's naked attempt to hitch statutory law onto state constitutional law and failure to give a "fair reading" to Utah law violates the Elections Clause under *Moore*.**

While SCP'S and NRF Amicus defend the state court as merely exercising "ordinary judicial review" under *Moore* by giving a "fair reading" to state law, that argument fails for at least two reasons: the Legislature's exercise of redistricting authority can only be limited by state *constitutional* law and the state court's reading of that law was anything but fair.

1. Only the state Legislature, however that is defined by the state constitution, may ultimately exercise redistricting authority. *See Ariz. State Legislature v. Ariz.*

*Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015). And the Utah Constitution makes clear that the State Legislature wholly retains this federal redistricting authority. Utah Const. art. IX, §1 ("[T]he Legislature shall divide the state into congressional, legislative, and other districts accordingly.").

There are only two recognized ways to limit this state legislative redistricting authority. The first is textual and broad—Congress may jump in. *See* U.S. Const. art. I, §4. The second is narrow: "A state legislature may not create congressional districts independently of requirements imposed by the state *constitution* with respect to the enactment of laws." *Moore*, 600 U.S. at 26 (emphasis added) (citation omitted).

In other words, there are two elements of this limitation. First, any requirements imposed must be constitutional, not statutory. *See also id.* at 37 ("State courts retain the authority to apply state constitutional restraints when legislatures act under the power conferred upon them by the Elections Clause.") Second, the only requirements that may be imposed deal with the limited topic of the enactment of laws. Both are required and the state court ignored them here. It follows that, in enjoining the 2021 map for being promulgated under the *procedures* of one state law that the state court found unlawful rather than another state law the court deemed lawful, Ex.B. at 73, the court was not applying state constitutional restraints, but statutory ones.

To get around this, the state court implicitly pointed to the reason she deemed the state law under which the map was promulgated unlawful: that the law (in her

view) violated the state constitution. But that is one step removed from what *Moore* allows. There is nothing in Utah's constitution that the state court directly relied on for enjoining the 2021 map, much less finding it unlawful.

For instance, the popular initiative power in Utah only has statutory, not constitutional authority. Utah Const. art. VI, §1 (discussing People's ability to "initiate any desired legislation"); *League of Women Voters of Utah v. Utah State Legislature*, 554 P.3d 872, 909 (Utah 2024) (initiatives are not "accorded a higher status than other statutes"). And Utah's redistricting commission was not placed in the state constitution, much less the Legislature. *League of Women Voters*, 554 P.3d at 882 (Proposition 4 enacted Utah Independent Redistricting Commission and Standards Act at Utah Code §§20A-19-101 to -301 (2018)). Nor was the Legislature's redistricting map vetoed by popular initiative, as in the precedent *Moore* relied on. *See generally Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916).

What happened here was far more tenuous. The state court declared that a legislatively drawn map had been produced under a different state law that, in the court's view, violated the state constitution's grant of statutory initiative power the people. Doc.17-3 at 69-72. In other words, the "requirements imposed" on the Legislature by the state court "with respect to the enactment of laws" were not "by the state constitution" but by state statute (Proposition 4). So the state court's action falls well outside of what *Moore* allows.

And pointing to the Utah constitutional right to "alter or amend" the state government does not save the state court's judicial review. That state constitutional right is not a restriction on the Legislature's enactment of laws. It merely gives the people general concurrent legislative authority to pass statutes, or to amend the constitution (which did not happen here), though the state constitution still reserves redistricting authority solely to the Legislature.

Thus, by not finding that the 2021 map violated a state constitutional provision that regulates the Legislature's enactment of laws before enjoining it and replacing it with the court's own map, the state court transgressed what limited authority it has under *Moore*, and in so doing violated the Elections Clause.

2. In requiring that state courts in the Election Clause context stay within their lane by conducting only "ordinary judicial review," the Supreme Court did not adopt a standard for assessing when those bounds had been crossed. *Moore*, 600 U.S. at 36. But whether this Court adopts Chief Justice Rehnquists "fair reading" test, *id.*, as Justice Kavanagh would, or Justice Souter's "transcends the limits of reasonable statutory interpretation," *id.*, the state court here flunks either. *See also* Legis.Am.Br. 9-15. Further, as the Supreme Court has not yet adopted a test under the Elections Clause for what is "ordinary judicial review," this Court is free to select its own. And given the Supreme Court focuses on original meaning, or history and tradition, so too should this Court. *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (holding gun regulations permissible under the Second Amendment only if

those laws are "consistent with the Nation's historical tradition of firearm regulation"); *Kennedy v. Bremerton School District*, 597 U.S. 507, 535, 536 (2022) (holding that the Establishment Clause is to "be interpreted by reference to historical practices and understandings," using an "analysis focused on original meaning and history"). Specifically, "[t]hough flexible, [a court's] equitable authority is not freewheeling" and "encompasses only those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception. *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (internal quotation marks omitted). State courts did not enjoin redistricting maps when the Elections Clause was adopted, and thus cannot properly do so now under an originalist test.

Additionally, like the federal Constitution, Utah's Constitution clearly states that only the Legislature may produce redistricting maps. Utah Const. art. IX, §1. And the creation of a redistricting commission did not change that, as the Utah Supreme Court has made clear. *League of Women Voters*, 554 P.3d at 916-17. Thus, neither Defendant nor the state court can point to anything in the state constitution that authorized the state court's actions here, including its August injunction, Thos actions were not within a Utah state court's ordinary exercise of equitable power. *See* Legis. Am.Br. 10-11.[3]

---

[3] The Utah Code expressly recognizes the Legislature's authority to create a new map: "Upon the issuance of a permanent injunction ..., the *Legislature* may enact a new or alternative redistricting plan that abides by and conforms to the redistricting standards, procedures, and requirements" of Utah law. Utah Code §20A-19-301(8) (emphasis added).

Additionally, the district court erred by adopting a redistricting map drawn by a private entity and amending it herself, instead of turning this over to the Legislature. *See* Utah Const. art. IX, §1; Utah Code §§20A-19-301(2),(8). Or, if there was not time for the Legislature to draw a new map, the state court violated 2 U.S.C. §2a by not using the 2021 map, the last lawful map—which the court never found to be substantively unlawful. *See also* AFL Amicus Br. 8-12 (Doc.63-1). Therefore, the Lieutenant Governor—the only defendant in this case—violates the Elections Clause and 2 U.S.C. §2a by not using the 2021 map.

### 2.    The examples the SCP's and NRF Amicus provide of state courts drawing redistricting maps are inapplicable here and largely pre-date *Moore*.

To be sure, SCP's and NRF Amicus' brief also provide several examples of state courts adopting their own maps despite state law giving that responsibility to the legislature.[4] Doc.50 at 17-19; NRF Am.Br. 8-10. But these cases are inapposite here as all involved (1) the state court finding the previous map unlawful; and (2) the Legislature failing to adopt a new map, often because of time considerations or because the political branches were at an impasse.

Neither condition exists here. The state court made here clear in her ruling and order enjoining the 2021 legislatively drawn map that the lawfulness of the map was not the issue before the court. Instead, it was "does S.B. 200 satisfy strict scrutiny

---

[4] Strangely, SCP'S and NRF Amicus also include federal cases were federal courts have promulgated maps as examples, but such cases have no relevance here.

under the new legal standard established by the Utah Supreme Court." Ex.B at 2. And never once in a 76-page opinion did the court declare that the 2021 map was substantively unlawful. *See* Ex.B. Instead, the state court determined that "it is both unnecessary and inconsistent with both constitutional principles and equitable remedies to require Plaintiffs to prove" the map was unlawful. *Id.* at 74. So the state court enjoined the map because it was promulgated under a separate law that she found unconstitutional, and is thus "the fruit of that unlawful [statute]." *Id.* at 70. Any analysis of whether the 2021 map was unlawful never occurred as these claims by SCP's "had not advanced past the pleading stage." Legis. Am.Br. at 13.

Not a single case SCP's' or NRF Amicus' brief brought to this court's attention involves such a "fruit-of-the-poisonous-tree" rationale for enjoining a legislatively drawn map under the Elections Clause: All involved a predicate finding that the map was unlawful. Thus, the state court's judicial review here was anything but ordinary.

Furthermore, the state cases cited are within the last quarter century, That is significant because "the practice of court-drawn maps does not have an extensive constitutional pedigree. No such thing occurred in the early years of the republic. It was an innovation of the mid-20th century, emerging from modern trends in election law." Baude & McConnell, *supra*. Yet redistricting has been with us since our country's birth. That makes the practice of court-drawn maps unlikely to be consistent with the history-and-tradition test the Supreme Court increasingly employs for determining the Constitution's original meaning. And since that "practice

has never been put to the authoritative constitutional test" by the Supreme Court, *id.,* that history and tradition, or lack thereof, is important.

Additionally, at the time the state judge drew Map 1, there was still ample time to allow the Legislature to draw another map—given that the Legislature could push back the election deadlines upon which Defendant relied for her November 1, and then November 10, 2025 deadline. But the state court never gave the Legislature a chance to push back the deadlines and draw another map—which the Legislature showed it was capable of by later changing the deadlines. Yet in the state cases raised by SCP's and Amicus NRF, there was either an impasse or there was no time left for the Legislature to draw another map.

Because neither was true here, the state court's exercise of "judicial" power here was truly extraordinary. And under *Moore,* the state court violated the Elections Clause by "arrogat[ing] to [itself] the power vested in state legislatures to regulate federal elections." 600 U.S. at 36.

*   *   *

Neither SCP's nor NRF have identified a single Supreme Court case that authorizes a state court judge, consistent with the Elections Clause, to enjoin a map never held unlawful and instead impose its own map never touched by the Legislature, especially when there was still time for the Legislature to extend the relevant deadlines and draft a new one. *Growe* is not that case. Neither is *Branch.* Neither is *Moore.* And *Arizona Redistricting Commission* has nothing to do with this

29

case as there is no redistricting commission given independent legislative redistricting authority embedded in the Utah constitution. This Court would thus be going beyond not just the Constitution's text and original meaning by upholding the constitutionality of the state court's actions and Defendant's implementation of them, but also extending Supreme Court precedent far beyond that text and original meaning.

At a minimum, Plaintiffs' legal position is at least plausible, and that is all that is necessary to defeat SCP's motion to dismiss.

## III.  There Is No Reason for This Court to Abstain.

As to the SCPs' abstention arguments:  Plaintiffs agree that "federalism and a robust respect for the substantial authority of the state courts are essential to our constitutional order." *Wise*, 978 F.3d at 112 (Wilkinson & Agee, JJ., dissenting). But there is no reason the ongoing state litigation or any abstention doctrine precludes this Court from hearing this case. As they concede in a footnote, for the past two months SPC's have insisted in state court that nothing is final there and have moved to dismiss the Legislature's recent appeal to the Utah Supreme Court on those grounds. Doc.50 at 1 n.1. But SPC's cannot have it both ways—with the state court proceeding deemed final in this court to preclude federal review but not final in state court to preclude state appellate review.

### A.    Issue preclusion does not bar Plaintiffs' suit.

SCP's are wrong, first, in asserting that "issue preclusion bars this suit. Doc.50 at 7-10. Utah state law applies to determine whether a Utah state-court judgment has preclusive effect in federal court. *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 525 (1986) ("the Full Faith and Credit Act requires that federal courts give the state-court judgment ... the same preclusive effect it would have had in another court of the same State."). And the Utah Supreme Court has held that four elements must be satisfied for issue preclusion to apply:

> (i) the party against whom issue preclusion is asserted was a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication was identical to the one presented in the instant action; (iii) the issue in the first action was completely, fully, and fairly litigated; and (iv) the first suit resulted in a final judgment on the merits.

*Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 23, 285 P.3d 1157, 1164. Failing to satisfy even one of these elements is fatal to an assertion of issue preclusion. *See id.* And here, SCP's have failed to show that *any* of the four required elements have been satisfied.

**Lack of Privity**. Because Plaintiffs were not a party in the state court litigation, and SCP'S have failed to show that Plaintiffs are in privity with the Utah Legislature or any other party in the state court litigation with respect to the claims brought here, *cf.* Doc.50 at 7-9, issue preclusion does not apply to bar Plaintiffs' claims.

SCP's nevertheless cite two cases in advancing their privity argument—*Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, 508 P.3d 84 (Utah 2022), and *Lance v. Dennis*, 444 F.Supp.2d 1149, 1156 (D. Colo. 2006), *aff'd in part, vacated in part, Lance v. Coffman*, 549 U.S. 437 (2007). But neither case supports finding privity between Plaintiffs here and the Utah Legislature in the state court litigation to justify barring Plaintiffs' suit. In *Daz*, the Utah Supreme Court merely held that an individual and the limited liability company that he owned and managed were in privity when defending against the same breach of contract claim. 508 P.3d at 94-95. And the three-judge district court's decision on privity in *Lance*—which was vacated on appeal because it "erroneously conflated preclusion law with *Rooker-Feldman*[,]" *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (per curiam)—is irrelevant because it applied Colorado (not Utah) law. *Lance*, 444 F.Supp.2d at 1158.

In short, SCP's have identified *no* Utah precedent for their argument that the relationship between the Utah Legislature and Plaintiffs here—incumbent Members of Congress, county elected officials, and registered Utah voters whose campaign activities, representational interests, and voting rights will be governed by the congressional map used in the 2026 elections—creates privity with respect to Plaintiffs' claims. And, as the Supreme Court has explained, nonparty preclusion is an "exception" in "limited circumstances" to "the general rule that a litigant is not bound by a judgment to which she was not a party[.]" *Taylor v. Sturgell*, 553 U.S. 880,

898 (2008). This court should therefore reject SCP's' attempt to extend Utah privity law in this novel fashion.

**Issues Not Identical**. Issue preclusion is also improper here because SCP's have not shown that the issues raised by Plaintiffs here are identical to those raised in the state court litigation. *Cf.* Doc.50 at 9. And, in arguing that the issue raised in both cases is whether "the Elections Clause gave the Legislature the exclusive constitutional authority over congressional redistricting[,]" *id.*, SCP'S describe the issues presented at too high a level of generality. The issue raised in the state court litigation was whether the Utah Legislature "shared co-equally with the people of Utah" the "legislative function" of redistricting. *See League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 2644292, *12 (Utah Dist.Ct. Aug. 25, 2025). In contrast, the issue raised here is whether, under the Elections Clause and *Moore*, the state trial judge exceeded her authority by adopting a map created by a private, out-of-state individual—rather than the Utah Legislature. *See also* Doc.1 ¶¶ 90-96; Doc.19 at 21-24. Because these issues are not the same, issue preclusion does not apply.

**Not Fully Litigated**. SCP's have not even attempted to show that the issue presented by Plaintiffs in this case—whether a state trial judge exceeded her authority under the Elections Clause and *Moore* by adopting a map not created by the Utah Legislature or the Utah redistricting commission—was "completely, fully,

and fairly litigated" in the state court litigation. *Cf.* Doc.50 at 9-10. This failure independently dooms their assertion of issue preclusion.

**No Finality**. SCP's have also failed to demonstrate that the state court litigation resulted in a final judgment on the merits, which is fatal to any issue preclusion. The Court of Appeals of Utah has "recognized [a] split in Utah case law on the general issue of the finality of judgments pending appeal[.]" *Youren v. Tintic Sch. Dist.*, 2004 UT App 33, 86 P.3d 771, 773 n.2. But even if "the better approach" is generally that "a rendered judgment is final for purposes of res judicata until reversed on appeal[,]" *id.*, SCP's concede that they are currently arguing in the Utah Supreme Court that "the Rule 54(b) final judgment was erroneously entered." Doc.50 at 1 n.1. It would be extraordinary to use that state court judgment against Plaintiffs—non-parties to the state court litigation—while SCP's are currently arguing before the Utah Supreme Court that "Rule 54(b) certification is inappropriate because no 'claim' is final in the district court proceedings[.]" *See* Appellees' Mot. for Summary Disposition at 16. And of course, the state court case is still on appeal—which independently defeats finality. Accordingly, this Court should reject the heads-I-win-tails-you-lose scenario advanced by SCP's and hear Plaintiffs' suit on the merits.

## B. There is no basis for abstention.

Amicus NFR's argument that this Court should abstain jurisdiction under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), also fails. They ignore that *Pullman* abstention "is a 'narrow exception' to the federal courts' general

duty to decide cases and 'is used only in exceptional circumstances.'" *Caldara v. City of Boulder*, 955 F.3d 1175, 1178 (10th Cir. 2020) (quoting *Kan. Jud. Review v. Stout*, 519 F.3d 1107, 1119 (10th Cir. 2008)). There are three requirements, *all* of which must be met to bring a suit within *Pullman*:

> (1) an uncertain issue of state law underlies the federal constitutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law by the district court would hinder important state law policies.

*Id.* at 1179 (quoting *Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir. 1992)). Not only must all three requirements for *Pullman* abstention be met, but this Court must also "make a discretionary determination, based on the weight of these criteria and other relevant factors, as to whether abstention is in fact appropriate." *Vinyard v. King*, 655 F.2d 1016, 1018 (10th Cir. 1981). However, Amicus NFR has not shown that any of the three requirements have been met, much less all, nor that circumstances are so exceptional as to warrant this Court declining to exercise its federal jurisdiction.

*First,* NFR Amicus inaccurately claims that "multiple issues of state law ... precede any federal constitutional question." NFR Am.Br. at 21. But this Court need not address any uncertain issues of Utah law to determine that the state court exceeded her authority under *Moore* by (1) enjoining the 2021 map when she had not determined it was unlawful, and (2) imposing a private-party map not drawn by the Utah Legislature and altered by the state judge. The Utah Supreme Court has already

35

decided that Utah law "did not take the authority to enact electoral maps from the Legislature and give it to the Independent Commission," but "empowered the Independent Commission to create proposed maps, which the Legislature was required to consider." *League of Women Voters*, 554 P.3d at 916-17. Furthermore, as noted above, Utah law clearly does not give state courts authority to create redistricting maps. And as Amicus Legislature points out, Utah judicial equitable power also does not allow an injunction of a law not found to be substantive unlawful. Doc. 57 at 12-13.

Because NFR have not shown that any Utah law on which Plaintiffs' federal claims rely is uncertain, the first requirement for *Pullman* abstention has not been met. This alone defeats their abstention argument.

*Second*, NFR's point generally to ongoing litigation before the Utah Supreme Court to argue that the second *Pullman* requirement—that resolution of underlying, uncertain state law issues will narrow the federal constitutional claims—has been met. *See* NFR Am.Br. at 21-22. But their argument again relies on a mischaracterization of Plaintiffs' suit here, which challenges the state court's constitutional overreach under the Elections Clause and *Moore* as well as the Lieutenant Governor's implementation of a map that was not created by the Utah Legislature. The argument also ignores the Supreme Court's explanation in *Growe* that federal and state courts can concurrently exercise jurisdiction over congressional redistricting challenges. 507 U.S. at 32. Thus, that the Utah Supreme Court is

36

reviewing the state court order does not provide a basis for this Court to abstain from exercising its federal jurisdiction to decide whether the state court exceeded its authority.

*Third*, NFR's attempt to invoke state policies falls flat because they misstate the relevant *Pullman* requirement and again mischaracterize Plaintiffs' suit. The question is not whether "disposition of this case plainly touches on important state policies[,]" NFR Am.Br. 23, but rather whether this Court's "incorrect decision of state law . . . would hinder important state law policies." *Caldara*, 955 F.3d at 1179. Because Plaintiffs are not asking this Court to interpret any uncertain Utah law, but rather determine whether the state court exceeded its authority under the Elections Clause as interpreted in *Moore*, this *Pullman* requirement also has not been met.

In short, none of the *Pullman* requirements is met, and there are no exceptional circumstances warranting this Court to decline to exercise its federal judgment. And, as the Supreme Court instructed in *Moore*, this Court has "an obligation to ensure that state court interpretations of [state] law do not evade federal law." 600 U.S. at 34.

### C.   No stay is warranted.

SPC's reliance on *Growe v. Emison*, 507 U.S. 25 (1993), and the *Colorado River* doctrine to argue for a stay of Plaintiffs' suit is misplaced. *Cf.* Doc.50 at 22-23. As already noted, *see supra* II.A, *Growe* presented a different question in a different scenario than here, and *Growe* acknowledged that federal courts may entertain

claims against state court redistricting once the state court has been allowed to produce a final map. *Growe,* 507 U.S. at 28, 34, 36; *see also Thompson*, 52 F.Supp.2d at 1368 ("*Growe* made clear that federal courts and state courts have concurrent jurisdiction to entertain challenges to redistricting plans and that, as a result, both courts are open to such claims."). That has happened here.

Further, *Growe* is about initial—not permanent—deferral. Plaintiffs appropriately waited to file their suit until after the state trial proceedings had concluded. But when it became apparent that the Legislature would not even be allowed a final judgment to appeal the rejection of not just one but two legislatively enacted maps, there was no further need for any deference under *Growe*. 507 U.S. at 36.

And SCP's reliance on the *Colorado River* doctrine is similarly misplaced. *Cf.* Doc.50 at 23-25 (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). As the Tenth Circuit has explained, the *Colorado River* doctrine "is appropriate only in 'exceptional' circumstances." *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994) (quoting *Colo. River*, 424 U.S. at 818)—and the circumstances here do not warrant it.

As a threshold matter, Plaintiffs' suit is not "parallel" with the state court proceeding, because the two proceedings do not involve "substantially the same parties litigat[ing] substantially the same issues." *See Fox*, 16 F.3d at 1081. Plaintiffs here are not parties in the state court proceeding, nor are they in privity with any

party in the state court proceeding. *See supra* III.A (showing that Plaintiffs here are not in privity with Utah Legislature for purposes of issue preclusion). And SCP's do not identify any precedent showing Plaintiffs here—incumbent Members of Congress, elected officials, and registered Utah voters—should be considered "substantially the same" as any party to the state court proceeding. *See United States v. City of Las Cruces*, 289 F.3d 1170, 1182 (10th Cir. 2002) (noting that "exact identity of parties . . . is not required" to be "substantially the same", but not further clarifying the overlap required); *Lumen Constr., Inc. v. Brant Constr. Co., Inc.*, 780 F.2d 691, 695 (7th Cir. 1985) (holding that individuals who were "sole shareholders and owners" of a company had the same interests as that company); *Health Care & Ret. Corp. of Am. v. Heartland Home Care, Inc.*, 324 F.Supp.2d 1202, 1204-05 (D. Kan. 2004) (holding that two corporate affiliates are "substantially the same" party). This failure is independently fatal to their *Colorado River* argument.

Moreover, SCP's also fail to show that the issues here are substantially the same as those being litigated in the state court proceedings. *See supra* III.A (showing that issues are not identical for purposes of issue preclusion).

Furthermore, SCP's spill very little ink in arguing that the *Colorado River* factors favor abstention. *See* Doc.50 at 25. Indeed, they only touch on three factors, addressing them all in a single sentence and providing no evidence of any supposed inconvenience that would be caused by litigating before this Court. *See id.* And they simply do not address most of the factors the Tenth Circuit listed in *Fox. See* 16 F.3d

at 1082 (setting forth eight different factors). For example, they ignore that (1) Plaintiffs' suit arises under the Elections Clause of the U.S. Constitution; and (2) the state court action is not adequate to protect Plaintiffs' rights—including because they are not parties to that action. *See id.* (listing "whether federal law provides the rule of decision" and "the adequacy of the state court action to protect the federal plaintiff's rights" as two *Colorado River* factors). Because the balancing of the *Colorado River* factors is "heavily weighted in favor of the exercise of jurisdiction[,]" *Jones v. Great S. Life Ins. Co.*, 232 F.3d 901 (10th Cir. 2000), this Court should decline to apply that doctrine here.

In sum, there is no reason that this Court should not decide this case and do so quickly.[5]

## CONCLUSION

Under a motion to dismiss, Plaintiffs must only allege plausible legal claims. And they easily clear that hurdle here. Whether relying on the Constitution's plain text and original meaning, the nation's history and tradition, or Supreme Court precedent, Plaintiffs' legal theory is not only plausible, it is correct. Defendant and the state court she relies on cannot impose Map 1 on Plaintiffs, nor could the state court enjoin the 2021 map. The 2026 election must be held under that latter map. The motion to dismiss should be denied.

---

[5] Should the Utah Supreme Court enjoin Map 1, that may moot Plaintiffs' Motion for Preliminary Injunction but not be grounds for this Court to stay this litigation.

February 14, 2026                          Respectfully submitted,

                                           */s/ Gene C. Schaerr*
                                           GENE C. SCHAERR*
                                           D.C. Bar No. 416368
                                           JAMES C. PHILLIPS (17302)
                                           JUSTIN A. MILLER (*pro hac vice*)
                                           D.C. Bar. No. 90022870
                                           TYLER B. LINDLEY (18635)

                                           *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I certify that Plaintiffs have concurrently filed a Motion for Leave to File an Overlong Opposition of 10,280 words, and that the foregoing document complies with the word count set forth in that motion. I further certify that the foregoing document complies with DUCivR 10-1 because it was prepared in 12-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word.

Dated: February 14, 2026              */s/ Gene C. Schaerr*
                                      Gene C. Schaerr (*pro hac vice*)
                                      D.C. Bar No. 416368

                                      *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 14, 2026, the foregoing document was filed with the Clerk of the Court by this CM/ECF filing system, which will cause all counsel of record to be served electronically.

Dated: February 14, 2026

*/s/  Gene C. Schaerr*
Gene C. Schaerr (*pro hac vice*)
D.C. Bar No. 416368

*Counsel for Plaintiffs*

43