Christina M. Jepson (USB 07301)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Phone: (801) 532-1234
Fax: (801) 536-6111
cjepson@parsonsbehle.com
ecf@parsonsbehle.com

Mitchell D. Lange (*Pro Hac Vice Forthcoming*)
Parsons Behle & Latimer
800 West Main Street, Suite 1300
Boise, ID  83702
Phone: (208) 576-3214
Fax: (208) 562-4901
mlange@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Ben McAdams*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMELIA POWERS GARDNER, et. al,<br><br>    Plaintiffs,<br><br>vs.<br><br>LIEUTENANT GOVERNOR DIEDRE HENDERSON, in her official capacity,<br><br>    Defendant. | Case No. 2:26-cv-84-RJS-JCB<br><br>**PROPOSED AMICUS CURIAE BRIEF OF BEN MCADAMS IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION**<br><br>Judge Timothy M. Tymkovich<br>Judge Robert J. Shelby<br>Judge Holly L. Teeter<br>Magistrate Judge Jared C. Bennett |
| LEAGUE OF WOMEN VOTERS OF UTAH, *et. al.*,<br><br>    Proposed Intervenors. | |

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ............................................................................................... 1

BACKGROUND .............................................................................................................................. 2

    A.    McAdams begins campaigning for Congress ......................................................... 2

    B.    Volunteers, donors, delegates and supporters for McAdams rely on the current boundary .................................................................................................... 4

ARGUMENT .................................................................................................................................... 5

    A.    The balance of equities and public interest do not favor Plaintiffs ........................ 5

CONCLUSION ................................................................................................................................. 8

4907-9818-6640.v8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens United v. Federal Election Comm'n*,
  558 U.S. 310 (2010) ................................................................................................................ 5

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
  --- U.S. ----, 141 S. Ct. 28 (2020) .......................................................................................... 7

*League of Women Voters of Utah v. Utah State Legislature*,
  No. 220901712, 2025 WL 3145894 (Utah 3d Dist. Ct. Nov. 10, 2025) .................................. 2

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................................ 6

*Merrill v. Milligan*,
  --- U.S. ----, 142 S. Ct. 879 (2022) ........................................................................................ 7

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................................... 6

## INTEREST OF *AMICUS CURIAE*

Ben McAdams ("McAdams") is a congressional candidate in Utah's First Congressional District ("CD1"). McAdams served as a Utah State Senator from 2009 to 2013, Mayor of Salt Lake County from 2013 to 2019, and U.S. Representative for Utah's 4th Congressional District from 2019 to 2021.

McAdams is no stranger to elections in Utah. Once the new map was lawfully imposed by the Utah District Court in November 2025, he moved quickly to get his campaign off the ground to compete in the now competitive district. Since then, McAdams has raised over $900,000 in donations from Utah voters and has already spent over $200,000 to establish campaign infrastructure. Along with a team of campaign staff—and significant support from the public—McAdams has initiated his campaign for Congress in reliance on the existing Map 1 boundaries within CD1.

Ben McAdams submits this Proposed *Amicus Curiae* Brief of Ben McAdams in Opposition to Plaintiffs' Preliminary Injunction Motion (the "Memorandum") to provide critical context from a perspective on the ground in CD1. This is a perspective from an active congressional campaign regarding the extensive efforts already undertaken to become the Democratic nominee in CD1. McAdams' campaign has already, among other things, invested hundreds of thousands of dollars to create campaign infrastructure, organized volunteers, recruited and trained delegates within the boundaries of Map 1 for the Democratic Caucus, and secured 7,000 signatures to qualify as a candidate in the Democratic Primary in CD1. The facts show that McAdams' campaign and his campaign supporters have significantly relied on Map 1 and the current CD1 boundary as defined by Map 1. In other words, the twelfth hour has arrived.

1

Accordingly, the Court should not grant Plaintiffs' request for preliminary injunction. Such action would profoundly disrupt Utah's democratic process. Plaintiffs' preliminary injunction would harm not only McAdams' campaign, but all the volunteers, donors, delegates and supporters expending their money and valuable time supporting his campaign.

## BACKGROUND

On November 10, 2025, the State Court Judge made a determination that Map 1 would be the operative map for the upcoming election 2026. *See League of Women Voters of Utah v. Utah State Legislature*, No. 220901712, 2025 WL 3145894, at *1 (Utah 3d Dist. Ct. Nov. 10, 2025) ("November 2025 Order"). In reliance on the November 2025 Order, McAdams began organizing and establishing his campaign in anticipation of the 2026 election cycle. More importantly, the volunteers, donors, delegates, and supporters who have supported McAdams's campaign have similarly relied on the boundaries imposed in the November 2025 Order.

A.   **McAdams begins campaigning for Congress**

About a month prior to the November 2025 Order, McAdams updated his Statement of Candidacy with the Federal Election Commission expecting that the State Court would determine the final maps for the 2026 election cycle. (McAdams Decl., ¶ 5.) After the State Court determined the district boundaries, McAdams publicly declared his candidacy to run as a Democratic candidate for the seat within CD1 (as defined by Map 1) on November 13, 2025. (*Id.* at ¶¶ 6–7.)

Within a short time period, McAdams' campaign raised over $900,000 and continues to accumulate donations from donors with the expectation and belief that the CD1 boundary (as defined by Map 1) would remain as the operative map throughout the 2026 election cycle. (*Id.* at ¶¶ 10–11.) In coordination with the substantial donations, McAdams' campaign has spent over

2

$200,000 on campaign expenditures. (*Id.* at ¶ 12.) All campaign expenditures have been made in reliance on the boundaries within the November 2025 Order. (*Id.* at ¶ 13.)

Campaigns have many moving parts and must organize quickly to meet all the established statutory deadlines. Consequently, McAdams' campaign has already invested significant resources to either become the Democratic Party's nominee at the Utah Democratic Party Nominating Convention, or during the primary election on June 23, 2026. (*Id.* at ¶¶ 8–9.) In reliance on the November 2025 Order and the implementation of Map 1, the McAdams campaign has made all the following actions and commitments:

a. **Qualifying for the primary ballot** by completing the statutory process for collecting all 7,000 required signatures to qualify for the Democratic primary. This required significant investment by securing and coordinating over one hundred volunteers to collect signatures and hiring paid signature gatherers to collect signatures. Although not required, the campaign focused on collecting signatures within CD1 as defined by Map 1.

b. **Building campaign infrastructure** by hiring six full-time campaign staff members, hiring campaign consultants, and leasing office space within the CD1 boundary as defined by Map 1.

c. **Building and maintaining voter databases** by purchasing registered voter data of voters within CD1 as defined by Map 1, building voter models (as defined by Map 1) to inform campaign strategy, conducting paid polling research based on voters within CD1 as defined Map 1, and purchasing other related data services for voters specific to CD1 as defined by Map 1.

d. **Establishing voter communication materials** by producing professional video content and printing campaign literature and brochures identifying CD1 as defined by Map 1 as the proper boundary, printing and deploying yard signs throughout CD1 as defined by Map 1 as the proper boundary, and deploying other communications and campaign outreach to voters within CD1 as defined by Map 1.

e. **Training and recruiting delegates** for the Utah Democratic Party Nominating Convention on April 25, 2026, by surveying and providing in-person training for delegates about once a week. These delegates all reside within the boundaries of CD1 as defined by Map 1.

  f. **Training and recruiting campaign volunteers** by engaging community members and voters who reside within CD1 as defined by Map 1.

  g. **Communicating** with the public via media coverage, social media, and in other capacities to inform the public about my candidacy with the expectation that the CD1 boundary as defined by map 1 is the proper boundary in the upcoming election.

(*Id.* at ¶ 12.) As is apparent from the investments made by McAdams' campaign, if the boundaries within CD1 (as defined by Map 1) were altered in any manner, it would require significant restructuring of his campaign's operations. (*Id.* at ¶ 15.) Critically, this means that every dollar and every minute invested in the campaign thus far would be effectively invalidated because these investments were made with the expectation that the CD1 boundary in Map 1 would remain operative throughout the 2026 election. (*Id.* at ¶ 15–16.) These various campaign assets are almost all entirely relevant to the boundary in Map 1 and would be largely useless if the boundaries are changed. (*Id.*) It would also create significant voter confusion because all of McAdams' communications and campaign literature were made referencing the current CD1 boundary in reliance on the November 2025 Order. (*Id.* at ¶ 17.)

  As the election cycle continues, each week the McAdams campaign continues to invest in the upcoming election in reliance on existing boundaries established by the November 2025 Order. But McAdams is not the only person who has relied on the boundaries of CD1 within Map 1. All the volunteers, donors, delegates and supporters who have contributed their time and resources to McAdams' campaign have also relied on the boundaries within CD1 (as defined by Map 1).

**B. Volunteers, donors, delegates and supporters for McAdams rely on the current boundary**

  In the past few months alone, McAdams has garnered significant support from the residents living within CD1 (as defined by Map 1) with the understanding that he was running as a

4

Democratic Candidate for CD1, the boundary in which they currently reside. (Davidson Decl. ¶ 1; Crompton Decl. ¶ 1.)

McAdams' supporters have attended his campaign events and engaged with other voters who all understood that he was running as a Democratic Candidate for CD1. (Davidson Decl. ¶ 5; Crompton Decl. ¶ 4.) Thousands of his supporters have also donated funds to his campaign on a one-time or monthly recurring basis in support of his candidacy within CD1 (as defined by Map 1). (Davidson Decl. ¶ 4; Crompton Decl. ¶ 3.) With the help of these supporters, McAdams was able to gather 7,000 signatures in large part because they were willing to gather signatures and discuss McAdams' candidacy with residents in CD1 (as defined by Map 1). (Davidson Decl. ¶¶ 6-7; Crompton Decl. ¶¶ 6–7.)

The residents within CD1 (as defined by Map 1) and the supporters of McAdams' campaign have invested significant time, money, and effort to support his candidacy in reliance on the November 2025 Order establishing the boundaries for CD1. (*See generally* Davidson Decl., Crompton Decl.)

## ARGUMENT

### A. The balance of equities and public interest do not favor Plaintiffs

McAdams provides significant evidence showing that money and resources have already been expended in reliance on the current map implemented in the November 2025 Order. In such case, the substantial disruption to Utah's democratic process outweighs any alleged harm identified by Plaintiffs. Indeed, "[s]peech is an essential mechanism of democracy[.]" *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010). Granting Plaintiffs' preliminary injunction would suppress and annul the political participation of Utahns conducted in reliance on Map 1. To

5

do so, just before the election would substantially undermine the democratic process. Consequently, *Amicus* respectfully requests the Court, after considering all the relevant facts provided by *Amicus*, to deny Plaintiffs' motion for a preliminary injunction.

A preliminary injunction is an "extraordinary and drastic remedy, [and] one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*) (cleaned up). "In exercising their sound discretion, courts of equity should pay particular regard for the *public consequences* in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations and quotations omitted) (emphasis added).

The facts provided by *Amicus* clearly show that significant investment has already been made in the 2026 election cycle in reliance on the November 2025 Order and Map 1. A complete reversal of the November 2025 Order and subsequent redrawing of the boundary would severely undermine the efforts to organize a congressional campaign already taken by *Amicus* and the thousands of Utahns who have taken concrete action to support the McAdams campaign. Plaintiffs, on the other hand, allege that they suffer injury because they may have to "start over with a new representative" and would be forced to cultivate new relationships. (ECF No. 19, p. 14.) Curiously, Plaintiff candidates also allege that they would be "forced to introduce themselves to new voters." (ECF No. 19, p. 12.) Plaintiff candidates also allege that they may have to spend additional resources to campaign in a larger district, but, in their words they "are more than happy to do that." (ECF No. 19, p. 12.) Plaintiffs also make other generalized grievances like "vote dilution," that the November 2025 Order unconstitutionally deprives Plaintiffs of a fair process, and the inability to "screen and vet" candidates. (ECF No. 19, pp. 12–14.)

4907-9818-6640.v8

The November 2025 Order established the operative boundaries for the 2026 election cycle. Since then, every candidate has had notice of the congressional districts as defined by Map 1 and has had to start campaigning from an even playing field. Plaintiff candidates allege that they have experienced harm because the November 2025 Order now forces them to expend significant resources to begin campaigning in the new boundaries established by Map 1. But *every candidate* has had to invest resources into their campaigns in reliance on Map 1. In fact, Plaintiff candidates have had every opportunity to start campaigning since the November 2025 Order but have instead declined to do so. Thus, any harms now alleged by Plaintiffs are not a consequence of the November 2025 Order, but because of their inaction.

*Amicus*, however, has wasted no time significantly investing in campaign infrastructure in reliance on the Map 1 boundaries. As made clear by the facts presented above, the consequences of now changing the boundaries would be detrimental to all the voters, volunteers, donors, and delegates contributing to *Amicus's* campaign in reliance on Map 1. Facts which suggest that a preliminary injunction imposed at this stage election cycle would nullify all investments expended by *Amicus* and all the volunteers, donors, delegates and supporters to organize a congressional campaign. Consequently, the harm that would result from granting the preliminary injunction far outweighs Plaintiffs' harm because the parties had an equal opportunity when Map 1 was selected.

Notably, "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters[.]" *Merrill v. Milligan*, --- U.S. ----, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This is why the "Court has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election[.]" *Democratic Nat'l Comm. v. Wisconsin State Legislature*, ---

U.S. ----, 141 S. Ct. 28, 30 (2020) (Mem.) (Kavanaugh, J., concurring). The consequences of a preliminary injunction at these late stages likely will result in additional unanticipated repercussions.

What is not an unanticipated consequence, however, is the over $900,000 in donations received by McAdams' campaign from thousands of Utahns in reliance of the current CD1 boundary as defined by Map 1. The campaign has spent over $200,000 for campaign activities that include gathering signatures to qualify as a candidate, hiring and retaining campaign staff, leasing office space (within the boundaries of Map 1), organizing and training delegates (within the boundaries of Map 1) for the convention, creating voter communications within the boundaries of Map 1, recruiting volunteers, building voter models based on the boundaries of Map 1, and other spending in reliance on Map 1 and the November 2025 Order. Importantly, organizing a campaign is not just simply spending money in hopes of winning an election. The campaign volunteers, donors, delegates and supporters who, upon reliance that the CD1 boundary was conclusively set, have already exercised their First Amendment right to participate in the political process. Efforts that would be effectively nullified and suppressed if Plaintiffs' motion is granted.

## CONCLUSION

*Amicus* respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction. The facts provided by *Amicus* show that the balance of equities and public interest weigh firmly against granting the preliminary injunction.

8

DATED this 17th day of February, 2026.

        PARSONS BEHLE & LATIMER

        <u>*/s/  Christina M. Jepson*</u>
        Christina M. Jepson
        Mitchell D. Lange

        *Attorneys for Ben McAdams*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 17th day of February, 2026, I caused a true and correct copy of the foregoing **PROPOSED AMICUS CURIAE BRIEF OF BEN MCADAMS IN OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION** to be filed electronically via the Court's CM/ECF system, which caused service by electronic mail on all counsel of record.

/s/ Christina M. Jepson