Christina M. Jepson (USB 07301)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Phone: (801) 532-1234
Fax: (801) 536-6111
cjepson@parsonsbehle.com

Mitchell D. Lange (*Pro Hac Vice Forthcoming*)
Parsons Behle & Latimer
800 West Main Street, Suite 1300
Boise, ID  83702
Phone: (208) 576-3214
Fax: (208) 562-4901
mlange@parsonsbehle.com

*Attorneys for Ben McAdams*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMELIA POWERS GARDNER, et. al, <br><br> Plaintiffs, <br><br> vs. <br><br> LIEUTENANT GOVERNOR DIEDRE HENDERSON, in her official capacity, <br><br> Defendant. | Case No. 2:26-cv-84-RJS-JCB <br><br> **BEN MCADAMS'S DECLARATION IN SUPPORT OF AMICUS BRIEF OF BEN MCADAMS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge Timothy M. Tymkovich <br> Judge Robert J. Shelby <br> Judge Holly L. Teeter <br> Magistrate Judge Jared C. Bennett |
| LEAGUE OF WOMEN VOTERS OF UTAH, *et. al.*, <br><br> Proposed Intervenors. | |

I, Ben McAdams, under penalty of perjury, hereby testify and declare as follows:

4911-1426-6768.v4

1.      I am the interested *Amicus Curiae* in the above-captioned action, and I have personal knowledge of the facts in this declaration. I am over age 18 and a resident of Salt Lake County, Utah. I am competent to testify to the matters set forth herein.

2.      This declaration is not offered to advance a personal political interest, but to highlight the practical consequences to voters, volunteers, donors, delegates, and candidates when district boundaries are altered after the election process has begun. Stability in the rules governing elections is essential to public confidence and fair competition.

3.      I am a congressional candidate in Utah's First Congressional District. I previously served as a Utah State Senator from 2009 to 2013, Mayor of Salt Lake County from 2013 to 2019, and U.S. Representative for Utah's 4th Congressional District from 2019 to 2021. I am a registered voter.

4.      I have remained interested in running for the House of Representatives if a map created an environment for a competitive race where boundaries were not drawn using partisan data that caused cities and counties to be excessively divided among different districts. Accordingly, I was following the state redistricting litigation closely in anticipation of a determination of the map and associated boundaries for the 2026 election cycle.

5.      Lieutenant Governor Deidre Henderson set a deadline of November 10, 2025 to have a map in place in anticipation of the 2026 election cycle. Accordingly, on October 16, 2025, I updated my Statement of Candidacy with the Federal Election Commission with the expectation that the State Court Judge would issue a ruling and declare one of two maps operative for the 2026 election cycle, either "Map C" or "Map 1."

Docusign Envelope ID: 81C780DA-A91B-4631-915F-7830FB79BD58

6.  On November 10, 2025, the State Court Judge approved Map 1 to be used for the 2026 election and Lieutenant Governor Henderson indicated that she would abide by the ruling unless ordered to do otherwise.

7.  On November 13, 2025, two days after the State Court's order, I publicly announced my candidacy for Utah's First Congressional District ("CD1") as defined by Map 1.

8.  The immediate goal of my campaign is to receive the Democratic Party's nomination for the general election in CD1 as defined by Map 1. Under Utah law and Utah Democratic Party rules, there are two parallel paths for a candidate to qualify for the Democratic primary ballot: (1) collecting the required number of signatures, or (2) receiving more than 40% of the delegate vote at the Utah Democratic Party nominating convention. If a candidate receives 60% or more of the convention vote, that candidate advances as the sole convention-qualified candidate; however, any other candidate who qualifies through signature gathering will also appear on the primary ballot, and a primary may still occur. I therefore pursued both routes—organizing to compete at the convention while also undertaking the signature-gathering effort to qualify for the primary.

9.  As a result of my decision to pursue both options to be nominated as the Democratic Party's nominee, my campaign has already expended significant resources.

10. At the end of December 2025, I disclosed that my campaign received $955,730.21 in donations from thousands of individuals and spent $206,022.32. The campaign has continued to raise money and spend money since that day.

4911-1426-6768.v4

11. The donors to my campaign donated money with the expectation and belief that the Map 1 boundary for CD1 was established and would remain operative through the 2026 election cycle.

12. My campaign has spent over $206,000 in expenditures since fundraising began and has continued to spend money to fund the campaign. Specifically, these expenditures have been made upon all the following actions and commitments:

    a. **Qualifying for the primary ballot** by completing the statutory process for collecting all 7,000 required signatures to qualify for the Democratic primary. This required significant investment by securing and coordinating over one hundred volunteers to collect signatures and hiring paid signature gatherers to collect signatures. Although not required, the campaign focused on collecting signatures within CD1 as defined by Map 1.

    b. **Building campaign infrastructure** by hiring six full-time campaign staff members, hiring campaign consultants, and leasing office space within the CD1 boundary as defined by Map 1.

    c. **Building and maintaining voter databases** by purchasing registered voter data of voters within CD1 as defined by Map 1, building voter models (as defined by Map 1) to inform campaign strategy, conducting paid polling research based on voters within CD1 as defined by Map 1, and purchasing other related data services for voters specific to CD1 as defined by Map 1.

    d. **Establishing voter communication materials** by producing professional video content and printing campaign literature and brochures identifying

        CD1 as defined by Map 1 as the proper boundary, printing and deploying yard signs throughout CD1 as defined by Map 1 as the proper boundary, and deploying other communications and campaign outreach to voters within CD1 as defined by Map 1.

    e.    **Training and recruiting delegates** for the Utah Democratic Party Nominating Convention on April 25, 2026, by surveying and providing in-person training for delegates about once a week. These delegates all reside within the boundaries of CD1 as defined by Map 1.

    f.    **Training and recruiting campaign volunteers** by engaging community members and voters who reside within CD1 as defined by Map 1.

    g.    **Communicating** with the public via media coverage, social media, and in other capacities to inform the public about my candidacy with the expectation that the CD1 boundary as defined by Map 1 is the proper boundary in the upcoming election.

13.    All these expenditures and actions taken to establish infrastructure and organize my campaign were done in reliance that the CD1 boundary as defined by Map 1 would be the final, operative, boundary in the 2026 election.

14.    All the voters and individuals involved in donating money or volunteering their time to support my campaign did so in reliance on the current boundaries of CD1 as identified by Map 1.

15.    If the boundaries within CD1 were altered then it would require significant restructuring of my campaign's operations and would invalidate substantial investments already

4911-1426-6768.v4

made by my campaign. The expenditures described above are sunk costs. If the boundaries are changed at this stage of the election cycle, my campaign would be required to duplicate data purchases and conduct new polling, revise voter models, retrain staff, and reprint materials. These costs cannot be recouped, and the time lost during the reorganization would materially impair my ability to compete in the 2026 election.

16. Importantly, changing congressional district boundaries after candidates have declared, expended resources, and organized campaigns would create uncertainty and instability not only for my campaign but for voters, volunteers, donors, and other parties who have relied on the operative CD1 boundary as defined by Map 1 if the boundaries were altered.

17. My communications to the public in the media and within the campaign literature I have already created will also cause further confusion for voters if the boundaries were altered because those communications and materials were made in reliance on the current boundaries established in Map 1.

I declare under penalty of perjury, pursuant to the laws of the United States, that the foregoing is true and correct.

DATED this 17th day of February, 2026.

DocuSigned by:
Ben McAdams
26F180A43E55460...
Ben McAdams