# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2                        DISTRICT OF UTAH

3                        CENTRAL DIVISION

4

5    COMMISSIONER AMELIA POWERS      )

6    GARDNER, a registered voter and )

7    elected official, et al.,       )

8                Plaintiffs,         )

9    vs.                             )  Case No. 2:26-CV-84-RJS

10   LIEUTENANT GOVERNOR DEIDRE      )

11   HENDERSON, in her official      )

12   capacity,                       )

13               Defendant.          )

14   _____ )

15

16
             BEFORE THE HONORABLE ROBERT J. SHELBY
17        BEFORE THE HONORABLE TIMOTHY M. TYMKOVICH
             BEFORE THE HONORABLE HOLLY L. TEETER
18

19                    February 18, 2026

20

21

22                     Motion Hearing

23

24

25

1

2                         A P P E A R A N C E S

3

4

5   For Plaintiff:              GENE C. SCHAERR
                                1717 K Street NW
6                               Suite 900
                                Washington, DC

7                               JAMES C. PHILLIPS
                                299 South Main Street
8                               Suite 1300
                                Salt Lake City, Utah

9

10

11  For Defendant:              ANNIKA HOIDAL
                                LANCE SORENSON
12                              160 East 300 South
                                5th Floor
13                              Salt Lake City, Utah

14

15  For Proposed Intervenors:   DAVID C. REYMANN
                                CHEYLYNN HAYMAN
16                              101 South 200 East
                                Suite 700
17                              Salt Lake City, Utah

18                              MARK P. GABER
                                1101 14th Street NW
19                              Suite 400
                                Washington, D.C.

20

21

22

23  Court Reporter:             Ed Young
                                351 South West Temple
24                              Room 3.302
                                Salt Lake City, Utah 84101-2180
25                              801-328-3202
                                ed_young@utd.uscourts.gov

```
 1   February 16, 2025                              9:00 a.m.

 2                    P R O C E E D I N G S

 3

 4            JUDGE SHELBY:  Good morning, everyone, and

 5   welcome.

 6            We'll go on the record and call case number

 7   2:26-CV-84, Powers Gardner and others versus Henderson and

 8   others.

 9            Counsel, why don't we start with our appearances,

10   should we?  For the plaintiffs?

11            MR. SCHAERR:  Your Honor, Gene Schaerr and James

12   Phillips.

13            JUDGE SHELBY:  Welcome.

14            For the defendant?

15            MS. HOIDEL:  Your Honor, Anikka Hoidal.  With me

16   is Lance Sorenson.

17            JUDGE SHELBY:  Welcome to both of you.

18            For the proposed intervenors?

19            MR. REYMANN:  Good morning, Your Honor.  David

20   Reymann and Cheylynn Hayman from Parr Brown and Mark Gaber

21   from the Campaign Legal Center for the intervenors.

22            JUDGE SHELBY:  Terrific.  Thank you, everyone.

23            As a housekeeping matter at the outset, we have

24   carefully considered and reviewed the proposed intervenors'

25   motion to intervene, Docket 17, as well as the opposition to
```

1    that motion.

2            We conclude it is well taken and that motion is

3    granted.

4            We signaled yesterday in our email communication

5    to the lawyers how we anticipated we would be proceeding

6    today.  What we had in mind is we thought we would allot up

7    to 15 minutes for each party to provide any additional

8    opening sort of argument that you wish to make.  Then I

9    think we'll have some questions for all of you.  We'll

10   proceed probably one party at a time in the way that you're

11   familiar with in this court.

12           We'll say we have read your papers more than once,

13   and there is some redundancy in the papers.  We are

14   familiar, we think, with your arguments.  We have some

15   questions.  We'll be eager to hear what you have to share

16   with us.  It is your time.  We encourage you to try to think

17   if there is something that you would like to share with us

18   besides reiterating what you have already told us in your

19   papers.  We would be eager to hear that.

20           We don't have the fancy clocks that we have in the

21   Tenth Circuit, but I will keep an eye on things and try to

22   give you some sense for where we are.

23           Should we begin with the plaintiffs, Mr. Schaerr?

24           MR. SCHAERR:  Thank you very much.  Let me

25   especially thank the panel for what I know is an enormous

1     effort involved in convening this panel and reviewing all of

2     the briefing on an exceptionally expedited schedule.  On our

3     side of the bench we are still reeling from that a bit, as

4     you can imagine, but we certainly appreciate the enormous

5     effort that has gone into that on your side as well.

6            As the Court is well aware, we challenge the

7     decision of Utah's lieutenant governor to acquiesce, however

8     reluctantly, to a series of state court decisions that

9     purported to invalidate the congressional map passed by the

10    Utah Legislature in 2021 and without any finding that its

11    districts are substantively unlawful.  And then ultimately

12    the state court adopted its own map which it called Map 1

13    that was proposed by the interveners here in that state

14    court action.  We believe that the L.G.'s plan to implement

15    the map drawn by the state court instead of the

16    Legislature's own 2021 map is foreclosed, not just by the

17    terms of the Elections Clause, but by the Supreme Court's

18    latest decision interpreting that clause in *Moore against*

19    *Harper*.

20           Now, that plan imposes a series of irreparable

21    costs on the plaintiffs, including two of Utah's sitting

22    Congressmen and candidates for reelection, and we detailed

23    those costs in our complaint, our P.I. motion and the

24    declarations that we have submitted with that motion.  And

25    especially after the Supreme Court's *Bost* decision we don't

1    think there is any doubt that we have at least one plaintiff

2    with standing here.  We think all of them have standing.

3            None of the many injuries identified in the

4    plaintiffs' declarations are compensable or reparable by any

5    court decree or otherwise, and, therefore, there is

6    obviously no damages remedy against the Lieutenant Governor

7    or the state court for what they did or what they are

8    proposing to do, and so we think irreparable injury is clear

9    as well.

10           Now, my sense from the Lieutenant Governor's

11   filing is that she would be happy to follow the plain

12   language of the Elections Clause and *Moore versus Harper* and

13   go back to the 2021 map that was drawn by the Legislature.

14   So the principal question before this Court and the key to

15   our likelihood of success on the merits is whether the

16   intervenors in their amici have identified any valid

17   exception to the Election's Clause's general requirement of

18   legislative map drawing and some exception that would

19   justify the use of a map drawn by a state judge rather than

20   the Legislature.

21           In my time today I would like to address those

22   possible exceptions, beginning with *Moore versus Harper*,

23   which, obviously, outlines a possible exception and the

24   other Supreme Court decisions on which the intervenors rely.

25           And, finally, I will briefly address the remaining

1    preliminary injunction factors as well as the intervenors'

2    arguments about such things as abstention and *Purcell* and

3    the relief that this Court can order.

4          Turning to *Moore versus Harper*, *Moore*, of course

5    was a broad challenge by the North Carolina Legislature to

6    the idea that state courts had any constitutionally

7    permissible role in federal redistricting.  I think they

8    called it legislative supremacy or autonomy or something

9    like that.

10         Now, all nine of the justices on the Supreme Court

11   agreed that, as the chief justices majority opinion put it,

12   and I quote, "State courts do not have free rein in

13   redistricting because the Elections Clause expressly vested

14   power to carry out its provisions in the legislature of each

15   state, a deliberate choice that courts must respect."

16         Now, yes, there was some disagreement about how

17   far that principle goes, with Justices Gorsuch and Thomas

18   urging that the clause precludes any review by state courts

19   of the legislature's redistricting, but of course the

20   majority rejected that broad position and concluded instead

21   that what they called "ordinary judicial review" by state

22   courts is not categorically precluded under the Elections

23   Clause.

24         The court didn't define that term, "ordinary

25   judicial review," but they did note that its purpose is to

 1    prevent courts from "abrogating redistricting power to

 2    themselves."

 3              Here we believe that *Moore* forecloses the state

 4    court's actions for three independent reasons:  Number one,

 5    the crafting and imposition of a new map by a state judge

 6    cannot fairly be characterized or considered as an act of

 7    ordinary judicial review, especially when there has been no

 8    finding that the existing districts are in any way

 9    substantively illegal.

10              Certainly, when the Elections Clause was written

11    and drafted, a state judge's drawing and imposing a new map

12    against the legislature's wishes would certainly not have

13    been considered ordinary judicial review.  In an article

14    that we have cited, Professor McConnell and coauthors have

15    shown that judicial involvement in legislative map drawing

16    didn't even begin until about the middle of the last

17    century, more than 150 years after the Constitution was

18    adopted, and almost all of that activity, as this Court is

19    probably aware, was in response to Congress using its own

20    authority under the Elections Clause to regulate the state

21    legislature's regulation of elections and subject to review

22    in federal courts.  So judicial review of legislative

23    redistricting by state courts wasn't -- and even remains

24    very rare.

25              But even if ordinary judicial review creates an

1    evolving standard that looks to the practices in other

2    courts, neither the intervenors nor their amici have

3    identified even one case in which a state court has created

4    and imposed a map without finding any of the legislature's

5    existing districts substantively unlawful.

6           And here the August order by the state court judge

7    didn't find any substantive illegality.  That order merely

8    found that there had been a violation of certain procedural

9    requirements of what is called Proposition 4.  There was no

10   finding of any substantive invalidity.  And the November

11   order which the other side claims did find substantive

12   invalidity in the 2021 map -- in fact, the portion of that

13   order that they cite in their papers was actually not

14   addressing the 2021 map, it was addressing a different map

15   known as Map C.

16          So there has never been any finding by the state

17   court that the 2021 legislative districts adopted by the

18   Legislature are substantively unlawful in any respect.  So

19   we think that that alone makes it impossible to square the

20   state court's attempt to invalidate the 2021 map with *Moore*.

21          Second, and, in any event, the state court here

22   violated the ordinary judicial review standard in another

23   way, and that is by retroactively invalidating the

24   Legislature's map, which had been enacted in a law called

25   HB-2004, as a remedy for, in her view, improperly passing a

1    separate statute known as SB-200 that effectively amended

2    some of the provisions of Proposition 4.

3          Now, here again, the intervenors in their amici

4    have pointed to no decision in which any court has done that

5    to a legislature, especially on an elections issue.  While

6    it is true that a court can invalidate an unconstitutional

7    law, that does not invalidate other laws that may have been

8    passed pursuant to that law.

9          Remember that the Legislature's authority, over

10   redistricting of congressional elections at least, flows

11   from the Elections Clause of the Constitution directly.  It

12   does not flow from the state constitution or from any law

13   passed by the Legislature.  They have authority to

14   redistrict directly under the Elections Clause.

15         I have been struggling to find an example of why

16   this sort of fruit of the poisonous tree approach that the

17   state court took is so perverse.  One example that comes to

18   mind is the congressional budget process.  You are all

19   probably aware that every year when Congress decides to

20   spend money, they first pass a budget resolution that kind

21   of serves as a framework for all of the other spending

22   bills.

23         Now, imagine that a judge decides that the budget

24   framework is unlawful in some respect.  Well, does that mean

25   that all of the spending bills that have been passed under

1    that budget framework are now automatically unlawful just

2    because the framework has been found unlawful?  No.  You

3    would look at the individual -- assuming that the court

4    could do it, which, of course, they can't -- but if judicial

5    review were there, you would have to look at each of the

6    individual spending bills and figure out whether there was

7    something unlawful about that bill.  You can't just

8    invalidate a subsequent bill because the master legislative

9    framework is in your view deficient in some fashion.

10           For that reason, too --

11           JUDGE SHELBY:  About four minutes.

12           MR. SCHAERR:  For that reason, too, the fruit of

13    the poisonous tree approach is not only far beyond ordinary

14    judicial review, but it is inconsistent -- flatly

15    inconsistent with the respect for the legislative

16    prerogatives that are required by *Moore*.

17           Third, in any event, Moore's authorization for

18    state court judicial action on federal redistricting is

19    expressly limited to state constitutions.  That is on page

20    37 of *Moore*.  Yes, the state court here arguably relied on

21    the Utah Constitution and the alter or amend clause as part

22    of her chain of reasoning in invalidating the 2021 map.  As

23    I have mentioned, that depends on this fruit of the

24    poisonous tree idea.

25           But, as I mentioned, she didn't find the 2021

1    districts were substantively unlawful under the Utah

2    Constitution at all, and she didn't purport to apply the

3    Utah Constitution in creating Map 1.  What she purported to

4    apply there was Proposition 4, which all agree merely has

5    statutory status.  It does not have constitutional status.

6    And because the redistricting was purportedly based on

7    Utah's statutory law rather than its constitution, for that

8    reason, too, that decision falls outside the state judicial

9    review that is authorized by *Moore*.

10           So for each of these independent reasons, the

11   state court decisions that the Lieutenant Governor is

12   currently planning to implement are invalid under the

13   Elections Clause as understood in *Moore*.

14           I will take just a moment to discuss a couple of

15   the other Supreme Court decisions raised by the other side.

16           *Growe* obviously does not really apply here.  We

17   are not asking the Court to enjoin any state proceeding or

18   to find the state court's redistricting unlawful under any

19   federal statute.  We are just seeking an order that excuses

20   the Lieutenant Governor from complying with the state

21   court's decision on the ground that those decisions violate

22   the Elections Clause.

23           *Branch* is an interesting case.  We think *Branch*

24   clearly supports our position, and we have explained that in

25   the papers, but let me add one additional point that we just

1    discovered since our papers were filed.  I urge the Court to

2    read this.

3            There was a three-judge panel opinion that led to

4    *Branch* and that was one of the three or four decisions that

5    were reviewed by the Supreme Court in *Branch*.  I urge the

6    Court to look at the February of 2002 decision in *Smith*

7    *versus Clark* in the Southern District of Mississippi, which

8    really provides a road map -- a kind of road map for what we

9    are asking the Court to do here.

10           What the three-judge panel did in that case was

11   they basically held, as we are urging this Court to hold,

12   which is that the state court lacked authority under the

13   Elections Clause to draw its own maps.  It issued that

14   ruling as an alternative to another ruling, which was that

15   maps violated Section 5 of the Voting Rights Act.

16           One minute?

17           JUDGE SHELBY:  Okay.

18           MR. SCHAERR:  Thank you.

19           What the Supreme Court did is they said, Okay.

20   We're going to adopt your Section 5 ruling and, therefore,

21   we don't even have to opine on your ruling under the

22   Elections Clause.  That was that.  The Supreme Court didn't

23   disagree with that aspect of the three-judge panel's ruling.

24           And then when the same case, basically, got before

25   the Mississippi Supreme Court, that court said, Oh, yeah, we

1  agree with the three-judge panel.  What the state court did

2  was plainly unconstitutional under the Elections Clause.  I

3  think that that is an interesting and important precedent to

4  look at.

5        For all of these reasons, we urge the Court to

6  grant our preliminary injunction motion in order to

7  vindicate both the language of the Elections Clause and also

8  the underlying concern about respect for legislative

9  prerogatives.

10       Thank you.

11       JUDGE SHELBY:  Thank you, Mr. Schaerr.

12       Should we hear next from the Lieutenant Governor?

13       MS. HOIDEL:  Good morning, Your Honors.

14       Anikka Hoidal with the Utah Attorney General's

15  Office on behalf of Defendant Lieutenant Governor Henderson.

16       First of all, thank you for being here to hear

17  this matter on an expedited basis.  Thank you also for the

18  15 minutes.  I intend to take just one or two.

19       As indicated in the Lieutenant Governor's response

20  to the plaintiffs' motion for a preliminary injunction, the

21  Lieutenant Governor takes no position on the merits here.  I

22  want to mention that the Lieutenant Governor is also a

23  nominal defendant in the state court litigation the League

24  of Women Voters versus the Utah Legislature.  In that state

25  court litigation she also has taken no position on the

1    merits.

2           I will highlight just two points from the

3    Lieutenant Governor's response.  First is the Lieutenant

4    Governor's role.  As chief elections officer, she must

5    administer the state elections which involves administering

6    the congressional election.  In order to do so there needs

7    to be a map identifying the congressional district

8    boundaries.  As of now the Lieutenant Governor is following

9    a court order to use what is known as Map 1, which leads to

10   my second point, which is the February 23rd date.  That is

11   the date by which the Lieutenant Governor needs to know

12   whether to use Map 1, which is currently in place to be used

13   for this election, or if she needs to use what is known as

14   the 2021 map.

15          The details of why the February 23rd date is

16   necessary is because of the nine business days that it will

17   take to logistically implement it or reinstate it before

18   March 9th and the beginning of the candidate filing period.

19   That is detailed in the response and also in the notice of

20   the 2026 congressional filing timeline that the Lieutenant

21   Governor has also filed.

22          With that, I will be available for additional

23   questions.

24          JUDGE SHELBY:  Thank you, Ms. Hoidel.

25          Mr. Gaber.

1              Did I pronounce that correctly?

2              MR. GABER:  Yes, you did, Your Honor.  Thank you.

3              Good morning, Your Honors.

4              May it please the Court, Mark Gaber for the League

5    of Women Voters, intervenors.

6              I think it would help to back up and discuss how

7    we got here.  The Utah Supreme Court ruled that its state

8    constitution provided a claim for the plaintiffs in that

9    case, the plaintiffs that I represent, that the repeal of

10   Proposition 4 had violated the alter or reform clause of the

11   Utah Constitution.  The Utah Supreme Court said that that

12   claim encompassed not just the repeal of Proposition 4, but

13   also the challenge to the 2021 congressional map, which was

14   not enacted under Proposition 4's requirements.

15             In August of last year, the state district court

16   issued its ruling enjoining the repeal of Proposition 4

17   declaring that that was the redistricting law of the land in

18   Utah going back to 2018 when it was enacted because of the

19   the void ab initio ruling, and under both the Utah

20   Constitution and under Proposition 4's requirements enjoined

21   the 2021 map, and that it was part of the alter or reform

22   clause violation that occurred and that the plaintiffs in

23   the case, the intervenors here, had proven that the map

24   violated the procedural requirements of Proposition 4.

25             The Court also noted, as the U.S. Supreme Court

1    did in its *Moore* decision, that procedural requirements are

2    often substantive in nature and ruled that in this case

3    these were important and substantive -- you know, at the

4    line of substance and procedure for what the voters were

5    attempting to accomplish in Proposition 4.  The court,

6    having enjoined the map, provided the Legislature with, I

7    think, 40-plus days to enact an alternative map that would

8    comply with Proposition 4's requirements.  The Legislature

9    agreed to a process that would include the plaintiffs in the

10   case, the intervenors here, proposing alternative maps in an

11   evidentiary hearing in late October on all aspects of the

12   maps.

13          After that hearing, the Legislature's map, Map C,

14   was enjoined as violating Proposition 4 and its substantive

15   requirements -- all of them, actually.  In doing so, the

16   Court commented and made factual findings that the 2021 map

17   also violated the county split minimization requirement and

18   the prohibition on partisan gerrymandering.

19          At that point it was November 10th and that was

20   the deadline that the Legislature had given for when a map

21   needed to be finalized.  Under the Supreme Court's --

22   decades of U.S. Supreme Court precedent, the state court at

23   that point was obligated to impose a map.  Under statutes

24   that Congress enacted pursuant to the Elections Clause, the

25   *Branch* case holds that both state and federal courts when

1   they are in this predicament have an obligation under 2 USC

2   2c to ensure that there is a lawful single-member district

3   plan in place.  The court specifically said that state

4   courts are empowered under the statute Congress enacted to

5   do that and should.

6          They also said that when they are doing that

7   pursuant to 2 USC 2a(c) they should follow the substantive

8   requirements of the state's redistricting law.  That is what

9   the district court did here.  It imposed a map that complied

10  with Proposition 4.

11         The U.S. Supreme Court from the *Germano* case to

12  the *Growe* case to *Branch* has repeatedly held that not just

13  that state courts can do this, but they have the obligation

14  to and that federal courts cannot interfere with state

15  courts imposing lawful congressional maps.  That is

16  precisely what the plaintiffs ask you to do here.

17         Now, I want to back up.  There was a lot mentioned

18  by opposing counsel about the 2021 map injunction.  You will

19  look at the plaintiffs' complaint in this case and you will

20  not see a single challenge to the injunction against the

21  2021 map.  The complaint is framed entirely as a challenge

22  to the authority of the state district court to impose any

23  map at all, ever, and specifically Map 1.

24         So what they are asking this Federal Court to do

25  is to order the State of Utah to impose a map, the 2021 map,

1    that a state district court has permanently enjoined as

2    violating the State Constitution and Proposition 4, and

3    order the State to use that map even though their claim does

4    not say that there is a federal law violation with the

5    underlying state court injunction.  That would be an

6    egregious violation of a Federal Court's remedial power to

7    order a remedy that goes well beyond the scope of the

8    plaintiffs' claimed violation of law.

9         But it does not even make sense under the statutes

10   that they cite.  2 USC 2a(c)(1) says if no redistricting has

11   occurred -- it has occurred here.  Map 1 is in place, as

12   *Branch* recognizes.  But if no redistricting has occurred to

13   use the then-prescribed-by-law plan.  Well, under the *Branch*

14   decision "by law" means court decisions as well, so there is

15   an injunction against the 2021 map.  It is not the law of

16   Utah.

17        If you look at the Utah Code, it is not the law of

18   Utah.  Map C is.  The plaintiffs are not asking for Map C.

19   Map C is enjoined.  They don't challenge that injunction, so

20   they are left with saying that the district court should

21   have sent it back to the legislature again after the

22   district court enjoined Map C, but there was no time.  The

23   precedent establishes that in that situation where the

24   Legislature has failed to enact a lawful map, it has the

25   obligation to impose that map.

1          Now, another problem with the argument that I

2    heard from opposing counsel is that, Well, the district

3    court in its August injunction didn't find a substantive

4    violation of the 2021 map.  First, as I said, that would

5    need to be a claim that was made in their Federal Court

6    complaint.  But it is interesting to me that they challenge

7    the fact that the state district court found procedural

8    violations, because on page 23 of their opposition to the

9    motion to dismiss, they identified procedural violations in

10   the lawmaking process as one of the only ways that a state

11   court could enforce state law under *Moore vs. Harper*.

12          Now, that is wrong.  In Moore vs. Harper the U.S.

13   Supreme Court explicitly rejected the idea that only

14   procedural and not substantive state law requirements could

15   be enforced by state courts.  But if that is their position,

16   they can't then say there was something in violation of the

17   Elections Clause, because the state district court found

18   procedural violations with how the 2021 map was adopted and

19   not in compliance with the requirements from the Legislature

20   under Proposition 4.

21          I also want to address the interpretation of

22   *Branch vs. Smith* and the lower court's decision in *Smith vs.*

23   *Clark*.  The U.S. Supreme Court in *Branch* addressed the

24   Elections Clause, it addressed the power of state courts to

25   impose maps, it addressed Congress's Elections Clause

1    statutes, and it addressed the underlying decision of the

2    *Smith vs. Clark* district court that the Elections Clause

3    prohibited the Mississippi Chancery Court from imposing a

4    map.

5            Its conclusion was, We're vacating the rationale

6    stated by the *Smith vs. Clark* case, that the plaintiffs now

7    ask this Court to follow, and warning litigants not to rely

8    on that case in the future and saying that the Mississippi

9    Chancery Court in the future shouldn't think that it is

10   bound not to impose a map because of that decision.  And

11   then in that same decisio,n interpreting the Elections

12   Clause concluded that state courts had an obligation to

13   impose maps.

14           There is no way to finish reading *Branch* and

15   arrive at the conclusion that a state court does not have

16   the power to impose a map and that the Federal Elections

17   Clause says that.  In fact, Congress's superior power under

18   the Federal Elections Clause has been held to require that.

19           Now I want to address as well the *Purcell* issue on

20   the preliminary injunction motion.  The Lieutenant Governor

21   has stated the position that in order to recode the voters

22   in the database they need at least nine days.  *Purcell* is

23   not about just how long does it take to recode voters in the

24   state database.  It is about the effect on candidates who

25   are running in a primary campaign, on voters who are

1    participating in that campaign and trying to decide who they

2    want to vote for.

3          By February 23rd we are, like, two weeks or three

4    weeks away from the March caucuses, which is the first step

5    of the convention process.  Not only is that relevant to

6    candidates, but anyone in Utah who wants to run for a party

7    office depends on the precinct lines that are in place now.

8    Those precinct lines were changed to accommodate Map 1.

9    They would need to be radically changed again to accommodate

10   the 2021 map, affecting everyone who might be wanting to run

11   for their neighborhood precinct to be a party officer.

12         From the candidate perspective you have the

13   declaration from former Congressman McAdams and two

14   supporters which lays out in detail the effect that it would

15   have on the ongoing primary campaign and millions of

16   dollars, at least, since the last filing deadline that have

17   already been raised and are being spent, and campaign

18   activity happening on the basis of these lines, and physical

19   structures, renting campaign offices based on the

20   boundaries, having volunteers come in, training volunteers

21   for the convention based on these boundaries.

22         And here we are where the map was imposed on

23   November 10th and three months go by before the plaintiffs

24   come to this court and raise a federal law challenge to that

25   map.  It is merely two weeks before the absolute deadline

1    simply to change where the voters are located in the

2    computer system.  There is no explanation for why these

3    three months have gone by other than to say that *Growe*

4    prevented us from filing it.

5         Again, there is no way to finish reading *Growe* and

6    come to the conclusion that you are barred from filing a

7    Federal Court challenge until the state court's map is in

8    place.  And, in any event, it has been in place since

9    November 10th.  So, you know, at least under Justice

10   Kavanaugh's conception of the *Purcell* doctrine, the undue

11   delay is a serious problem for the plaintiffs under *Purcell*,

12   and even under the regular preliminary injunction standard

13   it is a serious problem, because you cannot show irreparable

14   harm if you wait until the twelfth hour to come into court

15   and ask for preliminary injunction relief.

16        Under the Supreme Court's most recent case

17   applying *Purcell* -- I was counsel on this case, in fact, and

18   we were challenging Texas's redistricting.  We won a

19   decision in the District Court.  It was four months before

20   the primary.  The Supreme Court in a published opinion,

21   which does not often happen on a state docket, held that the

22   district court had inserted itself into an active primary

23   campaign, thereby violating the *Purcell* Principle.  That is

24   when Texas was four months away from the primary, the exact

25   period of time we have standing here today from Utah's

 1    primary, and when there was an active primary campaign.

 2              Notably, at that time Texas was still implementing

 3    its 2021 map.  There were ongoing special elections for

 4    Congress -- for Congressional District 18 in Houston that

 5    were happening after the Supreme Court issued its decision.

 6    I think maybe just a couple of weeks ago was that special

 7    election for that congressional district.

 8              So the largest county in Texas was still

 9    implementing the 2021 map and the Supreme Court said, No, it

10    is too late.  You're interfering with an active primary

11    campaign.  You can't get an injunction right now.

12              That is not the situation here.  The 2021 map is

13    not being implemented.  That is why the Lieutenant

14    Governor's office would have to hurry and recode the

15    computer program to do that.  That was not the case in

16    Texas, yet the Supreme Court said it is too late.  There has

17    been no explanation for how the *Purcell* Principle could be

18    overcome in this scenario when apparently it was not too

19    much of an emergency in November.

20              I can stop there.  I will give the Court back some

21    time and I will take Your Honors' questions.

22              JUDGE SHELBY:  We'll gladly take back the time.

23              MR. GABER:  Thank you.

24              JUDGE SHELBY:  Thank you.

25              Mr. Schaerr, why don't we invite the plaintiff

```
 1    back to the podium.

 2              We appreciate those preliminary remarks from

 3    everyone.  Thank you.

 4              JUDGE TEETER:  Mr. Schaerr, what the panel has

 5    talked about doing is kind of just asking questions by

 6    subject matters.  So I think we're going to start with

 7    subject matter jurisdiction and talk a little bit about some

 8    of the arguments and issues that have been raised in that

 9    regard.

10              Just to kind of get things kicked off, I am,

11    obviously, very familiar at this point with the Supreme

12    Court's opinion in Bost.  It seems like the Court was taking

13    pains to kind of draw some type of a limitation saying, We

14    are not creating candidate standing, but where is the line

15    in your opinion between what the Supreme Court held in Bost

16    versus what is allowable under Bost but does not cross that

17    line into just creating kind of per se candidate standing

18    that they seem to be rejecting?

19              MR. SCHAERR:  Well, certainly we wrote our

20    complaint and our motion in light of Bost, and we think that

21    the injuries that we have asserted are clearly the types of

22    injuries that the court identified in Bost as providing

23    standing for candidates.

24              I can't tell you exactly where the line might be.

25    I don't think the Supreme Court has yet tried to identify
```

1   that, but certainly the harms that we have alleged we

2   believe fall well within the principles articulated in *Bost*.

3           JUDGE TYMKOVICH:  Wouldn't those harms, though, be

4   true for any partisan redistricting?  I mean, you're just

5   shifting around voters, but you ordinarily would not think

6   of that as a harm because they have to plead for those votes

7   anyway.

8           What is the actual injury?

9           MR. SCHAERR:  Well, as we set out in our motion

10  and in the declarations by the plaintiffs, the harms go far

11  beyond just having to possibly campaign in a different

12  district.  There are lots of out-of-pocket costs associated

13  with that.  There is uncertainty about, you know, What

14  district am I going to run in?  Obviously it is a problem

15  for candidates sometimes if they don't live in the district

16  that they want to run in.

17          It may well be that under *Bost* congressional

18  candidates challenging congressional redistricting pretty

19  much always have standing to challenge congressional

20  redistricting.  That does not mean that every candidate

21  would have standing to challenge every kind of election

22  regulation that might be passed under state or federal law.

23          But, you know, it may well be that the implication

24  of *Bost* is that candidates for Congress have standing to

25  challenge changing Congressional boundaries.

1          JUDGE TYMKOVICH:  That is because, why?  You're

2     alleging that the state court process was unreasonably

3     unfair.  Be more specific about what the problem is with the

4     process.  In *Bost* we have counting after election day or

5     whatever and here we have redistricting.

6          Is it because the district court exceeded her

7     powers, or is it something else?

8          MR. SCHAERR:  Well, that, of course, gets to the

9     merits.  I think, you know, we have identified three

10    independent reasons why what the district court did was

11    contrary to the Elections Clause as interpreted in *Bost.*

12         One of those, of course, was purporting to

13    invalidate a map drawn by the Legislature and not relying

14    on the constitution but, instead, relying on statutory law

15    and using statutory law to create a new map.  That is

16    certainly one of our reasons.

17         Then I talked about the two reasons why we think

18    the state court's decision was far beyond ordinary judicial

19    review.  Both of those points, it seems to me, are genuine

20    outliers.  I have never seen a court decision that did

21    either of those two things that we identify.

22         JUDGE TYMKOVICH:  Do you think there is

23    reputational harm here to the incumbent congressional

24    candidates, and, if so, how would you articulate that?

25         MR. SCHAERR:  I don't know that there is any

1    particular reputational harm to them.  You know, one of the

2    interesting aspects of this whole redistricting effort is

3    that it has been pushed by forces aligned with the

4    Democratic party in Utah.  And, of course, the Democratic

5    party prides itself on protecting minorities and yet, you

6    know, the ironic impact of what they are doing here is that

7    if this succeeds, they will essentially unseat the only

8    minority member of Congress from Utah.

9          JUDGE SHELBY:  I didn't see addressed in the

10   papers anywhere the additional elements of -- well, I think

11   the words are in the papers, but there is not really any

12   discussion about, I think, the requirement that a litigant

13   establish that the injury that is complained of is concrete

14   and particularized and actual and imminent.  It seems as I

15   read through your recitation of the harms to -- let's focus

16   on the congressional candidates.  It all seemed like it was

17   potentially speculative.  This might happen.  This could

18   happen.

19         Do we consider whether the injury is actual and

20   imminent, concrete and particularized?

21         MR. SCHAERR:  Well, I guess I would respectfully

22   disagree with the Court's characterization of the

23   allegations.  I think they are not speculative harms.  We

24   have explained concrete harms that they are going to face

25   and concrete expenses that they are going to have to incur

1   as a result of the state court's unlawful rejection of the

2   Legislature's maps.

3            JUDGE SHELBY:  Is there a redressability issue

4   here?

5            MR. SCHAERR:  No, I don't think so.

6            JUDGE SHELBY:  What if we find that the 2021 map

7   is not a map that we can lawfully impose, but we grant you

8   the relief you're seeking and we enjoin the use of Map 1?

9   Where do the congressional applicant plaintiffs find

10  themselves and how can we redress any injury here under

11  those circumstances?

12           MR. SCHAERR:  Well, we have also asked that the

13  Court reinstate the 2021 map.

14           JUDGE SHELBY:  Right.

15           MR. SCHAERR:  But if the Court finds that the

16  Court can't do that, then another option would be to send

17  the issue back to the state Legislature.

18           JUDGE SHELBY:  We couldn't go under the 2011 map.

19  I think everybody agrees about that in the state court and

20  nobody is saying otherwise here.  So there would be no map,

21  and we would be at the date that the Lieutenant Governor has

22  said, We need to have a map.

23           So have we helped the plaintiffs or have we not?

24           MR. SCHAERR:  Well, you certainly would have

25  redressed the violation of the Elections Clause in doing

1    that and helped the plaintiffs as well.  You know, it is

2    very likely that if the Legislature has an opportunity to

3    pass a new map, it is going to look more like the 2021 map

4    than the map adopted by the state court here.  That is

5    something that the Legislature can do very quickly.

6         The Legislature also has the ability to make some

7    adjustments to the schedule to accommodate that kind of a

8    decision if the Court decided that, yes, it is going to

9    enjoin Map 1, but it is going to send the whole issue back

10   to the Legislature to decide.  In some ways, obviously, that

11   would be the best outcome because that would be giving the

12   Legislature the opportunity to solve the problem.

13        JUDGE TYMKOVICH:  I don't disagree with that, but

14   we have a deadline of February 23rd and I don't think the

15   Legislature has made any representations to this panel that

16   it is able and willing to extend deadlines or craft a new

17   map, and it has not done so in the several months that these

18   proceedings have been pending here and in the Utah Supreme

19   Court.

20        MR. SCHAERR:  Well, actually, they did adjust the

21   candidate filing date.  I can't remember what the prior date

22   was, but --

23        JUDGE TYMKOVICH:  Yes, I realize that, but they

24   have not said, If you grant a stay, if not an injunction,

25   we'll get this done by March 1st.  So we really don't have

1   any reason to know or believe that they can get it done in

2   time.

3          MR. SCHAERR:  Well, except that they have done it

4   in the past.  We're still several months out from the

5   designated date of the primary election, which can also be

6   adjusted by the Legislature if need be.

7          Again, that is not the principal relief we're

8   asking for.  I'm just responding to the hypothetical --

9          JUDGE TYMKOVICH:  Right.

10          MR. SCHAERR:  -- that you find that you cannot

11   reinstate the 2021 map.

12          JUDGE TYMKOVICH:  One last standing question.

13          Has the implementation of Map 1 caused the

14   candidates to expend any money that would not have been

15   expended under either Map C or the 2021 map?

16          MR. SCHAERR:  Yes.

17          JUDGE TYMKOVICH:  In particular, I am just looking

18   at Justice Barrett's concurrence in *Bost*.

19          MR. SCHAERR:  Yes.  Right.

20          In fact, if you look at Representative Maloy, for

21   example, her current district includes southern Utah and a

22   part of the western side of the state, but under Map 1 her

23   district would include all of southern Utah and then the

24   entire east side of the state.  I think she would have,

25   like, 21 -- she would have the vast majority of Utah

1    counties and the vast majority of the geographic areas.

2           Yes, she has already had to spend money in

3    anticipation of possible, you know, running in a district

4    that includes the entire eastern part of the state rather

5    than the western part of the state.

6           JUDGE TEETER:  This is my last question on

7    standing.

8           My understanding is that only one of the

9    plaintiffs has to have standing for this case to move to the

10   next step.

11          Which plaintiff in your opinion has the best case

12   for standing in this case?

13          MR. SCHAERR:  Certainly in light of *Bost* both of

14   the congressional candidates do.  I think their standing

15   arguments are equally strong.

16          JUDGE SHELBY:  Why don't we turn to the *Purcell*

17   issue.

18          How do the plaintiffs thread the needle between

19   *Purcell* and *Abbott*?  Where is there daylight here to find

20   that we are not too close to the primary election to disrupt

21   confidence in the proceedings?

22          MR. SCHAERR:  Well, there is a fundamental

23   difference between this case and *Abbott*.  That is, in *Abbott*

24   the candidate filing deadline had already passed and

25   candidates had already filed and they were already actively

1    campaigning.   In this case the candidate filing deadline is

2    still in the future.

3            As I said, what is past is prologue and the

4    candidate filing deadline could still be conceivably moved

5    by the Legislature.  I am not speaking for them, obviously,

6    but we know that in the past they have done that.  To me

7    that is the fundamental difference between this case and

8    *Abbott*.

9            JUDGE SHELBY:  Where do you find support for the

10   proposition that that is the relevant consideration under

11   *Purcell*?  I mean, I read *Purcell* to be speaking more broadly

12   about proximity to the election and voter certainty and

13   clarity.

14           MR. SCHAERR:  Well, we are still a long way out

15   from the election.  Except for in *Abbott* where the candidate

16   filing deadline had already passed, I am not aware of any

17   other decision that has invoked *Purcell* to avoid providing

18   relief for a violation of any election related law, much

19   less the Elections Clause, when we have as much time before

20   the election as we have right now.  I mean, we are still

21   quite a ways out from the beginning of the election.

22           JUDGE SHELBY:  Do you think that the merits of the

23   underlying suit are relevant under *Purcell*, that is, the

24   clam?  Is that what you just said?

25           MR. SCHAERR:  No.  I'm saying that as far as the

 1    timing is concerned, I'm not aware of any court decision

 2    that has invoked *Purcell* to avoid providing relief on a

 3    timetable that is still as far from the election as we are

 4    now.  The cases where courts have invoked *Purcell* for that

 5    purpose, with the exception of *Abbott*, which was a special

 6    case, have uniformly been much closer to the election.

 7         JUDGE TYMKOVICH:  What do we do about the fact

 8    that we do have these candidates and prospective candidates

 9    already actively campaigning and setting up offices and

10    spending money and that sort of thing?  Isn't that one of

11    the problems that *Purcell* was designed to protect?

12         MR. SCHAERR:  Well, you know, many candidates

13    start campaigning years before the election.  In fact,

14    people who are in Congress are pretty much campaigning

15    constantly.  So people who are interested in running for

16    public office are always going to be trying to set that up

17    as early as they can.  I don't think that that is

18    dispositive or even very important.  I think the key date is

19    the candidate filing deadline.  I mean, that is the first

20    point at which any perspective candidate really has the

21    right to know exactly what the lines are going to be.

22         JUDGE TYMKOVICH:  For *Purcell* purposes does it

23    matter that -- I mean, the currently operative map is

24    state-drawn Map 1 versus a legislative-created map, and in

25    *Abbott* you did have, arguably, two legislative maps.  Here

1    you have a legislative map, if we go the path you have

2    requested --

3              MR. SCHAERR:  Yes.

4              JUDGE TYMKOVICH:  -- versus a state judicial

5    remedy.  Does that matter for *Purcell* purposes?

6              MR. SCHAERR:  I would think it matters

7    substantially.

8              JUDGE TYMKOVICH:  Why?

9              MR. SCHAERR:  Again, because of the principle

10   underlying the Elections Clause and reinforced and

11   emphasized in *Moore versus Harper*, which is respect for

12   legislative prerogatives.  If the election is going to

13   proceed based on Map 1, that is going to be a constant,

14   longterm affront to the prerogative of the Legislature under

15   the Elections Clause.  Reinstating the 2021 map or giving

16   the Legislature an opportunity to do another one, both of

17   those options would respect the legislative prerogative that

18   is embedded in the Elections Clause.

19             Yeah, I think that is a very important factor in

20   the *Purcel* analysis.

21             JUDGE TYMKOVICH:  Where is the Utah Supreme Court

22   in this?  It seems like an important matter of state law has

23   been pending for several months and, to my knowledge, the

24   panel has not heard a peep from them and we're rapidly

25   approaching some very important deadlines.  A central issue

1    of your argument is an interpretation of state law that we

2    would greatly benefit from the Utah Supreme Court's primary

3    role in this matter.

4            What is going on there?

5            MR. SCHAERR:  Well, two responses.

6            First of all, procedurally, my understanding is

7    that there is a motion for stay pending before the Utah

8    Supreme Court to stay the decision of the lower state court.

9    The Legislature has asked the Utah Supreme Court to rule on

10   that motion for stay by February 20th, so two days from now.

11   We don't know whether they will, but that request has been

12   made and, you know, my guess is that they are taking that

13   seriously.

14           As to your other point about the issues of state

15   law, we are really not asking this Court to decide issues of

16   state law.  All we are asking the Court to do and the most

17   we are asking the Court to do with respect to state law is

18   to find, as *Moore Versus Harper* says the Federal Court can

19   and must do, but we are just asking this Court to determine

20   whether the state court's approach to this problem satisfies

21   the requirement of ordinary judicial review.  That is not a

22   state law issue.  That is a federal issue under both the

23   Elections Clause and *Moore versus Harper*.

24           JUDGE SHELBY:  That is only part of it, though,

25   isn't it?  You also ask us indirectly, I think, to determine

1    that the state trial court's injunction of the '21 Map under

2    state law was unlawful.

3            That was a purely state law determination by the

4    state court judge, was it not?

5            MR. SCHAERR:  That was a purely state law

6    determination, but what we're asking the Court to do is not

7    to decide whether the state court was right as a matter of

8    state law, but to determine whether her approach to deciding

9    the issue satisfied the ordinary judicial review requirement

10   in *Moore versus Harper*.  That is an important condition,

11   right, and, I mean, in a sense you can view *Moore versus*

12   *Harper* as kind of a compromise position between the very

13   strong position taken by Justices Gorsuch and Thomas that

14   there is no role consistent with the plain language of the

15   Elections Clause for state court review of what legislatures

16   have done in federal congressional redistricting.

17           The majority, obviously, didn't go that far, but

18   their requirement that those state court decisions be

19   consistent with ordinary judicial review is an important

20   requirement, a federal law requirement that is, as the court

21   said, is designed to ensure that state courts, when they do

22   engage in review of legislative decision-making about maps,

23   to ensure that they are exercising the appropriate respect

24   for legislative prerogatives and that they are not

25   abrogating to themselves the authority to redistrict.

1       If you look at what happened here, that is exactly

2   what the state court did.

3       JUDGE TEETER:  My understanding of the *Purcell*

4   Principle is essentially that Federal Courts shouldn't

5   tinker at the last minute with an election's administrative

6   workings when doing so would threaten to create last-minute

7   chaos.

8       If I understand your argument and position

9   correctly, in your view no chaos would result if we were to

10  grant the relief you're seeking because 2 USC 2a(c) would in

11  a sense revive the 2021 map and put it back in play.

12      Is that the only scenario where you think the

13  chaos that *Purcell* is seeking to avoid would be prevented,

14  the 2021 map getting revived?

15      MR. SCHAERR:  Well, I think that is the -- I think

16  that you have well summarized *Purcell*, but I think that that

17  is the only scenario that is a risk here.  I mean, the

18  Lieutenant Governor has said that, I can easily go back to

19  the 2021 map.  It will take me nine days to do it, but I can

20  easily do that.  It is not going to create massive confusion

21  or anything like that.

22      Again, it is still before the candidate filing

23  deadline, so people who want to run for office are still

24  going to know exactly what their districts look like before

25  they have to file.  To me, under *Purcell* the risk of chaos

1    is just minimal here given what the Lieutenant Governor has

2    told us.  And, of course, the Legislature also has some

3    ability to prevent chaos if it looked like something else

4    was going to happen.

5          Given the timing, I don't think we are in the land

6    of *Purcell* problems.

7          JUDGE TYMKOVICH:  If you are done on *Purcell*,

8    let's move to the merits.  I guess the merits really center

9    on *Moore versus Harper*, and that is your principal case

10   here.  You have distinguished *Growe* and *Branch* from your

11   perspective.  I am interested in your juxtaposition of

12   compliance with state constitutional law versus compliance

13   with state statutory law.  I think you can read *Moore* to

14   suggest that state courts or even federal courts can look at

15   both as a part of this process.

16         But if I understand your argument correctly, if

17   there is not a role for the state court to draw a map in the

18   state constitution, it really does not matter what the

19   auxillary state statutory provisions provide.  Here, of

20   course, we have the state statutory provision of Prop 4 --

21         MR. SCHAERR:  Right.

22         JUDGE TYMKOVICH:  -- that provides this overlay.

23   Prop 4 does delegate or provide specifically for state court

24   review of partisan maps, right --

25         MR. SCHAERR:  Right.

1          JUDGE TYMKOVICH:  -- and the authority to impose

2     an injunction, which more or less has happened here.

3          MR. SCHAERR:  Right.

4          JUDGE TYMKOVICH:  We do have that grant of

5     authority under Prop 4 that I think is an obstacle for

6     granting relief under a purely constitutional framework.

7     I'm not aware of any state that actually empowers state

8     courts to do anything in redistricting or state

9     constitutions.  Tell me if I am wrong.  You can imagine

10    other state procedural problems like a super majority clause

11    for a redistricting map or some special processes that give

12    it some additional authority.

13         MR. SCHAERR:  Right.

14         JUDGE TYMKOVICH:  What do we do about that reading

15    of *Moore* that suggests that those statutory provisions have

16    some moment versus your argument that says, Well, as an

17    original matter the Elections Clause does not sanctify state

18    procedural add-ons that go too far?

19         MR. SCHAERR:  I think that is a fair question.

20    Why would the Supreme Court draw a distinction between state

21    constitutional law and state statutory law?  I think that

22    that is maybe the heart of the question.  I think the answer

23    to that is quite clear from the opinion itself and its

24    emphasis on deference to legislatures, and, you know,

25    required not just by general federalism principles, but also

1    by the Elections Clause itself.

2           I think the reason for the distinction and the

3    reason the distinction makes sense is that statutes are

4    within the domain of the legislature, whereas the

5    constitution of the state is not.  The constitution

6    obviously overrides everything else.  The legislature is

7    subject to the constitution, but, you know, in a typical

8    state the legislature is not subject to statutory law.

9    Statutory law is a creature of the legislature.

10           I think that that same distinction actually is

11    apparent in the Arizona redistricting case, right, where it

12    was important to the court that the independent

13    redistricting commission there had actually been made part

14    of the legislature.  So it wasn't exercising just statutory

15    authority.  It was exercising legislative authority.  I

16    think that supports the distinction as well.

17           JUDGE TYMKOVICH:  What do you hypothetically here

18    where you have the Utah Legislature dishes out a partisan

19    map and it gets judicial review under Prop 4, enjoined,

20    ping-pongs back to the Legislature, new map, same partisan

21    problem, and back and forth and back and forth and then

22    deadline?

23           Can the legislature under your theory continue to

24    follow state procedure law and get away with it under the

25    Elections Clause?

1    MR. SCHAERR:  Well, there is certainly the

2    possibility of an impasse.  That leads me to another

3    decision that we found since we filed our papers that the

4    Court ought to be aware of.  That is a decision apparently

5    written by Judge Thapar of the Sixth Circuit.  He was

6    sitting as a member of the three-judge panel in a case

7    called *Gonidakis versus LaRose*.  The opinion, I think, was

8    from 2022, the Southern District of Ohio.  It will be easy

9    to find.  Judge Thapar was on the panel.

10    That panel dealt with a similar situation where

11    there was kind of a ping-pong back and forth between the

12    courts and the legislature.  The three-judge panel said,

13    Okay.  We're going to give the state actors as much time as

14    possible, but here is a date by which a map has to be in

15    place.  So the three-judge panel actually chose a map that

16    had been ruled unconstitutional by the Ohio Supreme Court.

17    They acknowledged that, This is not ideal and we don't like

18    the idea of imposing a map that has been ruled

19    unconstitutional by the Ohio Supreme Court, but we have got

20    to have a map and we don't have anything else that we can

21    do.

22    JUDGE TYMKOVICH:  Unconstitutional under a state

23    constitution or federal?

24    MR. SCHAERR:  Under state law, yes.

25    JUDGE TYMKOVICH:  Yes.

1          MR. SCHAERR:  So the panel said, you know, on

2    such-and-such a date this map that has already been reviewed

3    by the Ohio Supreme Court and found unlawful under state law

4    is going to go into effect unless the state actors come to

5    an agreement.

6          JUDGE TYMKOVICH:  Are you saying that we are at an

7    impasse now and we need to chose between --

8          MR. SCHAERR:  I don't think we are at an impasse

9    now.  I wouldn't interpret this as being an impasse now.

10         I think that is part of the problem with the state

11   court's decision here, maybe another reason and maybe a

12   fourth independent reason why that state court's decision

13   departed from the standard of ordinary judicial review,

14   because once the state court concluded that Map C was

15   unlawful, there would have been time to send it back to the

16   Legislature and say, you know, You need to try again.

17         JUDGE SHELBY:  You gave a citation, I think, for

18   the case you just mentioned, but I was elsewhere and I

19   didn't have my pen.  What is that case?  Did you --

20         MR. SCHAERR:  I will give you the exact citation

21   in a moment.  It is called *Gonidakis versus LaRose*, Southern

22   District of Ohio.  I think it was in 2022.  I will give you

23   the exact Reporter citation in a moment.

24         JUDGE TEETER:  I think this kind of builds on what

25   Judge Tymkovich has been asking about.  Essentially, the way

1    I understand your argument between drawing a distinction

2    between constitutional and statutory violations would

3    essentially mean that although a judge may be able to enjoin

4    a map, there is really no form of judicial review for

5    violations of Prop 4.  Basically, what you're arguing is

6    that while Prop 4 might be the law, it is, nevertheless,

7    incapable of being enforced without just always giving it

8    back to the Legislature.

9            MR. SCHAERR:  Well, that is an issue of state law

10   and, you know, I think the state court got that issue wrong

11   as well.  I think the state court violated the Utah Supreme

12   Court's opinion which made clear, you know, that it is the

13   Legislature that has to draw maps.

14           In the *Gonidakis* case that I mentioned, Ohio had

15   an express constitutional prohibition, which I think Utah

16   also has, but it was enforced in Ohio, an express

17   constitutional prohibition on courts drawing maps.  So the

18   only remedy if they thought the legislature had violated the

19   law was to send it back to the legislature.  To some extent

20   that is why this ping-pong situation occurred.

21           It is not that uncommon for state courts, if they

22   think a map is unlawful or unconstitutional, to send it back

23   to the legislature.  And there might be multiple iterations.

24   As *Gonidakis* shows, at some appropriate point federal courts

25   can step in and resolve the impasse if needed.  I think

1    those kinds of impasses are quite rare.

2            And, of course, it is also something that the

3    Congress can fix, right?  Congress has the authority if

4    something like that happens to step in and say, Okay.  We,

5    Congress.  Are going to draw the map.  I don't know that it

6    has happened, but they certainly have that authority under

7    the Elections Clause.

8    JUDGE SHELBY:  You mentioned ordinary judicial

9    review under *Moore*.  I am just reading the chief justice's

10   opinion in a couple of places sort of framing the question

11   that was before the court.  In one instance I am reading

12   from page 19 of the decision.  The chief justice says, "The

13   question on the merits is whether the Elections Clause

14   insulates state legislatures from review by state courts for

15   compliance with state law."

16           I think a moment ago in response to Judge Teeter's

17   question that you agreed that at least one of the central

18   issues in the state case, and now I think what you have

19   indirectly incorporating into this case, is a purely state

20   law question.

21           Later on, a page or two later, on page 22 of the

22   decision in *Moore*, referencing the history and tradition of

23   judicial review of state court actions, the chief justice

24   goes on to say, "We are asked to decide whether the

25   Elections Clause carves out an exception to this basic

 1    principle," a state judicial review of legislative actions.

 2    "We hold that it does not.  The Elections Clause does not

 3    insulate state legislatures from the ordinary exercise of

 4    state judicial review."

 5           What could be more ordinary in the history and

 6    tradition of state court review than reviewing legislation?

 7           MR. SCHAERR:  We are not claiming that that in and

 8    of itself went beyond the --

 9           JUDGE SHELBY:  It is the remedy I think that you

10    say -- that is where the trial court exceeded ordinary

11    review?

12           MR. SCHAERR:  Yes, that is exactly right.

13           We do in our complaint, by the way.  We challenge

14    both of those remedial decisions, the invalidation of the

15    2021 map and the creation of the new one, yes.

16           JUDGE TEETER:  If this panel disagreed with you on

17    the district court judge exceeding her authority to enjoin

18    the 2021 map, then that map at that point becomes kind of a

19    legal nullity because it is enjoined, which would then mean

20    that the last lawfully passed map would be the 2011 map,

21    which everyone agrees was malapportioned.  So wouldn't it,

22    almost regardless of state law, kick over to 2 USC 2c where

23    the district court judge was required to impose a map

24    consistent with the Voting Rights Act because the deadline

25    was upon us?

1          I understand your argument, Well, the legislature

2     could have moved it.  The reality is at the time she ruled,

3     the deadline was upon her.

4          MR. SCHAERR:  It wasn't immediately upon her.

5          JUDGE SHELBY:  Five minutes away.

6          JUDGE TEETER:  Five minutes away.

7          My question, therefore, is there is a bunch of

8     discussion about state law and there is bunch of ink that is

9     spent discussing whether or not state law gives her the

10    authority to impose a map.

11         But my question is if she was right to enjoin the

12    2021 map, at that point the last legislatively enacted map

13    that was available was the 2011 map, which was

14    malapportioned, which 2 USC 2c, under *Branch*, in particular,

15    would seem to require her at that point to impose a map.

16         Tell me where I am wrong there.

17         MR. SCHAERR:  Well, our objection to the

18    invalidation of the 2021 map is not the mere fact that she

19    invalidated it; it is the manner in which that was done.

20         First of all -- well, for the two main reasons

21    that I have described earlier, invalidating the map without

22    any finding that the districts were substantively unlawful

23    under any law and that -- I think my example of the budget

24    resolution to me speaks to that issue.  If you have got a

25    situation where one piece of legislation sort of sets up a

1    framework for other legislation, it is the height of

2    disrespect for the Legislature to say, I'm going to

3    invalidate your framework-setting legislation and then

4    automatically invalidate everything that you have done under

5    that framework.  That is especially true here when we are

6    talking about a power that is expressly given to state

7    legislatures in the Elections Clause of the U.S.

8    Constitution.

9          JUDGE TYMKOVICH:  I want you to answer Judge

10   Teeter's question, but by substantive review do you mean

11   walking through the convoluted statistical analysis of Prop

12   4, or something else?  If she had done that, if she had done

13   a substantive review like she did for Map C, you know, ad

14   nauseam, and a little bit less for Map 1, but if she had

15   done that would your claim still be viable?

16         MR. SCHAERR:  That particular departure from

17   ordinary judicial review would not a concern if she had done

18   that.  If she had looked at the substantive standards in

19   Prop 4 and had said, you know, I find that the way this

20   district has been drawn violates the standard of Prop 4

21   because it was, you know, driven by bipartisan

22   considerations, or, you know, it improperly moved different

23   populations from one place to another where I don't think

24   they should have been moved.  If she had applied the

25   substantive standards in Prop 4, then I wouldn't have that

1    argument under *Moore*.  I would still have two other

2    arguments under *Moore*, but I wouldn't have that one.

3              JUDGE TYMKOVICH:  Sorry to interrupt you.

4              JUDGE TEETER:  No.

5              Just to refocus it, assume in my question that the

6    Court found she was correct to enjoin the 2021 map.  I

7    understand you disagree with that and I understand the

8    argument there, but if the panel were to say that she was

9    correct in the ordinary course of judicial review to enjoin

10   the 2021 map, do you agree that, given that the deadline was

11   five minutes away and the 2011 map was malapportioned, that

12   2 USC 2c gave her the authority to impose a map?

13             MR. SCHAERR:  No.

14             JUDGE TEETER:  Why?

15             MR. SCHAERR:  I don't think 2 USC gives that

16   authority to state judges.

17             JUDGE SHELBY:  What is your authority for that

18   proposition?  What case says that?

19             MR. SCHAERR:  Well, I don't know that it has been

20   litigated, but what should have happened is that she should

21   have given the legislature an opportunity to redraw it.

22             Again, you know, I think the *Gonidakis* case is

23   instructive on that point as well, because even if you think

24   that the 2021 map was validly declared unlawful, given the

25   fact that you have got a binary choice here between two

1    maps, you can still impose it as the three-judge panel did

2    in the *Gonidakis* case as a second solution, right?

3            We realize that this is not ideal because this map

4    has been declared unlawful by a state court judge, but, you

5    know, we only have two options here.  We need to have a map

6    and so we're going to go with the 2021 map, unless -- and,

7    again, this would be the model with the *Gonidakis* case --

8    we're going to go with the 2021 map unless the Legislature

9    acts before a date certain.

10    JUDGE SHELBY:  Maybe standing in front of the

11   question Judge Teeter just asked is a question about Judge

12   Gibson's determination about Map C.  I'm reading your claim

13   in your complaint and I'm reading your prayer for relief.

14   You have not asked us in this complaint to take any action

15   with respect to her determination about the viability of

16   that map.

17           Am I wrong?  If I am wrong, where in your

18   complaint do we find that?  There is reference to it in the

19   factual recitation of the history of the case --

20    MR. SCHAERR:  Right.

21    JUDGE SHELBY:  -- but you have not placed that

22   question in front of us, have you?

23    MR. SCHAERR:  No.  We have not challenged her

24   invalidation of Map C in part because, you know, in the

25   current setting it is not a viable map and it is not one

```
 1    that the Lieutenant Governor thinks could be implemented

 2    quickly.  The advantage of the 2021 map is that it was the

 3    map that was already in place and everybody knows how to

 4    implement that map.

 5              JUDGE SHELBY:  Okay.

 6              We try to give our court reporter a chance to

 7    stretch his fingers about every hour and a half.  We're

 8    coming up on an hour and a half.  Why don't we take about a

 9    12-minute recess.  Why don't we plan to come back at 10:30,

10    and we'll look forward to hearing from the other parties.

11              Thank you.

12              MR. SCHAERR:  Thank you.

13              (Recess.)

14              JUDGE SHELBY:  Thank you and welcome back.

15              I think I infer from Ms. Hoidel's opening remarks

16    that the Lieutenant Governor probably does not have much to

17    add to this discussion that has been ongoing on the merits

18    of the briefing.

19              Is that true, Ms. Hoidel?

20              MS. HOIDEL:  Yes, Your Honor.

21              JUDGE TYMKOVICH:  I actually did have one, if you

22    can approach and just clarify how the Lieutenant Governor

23    would implement the 2021 map if we accept the plaintiffs'

24    theory of the case and what the deadlines are for candidates

25    filing for the primary and those sorts of questions.
```

1          MS. HOIDEL:  Just to clarify, Your Honor, the

2    question is how would the Lieutenant Governor implement the

3    2021 map?

4          JUDGE TYMKOVICH:  Yes.

5          MS. HOIDEL:  So that would begin as soon as the

6    final decision was issued and the Lieutenant Governor was

7    ordered to use the 2021 map.  Then the process starts as

8    indicated in the declaration of Daniel Wade.  So the

9    Lieutenant Governor would coordinate with the Utah

10   Geospacial Resource Center to reinstate the map, which first

11   involves reinstating each of the 29 county maps.

12          Then the second part or the next part of that is

13   each county map would then have to be uploaded into the

14   Lieutenant Governor's election management system.  That

15   could take some time, particularly with the larger county

16   maps such as Salt Lake County.  Even days is what that can

17   take, nine days at a minimum.

18          Then the counties will verify or reimplement the

19   congressional district maps.  That is manual.  They will

20   have to verify or reassign and make sure that the precinct

21   assignments are correct.

22          Then there will be proofreading to identify

23   mistakes, but it will be a  reinstatement of the 2021 map.

24          JUDGE TYMKOVICH:  When is the primary candidate

25   filing deadline?

1          MS. HOIDEL:  It begins March 9th at 8:00 a.m. and

2     runs until March 13th.

3          JUDGE TYMKOVICH:  I think the Lieutenant Governor

4     has represented that she can meet those deadlines if ordered

5     to do so.

6          MS. HOIDEL:  Yes, with the 2021 map.

7          JUDGE SHELBY:  I think I heard this in your answer

8     already, but redrawing the precincts would be accomplished

9     as part of what you have just described, so that would all

10    happen in time for the implementation of the 2021 map as

11    well?

12         MS. HOIDEL:  Correct.

13         JUDGE SHELBY:  Thank you.

14         MS. HOIDEL:  Thank you, Your Honor.

15         JUDGE SHELBY:  Mr. Gaber.

16         MR. GABER:  I have things to say, but I can wait

17    for questions, too.

18         JUDGE SHELBY:  There will be no shortage of

19    questions.

20         JUDGE TEETER:  I will start again with subject

21    matter jurisdiction.  I am going to go back to *Bost*.  *Bost*

22    seems to suggest that the injury in fact is sort of a

23    procedural or process-based harm that concerns the

24    candidate's particularized interest in competing in a fair

25    election.  If this understanding of *Bost* is correct, help me

1    understand why a map drawn, as the plaintiffs allege

2    unlawfully, that includes a pool of voters different from

3    the pool that they would otherwise have doesn't prevent that

4    type of competitive harm identified in *Bost*?

5         MR. GABER:  I think that, Your Honor, the position

6    advocated by the plaintiffs and perhaps isn't inherent in

7    the question takes too broad a view of what the Supreme

8    Court was holding in *Bost*.  All of the examples it gave

9    flowed from the vote counting.  What happens when there is

10   an alleged problem with how the votes are counted?  That is

11   why the court sort of hung onto the reputational injury that

12   its cases had found to be a classic Article III harm.

13        It gave examples in Bost.  Say the election was

14   decided by flipping a coin or we disregard a random ten

15   percent of the cast votes.  All of its examples flowed from

16   what happens when the actual election result of how the

17   people voted, the tabulation of those results might be

18   wrong, and what happens then to the candidate whose

19   reputation has literally been calculated incorrectly and

20   reported to the public incorrectly?  I think that the

21   Supreme Court -- that is why it was careful in its footnote

22   at the end of the decision to say, No dissent, you know, the

23   parade of horribles is not going to happen because we decide

24   here only that when the system of counting the votes is

25   challenged as unlawful, that gives the candidate who is

1    participating in that election a cognizable harm.

2            I think it is critical that plaintiffs' counsel

3    acknowledged that there is no reputational harm to

4    Representatives Maloy or Owens on account of the fact that

5    the state court following *Branch* imposed a remedial map.  No

6    one in Utah would say that, I view Representative Maloy

7    unfavorably now because a state court judge imposed the map.

8    That is just implausible that someone would attribute that

9    to the candidate who is running.  I think that is the clear

10   distinction in *Bost*.

11           JUDGE TYMKOVICH:  On that score and just thinking

12   about *Bost*, and if he is currently in a district where he

13   might win 60-40 and then in the new district he is going to

14   win 55-45, so it might look to outside observers that he has

15   lost his mojo and he is less popular in Utah all of sudden

16   where that is not necessarily true, doesn't the injury on

17   the vote counting kind of flow into a scenario like that

18   one?

19           MR. GABER:  I think that that is where we run into

20   the problem of alleging an injury that is based on partisan

21   electoral composition of the districts with Rucho, because

22   while the Supreme Court has said the electoral consequences

23   might be a harm when it is about the access to voting or

24   tabulating the voting or fencing off voters from

25   participation in the eviction, and they have been very

1    clear -- and I wish they hadn't been -- they have very clear

2    that when what you are alleging is that there is something

3    about the partisan way in which the lines are drawn, Article

4    III does not allow federal courts to touch that.

5           JUDGE TYMKOVICH:  Notwithstanding that Utah law

6    does identify partisan redistricting as a specific harm, and

7    I understand that with Prop 4 anybody can litigate that

8    issue, and why isn't that an injury that might be

9    encompassed, just because it is a state injury and not an

10   Article III injury?

11          MR. GABER:  I think if the representatives thought

12   that there was something improper with the electorial manner

13   in which the lines were drawn, the partisan composition of

14   Map 1, they could file a state court lawsuit challenging it

15   under Prop 4.  I think they would run into a problem, as the

16   judge's decision in the state court revealed, but that is an

17   Article III standing hurdle and that just does not work.

18          Judge Tymkovich, you had asked about whether there

19   was a monetary harm to Representative Maloy.  If you look at

20   her declaration, which is at ECF 19-12, she actually alleges

21   that she has not spent money because she says she is unsure

22   of what the map will be.  So I don't think it works to say

23   that she has spent some money and that money is now gone.

24          JUDGE TYMKOVICH:  She is holding back.

25          MR. GABER:  Right.

1          The only candidate that is before the Court with a

2     declaration says, I spent money and I will be harmed by the

3     Federal Court acting is former Congressman Ben McAdams, who

4     has put evidence in front of the Court of the financial

5     resources that he has spent.

6          JUDGE TYMKOVICH:  And he won't be a formal

7     candidate nor any of them will be until the candidate filing

8     deadline?

9          MR. GABER:  The candidates have all declared with

10    the Federal Elections Commission, so they are raising money

11    and they are spending money.  There is the filing for the

12    primary, but separate from the primary, Utah has the caucus

13    and convention system.  So what we have heard from the

14    Lieutenant Governor is in order to get the voters assigned

15    to run the primary, and it was at a minimum nine days, and

16    nine days is Monday the 23rd.

17         That assumes that nothing goes wrong in the

18    process.  So to the extent the minimum becomes no longer

19    what is needed, then we're already too late to just reassign

20    the voters.  But the Lieutenant Governor's declaration is

21    not about the caucus or convention aspect of running for the

22    primary in Utah.  The work is already happening to get the

23    delegates to attend that caucus, to attend the convention,

24    to get your folks elected to be the delegates to the

25    convention.  So that is just an entirely different aspect of

1    the state's primary system that the Lieutenant Governor does

2    not touch on because that is not run by her office.

3           JUDGE SHELBY:  What about this language in *Bost*?

4    It is near the end of the chief justice's opinion.  The

5    first part of it I understand is cabined in the way that

6    you're arguing about candidates for office having a concrete

7    and particularized interest in the rules that govern the

8    counting of votes in their election.  But if we continue on,

9    and I didn't finish there, but the next sentence says,

10   "Their interest extends to the integrity of the election and

11   the democratic process by which they earn or lose the

12   support of the people that they seek to represent."

13          Isn't that what the plaintiffs are contending

14   here, that this is a faulty process and doesn't that give

15   rise to standing for at least the congressional candidates?

16          MR. GABER:  I think that the problem with that is

17   that that is the very sentence that then follows by the

18   court with its footnote saying, What we decide here is about

19   vote counting.  That is a level of generality where you can

20   understand why how the votes are tabulated flows from this

21   interest that is articulated, but it is hard to see how that

22   flows from the state court imposing a map, particularly when

23   the allegations are that there is no objection to the actual

24   map.  They only object to the fact that the state court

25   imposed it.  So if they don't have an objection to the

1    actual lines of the map, then I don't see how this language

2    could apply to articulate that injury.

3              So given the clear difference between the

4    redistricting context versus the vote counting context, I

5    think we should be talking about *Lance versus Coffman* where

6    the Supreme Court unanimously held that plaintiffs who are

7    not relators on behalf of the State lack Article III

8    standing to say -- the challenge the fact that a state court

9    imposed a map and the legislature did not draw it, and so I

10   don't know how we get around that very direct holding of the

11   Supreme Court.

12             JUDGE SHELBY:  What do you make of the fact that

13   the heart of the injury that the plaintiffs are complaining

14   about here is an unconstitutional process that deprives the

15   Legislature of its -- at least in the plaintiffs' view --

16   its exclusive right to redistrict and the Legislature is not

17   here?

18             MR. GABER:  Yes, I think -- that is curious to me.

19   The Legislature is making some of the new arguments that are

20   being made about the 2021 injunction.  Those are arguments

21   that are being made by the Legislature in the state court.

22   I have assumed the reason that they have not challenged

23   it -- Your Honor, you had asked whether Map C was challenged

24   in the prayer for relief.  It isn't.  But the 2021 map

25   injunction is not challenged in the prayer for relief.

1          JUDGE SHELBY:  That is right.

2          MR. GABER:  I assume that they have done that to

3    try to keep the case separate from what is in the state

4    court so that they could, you know, defend against our

5    argument that we ought to wait for what the state court

6    does.  They don't challenge the 2021 map.  It is in the

7    injunction against the 2021 map.  Nowhere in the complaint

8    is that there.

9          I have lost track of your question.  I may have --

10         JUDGE SHELBY:  It wasn't a piercing question to

11   begin with.

12         MR. GABER:  But what I did want to say is -- maybe

13   we are not done with standing.  I wanted to just make this

14   point.  There was a lot of argument about whether a state

15   court can interpret state statutes that regulate federal

16   redistricting.  First, that argument would flow from an

17   argument that the injunction against the 2021 map was

18   unlawful under federal law.  I can't repeat this enough,

19   that there is no challenge in this case in the complaint

20   that that is the case.  So the question of whether or not

21   the Elections Clause permits a state court judge to

22   interpret state statutory law versus state constitutional

23   law really is just not before this Court.  We don't get to

24   that argument because they don't claim that the injunction

25   was a violation of federal law.

1          JUDGE TEETER:  I have one last question on

2     standing.

3          In preparing for this hearing today and doing some

4     of my own research, I came across *Whittman vs.* --

5          MR. GABER:  *Personhubullah*.

6          JUDGE TEETER:  Yes.  So you are familiar with the

7     case.

8          So the part to me that kind of jumped out is kind

9     of the tail end of 544 to 545 where it talks about the two

10     representatives who were challenging -- basically, in their

11     opening brief they argued that they have standing to

12     challenge the district court's order because unless

13     the inactive plan is reinstated, a portion of their base

14     electorate will necessarily be replaced with unfavorable

15     democratic voters, thereby reducing the likelihood of the

16     representatives' reelection.  The court says even assuming,

17     without deciding this kind of injury is legally cognizable,

18     Representatives Whittman and Brat have not identified record

19     evidence establishing their alleged harm.

20          Now, I realize that they are not deciding, but do

21     you agree that in this case Congressman Owen has at least

22     come forward with some evidence that the electorate in his

23     district would at least change?  I believe the Cook report

24     suggested up to a 26-point swing.

25          MR. GABER:  Well, I don't know where

1    Representative Owens lives.  He identifies CD1 in his

2    declaration but also says he does not know where he wants to

3    run yet.  So it is speculative, I think, that he would even

4    choose to run in CD1, as opposed to there being a primary

5    between Republican incumbents in the neighboring district.

6    I don't think that evidence -- similarly to *Personhuballah*,

7    I don't think that evidence is actually in the record here

8    as well.

9              I think had the court gone a little bit further

10   and had that evidence, it would have run into, I think, a

11   Rucho problem with that being an Article III injury.

12             There is one more thing on standing.  I can't

13   remember which of Your Honors asked it -- perhaps it was

14   Judge Gibson about the redressability point.  It is not

15   redressable because the relief they are asking for is

16   illegal and is not actually something that their complaint

17   makes possible.  This Court cannot order the 2021 map to be

18   into effect, because under *Branch* and under 2 USC 2c and

19   under 2 USC 2a(c) it is just not a lawful map.  The state

20   court has enjoined it.  They don't challenge that injunction

21   in their complaint.  If you look at the Utah Code, it has

22   been repealed.  So if we're talking about, Well, what is the

23   Legislature's preference?  We look at the code.  The code

24   repealed it whenever there was an injunction against it and

25   whenever Proposition 4 was in effect and it replaced that

1  with Map C.  So that is the expression of the legislature's

2  preference.  But, again, they are not challenging the state

3  court's injunction against Map C.

4      JUDGE SHELBY:  Your answer about not yet knowing

5  where Congressmen Owens might run is a nice entre to *Purcell*

6  and *Abbott* maybe.  The plaintiffs argue that in this case

7  *Abbott* is of no moment here because we are in a different

8  posture and there are a lot of factual differences.

9      Why do you think *Abbott* is controlling, or do you?

10      MR. GABER:  I do.

11      For one, there was a mistaken representation about

12  the candidate filing period in *Abbott*.  Texas has a

13  month-long candidate filing period when the district court

14  issued its injunction and the candidate filing period was

15  going on for quite a while longer.  In fact, the Supreme

16  Court issued its decision before the candidate filing period

17  ended even.

18      But what the Supreme Court said in *Abbott* was

19  nothing about the candidate filing period and nothing about

20  the ability of, in that case, the Secretary of State to

21  implement the 2021 map again, which was the relief that the

22  district court had ordered.  The reason is because the Texas

23  State defendants did not allege that it was too late to

24  switch back to the 2021 map.  There was no evidence.  In

25  fact, the evidence at trial was that they could very easily

1    switch back at that time to the 2021 Texas map.  What the

2    Supreme Court instead said is that the district court had

3    inserted itself into an active primary campaign.

4          The evidence before this Court is that there is a

5    very active primary campaign underway, and the actual

6    State-run primary election is the same period of time away

7    as it was in *Abbott*, and you layer onto that something that

8    wasn't present in *Abbott*, which is an earlier caucus and

9    convention process that is underway in Utah, so the

10   situation is significantly worse here than it was in *Abbott*

11   under those circumstances.

12         JUDGE TEETER:  Isn't there a risk -- and I

13   recognize that you are not representing the Legislature, but

14   wouldn't there be a risk to some extent that if *Purcell* was

15   to begin applying this far out, it basically creates a road

16   map for legislatures to enact maps that are then insulated

17   from any type of review until almost a hear before the

18   actual election and isn't that a problem?

19         MR. GABER:  Judge Teeter, I have made that

20   argument so many times and I have ended up losing at the

21   Supreme Court on all of them.  Representing the plaintiffs

22   in the Texas case, that is the exact argument we made in the

23   Texas case.  In my application or the response to the

24   application for a stay, I made the argument that the

25   election is in November of 2026, there are four months until

1    the primary; the candidate filing has not closed; everyone

2    knew where the prior lines were.  And, nevertheless, the

3    Supreme Court said no, that the primary campaign was

4    underway; it was four months way until the election occurred

5    and so it was too late for a Federal Court to intervene at

6    that point.  I would love for that to have been the rule,

7    but it just is not.

8           Judge Tymkovich, you had asked whether it matters

9    that this is a state court imposed map as opposed to a

10   legislative one --

11          JUDGE TYMKOVICH:  Yes, wondering whether *Purcell*

12   should matter with whether we respect the legislative

13   pronouncement which was true for both of the maps in *Abbott*,

14   but it is only true for one of the maps today.

15          MR. GABER:  I think the precedent from the Supreme

16   Court is not focused on that.  It is focused on what is the

17   time period until the election machinery is underway?  Map 1

18   has been implemented since November 10th.  Under *Growe* and

19   under *Germano* and under *Branch*, all three of those decisions

20   recognize that the Federal Court should give respect to

21   state court judicial districting.  So I don't see how you

22   could read sort of an exception into *Purcell* if the map that

23   is being challenged is one that a state court imposed.

24          JUDGE TYMKOVICH:  Is there a *Purcell* Principle

25   case with that fact pattern that gives deference to the

1  state court imposed map?

2      MR. GABER:  I would have to think about that.

3      JUDGE TYMKOVICH:  I was looking for one, but I

4  didn't find one.  It sounds like you have surveyed all of

5  them.

6      MR. GABER:  It is not coming to mind, but there is

7  also nothing in the court's *Purcell* Principle pronouncements

8  to suggest that it would depart from the rule as set forth

9  in *Germano* and *Growe* and *Branch* that federal courts need to

10  respect state court judicial redistricting.

11      JUDGE TYMKOVICH:  I just wonder if there was kind

12  of a federalism implication here, and setting aside the

13  merits question, under the Elections Clause, at least, which

14  does use the term "legislature," and that maybe you get

15  primary deference when there are two competing maps to

16  choose from.

17      MR. GABER:  So I do think there is a federalism

18  issue.  I think it is a federalism issue as between the

19  Federal Court and the state court, but as to the Elections

20  Clause it says that the time, place, and manner shall be set

21  by the legislature thereof.  Then Congress can pass

22  regulations that supercede those.

23      Two things here.  One is that, and we say this in

24  the papers, the Arizona case said that the legislature

25  refers to the state lawmaking process, not just the body

1    that calls itself the legislature.  Well, under Article VI

2    Section 1 of the Utah Constitution, there is a legislative

3    department.  That is the body that is the legislature and it

4    is the people via their initiative power to enact "any

5    desired legislation."

6             So under the Arizona Independent Redistricting

7    Commission case, when the people of Utah enacted Proposition

8    4, they were exercising their Elections Clause power to

9    regulate the time, place and manner of congressional

10   elections.

11            Included in that law is state court judicial

12   review.  One of the provisions says, and this is Utah Code

13   20A-19-301 says that When there is a determination by the

14   state court judge that the legislature did not abide by or

15   comply with -- there are three words -- requirements,

16   something, and procedures in Proposition 4, then the

17   District Court shall issue an injunction.

18            Now, the argument, I take it -- again, we

19   shouldn't be talking about this because the 2021 injunction

20   is not in the plaintiffs' complaint, but the argument is

21   that somehow it violates the Elections Clause for the state

22   court to interpret state law that was enacted pursuant to

23   the Elections Clause.  That does not make any sense.

24            Then when you layer on top of that Judge Teeter's

25   question, which is when a state district court found itself

1    having enjoined the 2021 map, having enjoined Map C, and the

2    deadline being -- I think it was actually 24 minutes away.

3    I was out waiting.  What then?

4            What *Branch* says is that Congress exercised its

5    superior Election Clause power under 2c to require state

6    courts to impose Congressional maps at that juncture.  So it

7    really does not matter what article -- we think they are

8    wrong about Article IX.  It is just a temporal obligation on

9    the Legislature to act to redistrict, and we think they are

10   wrong about their interpretation about the state court's

11   power to impose a map under Proposition 4, but at that point

12   the Supremacy Clause takes over and the state court must

13   follow 2 USC 2c and ensure that there is a lawful

14   redistricting map in place.  So that is why the reference to

15   the *Gonidakis versus LaRose* -- for the Court, it is 599

16   F.Supp. 3d 642.

17           JUDGE SHELBY:  I'm sorry.  One more time.

18           MR. GABER:  599 F.Supp. 3d 642.

19           That case is entirely different than this.  What

20   happened there is that there was a series of maps that were

21   passed by a commission in Ohio that was set up under its

22   state constitution.  The state constitution expressly says

23   that the only remedy that is available is an injunction, a

24   prohibitory injunction, and that a state court cannot impose

25   its own remedial map.

```
 1              Now, I think that the litigants in that case

 2    missed the fact that under the Supremacy Clause 2 USC 2c

 3    actually would have required the state supreme court to

 4    impose a map.  I wasn't there.  There was nothing that I

 5    could do about that.  That is the scenario that that case

 6    was in, was that no map existed.  There was no map in place.

 7    So the Federal Court said, We're going to look at the series

 8    of maps that had been passed and struck down and pick one of

 9    those.

10              I think that that was a serious violation not just

11    of 2 USC 2c but also of principles of federalism that a

12    Federal Court would chose a remedial map that had been

13    determined by the state supreme court to be unconstitutional

14    under state law.  I can't fathom that that is an appropriate

15    judicial remedy for a federal court to do.

16              Nevertheless, there was no argument in that case

17    that Branch or 2 USC 2c would kick in and require the state

18    court to act.

19              JUDGE SHELBY:  Your eagerness to argue the merits

20    is not lost on me, but --

21              MR. GABER:  I'm happy to --

22              JUDGE SHELBY:  -- I want to steer you back to

23    Purcell for just a moment.  I think we don't often get a lot

24    of guidance from the Supreme Court in many of these cases,

25    but temporally where else do you find cases that you think
```

1    are analogous to where we are in the election season?

2          MR. GABER:  Well, I think the preliminary

3    injunction that was issued in the lower court in the

4    *Milligan* case, and this is challenging Alabama's map under

5    Section 2 of the Voting Rights Act, and this is where

6    Justice Kavanaugh sort of proposed with Justice Alito

7    joining the four-part test that is in his decision.  At that

8    point I think the lower court perhaps -- the lower federal

9    court had moved the candidate filing as part of its order,

10   but we were similarly close to the voting happening in the

11   primary in that case and campaigns were underway, and

12   Justice Kavanaugh opined that they were beyond the *Purcell*

13   deadline.

14          That case is, I think, interesting because, you

15   know, he devised the clear-cut on the merits requirement as

16   part of that and said, you know, they don't satisfy that

17   here.  As we all know, the plaintiffs ended up winning in

18   the Supreme Court in the *Milligan* case and Alabama is now

19   under a court-imposed congressional remedial map.  There was

20   a stay application sent to the Supreme Court that was

21   denied.

22          So the idea that court imposed maps are unlawful

23   is --

24          JUDGE TYMKOVICH:  In *Milligan* wasn't the map that

25   the court deferred to the state legislative map at the time?

1    Am I remembering that wrongly?

2              MR. GABER:  Well, what the Supreme Court did was

3    stay the decision.  I don't think they got to the remedial

4    phase in the district court.  I think it stayed the decision

5    so that the 2021 or 2022, whatever year --

6              JUDGE TYMKOVICH:  They stayed the decision of the

7    three-judge panel?

8              MR. GABER:  Correct.

9              JUDGE TYMKOVICH:  It allowed the state legislative

10   map to go forward?

11             MR. GABER:  That is right, yes.

12             Perhaps not from the Supreme Court, but the Fifth

13   Circuit in another case that I had about the Galveston

14   County Commission district and precincts, there the Fifth

15   Circuit found in a similar timeline to the subsequent Texas

16   congressional case of *Abbott*, in an en banc decision that

17   *Purcell* -- they applied Justice Kavanaugh's test and found

18   that *Purcell* was not overcome in that case.

19             I think it is important to understand that because

20   of the primary system and caucus system here in Utah, we are

21   not justing talking the June primary.  We are talking about

22   a process that starts on March 17th.  You will not find a

23   Supreme Court decision that allows a federal court

24   injunction this close to that process.

25             JUDGE SHELBY:  Do you find any Supreme Court

1    precedent talking about precincts at all in connection with

2    *Purcell*?

3            MR. GABER:  I haven't, but, you know, what they do

4    say is that it is unfair to candidates, and it is unfair to

5    campaigns, and it is unfair to voters, and it is unfair to

6    political parties.  Here because of this unique system and

7    the changing of the precincts, that is the basis for how

8    Utah's political parties organize themselves, and they hold

9    precinct officer elections based on these lines.  It is a

10   not insignificant change to go from Map 1 to the 2021 map.

11   The reason, of course, is that the 2021 map cuts through,

12   like, 15 or 16 municipalities as opposed to one in Map 1.

13   So all of those municipalities would have to, I assume,

14   revert to the precincts they had for the 2021 map, although

15   what this is skipping over is that the Utah Code actually

16   has a whole process for how precincts are to be redrawn.

17           It has to be adopted and it has to be proposed by

18   the county clerk.  It has to be adopted by the legislative

19   body of the county.  All of those counties changed with the

20   exception of one, Washington County, and they changed their

21   local ordinances to comply with the precincts that are in

22   place for Map 1.  This Federal Court would just be skipping

23   over that process in Utah law for redrawing precinct

24   boundaries, which I think is another problem.

25           No, because this is unique to Utah, there is not a

1    *Purcell* case that is specifically about that, that I'm aware

2    of at least.

3              JUDGE TEETER:  I just want to correct it in my own

4    head because I am not as familiar with the campaign process

5    in Utah and other states.

6              In *Abbott* the primary campaign was underway,

7    correct?

8              MR. GABER:  Yes.

9              JUDGE TEETER:  It was a case that involved a

10   legislative map versus a three-judge panel map, correct?

11             MR. GABER:  The three-judge panel -- its order was

12   to use the 2021 map rather than the new mid-decade map.

13             JUDGE TEETER:  So those legislative maps, but the

14   three-judge panel imposed the other one?

15             MR. GABER:  Right.  Correct.

16             JUDGE TEETER:  The primary was four months away,

17   correct?

18             MR. GABER:  Correct.

19             JUDGE TEETER:  And the actual election was 11

20   months away?

21             MR. GABER:  That is correct.

22             JUDGE TEETER:  In our case when did the primary

23   campaign season begin?

24             MR. GABER:  I think on November 11th.  The first

25   candidate announced in the CD1, I think, on November 11th.

1    And then former Congressman McAdams announced on the 13th, I

2    want to say.  Maybe it was on November 12th and the 13th for

3    the first two, but days after and then several more

4    candidates announced in CD1.  There are primary candidates

5    in CD4, the northern Utah district, and recently a

6    Republican candidate announced in CD1.  So in November is

7    when it started.

8            JUDGE TEETER:  Then the primaries are in June.

9            Is that correct?

10           MR. GABER:  The primary election is in June.  The

11   caucus is on March 17th.  The convention is in mid-April.  I

12   am not exactly sure off the top which day.

13           JUDGE TEETER:  Did the *Abbott* case have any kind

14   of a caucus system?

15           MR. GABER:  No.  It was only the primary that was

16   four months away that was at issue there.

17           JUDGE TEETER:  So one of the distinctions that you

18   are drawing is that the caucus system that is in place in

19   Utah starts mid-March --

20           MR. GABER:  Right.

21           JUDGE TEETER:  -- whereas *Abbott* didn't have

22   anything along those lines.  It was just a primary that was

23   four months away?

24           MR. GABER:  That is right.

25           JUDGE TEETER:  Again, here we have an argument

1    between the legislative map and a court-imposed map?

2              MR. GABER:  That is right.

3              JUDGE TEETER:  Sometimes it is just easy to get

4    those facts succinctly laid out.  Thank you.

5              JUDGE SHELBY:  Why don't we reach the subject you

6    have been eager to get to, the merits.

7              JUDGE TYMKOVICH:  I guess I will get started.  And

8    I have the same question I had for the plaintiffs.  Where is

9    the Utah Supreme Court on this important issue of state law

10   and, you know, crediting both sides' theories and what are

11   we supposed to do?  Must we wade into this thicket without

12   guidance from the Utah Supreme Court, or could we ask a

13   certified question to them?  What is the intervenor's view

14   on where that process is and whether we are going to get any

15   guidance in this case?

16             MR. GABER:  Of course, we have moved to dismiss or

17   stay.  So my first answer would be that this Court should

18   not do anything until the state court process is resolved.

19   The Lieutenant Governor asked the State Supreme Court to

20   issue a decision on the pending motion -- there are three

21   motions actually pending before the State Supreme Court

22   right now.  The Lieutenant Governor asked for a decision by

23   February 23rd.

24             The Legislature asked the State Supreme Court for

25   a decision by this Friday, the 20th.  So it is not the case

1    that the State Supreme Court has been sort of dawdling.  It

2    was asked for those dates as the deadlines.  Perhaps the

3    reason that those are the dates is that this federal

4    litigation was not filed until after the briefing in the

5    State Supreme Court -- at least the first round of it was

6    done.  That is the deadline it is working on.

7            I think it would be more proper for this Court to

8    send a certified question to the State Supreme Court than it

9    would be for this Court to issue some sort of ruling,

10   although I guess I would wonder what that question would be,

11   because the argument that principally I heard today was this

12   question of whether under *Moore* a state court can interpret

13   state statutes and enforce state statutes on federal

14   redistricting.

15           Of course, as I perhaps have said too many times,

16   there is no challenge in the complaint to the injunction

17   against the 2021 map, and that is the issue that that

18   question flows from.  The sole question before this Court

19   based on the complaint is can a state court impose a

20   remedial map.  Once it has enjoined a map as unlawful, can

21   it impose a remedial map?  *Germano*, *Growe* and *Branch* answer

22   that question repeatedly and directly.  So I don't know that

23   there is a certified question to ask.

24           JUDGE TYMKOVICH:  Wouldn't a state court ruling,

25   at least as framed in the pleadings before the Utah Supreme

1    Court, basically answer the hardest questions here about

2    whether the district court exceeded her authority under Prop

3    4 and --

4            MR. GABER:  Yes.

5            The legislature is asking those questions.  That

6    is the issue.  That is one of the issues that the

7    Legislature is appealing in the State Supreme Court is

8    essentially whether or not Proposition 4 violates the

9    Elections Clause and then whether or not the state court's

10   interpretation of it does.

11           So that question is being decided by the State

12   Supreme Court, but that is a question that I think is not

13   actually a part of this case.

14           JUDGE TYMKOVICH:  The last thing we want to do is

15   wade into an unanswered and important issue of Utah --

16           MR. GABER:  Yes.

17           JUDGE TYMKOVICH:  -- substantive law.

18           If we issued a stay, what would happen?

19           MR. GABER:  Currently the proceedings in the state

20   court is currently on stay in the state proceeding.

21   Eventually there is going to be a determination on the

22   merits on that appeal.  Once that happens, then this Court

23   could determine whether or not there was some Elections

24   Clause violation that happened in this case.  We are not

25   talking about the 2026 election now because it is our

 1    position that it is already too late for that.

 2         JUDGE TYMKOVICH:  There is this dispute between

 3    whether there was ever any substantive review of the 2021

 4    map, and the pleadings are a little convoluted to me about

 5    what your original complaint looked like and whether it

 6    included a request that 2021 be declared unconstitutional or

 7    unlawful under Prop 4.  I don't think it was there, yet

 8    somehow in the last eight months, arguably -- not

 9    arguably -- the district court briefed that she had the

10    authority to review the 2020 map and declare it unlawful,

11    which she did.

12         One concern that I have is that her remedy is a

13    map that she claims satisfies the requirements of Prop 4,

14    but there has never been any substantive determination that

15    the 2021 map is a partisan gerrymander under the rubric of

16    Prop 4.

17         There is 50 pages on Map C, right, but there is

18    really nothing on the 2021 map.  I would have liked to have

19    seen that in a case when she is going to pick and choose

20    between maps put together by biased parties that are

21    advocating for their interests, and she didn't appoint a

22    special master or neutral arbiter to generate a map.  As I

23    understand it, there are three maps.

24         Did anybody else file a map that she could pick

25    from?  It just seems like that process seems unusual and not

1    really designed to get a neutral court order, but she is

2    kind of picking between two partisan objectives.  The

3    defendant's map was partisan in favor of the Republicans and

4    they argue that Map 1 is partisan in favor to the Democrats,

5    and we are kind of at the place where Prop 4 does not want

6    us to be.

7         Can you tell me why does it matter that she never

8    did a review of the partisan makeup of the 2020 map under

9    Prop 4?

10        MR. GABER:  I will wind back a little bit further

11   in answering Your Honor's question.  Our state court

12   complaint in the prayer for relief requested an injunction

13   against the 2021 map, and particularly on the basis of

14   Article I Section 2 and other articles -- there were several

15   claims in the case, but one of them was Article I Section 2

16   of the Utah Constitution which is the alter and reform

17   clause.  So our Count V did encompass -- Count V is the one

18   about repealing Prop 4.

19        JUDGE TYMKOVICH:  The '21 map violated the

20   Constitution because of the procedural defects or because of

21   the substantive line drawing?

22        MR. GABER:  Both, in that by passing SB-200 -- the

23   whole purpose SB-200 was passed was so that they could pass

24   a map not subject to Proposition 4's requirements.  So what

25   the state court found was that it is part of the violation

1    of the alter and reform clause of the constitution, that

2    infringement of plaintiff -- intervenor here, plaintiff

3    there -- their right to have repealed Proposition 4 and then

4    immediately enacted a map that was not in compliance with

5    Proposition 4, that that was a violation of the alter and

6    reform clause.  But more to the point, the Court found that

7    it was a violation of Proposition 4.

8         Now, the Utah Supreme Court did not interpret

9    plaintiffs' complaint as Your Honor set out in the question.

10    The Utah Supreme Court reviewing on an interlocutory appeal

11    from the motion to dismiss proceedings in the state court

12    twice said that Count V was the broadest count in the

13    complaint that the plaintiffs had brought, and specifically

14    said it encompassed both issues in the case, the repeal of

15    Proposition 4 and the congressional map that was enacted as

16    a result.

17         So the State Supreme Court has interpreted the

18    plaintiffs' complaint in the state case to challenge under

19    Count V the 2021 Congressional map.  The state district

20    court judge taking that interpretation of the plaintiffs'

21    complaint ruled on a summary judgment motion that we filed.

22    That summary judgment motion specifically asked in the

23    remedies section for an injunction against the 2021 map as a

24    part of the constitutional violation and because of the

25    independent violation of Proposition 4's procedural

1  requirements which were undisputed not to have been

2  followed.

3        So on the basis of an undisputed summary judgment

4  motion, the State District Court issued an injunction, as

5  the literal text of Proposition 4 required of it, because

6  there was a finding of a violation of Proposition 4's

7  procedures.

8        So from everything I have said to now I can't spot

9  something that was outside of the bounds of ordinary

10  judicial review, unless summary judgment has now become

11  outside the bounds of ordinary judicial review.  In my

12  experience when a litigant does not oppose an issue on

13  summary judgment, that is it.  That is your opportunity to

14  challenge that, and the Legislature did not challenge that

15  they had not followed Proposition 4 procedures.

16        What they did is after the fact say, It is not in

17  the complaint and it is not in the motion.  But it was in

18  the motion.  You can only object so long to what has been

19  moved until you have to respond to it.  The Legislature

20  didn't do that.  So there is nothing unordinary about

21  following a state statute passed by the voters pursuant to

22  their Elections Clause power that gives judicial review and

23  requires the injunction.

24        With respect to Your Honor's question about

25  whether or not there was a special master, the Legislature

1    stipulated to the remedial process in the case.  They

2    stipulated that there would be an October 6th deadline for

3    the Legislature to adopt its map.  That built in a ten-day

4    period that is required under Proposition 4 for public

5    review.  They stipulated that the plaintiffs would propose

6    alternative remedial maps.

7           In fact, earlier in their papers in the case they

8    said, Oh, we can't.  It is too late to have this proceeding

9    because redistricting remedial proceedings involve maps

10   proposed by the parties.  Having stipulated to a process

11   that involved the plaintiffs proposing remedial maps and

12   specifically no one else proposing remedial maps, it is too

13   late to come and now say that there was something wrong with

14   a judicial process and the remedial process that involved

15   court-imposed remedial maps from the parties.

16          Also, the Supreme Court in *Growe* specifically said

17   that the Federal Court had gone too far by not allowing a

18   state court remedial process in which the process was for

19   the parties to submit proposed maps.  That is what was going

20   to happen in *Growe*.

21          JUDGE TYMKOVICH:  I wonder if Judge Gibson was

22   inclined to strike down Map 1, whether she would have issued

23   an order and said, I'm going to stay this and give the

24   Legislature a chance to analyze all of the many problems I

25   found with Map 1 and try to submit a conforming map instead

1    of picking the other one.

2        I say that because the language of Prop 4 is

3    extensive and in my mind inscrutable on many levels, but

4    what it does not say is that a state court can draw its own

5    map.  It does not empower the state court to do anything of

6    the sort, nor does any other provision of state law.

7        It seems like you're taking the injunction

8    authority that Prop 4 gives, but you're not accepting the

9    fact that the entire scheme envisions that it is going to be

10   a legislative process with kind of a quasi-supervisory role

11   by the courts.

12       MR. GABER:  I disagree with that interpretation of

13   Proposition 4, but, more importantly, the state court

14   disagreed with that interpretation of Prop 4.

15       JUDGE TYMKOVICH:  Well, I know she did.  Yeah.

16       MR. GABER:  If the state court who has the

17   authority to interpret state law found that the first

18   section of Proposition 4 sets out five circumstances, I

19   think, when redistricting can occur.  Two of them are upon

20   an injunction and a final order of the court.  The court

21   found that that was not specific to the Legislature and that

22   that did not prohibit a court-imposed map; in fact, it

23   authorized it.

24       Also, Article I Section -- I am forgetting the

25   number -- I think it is 6 or 8 of the Utah Constitution, the

1    open courts provision requires that there should be a remedy

2    for all wrongs and cited that provision as authorizing a

3    judicial remedy.  That provision is similar to the one in

4    the Oklahoma Constitution that the Oklahoma Supreme Court

5    held that provided the authority for a state court to impose

6    a lawful map in the absence of a legislatively enacted one.

7            I think there is a problem when the Legislature

8    agreed to the process and agreed to what the deadline was

9    and never suggested to the court that there would be time

10   for another legislative process, and when the Legislature

11   then changed the candidate filing period from January to

12   March, which is the source of the injuries that is alleged,

13   the Legislature didn't come back to the state court and say,

14   We have changed the candidate filing deadline.  Vacate your

15   order imposing Map 1 and let us try again.

16           That has never happened, so I don't know what the

17   State District Court was supposed to do.  Federal law says

18   that you have to impose a lawful map when time has run out,

19   and it couldn't.

20           JUDGE SHELBY:  I read this part of your papers,

21   and I was wondering which legal category you were drawing

22   to.  Is it a waiver?  Of course it is the Legislature in

23   that case.  It is not the plaintiffs here.

24           There is not a waiver of the argument here, is

25   there?

1          MR. GABER:  Well, I think I would say there is

2     privity between -- they are putting themselves in the shoes

3     of the Legislature.  I think Lance kind of acknowledges

4     that.  But I think you can't come into court as a private

5     plaintiff under an Elections Clause theory that the

6     Legislature's powers have been infringed and say, You're not

7     subject to what the Legislature agreed to in the state court

8     litigation.

9          We can't have it both ways here.  If the

10    Legislature agreed to a process that has court-imposed maps,

11    if there is found to be a violation, then private plaintiffs

12    can't come in and say that the legislature's power has been

13    abrogated.  The legislature exercised that power.

14         JUDGE SHELBY:  I understood there Mr. Schaerr to

15    say two things that had never happened before.  That there

16    is no case where a state court judge throws out a

17    legislatively fashioned map without making a determination

18    that it is substantively illegal.  The second thing he said,

19    if I got this correctly, is that there is no case where a

20    state court judge has retroactively invalidated a map

21    because the legislature ran afoul of some different statute.

22         Are there any such cases and does it matter?

23         MR. GABER:  I don't think it matters.  I would

24    have to -- I heard that, too, for the first -- I would have

25    to think about that.

1          I think it is just not factually correct that the

2     District Court never found there to be a substantive

3     violation of the 2021 map.  At least as of the November 10th

4     order, and we cite this in our papers, there are a number of

5     times where the District Court makes findings, factual

6     findings, that the 2021 map was both an extreme partisan

7     gerrymander -- it was worse than Map C.  There are charts

8     all over in the State District Court's opinion showing how

9     it is more of an extreme outlier than Map C was.

10         The Legislature tried to scale back how extreme

11    the 2021 map was with the Map C and failed at that.  So the

12    district court specifically said that the four-way split of

13    Salt Lake County appeared to be designed to be a partisan

14    gerrymander to benefit the majority party.  The state court

15    also found that that was a violation of the county's

16    splitting requirement.

17         This happened in the context of Map C because the

18    court had already enjoined the 2021 map.  Of course, that is

19    why most of the proceedings at the October hearing were

20    about Map C.  But the evidence in showing why Map C was a

21    violation encompassed evidence of the substantive violation

22    of the 2021 map.

23         The legislature's expert, the map drawer of Map C

24    and the litigation expert, Dr. Sean Trende, testified that

25    the 2021 map violated Proposition 4.  So what the plaintiffs

1    here would have you do is impose a map that the

2    legislature's own expert witness testified was a violation

3    of Proposition 4, while claiming that there is no evidence

4    that there is a substantive violation of Proposition 4.  I

5    don't think we need to get to that question because the

6    record is clear in the case that there was a substantive

7    violation.

8           In Utah and the voters of Utah, acting as the

9    legislative department and acting pursuant to their

10   Elections Clause power, determined that following the

11   procedures that they set forth as mandatory and that if they

12   were not followed, the court was mandatorily required to

13   issue an injunction.  Utah is allowed to do that.  They are

14   allowed to regulate.  Congress has not told them that they

15   cannot have that time, place, and manner regulation for

16   their congressional elections.

17          That would be an affront to the Elections Clause,

18   would be for a Federal Court to say that the legislative

19   department of Utah was disempowered from deciding that its

20   Congressional map had to be enacted in the manner set forth

21   in Proposition 4 and that a federal court has to enjoin the

22   state court's enforcement of that provision under the

23   Elections Clause.  That simply does not -- unless the

24   plaintiffs can find a congressional statute that says that

25   the people of Utah were not allowed to require requirements

1    in adopting a map in the congressional redistricting

2    process, then there is no Elections Clause argument here.

3    The plaintiffs are asking for the violation of the Elections

4    Clause.

5              JUDGE TYMKOVICH:  Does it flow from your argument,

6    then, that Prop 4 prohibits the division of Salt Lake

7    County?

8              MR. GABER:  Salt Lake County is larger than a

9    congressional district, and so what the Legislature's

10   expert, Dr. Trende, testified was that the law require it to

11   be split into no more than two districts.  That is how

12   the --

13             JUDGE TYMKOVICH:  Is that what Map C did?

14             MR. GABER:  Map C split Salt Lake County into two

15   districts.  It split Utah County into three districts.  Utah

16   County is smaller than --

17             JUDGE TYMKOVICH:  Which one is Utah County?

18             MR. GABER:  South.  Davis is north.

19             Here is another reason why the district court made

20   a finding about the 2021 map.  It interpreted Proposition

21   4's requirement to minimize the division of counties across

22   multiple districts and to require not just a minimization of

23   the total number of county splits, but the number of times

24   any one county is split into multiple districts.  That is

25   why Dr. Trende very honestly on the stand said, Of course

1    the 2021 map violates Proposition 4.  It splits Salt Lake

2    County four times and it split, like, six or seven other

3    counties, which is more than twice what is necessary

4    to equally --

5            JUDGE TYMKOVICH:  Does that county splitting and

6    respect for boundaries, does that trump natural communities

7    of interest?

8            MR. GABER:  Yes.

9            JUDGE TYMKOVICH:  And is there a hierarchy there

10   that governs that?

11           MR. GABER:  Yes.  Proposition 4 lists maybe six or

12   so items in priority order.  The first one is first

13   minimizing the division of municipalities and counties but

14   with a priority for municipalities, and then it goes down

15   the list with compactness, continuity, following natural

16   borders, and towards the bottom is communities of interest.

17           JUDGE TYMKOVICH:  Can it use communities of

18   interest to explain why it had three county splits instead

19   of two and things like that?

20           MR. GABER:  That isn't the explanation that was

21   given.  I don't think so because of the priority order, so

22   they would have to minimize -- they might use communities of

23   interest to explain why they split it the way they did, but

24   they would still have to minimize the division of counties.

25   I don't think any of them -- the legislature ever suggested

1    that the way the 2021 map split Salt Lake County into four

2    pieces served the communities of interest.

3              JUDGE TEETER:  I have a few questions.

4              One, I want to go back and make sure I understand

5    your argument.  Doc 17-2 is the complaint that was filed at

6    the state court.  If I understand your position correctly,

7    Count V outlines the challenge to SB-200.  The last portion

8    of Count V says, if I remember correctly, the declaratory

9    and injunctive relief spelled out below, and then in the

10   remedy section and the second bullet point for the remedy

11   was the one seeking to have the 2021 map enjoined.

12             Is that your position?

13             MR. GABER:  That is my memory.  I don't have that

14   in front of me.  That is my memory of the complaint, yes.

15             JUDGE TEETER:  All right.  I want to ask a

16   question that is kind of the opposite of what I asked

17   opposing counsel.

18             So my understanding is that your position is that

19   if this Court were to find that Judge Gibson was acting

20   within her ordinary judicial review by enjoining the 2021

21   map under Proposition 4, that at that point it does not

22   really matter what state law says specifically about her

23   ability to impose a map; 2 USC 2c would kick in because the

24   only other available map was the 2011 map and federal law

25   would give her that authority.

1           Is that correct?

2           MR. GABER:  Yes, authority and responsibility.

3           JUDGE TEETER:  So here is my question to you to

4    push on that a little bit.  If that is your position, how

5    far does it go?  If a state supreme court or a state

6    constitution specifically does not allow a state district

7    court to impose a map, does 2 USC 2c still trump in that

8    situation, arguably here, if the Court was to agree with

9    your position on the 2021 map?

10          MR. GABER:  I think the Supremacy Clause, which

11   specifically says that state courts are to apply the U.S.

12   Constitution and the laws enacted thereunder, would require

13   the state court to follow 2 USC and follow *Branch* and to do

14   that.

15          JUDGE TEETER:  So in that regard does it matter

16   what the Utah Supreme Court would say with respect to

17   whether or not a district court judge had the authority

18   under state law to impose a map in this situation or would

19   federal law kick in and under the Supremacy Clause require

20   it?

21          MR. GABER:  I don't -- I don't want to minimize

22   the importance of understanding what the Utah Constitution

23   requires, but *Branch* could not have been clearer that

24   Congress passed that statute under its Elections Clause

25   power and *Branch* interpreted that to mean that state courts

1   should impose a map in the exact situation that the State

2   District Court found itself in here.

3        Judge Gibson said as much in the decision.  The

4   decision says that the state court is not remedying only a

5   violation of Proposition 4.  At this point there is no map.

6   There is either no map or there is the 2011 map, and cited

7   to 2c.  The court cited to 2 USC 2c and said, I have to.

8        JUDGE TEETER:  The last couple of questions I had

9   is there has been discussion about whether or not there were

10  substantive findings by Judge Gibson regarding the 2021 map.

11  I know that in the reply brief there was some citation to

12  the November order where your client suggests that she did

13  make substantive findings, and I want to make sure I have

14  identified the passage that you were talking about because

15  it was citations but not direct quotes.

16       So the citations in your brief were to the WestLaw

17  citations.  I instead have been using the citations and the

18  pages that are attached to Doc 17.  So by my count, if I am

19  matching it up correctly, the citations you are referring to

20  in Doc 17-4 would be on page 62.  I think you're referring

21  to the line where she says, "By cracking Salt Lake County

22  and dividing it between the four districts like what was

23  done in the 2021 Congressional map, this impairs the

24  minority party's ability to translate its statewide support

25  and representation enabling the favored party to

1    entrench its advantage by winning every seat."

2            Is that the specific quote you're talking about?

3            MR. GABER:  That is one of them.

4            JUDGE TEETER:  I know there is another one later

5    on, but with respect to the first one, is that the portion

6    you were discussing?

7            MR. GABER:  There is the one that Your Honor just

8    mentioned, and I don't have the page number of the District

9    Court -- I could get it for Your Honor.  The court on

10   November 10th also found with respect to Dr. Trende's

11   drawing of Map C -- and this is on page 7 of our response to

12   the preliminary injunction, Doc 56 in this Court -- "Dr.

13   Trende testified that the starting point for Map C now

14   enjoined the 2021 map which did not comply with the

15   procedural or substantive requirements of Proposition 4.

16   Map C, nevertheless, perpetuated many of the existing

17   dividing lines and problems with the 2021 map that appear to

18   be designed to favor the Republican party and disfavor the

19   Democratic party."

20           JUDGE TEETER:  I believe that is on page 82 of Doc

21   17-4.  That is all I was trying to verify and make sure that

22   I was understanding what portions you were trying to cite

23   to.  So if I am correct -- and you can tell me if I am

24   wrong -- you are citing to statements in Doc 17-4 at page 62

25   and Doc 17-4 on page 82.

```
 1              Is that correct?

 2              MR. GABER:  Could you do me a favor?  Doc 17 --

 3              JUDGE TEETER:  Doc 17-4 is, I believe, the

 4    preliminary injunction motion.  It is the motion to

 5    intervene.

 6              MR. GABER:  Okay.  Yes.

 7              So on page 62 in the middle paragraph the court

 8    talks about dividing Salt Lake County into four pieces in

 9    the 2021 congressional map and how that impairs the minority

10    party's ability to translate its vote.

11              And then again on page 82 of the State District

12    Court's November 10th decision -- again, the paragraph that

13    I just read and Your Honor said it correctly.  Then on top

14    of that, given the State District Court's interpretation of

15    the county division requirement and that no more than one

16    split is what is permitted, and the finding that it was

17    split four ways would be a violation of that particular

18    provision as well, which Dr. Trende admitted.

19              JUDGE TEETER:  Thank you.

20              JUDGE SHELBY:  I have a 2c question that is just

21    one out of ignorance.

22              Reading between the lines of some of the

23    plaintiffs' submissions -- and I am thinking about

24    preclearance cases and the like -- a lot of the maps that

25    get drawn by the judicial branch are three-judge panels.
```

1            Is there a line of cases where state court judges

2    are drawing those kinds of maps?

3            MR. GABER:  Well, I think in the preclearance

4    context that is actually -- the lower court case in *Branch*

5    was an example of that.  It had drawn a map with the

6    intention that it complied with Section V and the issue was

7    just the timing of getting the DOJ's preclearance was

8    insufficient, and so actually as a matter of federal law

9    there actually was no state court map because Section V --

10   Section IV maybe -- Section V provides that the law is not

11   operative until it has been precleared.  So as a technical

12   legal matter there was no state court map even though there

13   was in practice, so that's an example of that.

14           I am not sure that many of the cases where there

15   have been court-imposed -- state court-imposed maps where

16   there has been a claim under the Voting Rights Act, that

17   what the court does is ensure that it is complying with the

18   Voting Rights Act and preclearance is no longer an issue.

19   That is gone.  The state courts are always making sure that

20   Section 2 of the Voting Rights Act is complied with.

21           The current Wisconsin congressional map and the

22   state legislative maps were court imposed by the state

23   supreme court and the court undertook an analysis under the

24   Voting Rights Act there that ended up going up to the U.S.

25   Supreme Court and back down about the state legislative

1    maps.  But the court ensured that the congressional map

2    complied with Section 2 and there was never a dispute that

3    it did.

4            So it is -- it, along with the prohibition on

5    racial gerrymandering under federal law, and the requirement

6    to have single-member districts are always part of what a

7    state court has to consider and just as a result of the

8    Supremacy Clause.

9            When the state court here had the obligation under

10   2c, as Justice Scalia set out in the plurality section of

11   the *Branch* decision, that meant that it needed to follow

12   Proposition 4's requirements under 2a(c), because that is

13   what the manner of the law of the state is.  So what the

14   plaintiffs ask here would be particularly egregious for all

15   sorts of reasons, but one of them is that there has been --

16   as we have just gone through, there are specific findings

17   that it violated not just the substantive requirement, but

18   there is an injunction on the basis of it violating the

19   procedural requirements.  So this Federal Court would be

20   violating 2a(c) if it imposed a map that was not enacted in

21   the manner prescribed by Utah law, which is the 2021 map.

22           JUDGE SHELBY:  Let's pause for a moment.

23           Don't surrender the podium.

24           MR. GABER:  I can go on for a little bit.

25           (Time lapse.)

1          JUDGE SHELBY:  Thank you, Mr. Gaber.

2          Mr. Schaerr, the plaintiffs are the ones with the

3     burden here, at least on the substantive claims, and that is

4     a lot of water under the bridge, and I gather you didn't

5     agree with everything you heard.

6          MR. SCHAERR:  You're right, Your Honor.

7          JUDGE SHELBY:  Come on up, would you, please, for

8     a little rebuttal.

9          MR. SCHAERR:  I recognize the time, but let me

10    just briefly respond on five specific points.

11         First of all, with respect to standing, the *Bost*

12    decision, of course, did say that the candidates suffer what

13    seemed to be almost a per se reputational harm just by

14    participating in an election that was deemed unlawful or

15    where the maps were incorrectly drawn or something like

16    that.  And they can also suffer additional reputational harm

17    if they are put in a district where they get a lower

18    percentage of the vote.  So those things are clear in *Bost*

19    and they are virtually inevitable.

20         When I said earlier that I didn't see particular

21    reputational harm that our clients would suffer, I was not

22    meaning to exclude those that were mentioned in *Bost*.  I am

23    not claiming that they would suffer any additional

24    reputational harm beyond that.

25         Then with respect to whether our complaint

1    adequately claims that the state court acted unlawfully in

2    invalidating the 2021 map, we actually say that or strongly

3    imply it by my count in four different places in the

4    complaint:  In paragraph 3 where we complain about the court

5    not using the 2021 map, paragraph 5, and then in paragraph

6    88 we say that the 2021 map is the last lawful map; then in

7    the prayer for relief we specifically ask for reinstatement

8    of the 2021 map in the event that the Legislature does not

9    step in and offer a map of their own.

10           Now, with respect to the 2021 map, I think it is

11    fair to say that our allegations are as extensive as the

12    intervenor's allegations in their state court complaint were

13    with respect to the 2021 map, but if for some reason the

14    Court does not think that those allegations are adequate, we

15    are more than happy to amend, and we can do that in ten

16    minutes and have it on file.

17           I think our position about the 2021 map is at

18    least fairly implied in what is already in the complaint.

19           JUDGE TYMKOVICH:  What is your position on whether

20    we should stay this case until the Utah Supreme Court weighs

21    in?  If they don't, we can always issue an opinion.

22           MR. SCHAERR:  Well, you know, a stay until Friday

23    would probably be okay.  But, you know, if they don't act on

24    the stay request by Friday, then, you know, there is going

25    to be a real need for this Court to act in order to redress

1    what we think is quite a clear violation of the Elections

2    Clause, and that is as interpreted in *Moore versus Harper*.

3              *Moving on to Purcell*, *Purcell*, of course, is

4    grounded in the State's interest in its elections.

5    Certainly the Legislature's prerogatives assigned to them in

6    the Elections Clause of the U.S. Constitution have to be an

7    important part of the analysis, so it matters whether the

8    map that is allegedly insulated from redress because of

9    *Purcell* was a legislatively drawn map or a court-drawn map.

10   That is important to keep in mind, I think, as we consider

11   *Purcell*.

12             With respect to 2 USC 2, I just reviewed that

13   statute again and I don't see anything in the statute that

14   gives any authority whatsoever to state courts to draw maps.

15   It simply specifies a standard that would apply.

16             JUDGE SHELBY:  What does *Branch* say about that,

17   though?  The Supreme Court told us that --

18             MR. SCHAERR:  The Supreme Court left that question

19   open.  Yes, it was addressed in the plurality opinion, but

20   that is a controversial issue.  I would suggest that, you

21   know, in light of the rise of the Major Questions Doctrine

22   in the Supreme Court that, you know, one should not assume

23   that a statute that does not mention any role for state

24   courts in implementing it are, you know, empowered by that

25   statute to draw their own maps.  I mean, you know, talk

1    about hiding an elephant in a mouse hole -- that would be a

2    classic example of that.

3            JUDGE SHELBY:  Justice Scalia and reading from

4    page --

5            MR. SCHAERR:  I love Justice Scalia, but it was a

6    plurality opinion.

7            JUDGE SHELBY:  Hold on.

8            The opinion of the court with respect to parts 1,

9    2 and 3a -- I think I am reading here from 3a.

10            That is not the opinion of the court?  Am I

11    misreading it?

12            MR. SCHAERR:  Well, I don't have it in front of

13    me.

14            JUDGE SHELBY:  "To the contrary, every court that

15    has addressed the issue has held that Section 2c requires

16    courts when they are remedying a failure to redistrict

17    constitutionally to draw single-member districts whenever

18    possible."  He is not drawing a distinction between

19    three-judge federal court panels or single-judge federal

20    court panels.  Every court --

21            MR. SCHAERR:  He is also not holding anything

22    there either.  He is recounting the practice, but, you

23    know -- I mean, one of the main points of *Branch* was that

24    the three-judge panel had two alternative grounds, right,

25    for ruling the way they did.  One was that the state court

1    didn't have the authority to draw maps.  The other was the

2    Section 5 point.  So when the case got to the Supreme Court,

3    the majority opinion said, Okay.  We agree with the lower

4    court's rationale on Section 5 and we're going to find that

5    that is sufficient to sustain their judgment, and,

6    therefore, we don't have to reach the more controversial

7    question of whether the state court violated the Elections

8    Clause in drawing a map at all.  I am not even sure that --

9        JUDGE SHELBY:  This may be the last question on

10   this, but I am still reading from the opinion of the court

11   and it is the final paragraph of the opinion of the court.

12   "In sum, Section 2c is as readily enforced by courts as it

13   is by state legislatures and is just as binding on courts,

14   federal or state, as it is on legislatures."

15        That is not the Supreme Court saying states don't

16   do this, states don't draw maps?

17        MR. SCHAERR:  It is binding on them, but it does

18   not say that state courts can draw maps.  I mean, it is

19   binding on them in the sense that, you know, in their legal

20   rulings they are bound by it, but it does not empower them

21   somehow with authority to draw a map that the legislature

22   has not drawn.

23        JUDGE SHELBY:  I know that we touched on this

24   earlier -- and I am walking up to the horse and maybe this

25   is a kick -- and if the legislature just won't, then what?

1   How does a state court give effect to that federal mandate?

2   If the state Legislature has not produced a viable map, do

3   we just not have an election?

4          MR. SCHAERR:  Well, a Federal Court can step in,

5   and obviously the Federal Court acting under the Elections

6   Clause can do that.  Congress itself could step in.  One

7   reason that we are unlikely to see a genuine impasse is that

8   no state legislature is going to want to see a congressional

9   seat unfilled, right, because that reduces their influence

10  in Washington.  So at some level these parade of horrible

11  impasses are going to get resolved with a map that is going

12  to elect congressmen to go to Washington.

13         Finally, if I could just go back to the state

14  court litigation, and this has been touched on in some of

15  the questions earlier, the big problem with the litigation

16  about the 2021 map is that the issue of the map's

17  substantive validity was not litigated.  It was not called

18  into question in Claim 5, which was an attack on SB-200.  It

19  was not an attack on HB-2004, which was the 2021 map.

20         That attack appeared later in Counts VI and VII in

21  the state court complaint, but those never actually got

22  litigated.  That may be one reason why the portions of Judge

23  Gibson's decision that we were reading earlier don't say

24  that the 2021 map was unlawful.  It talks about the 2021 map

25  by analogy or with historical reference to Map C, which is

1    what she was analyzing, but there is never any analysis of

2    the legality of the 2021 map, which, by the way, was passed

3    before Proposition D.  There is never any substantive

4    analysis of that map's validity and no finding that it is

5    substantively invalid under the standards of Proposition D.

6            Unless the Court has --

7            JUDGE TYMKOVICH:  What about the expert's

8    concession below that the 2021 map was a partisan

9    gerrymander under Prop 4?  What do we do with that?

10            MR. SCHAERR:  Well, I think if Judge Gibson had

11    incorporated that concession into a finding and a holding

12    that map 2021 was invalid, then, you know, then we wouldn't

13    have that as one of our arguments under *Moore versus Harper*.

14    That argument would go away.  That is not what she did.

15            JUDGE SHELBY:  I want to back you up just a little

16    bit.

17            MR. SCHAERR:  Sure.

18            JUDGE SHELBY:  I'm getting old and I forget.

19            Maybe I misunderstood what you just said about

20    Count V and what it did and did not include.  At paragraph

21    61 the Utah Supreme Court said that the claim also

22    encompasses the constitutionality of the Congressional map

23    that resulted from SB-200 and was not subject to Proposition

24    4's requirements.

25            Is your statement and that statement in conflict,

1    or did I misunderstand what you said?

2            MR. SCHAERR:  No.  I don't recall what exactly the

3    Utah Supreme Court said about it.  I just know that Count V

4    itself did not specifically challenge the 2021 map.  It was

5    directed at SB-200.

6            JUDGE SHELBY:  Was the 2021 map a result of

7    SB-200?

8            MR. SCHAERR:  I think it was.

9            JUDGE SHELBY:  And so if the Supreme Court has

10   spoken on this question, do we credit the Supreme Court or

11   do we accept what you're saying today?

12           MR. SCHAERR:  I don't think there is any reason to

13   disagree with the Supreme Court on that, but the fact

14   remains that the state court held the 2021 map unlawful

15   without a finding that it -- it invalidated the map without

16   a finding that it was substantively unlawful, that the

17   districts were substantively unlawful.

18           Again, that is just one of the three ways -- in

19   fact, I would also urge the Court to review the

20   Legislature's amicus brief which well articulates a couple

21   of additional reasons why the state court's decision was not

22   within the requirement of *Moore versus Harper* to engage only

23   in ordinary judicial review and why the state court's

24   decision was outside of that requirement.

25           For all these reasons, unless the Court has

1    further questions, I would just urge you to issue the

2    preliminary injunction that we have requested.  That is the

3    only way that this Court can vindicate the Elections Clause

4    and the important principle of respect for state

5    legislatures in the redistricting process that that

6    provision commands.

7            Thank up.

8            JUDGE SHELBY:  Thank you.

9            (Time lapse.)

10            JUDGE SHELBY:  Mr. Gaber, I always get nervous

11    when I say briefly and the lawyers here speak quickly and we

12    have a court reporter who is trying to take down what we

13    have to say, but take two minutes and tell us your final

14    thoughts.

15            MR. GABER:  I just want to go to *Branch* for a

16    moment.  In the majority opinion section of *Branch* -- and

17    this is at page 272 -- the court says, "We think, therefore,

18    that while Section 2c assuredly envisions legislative

19    action, it also embraces action by state and federal courts

20    when prescribed legislative action has not been

21    forthcoming."

22            Earlier in the decision the court specifically

23    talks about judicially imposed maps.  The entire premise of

24    this case is about courts imposing maps and whether they

25    have to follow 2c or 2a(c)(5) when they do it.  Throughout

1    the majority opinion the court is clear to say both federal

2    and state courts, so it could not more clearly interpret

3    what Congress wrote in its Elections Clause statutes as

4    requiring court-imposed maps.  It did it by interpreting the

5    phrase "by law, imposed by law."

6         I guess I would just underscore, again, that if

7    you read the complaint, the request is phrased very narrowly

8    about the authority to impose a map.  When a state court has

9    enjoined a map, it does not have the authority to impose a

10   map.  All of this *Moore vs. Harper* and about what is in the

11   state court complaint and what Count V says, whether it is

12   just ordinary judicial review to enforce statutes or the

13   Constitution, none of that is encompassed within the

14   plaintiffs' complaint in this case.  Reaching it I think

15   would be a problem for a Federal Court to start parsing out

16   how a state court interpreted pleadings in the state

17   proceeding.

18        JUDGE TYMKOVICH:  Well, you did read from *Branch*

19   and it did punt on the alternative holding about mapmaking

20   authority.  So, I mean, isn't that still an open question

21   and a question of first impression that is lingering out

22   there?

23        MR. GABER:  I have read a lot of Supreme Court

24   opinions and I don't know that I have ever seen the Supreme

25   Court have a paragraph of its opinion vacating the rationale

1    that was stated, an alternative rationale that was stated in

2    a lower court's decision while affirming the injunction, and

3    then going on to say, "The District Court's alternative

4    holding is not to be regarded as supporting the injunction

5    we have affirmed on the principal ground or as binding upon

6    state and federal officials should Mississippi seek in the

7    future to administer a districting plan adopted by the

8    chancery court."

9         And then the whole premise of this majority

10   decision is that state courts are required by federal law to

11   impose maps in a decision that is talking about the

12   Elections Clause.  So I would not hang my hat on this

13   paragraph if I were the plaintiffs.  I think it is pretty

14   clearly telling everyone, Don't do that.  That would be a

15   problem because the Supreme Court has held for decades that

16   state courts are authorized and obligated to impose maps.

17        JUDGE TYMKOVICH:  It is a hard question and they

18   are finally getting around to asking us and the Supreme

19   Court to dive in.

20        JUDGE SHELBY:  It is not lost on us how much work

21   you have all done in the last week and a half or so under

22   very tight deadlines that we imposed to try to put ourselves

23   in a position to try to accommodate the Lieutenant Governor.

24        I think I can safely say on behalf of all three of

25   us that we appreciate the quality of the briefing and the

1    arguments that you have all made, and the briefing,

2    especially under the circumstances, was just really

3    terrific, and your argument today has been helpful.

4           Thank you.

5           We'll be in recess.

6           (Proceedings concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25