UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| COMMISSIONERS AMELIA POWERS GARDNER, GREG MILES, CLINT PAINTER, VICTOR IVERSON, LORI MAUGHAN, TAMMY PEARSON, and ADAM SNOW, each a registered Utah voter and elected official; et al.,<br><br><br>Plaintiffs,<br><br>v.<br><br><br>LIEUTENANT GOVERNOR DEIDRE HENDERSON, in her official capacity,<br><br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:26-cv-00084-RJS-JCB<br><br><br>Circuit Judge Timothy M. Tymkovich<br>District Judge Robert J. Shelby<br>District Judge Holly L. Teeter<br><br>Magistrate Judge Jared C. Bennett |

The Tenth Circuit convened a three-judge district court pursuant to 28 U.S.C. § 2284 to consider whether a state district court may impose a congressional redistricting map upon a state under the Elections Clause of the United States Constitution. That clause states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the *Legislature* thereof[.]" U.S. Const. art. I, § 4, cl. 1 (emphasis added). Plaintiffs seek a preliminary injunction to prevent the Lieutenant Governor of Utah from using the state district court's selected map in the upcoming 2026 congressional election. The Lieutenant Governor takes no position on the merits of Plaintiffs' claim; however, she represents to this court that she must know by February 23, 2026, which redistricting map to implement.

Because we conclude Plaintiffs have failed to demonstrate a likelihood of success on the merits, and because the *Purcell* principle counsels this court not to enjoin a state's election laws in the period close to an election, we **DENY** Plaintiffs' preliminary injunction motion.[1]

## I.      Background

Plaintiffs here are various Utah voters and elected officials, including United States House of Representatives incumbents Celeste Maloy and Burgess Owens.  The Defendant is Utah Lieutenant Governor Deidre Henderson who acts as Utah's chief election officer.  She is tasked with implementing congressional redistricting plans and ensuring Utah complies with federal and state election laws.

This lawsuit stems from long-running litigation in Utah state courts brought by the League of Women Voters of Utah, Mormon Women for Ethical Government, and various Utah voters (collectively, "the League") against the Utah Legislature, various state legislators, and the Lieutenant Governor.  We first chronicle this Utah state court litigation to set the stage for the current controversy.

### A.      The Utah State Court Litigation

In November 2018, Utah voters passed as a ballot measure the Utah Independent Redistricting Commission and Standards Act, also known as Proposition 4.  The statute imposes certain procedural and substantive redistricting requirements on the Utah Legislature.  It also creates an Independent Redistricting Commission to submit proposed redistricting plans to the Utah Legislature, which can either "enact without change or

---

[1]     Although we do not address the merits of the pending Rule 12(b)(6) motion at this time, we do find Plaintiffs have standing.

amendment" the Commission's plan, or reject it for the Legislature's own plan.  Utah Code § 20A-19-204(2)(a) (2018).  But if the Utah Legislature rejects the Commission's plan, Proposition 4 mandates it issue "a detailed written report setting forth the reasons for rejecting the plan" and submit "a detailed explanation of why the redistricting plan enacted by the [Utah] Legislature better satisfies the redistricting standards and requirements" of Proposition 4.  *Id.* § 20A-19-204(5)(a) (2018).  Proposition 4 further prohibits the Utah Legislature from "purposefully or unduly favor[ing] or disfavor[ing] any incumbent elected official, candidate or prospective candidate for elective office, or any political party" when creating a redistricting plan.  *Id.* § 20A-19-103(4)(a) (2018).  In other words, the Utah voters created a statute prohibiting the Utah Legislature from engaging in partisan gerrymandering when drawing congressional districts.

The Utah Legislature in March 2020 passed S.B. 200, which repealed and replaced many of Proposition 4's requirements.  Among the amendments, S.B. 200 did not require the Utah Legislature to enact or reject the Commission's proposed redistricting plans.  Utah Code § 20A-20-303(5) (2020).  In November 2021, acting under S.B. 200, the Utah Legislature enacted H.B. 2004 ("the 2021 Map") as the state's operative redistricting map.  Utah conducted congressional elections under the 2021 Map in both 2022 and 2024.

In March 2022, the League sued the Utah Legislature, various state legislators, and the Lieutenant Governor in Utah state district court.  The League asserted the 2021 Map was an illegal partisan gerrymander and requested the state court enjoin S.B. 200 as a violation of the Utah Constitution.  In Count V of the League's complaint, it alleged the voters of Utah enacted Proposition 4 through their constitutional right to "alter or reform their government," *see* Utah Const. art. I, § 2, and the Utah Legislature violated that right when it

3

repeated Proposition 4 and replaced it with S.B. 200, *see League of Women Voters of Utah v. Utah State Legislature* ("*LWV I*"), 554 P.3d 872, 887 (Utah 2024).

The Utah Legislature moved to dismiss the League's claims.  For Count V, it argued that because Proposition 4 was a statute—not a constitutional amendment—the Utah Legislature had plenary power to amend or repeal it.  The district court agreed and granted the Utah Legislature's motion to dismiss Count V.  The League appealed the dismissal.

The Utah Supreme Court reversed the district court and held "the people's right to alter or reform the government through an initiative is constitutionally protected from government infringement, including legislative amendment, repeal, or replacement of the initiative in a manner that impairs the reform enacted by the people."  *Id.* at 922.  It therefore concluded that "the general legislative power to amend and repeal statutes is not a basis to dismiss Count V."  *Id.* at 917.  In its instructions on remand, the Utah Supreme Court explained that if a citizen initiative is one that "alter[s] or reforms" the government, the Utah Legislature cannot "impair" it unless it can satisfy "strict scrutiny."  *Id.* at 918–19.  "Accordingly, if [the League is] ultimately able to establish the elements of their claim in the district court, the burden will shift to Defendants to show that S.B. 200 was narrowly tailored to advance a compelling government interest."  *Id.* at 921.  In conclusion, the Utah Supreme Court opined that "under Proposition 4, if the facts alleged by Plaintiffs are proven true, it is likely that the [2021] Map cannot stand."  *Id.*

On remand, the League amended its complaint and moved for summary judgment on Count V.  In August 2025, the state district court granted the League's motion.  It concluded S.B. 200 did not pass strict scrutiny because "there is no compelling state interest that justified the [Utah] Legislature's refusal to recognize the will of the people."  *League of*

*Women Voters of Utah v. Utah State Legislature* ("*LWV II*"), No. 220901712, 2025 WL 2644292, at \*53 (Utah Dist. Ct. Aug. 25, 2025).  The state district court thus held S.B. 200 "void *ab initio*" and declared Proposition 4 "as the only valid law on redistricting."  *Id.*  And because it found that the 2021 Map was the "fruit" of S.B. 200, the court permanently enjoined the Lieutenant Governor from using the 2021 Map "in any future elections."  *Id.* at \*54, \*58.  The state district court then directed the Utah Legislature "to design and enact a remedial congressional redisricting [sic] map in conformity with Proposition 4's mandatory redistricting standards and requirements."  *Id.* at \*58.

The Lieutenant Governor conveyed to the state district court that a new redistricting map "must be in place by November 10, 2025, to ensure an orderly process leading up to the 2026 election."  *League of Women Voters of Utah v. Utah State Legislature*, 579 P.3d 287, 289 (Utah 2025).  The Utah Legislature then moved the state district court to stay its injunction of the 2021 Map during the remedial process and pending an appeal.  The state district court denied the motion and the Utah Supreme Court later denied the Utah Legislature's petition for extraordinary relief challenging that ruling.  *See id.* at 295.

In October 2025, the Utah Legislature passed S.B. 1011, which amended Proposition 4, and S.B. 1012, which enacted a new redistricting map (Map C).  The League submitted its own maps (Map 1 and Map 2) to the state district court and moved to enjoin Map C as unlawful under Proposition 4.  The League alleged that S.B. 1011, like S.B. 200, violated the people's right to alter or amend the government under the Utah Constitution.

The state district court held a two-day evidentiary hearing and concluded that "S.B. 1011 unconstitutionally impairs Proposition 4's reforms in violation of Article I, Section 2 of the Utah Constitution."  *League of Women Voters of Utah v. Utah State Legislature*

("*LWV III*"), No. 220901712, 2025 WL 3145894, at *2 (Utah Dist. Ct. Nov. 10, 2025).  It

explained that "S.B. 1011 effectively mandates the very partisan favoritism that Proposition

4 was enacted to stop."  *Id.*  It found the evidence showed "Map C is an extreme partisan

outlier—more Republican than over 99% of expected maps drawn without political

considerations" and thus it failed "to comply with Proposition 4."  *Id.*  The state district

court then stated that "[b]ecause the Lieutenant Governor's November 10, 2025, deadline

for a map to be finalized is upon us," it bore "the unwelcome obligation to ensure that a

lawful map is in place," and adopted the League's "Map 1 for Utah's congressional

elections."  *Id.*

In December 2025, the Utah Legislature enacted S.B. 2001 which pushed back the

candidacy filing period for the 2026 congressional election to March 9, 2026, through

March 13, 2026.  The Utah Legislature then moved the district court for entry of final

judgment or certification of partial final judgment as to the League's Count V.  The state

district court certified an interlocutory appeal of its August 2025 order that declared S.B.

200 void and permanently enjoined the 2021 Map.  On January 7, 2026, the Utah

Legislature noticed its appeal and on January 23, it moved the Utah Supreme Court to stay

the injunction against the 2021 Map and asked that court to grant relief by February 20.  On

February 20, the Utah Supreme Court dismissed the appeal and dismissed the motion to stay

the injunction of the 2021 Map as moot.  *See* Dkt. No. 96-1.

### B.    Procedural History

Plaintiffs filed this lawsuit against the Lieutenant Governor on February 2, 2026.

Plaintiffs allege the state district court violated the Elections Clause of the United States

Constitution by enjoining the 2021 Map and imposing Map 1 in its place.  They seek a

declaratory judgment under 28 U.S.C. § 2201(a) that the state district court unconstitutionally imposed Map 1, and that the 2021 Map governs the 2026 elections unless the Utah Legislature timely enacts a new map. Plaintiffs moved for a preliminary injunction under 28 U.S.C. § 2202 to prevent the Lieutenant Governor from implementing Map 1 and any other map not passed by the Utah Legislature.

The Lieutenant Governor, a defendant in both this case and the underlying state court litigation, took no position on the merits of either case, and only asks this court to identify which congressional map she must implement. The Utah Legislature, a defendant in the underlying state court litigation, has filed an amicus brief in this case on behalf of Plaintiffs.

The League sought leave to intervene, which we granted. They also filed a motion to dismiss Plaintiffs' claim. The League argues Plaintiffs fail to state a claim under Rule 12(b)(6). They also argue we should dismiss the complaint under Rule 12(b)(1) because Plaintiffs lack Article III standing and that Plaintiffs are barred by abstention and issue preclusion doctrines.

After expedited briefing, we held a hearing on February 18, 2026, to receive arguments on Plaintiffs' preliminary-injunction motion.

## II.    Legal Standards

"Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted); *see also United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it

is clearly established.").  To obtain a preliminary injunction, Rule 65 of the Federal Rules of Civil Procedure requires plaintiffs to establish "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (citation omitted).  An injury is irreparable if a "monetary remedy after a full trial" is inadequate or difficult to calculate.  *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (citation omitted).  "[V]iolations of certain individual constitutional rights" may also constitute irreparable harm.  *Leacho, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024) (holding a violation of the Constitution's separation of powers does not, by itself, constitute irreparable harm for purposes of supporting a preliminary injunction); *see also Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) ("[C]ases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government."), *abrogated on other grounds by Garland v. Cargill*, 602 U.S. 406, 415 (2024).

Likelihood of success on the merits and irreparable harm are the most critical factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009).  The possibility of relief or irreparable injury are not sufficient.  *Id.*; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

### III.    Discussion

#### A.    Standing

Article III of the United States Constitution extends the judicial power to "[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2.  Over time, those two words have spawned several justiciability doctrines, which "define the scope of federal judicial power."  William Baude et al., *Hart and Wechsler's The Federal Courts and the Federal System* 65 (8th ed. 2025).  Standing is one of those doctrines.  And to have standing, a party invoking the court's power must "answer a basic question: 'What's it to you?'"  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024).  The plaintiff must show (1) that he "has suffered or likely will suffer an injury in fact," (2) "that the injury likely was caused or will be caused by the defendant," and (3) "that the injury likely would be redressed by the requested judicial relief."  *Id.* at 380 (first citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); and then citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

An injury in fact must be "concrete" and "particularized."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  A particularized injury is one that "affect[s] the plaintiff in a personal and individual way," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation modified), so alleging some "general interest common to all members of the public" will not suffice, *Lujan*, 504 U.S. at 575.  A concrete injury is one that is "real, and not abstract."  *TransUnion LLC*, 594 U.S. at 424.  The Supreme Court has explained that both tangible harms (like "physical harms and monetary harms") and intangible harms can "be concrete."  *Id.* at 425.

These abstract concepts apply here: have Representatives Maloy and Owens alleged an injury in fact caused by implementation of Map 1?  We hold they have.  And because we

find that the Representatives have standing, the suit may proceed. *See Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519 n.3 (2026) ("[O]nly one plaintiff needs standing for a suit to proceed . . . ." (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023))).

The Representatives are candidates in the coming 2026 election. The Supreme Court has recently explained the special interest a candidate for political office has in a fair electoral process. In *Bost v. Illinois State Board of Elections*, a candidate for the United States House of Representatives sought a declaration that "counting ballots received after election day violates federal law." 146 S. Ct. at 518. But to bring suit in federal court, candidate Bost (now Congressman Bost) needed standing. The Supreme Court found that Bost, as a candidate, had "an interest in a fair process." *Id.* at 519. And it further explained that when the electoral process "departs from the law," the candidate has been deprived "of a fair process." *Id.* at 519-20.

We apply that principle here. Because the Representatives allege the electoral process has departed from requirements of the Elections Clause, they have been deprived of the "opportunity to compete for election under the Constitution and laws of the United States." *Id.* at 521.

To be sure, *Bost* focused on rules governing "the counting of votes" in an election. *Id.* at 522 ("Candidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections . . . ."). But we think the same interest that supports a challenge to vote-counting rules—the "interest in a fair process"—applies equally to challenges to redistricting. *Id.* at 519. Drawing an electoral district is undeniably a major part of the electoral process, even though it comes earlier in the process than counting votes. Redistricting governs whose vote a candidate must secure.

Voters, too, have an interest in fair elections.  *Id.* at 520.  But candidates have a particularized interest in lawful redistricting because of their interest in a fair process.  *Id.* ("An unfair and inaccurate election plainly affects those who compete for the support of the people in a different way than it affects the people who lend their support.").  Through the process of congressional redistricting, a state legislature carves the citizenry into the various districts who will vote for candidates.  And because that line drawing determines whose vote a candidate must secure, the candidate has "an obvious personal stake" in how that rule is determined.  *Id.*

An allegation—which the Representatives make here—that a candidate's district lines have not been drawn in accord with the Elections Clause alleges a "[d]eparture[] from the preordained rules."  *Id.*  That departure causes candidates a "particularized and concrete harm."  *Id.*  An unlawful rule determining a candidate's relevant electorate "deprives candidates of the opportunity to compete for election under the Constitution . . . of the United States."  *Id.* at 521.

Nor are the Representatives only candidates; they are incumbents.  And as incumbents, they have pre-existing ties to their current constituency.  Indeed, they garnered the support of that constituency in the previous election, which elected them as Representatives.  Map 1 erases that existing support by altering the Representatives' constituencies.  Losing the incumbent's advantage is not a harm "common to all members of the public."  *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (per curiam) (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam)).

The Representatives also satisfy standing's two other requirements—causation and redressability.  These requirements "are often 'flip sides of the same coin,'" because

enjoining the challenged action "will typically redress that injury." *FDA*, 602 U.S. at 380–81 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). The Representatives' injury—having to run in an unfair electoral process that has deviated from constitutional requirements—flows from the Lieutenant Governor's implementation of Map 1, satisfying causation. And enjoining the Lieutenant Governor from implementing that map would remove that allegedly unlawful map.

We will not "make standing law more complicated than it needs to be." *Bost*, 146 S. Ct. at 523 (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)). The Representatives allege Defendant's implementation of Map 1 impairs their interest in a fair process. Requiring the Representatives to seek election according to a map adopted in violation of the Elections Clause would "deprive[] [them] of the opportunity to compete for election under the Constitution and laws of the United States."[2] *Id.* at 521.

### B.    *Purcell*

The parties dispute whether the *Purcell* principle precludes this court from granting the relief Plaintiffs seek. *Purcell* cautions that "federal courts ordinarily should not alter state election rules in the period close to an election." *Andino v. Middleton*, 141 S. Ct. 9, 10

---

[2]    The League's opposition to the preliminary-injunction motion also raises the possibility the Plaintiffs are barred from bringing this federal suit based on the doctrine of issue preclusion. Dkt. No. 56 at 22. But it does not develop the issue beyond a single clause introducing it. To the extent this is raised in the motion to dismiss, we leave consideration of that issue to another day. In its motion to intervene, the League also indicated it would argue this court should stay its hand while the state court litigation proceeds. Dkt. No. 17-1 at 7. A federal court has limited discretion to stay or dismiss proceedings because of ongoing litigation in state court. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). And *Colorado River* abstention is appropriate only when litigation is parallel, meaning "substantially the same parties litigate substantially the same issues in different forums." *Fox v. Maulding*, 16 F.3d 1079, 1081 (10th Cir. 1994). While parallelism does not require the litigations be identical, *D.A. Osguthorpe Family P'ship v. ASC Utah, Inc.*, 705 F.3d 1223, 1233 (10th Cir. 2013), we must resolve any doubts "in favor of exercising federal jurisdiction." *Fox*, 16 F.3d at 1082. Key parties in this case are not participants in the state court litigation, and vice versa. And lingering uncertainties about the existence of privity between those parties are sufficient to dissuade us from abstaining at this time. *See Colo. River*, 424 U.S. at 819 ("Only the clearest of justifications will warrant dismissal.").

(2020) (Kavanaugh, J., concurring). In *Purcell*, Arizona voters approved Proposition 200, an anti-voter-fraud law that required prospective voters provide proof of citizenship to register and present identification when voting. *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006). Six months before the 2006 November elections, the *Purcell* plaintiffs sought to enjoin the use of Proposition 200 in the upcoming election. *Id.* A federal two-judge screening panel entered the requested injunction on October 5, 2006. *Id.* at 3. The Supreme Court vacated, concluding the federal court erred in "alter[ing] the election rules on the eve of an election," *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell*, 549 U.S. at 1), because such interference could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5.

The Supreme Court has since "repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election." *See Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring); *Andino*, 141 S. Ct. at 10 (Kavanaugh, J., concurring) ("[T]his Court has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election."); *Republican Nat'l Comm.*, 589 U.S. at 425 ("The Court would prefer not to do so, but when a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this Court, as appropriate, should correct that error."). As Justice Kavanaugh has explained:

> When an election is close at hand, the rules of the road must be clear and settled. Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.

*Merrill*, 142 S. Ct. at 880-81.  *Purcell* does not establish a bright line, however, and the Supreme Court has not clearly delineated how close is too close.  *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) ("The Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes.").

The court concludes *Purcell* applies here and a federal court preliminary injunction is not appropriate because Utah's official primary process is upon us.  To begin, the filing period for Utah's congressional candidates opens on March 9, 2026, only 14 days from today.  *See* Dkt. No. 51 at 3.  Beyond that, Utah operates its elections through a two-track system.  Candidates have three options to run for office: participate in a caucus and convention system, gather signatures from voters, or both.  *See* Dkt. No. 90 at 3.  The caucuses of the State's political parties are scheduled for March 17, 2026, 22 days from today.  The political party conventions will be held on April 25, 2026, in just two months.

Caucuses are organized by precinct and, as the Lieutenant Governor explains, changing the map would require manually reassigning "thousands of precincts statewide." *See* Dkt. No. 51-2 at 2.  In sum, the candidate filing period opens in 14 days, the candidate selection process officially begins in just 22 days, and the requested relief would necessitate changing the voting districts for thousands of Utah voters.  Dkt. No. 44 at 3.  Under *Purcell*, it is simply too close to Utah's formal election process for this court to insert itself.

Plaintiffs and the concurrence cite *Abbott v. League of United Latin American Citizens*, 146 S. Ct. 418 (2025), to conclude *Purcell* does not apply.  In *Abbott*, the Texas Legislature enacted a redistricting map (2025 Map) in response to a letter from the U.S. Department of Justice threatening legal action if Texas did not dismantle and redraw certain

14

congressional districts. *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2025 WL 3215715, at *1–2 (W.D. Tex. Nov. 18, 2025). A majority of the Texas three-judge court to hear the legal challenges that followed the redistricting found the resulting 2025 Map was racially gerrymandered, enjoined the use of the 2025 Map, and mandated the use of the prior 2021 Map for the 2026 election. *Id.* at *69. In determining the *Purcell* principle did not apply, the *Abbott* majority noted the candidate-filing period would still be open for several weeks, the primary election was still four months away, and in "several critical respects, the State [was] still operating under the 2021 Map." *Id.* at *61-62. For example, a special election was currently underway using the 2021 Map in the state's largest congressional district, and "Texas voters [would] continue to vote under the 2021 Map after several key pre-election deadlines for the 2025 Map [had] already passed." *Id.* at *62. The *Abbott* majority ultimately concluded the harm of forcing racial minorities to be represented in Congress under unconstitutional racial classifications for at least two years outweighed the "minor inconveniences to the State's election administrators" and candidates, and the "residual voter confusion" would be marginal "given the short timeframe since the 2025 Map was passed." *Id.* at *68.

The Supreme Court rejected the panel's reasoning and stayed its injunction of the 2025 Map. The Court invoked the rule in *Purcell* and concluded that the panel had erred by improperly inserting itself into the active primary campaign season in Texas—"causing much confusion and upsetting the delicate federal-state balance in elections." *Abbott*, 146 S. Ct. at 419. Relying on *Abbott*, the concurrence here concludes "Utah has not entered an active primary season" and *Purcell* does not apply. We respectfully disagree.

First, Utah's election system puts us much closer to the "eve" of the election than Texas was in *Abbott*. Texas does not follow a caucus and convention system. There, the relevant date for *Purcell* consideration was the primary election four months away. Here too, the primary election date is still four months away. But that is not the beginning of Utah's election season. Because Utah's election system begins formally identifying primary candidates during the caucuses (unlike Texas), the primary campaign season begins before the caucus dates. With the caucuses scheduled just three weeks from now, Utah has entered an active primary campaign season, even if the congressional candidate filing period has not yet opened. Dkt. No. 56-6 at ¶ 8 (listing five congressional candidates who are actively campaigning for a congressional district under Map 1); Dkt. No. 89 at 4 (stating congressional candidate Ben McAdams began his election campaign in November 2025 and has invested funds in establishing the campaign infrastructure, securing signatures, and recruiting and training delegates for the 2026 caucus).

Second, the possibility of voter confusion is a considerable risk were the panel to enjoin the current election map. Plaintiffs rely on the Defendant's assurances that she has time to implement a new map to argue *Purcell* does not apply. But *Purcell* does not address what election rules are feasible or uncontested. Rather, *Purcell* guards against negative effects for voters: confusion and reduced election participation. As *Purcell* notes, "[a]s an election draws closer," the voter confusion "risk will increase." *Purcell*, 549 U.S. at 5. Here, an active primary is ongoing, and the election has drawn too close for the court to get involved.[3] To the extent the requested injunction would affect Defendant and Utah election

---

[3]    At oral argument, Plaintiffs represented the Utah Legislature could modify the election timeline, but that was not an option the Utah Legislature presented to the state district court, nor is it a possibility the Utah Legislature has stated it would entertain here if the court were to enjoin Map 1. *See generally* Dkt. No. 57.

officials, the court's "order would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion." *Merrill*, 142 S. Ct. at 880.[4]

### C.    Merits

Plaintiffs ask the court to preliminarily enjoin Defendant from administering the upcoming election under Map 1 and to either require implementation of the 2021 Map or permit time for the Utah Legislature to draw a new map.  The court's conclusion that *Purcell* applies requires denial of the preliminary-injunction motion.  But the court is mindful that the merits of an underlying claim may impact the *Purcell* analysis, as outlined in *Merrill v. Milligan.  See Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).  And the court is also mindful that this case and the issues it presents are special and profoundly sensitive.  The court thus turns to the merits of the preliminary-injunction motion to satisfy itself that application of *Purcell* is appropriate.

---

[4]    The concurrence is right to point out that risks of disruption and distortion of the proper state-federal balance in election administration undergird the *Purcell* principle.  And while there is certainly something to the idea that one of the constitutional interests *Purcell* seeks to vindicate is a state legislature's interest in how elections are run, we read *Purcell* and the cases applying it to focus primarily on temporal proximity to elections and the impact on voters of chaos and uncertainty occasioned by federal courts inserting themselves in state election matters on the eve of state elections.  *Purcell* is a pragmatic doctrine driven by eminently pragmatic concerns.  And we read the principal interest it seeks to vindicate to be the right belonging to each voter to cast her ballot in an election for her preferred candidate.  This right is fundamental.  This right is central to our representative democracy.  And the ability to exercise this right is endangered if the administrative machinery that makes elections run is damaged by last minute tinkering.  At present, "the law" governing Utah's upcoming election includes Map 1.  It would be improvident and contrary to *Purcell*'s primary guidance to enjoin that law now.  To the extent the concurrence views affirmative federalism concerns as cutting against issuing a stay, we note our decision here respects federalism by recognizing the supremacy of federal election law enacted by Congress.  We read the concurrence to more directly focus on separation-of-powers issues related to state legislatures and state courts.  We express no disagreement with that discussion in the concurrence.

1.    **Likelihood of Success on the Merits**[5]

Plaintiffs' claim is that the state district court violated the Elections Clause when it implemented Map 1 because doing so exceeded the bounds of ordinary judicial review by seizing for itself authority belonging to Congress and the Utah Legislature.  Plaintiffs contend the state district court exceeded its authority and violated the ordinary bounds of judicial review in three ways: (1) it reviewed the 2021 Map even though it was not part of Count V, (2) it enjoined the 2021 Map without finding substantive violations of Proposition 4, and (3) it usurped the Utah Legislature's redistricting authority by implementing Map 1. The court discusses the standard of ordinary judicial review as outlined in *Moore v. Harper*, 600 U.S. 1 (2023), and then explains why Plaintiffs have not shown a likelihood of success on the merits of their claim.

*Moore* considered "whether the Elections Clause insulates state legislatures from review by state courts for compliance with state law." *Id.* at 19.  Noting that judicial review dates back to *Marbury v. Madison* and is a fundamental principle of this nation, *Moore* held that the Elections Clause does not carve out an exception to this rule. *Id.* at 19–23.  Rather, "the Elections Clause does not exempt state legislatures from the ordinary constraints imposed by state law." *Id.* at 34.[6]

---

[5]    The Tenth Circuit has held that irreparable injury is the "single most important prerequisite for the issuance of a preliminary injunction, which must be met before the other requirements for the issuance of an injunction will be considered." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021) (internal quotation marks and citation omitted).  Here, whether Plaintiffs allege an irreparable harm depends on the merits of their alleged constitutional injury.  The court therefore starts with the merits analysis.

[6]    Plaintiffs argue that *Moore* limited state court judicial review to state constitutional questions.  While *Moore* discussed state constitutional limits on legislatures, its holding was not so narrow: "[T]he Elections Clause does not exempt state legislatures from the ordinary constraints imposed by state law...."  600 U.S. at 34; *see also id*. at 35–36 (discussing the Supreme Court's previous discussion of "state court review in the present context," *Bush v. Gore*, which considered whether the Florida Supreme Court's application of Florida *statutory* law exceeded ordinary judicial review in violation of the Elections Clause).

But *Moore* also highlighted that "state courts do not have free rein." *Id.* They cannot rely on state law to "circumvent federal constitutional provisions." *Id.* at 35. And although the Supreme Court declined to adopt a specific test to "measure state court interpretations of state law in cases implicating the Elections Clause," it held that "state courts may not transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections." *Id.* at 36. In other words, although state courts retain the authority to act as a restraint on state legislatures, "state courts may not so exceed the bounds of ordinary judicial review as to unconstitutionally intrude upon the role specifically reserved to state legislatures by Article I, Section 4, of the federal Constitution." *Id*. at 37.[7]

### a.    The State District Court's Review of the 2021 Map

Plaintiffs' first challenge is that the state district court violated the Elections Clause when it reviewed the 2021 Map because Count V in the state court complaint only challenged the lawfulness of S.B. 200 and it did not include a challenge to the 2021 Map, which the Utah Legislature enacted under a separate statute. Using *Moore*'s language, Plaintiffs contend the state district court exceeded the bounds of ordinary judicial review by reviewing the 2021 Map.

Plaintiffs have not shown a likelihood of success on this issue because it rests on a faulty factual foundation. The validity of the 2021 Map was at issue in the litigation, and its lawfulness was properly before the state district court. *LWV II*, 2025 WL 2644292, at *56. There is some merit to Plaintiffs' insistence that Count V was expressly aimed at a different

---

[7]    *Moore* did not settle on a standard for federal courts to use when evaluating state courts in this area. 600 U.S. at 36–37. But under either of the standards discussed, *see id.* at 38–39 (Kavanaugh, J., concurring), the court finds that the state district court was within the bounds of ordinary judicial review.

statute.  Count V directly challenged the constitutionality of S.B. 200, which purported to repeal Proposition 4.  But the final paragraph of Count V seeks "declaratory and injunctive relief as more fully set forth below."  Dkt. No. 17-2 at 78.  And that relief included declaring "H.B. 2004, which enacted the [2021 Map], invalid and unconstitutional" and enjoining the state-court defendants "from administering, preparing for, or moving forward with Utah's 2026 primary and general elections for Congress using the [2021 Map]."  *Id.* at 85.  The state district court therefore properly regarded Count V as a challenge to H.B. 2004 and the 2021 Map.  *LWV II*, 2025 WL 2644292, at *55–56.

The state district court didn't stand alone in this assessment.  The Utah Supreme Court recognized that Count V put the 2021 Map at issue in the litigation.  Indeed, the Utah Supreme Court characterized Count V as the "broadest claim, encompassing *both matters* at issue in this case: Plaintiffs' challenge to the redistricting process that led to the [2021 Map] *and* their challenge to the [2021 Map] itself."  *LWV I*, 554 P.3d at 889 (emphasis added).

The court finds Plaintiffs have not shown a likelihood of success on their claim to the extent it is based on their contention that the state district court exceeded the bounds of ordinary judicial review by considering the validity of the 2021 Map.

### b.    The State District Court Enjoins the 2021 Map

Plaintiffs' next challenge is that the state district court exceeded the bounds of ordinary judicial review because it enjoined the 2021 Map as the product of unconstitutional legislation (S.B. 200) without finding the 2021 Map itself was substantively unlawful.  Plaintiffs have not shown a likelihood of success on this issue.[8]

---

[8]    The court notes the League's argument that Plaintiffs' claim in this case does not encompass any challenge to the state district court's ruling enjoining the 2021 Map.  The court agrees it is questionable whether Plaintiffs' claim reaches that far.  *See* Dkt. No. 19 at 26 (Plaintiffs conceding that the state

First, the state district court found the 2021 Map was unlawful for failing to comply with Proposition 4's procedural requirements. After remand, the state district court found that S.B. 200 did not survive strict scrutiny. *LWV II*, 2025 WL 2644292, at *47. Because S.B. 200 was an unconstitutional act under the Utah Constitution, the state district court concluded S.B. 200 was void *ab initio*—"as inoperative as though it had never been passed." *Id.* at *52 (quoting *Egbert v. Nissan Motor Co.*, 228 P.3d 737, 739 (Utah 2010)). This ruling effectively revived Proposition 4. *Id.* at *53; *see also LWV I*, 554 P.3d at 921 ("In the event Plaintiffs prevail on their claim that S.B. 200 violates the people's right to alter or reform their government via citizen initiative, the act enacted by Proposition 4 . . . would become controlling law.").

The state district court then turned to whether it should enjoin the 2021 Map. *LWV II*, 2025 WL 2644292, at *53 (discussing H.B. 2004, which enacted the 2021 Map). The Utah Legislature enacted the 2021 Map under S.B. 200. The state district court found that enactment of the 2021 Map was not "a fresh or independent act—it is the fruit of that unlawful repeal, an extension of the very constitutional violation that tainted the process from the start." *Id.* at *54.

But, contrary to Plaintiffs' contention, the state district court *did not* limit its ruling to this "fruit of the poisonous tree" theory. It further found the 2021 Map did not comply with Proposition 4, which is the law of Utah. *Id.* at *56. The state district court found that enactment of the 2021 Map did not comply with the procedural requirements of Proposition

---

district court "could engage in 'ordinary judicial review' of state law to determine whether maps adopted by the State Legislature complied with that law . . ."); *see also id.* at 7-8 (explaining that this case only challenges the remedy fashioned by the state district court of selecting Map 1 and not the "underlying decisions on the merits"). But even assuming that argument has been made and sufficiently briefed, Plaintiffs have not shown they are likely to succeed in showing that the state district court's actions with regard to the 2021 Map exceeded the bounds of ordinary judicial review.

4 because the Utah Legislature: (1) did not vote on maps presented by the commission in the 2021 redistricting cycle, (2) did not make redistricting plans available for public review and comment, and (3) did not provide a written report explaining how the 2021 Map better complied with Proposition 4's standards.  *Id.*  The state district court found "[t]here is no dispute that these substantive procedural requirements [of Proposition 4] were not complied with."  *Id.*

The state district court addressed the state-court defendants' argument that those violations were procedural, not substantive, and therefore did not invalidate the 2021 Map. Plaintiffs here make a similar argument—that the state district court exceeded the bounds of ordinary judicial review by selecting Map 1 when the 2021 Map was never found to be *substantively* unlawful.  But the Supreme Court in *Moore* rejected a distinction between procedure and substance in this context as "too cramped."  600 U.S. at 30–32.  The state district court similarly rejected the distinction between procedure and substance as a distinction without a difference.  Proposition 4 was designed to be a "comprehensive process for redistricting," and though the standards for designing maps were important, the procedure outlined in Proposition 4 was no less so.  *LWV II*, 2025 WL 2644292, at *56 ("Failing to comply with Proposition 4's procedural requirements is a failure to comply with the substantive requirements of Proposition 4's redistricting reform.").  The state district court went on to explain: "Proposition 4's procedural requirements are so integral to the governmental reforms it put into place that any map enacted in their absence is, itself, a violation of the people's right to alter and reform their government."  *Id.*  Accordingly,

Plaintiffs have not shown a likelihood that the state district court's conclusions about the 2021 Map exceed the bounds of ordinary judicial review.[9]

Second, the state district court found the Utah Legislature's failure to comply with the procedural requirements of Proposition 4 compelled it to enjoin the 2021 Map. This is consistent with state law. Proposition 4 authorizes challenges to election maps. Utah Code § 20A-19-301(1). And it also explicitly requires a state court to permanently enjoin a noncompliant map. *Id.* § 20A-19-301(2). Specifically, Proposition 4 states: "If a court of competent jurisdiction determines in any action brought under this Section that a redistricting plan enacted by the [Utah] Legislature fails to abide by or conform to the redistricting standards, procedures, and requirements set forth in this chapter, the court shall issue a permanent injunction barring enforcement or implementation of the redistricting plan." *Id.* Given the state district court's findings and these statutory provisions, the court finds Plaintiffs have not shown they are likely to succeed in showing that the state district court exceeded the bounds of ordinary judicial review by enjoining the 2021 Map.

### c.    The State District Court Imposes Map 1

Plaintiffs' final challenge is that the state district court's implementation of Map 1 violated the Elections Clause and exceeded the bounds of ordinary judicial review.

---

[9]    The court also notes that the November decision addressed, at least in part, whether the 2021 Map substantively satisfied Proposition 4. The focus of the November decision was the newly proposed Map C and to a lesser extent Map 1. By November, these were the maps the respective parties were advocating for, the 2021 Map having been enjoined. *LWV III*, 2025 WL 3145894, at *1–2. But the 2021 Map was discussed because the newly proposed Map C had used the 2021 Map as a starting point. *Id.* at *56. The state-court defendants' expert candidly testified that the 2021 Map "did not comply with the procedural or substantive requirements of Prop 4." *Id.* Map C also perpetuated "existing dividing lines and problems with the original map that appear to be designed to favor the Republican Party and disfavor the Democratic Party." *Id.* The state district court also noted that the 2021 Map, like Map C, improperly divided at least Salt Lake County. *Id.* at *40.

Plaintiffs advance a textual argument that the Elections Clause authorizes only state legislatures and Congress (representative lawmaking bodies) to fashion regulations for federal congressional elections. They argue the state district court seized that authority for itself and arrogated power that properly belonged to the Utah Legislature and/or Congress. Plaintiffs' argument is attractive because it advances a straightforward text-based rationale. The argument is also attractive because it is consistent with how the Elections Clause places the regulatory authority over elections as close as possible to the people who vote in them—principally with the states and expressly to lawmaking bodies. And the court notes some discomfort with the tension between the text of the Elections Clause and the counter-majoritarian role courts sometimes play when they exercise judicial review and fashion relief accordingly. But *Moore* recognizes that the principle of ordinary judicial review provides a check for lawmaking bodies who transgress state-law limits on their regulatory authority over elections. And Congress has exercised its express authority under the Elections Clause and carved out a backstop involving state (and federal) court action where state legislatures have not fulfilled their federal constitutional obligation to draw properly apportioned electoral maps, time has run out, and no better options are available. This backstop is 2 U.S.C. § 2c.

Here, the state district court enjoined the 2021 Map. Thus, the 2021 Map was no longer law. And the parties all agreed that the prior map governing Utah elections—the 2011 Map— was unconstitutionally malapportioned after the 2020 census. *See LWV III*, 2025 WL 3145894, at *59. No one at the state district court nor in this litigation has advocated use of the 2011 Map. Whether the state district court's imposition of Map 1 was

24

proper must be evaluated in that context: no 2021 Map, no 2011 Map, and a rapidly approaching elections deadline.[10]

The state district court explained it was no longer just remedying a violation of Proposition 4.  It also noted that having no map was not a viable option under 2 U.S.C. § 2c, and it explained that courts are empowered or even obligated, perhaps reluctantly so, "to ensure a legally compliant map is in place."  *LWV III*, 2025 WL 3145894, at *59.  The state district court's solution was to impose Map 1.  The court concludes Plaintiffs have not shown a likelihood of success that this action transgressed the Elections Clause.

The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. art. I, § 4.  Under this provision, Congress retains the authority to displace and supplement state regulation of federal elections.  *Branch v. Smith*, 538 U.S. 254, 266–67 (2003).  And Congress has exercised that authority in a few instances, including by enacting 2 U.S.C. § 2c.  That statute says:

> In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, *there shall be established by law* a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninety-first Congress).

---

[10]   At the time the state court was deciding *LWV III*, the deadline to have a map in place was November 10, 2025.  *LWV III*, 2025 WL 3145894, at *1.  The state district court issued *LWV III* with just literal minutes to spare.  The Utah Legislature later pushed back some election deadlines.  But that didn't happen until December 2025.

2 U.S.C. §2c (emphasis added).

The Supreme Court discussed the role of § 2c in *Branch v. Smith*. *Branch* involved a three-judge federal court that enjoined Mississippi from using a redistricting plan developed by a state court. 538 U.S. at 259-261. After concluding the federal court's injunction of the state map was proper, the Supreme Court turned to the propriety of the redistricting plan the federal court adopted. *Id.* at 266. The issue was whether the federal court was empowered to draw single-member districts under § 2c, or whether it was required to order at-large elections under 2 U.S.C. § 2a(c)(5). *Id.*[11]

The Supreme Court considered the relationship between these two competing provisions. *Branch* rejected for several reasons the argument that § 2c refers exclusively to legislative, but not judicial, redistricting. First, because § 2c was passed at a time when judicial decisions were threatening to order at-large elections, it was unlikely that § 2c was directed at only legislative action. *Id.* at 269-70. Second, "every court that has addressed the issue has held that § 2c requires courts, when they are remedying a failure to redistrict constitutionally, to draw single-member districts whenever possible." *Id.* at 270. Third, the "more common meaning" of the phrase "there shall be established by law" in § 2c encompasses judicial action. *Id.* at 271. The Supreme Court explained that holding

---

[11]    Section 2a(c)(5) states:

> Until a State is redistricted in the manner provided by the law thereof after any apportionment, the Representatives to which such State is entitled under such apportionment shall be elected in the following manner:...(5) if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large.

2 U.S.C. § 2a(c)(5). Plaintiffs here advocate use of § 2a(c)(1), which requires apportionment in the following manner: "If there is no change in the number of Representatives, they shall be elected from the districts then prescribed by the law of such State, and if any of them are elected from the State at large they shall continue to be so elected." But this is based on the 2021 Map being the last lawful map. And, as discussed, the 2021 Map was properly enjoined. The 2011 Map can't invoke this provision because it is malapportioned.

otherwise could create a situation where all existing maps are malapportioned and a court would lack any way to impose the constitutionally mandated single-member districts. *Id.* at 272. The Supreme Court cautioned against an interpretation that would require such an unconstitutional result. *Branch* concluded: "We think, therefore, that while § 2c assuredly envisions legislative action, it also embraces action by state and federal courts when the prescribed legislative action has not been forthcoming." *Id.*[12]

*Branch* instructs that state courts ought to undertake the task of drawing a map themselves in the narrow circumstances when no other options are on the table and a legislature has failed to produce a properly apportioned map (as in this case). Map C failed to comply with state law. *LWV III*, 2025 WL 3145894, at *58. The 2021 Map had been enjoined for not complying with state law. And the 2011 Map was malapportioned. Under § 2c, "there shall be established by law" single-member districts, and *Branch* makes clear the state district court could be the one to make that happen. *Branch*, 538 U.S. at 272. Time had run out,[13] and Utah needed an electoral map. Proposition 4 was the controlling

---

[12]  In *Branch*, the lower federal court enjoined the state court primarily on grounds that the proposed map had not been precleared under the Voting Rights Act ("VRA"). 538 U.S. at 260–61. But it put forth an "alternative holding" in the event the VRA rationale was in error. *Id.* That alternative holding was that the Elections Clause prohibits state courts from "issuing a redistricting plan without express authorization from the state legislature." *Id.* at 261. The Supreme Court affirmed the injunction on the VRA rationale. *Id.* at 265. It said it had no occasion to address the alternative holding. *Id.* Plaintiffs rely on this to state that *Branch* is inapposite to the issue here and the Supreme Court specifically left that question open. But the Supreme Court clarified that the alternative holding "is not to be regarded as supporting the injunction we have affirmed on the principal ground, or as binding upon state and federal officials should Mississippi seek in the future to administer a redistricting plan adopted by the Chancery Court." *Id.* at 265–66. For the reasons discussed above, particularly its discussion of § 2c, the court finds *Branch* is relevant to this case.

[13]  Plaintiffs suggested at oral argument that referring the matter back to the Utah Legislature for another try was still an option for the state district court, and the election deadlines could always be pushed back, as they eventually were. But the court is tasked with viewing the facts as they happened, not as they could have happened. The deadline was November 10, and the state district court acted by that date. And as was pointed out at oral argument, even after the Utah election deadlines were extended, the Utah Legislature never went back to the state district court for another try.

law in Utah, and the state district court found that Map 1 complied with it.  *See LWV III*, 2025 WL 3145894, at *60–61.

The court reiterates the unique circumstances that led to the state district court imposing Map 1 and emphasizes that 2 U.S.C. § 2c is a safety valve to ensure a compliant map is in place for an election when all else fails.  On the *unique* facts of this case, therefore, the court finds Plaintiffs are unlikely to succeed on the merits of their claim that the state court erred in imposing Map 1.

A final note on the merits.  The parties address with admirable thoroughness whether state law empowered the state district court to impose Map 1.  Plaintiffs' arguments on this point are colorable.  But the court does not need to reach that question.  Congress is empowered by the Elections Clause to displace and supplement state regulation of federal elections.  *Branch*, 538 U.S. at 266–67; *see also Fish v. Kobach*, 840 F.3d 710, 725–26 (10th Cir. 2016) (explaining that "the power the Elections Clause confers is none other than the power to pre-empt" and "when Congress legislates under the Elections Clause, it necessarily displaces some element of a pre-existing legal regime erected by the States" (internal quotation and citation omitted)).  Congress did so when it enacted § 2c.  Section 2c authorized the state court to impose Map 1 on the narrow facts of this case.  Whether or to what extent that action would have been permitted under Utah law is not an answer we need to track down.

### 2.    Irreparable Harm

The other factors for a preliminary injunction do not justify granting the motion.  Plaintiffs correctly note that a constitutional violation is typically sufficient to show irreparable injury.  *See id.* at 752 ("When an alleged constitutional right is involved, most

courts hold that no further showing of irreparable injury is necessary." (internal quotation and citation omitted)).  Here, however, Plaintiffs have not shown they are likely to succeed on their alleged constitutional violation, namely that the state district court violated the Elections Clause when it imposed Map 1.

The court makes one other observation.  The state district court enjoined the 2021 Map on August 25, 2025.  In that order, it outlined the process it planned to take going forward, which included the submission of maps by the legislature, state court plaintiffs, and "other third parties." *LWV II*, 2025 WL 2644292, at *58–59.  The state district court imposed Map 1 on November 10.  Plaintiffs did not file this case until February 2, 2026. The only explanation for the delay through January 6 is that the state district court made changes to Map 1 and Plaintiffs had to wait for the ruling to become final.  *See* Dkt. No. 24 at 3–4.  But, even so, no explanation is offered for the delay between January 6 and February 2.  This delay is significant given the originally requested ten-day turnaround for this court to be empaneled and to rule.  It is Plaintiffs' burden to justify extraordinary relief. This timeline and related silence further undercuts Plaintiffs' claim of irreparable harm.

### 3.    Equities and Public Interest

Because Plaintiffs have not shown a likelihood of success on the merits or irreparable harm, the court does not reach the remaining injunction factors.

## IV.    Conclusion

For these reasons, Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

SO ORDERED this 23rd day of February 2026.

29

Entered for the Court


Per Curiam

**TYMKOVICH**, Circuit Judge, concurring in the judgment.

I disagree that the *Purcell* principle would bar us from judicial review. And while I agree with the panel that Plaintiffs fail to demonstrate a likelihood of success on their Elections Clause claims due to § 2c and *Branch*'s binding interpretation of it, state courts and legislatures must respect the core assumption underlying *Branch*—that they act diligently and in good faith to enact lawful election maps.

## I.    The *Purcell* Principle

The *Purcell* principle does not counsel that we stay our hand in this case. Neither of *Purcell*'s rationales—preventing election disruption and protecting a state legislature's constitutional interest in running elections—is served by doing so.

*Purcell*'s first rationale—disruption and confusion—does not apply. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring) (explaining that *Purcell* reflects the "bedrock tenet" that "[w]hen an election is close at hand, the rules of the road must be clear and settled"). In *Abbott v. League of United Latin American Citizens*, the Court stayed a federal court's injunction that upended an active primary season. 146 S. Ct. 418, 419 (2025). The candidate filing period had already been open for two months when the district court enjoined the new map. *League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2025 WL 3215715, at *124 (W.D. Tex. Nov. 18, 2025) (subsequent history omitted) (Smith, J., dissenting). Because the district court "improperly inserted itself into an active primary campaign, causing much confusion" by enjoining the late-enacted map, the Court stayed the injunction. *Abbott*, 146 S. Ct. at 419.

31

But Utah has not entered an active primary season. The Lieutenant Governor has assured us that she has time to implement a new map for caucuses and a primary. Any reliance interests of potential candidates are minimal since this case and the remedy were pending before the Utah Supreme Court for authoritative resolution of the state law issues. This case is complicated, moreover, by the state court's decision to make a ruling minutes before midnight, thereby precluding the legislature from attempting a new map in light of the court's rejection of Map C. The first-time exercise of power by the state court under state law to endorse a federal districting map created by the litigants at the same time without guidance from Utah's highest court underscores my belief that *Purcell* does not apply here.

The majority also highlights that we are four months from the June primary, the same timeframe as the district court in *Abbott*. *League of United Latin Am. Citizens*, 2025 WL 3215715, at *62. But *Purcell* is not a "tallying exercise." *Robinson v. Ardoin*, 37 F.4th 208, 229 (5th Cir. 2022). It "simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 881. Plaintiffs meet this burden. We are not on the "eve" of Utah's election. Unlike Texas in *Abbott*, Utah is not in an active primary. The candidate filing period has not begun. Def.'s Notice of 2026 Congressional Election Timeline, at 3–4, Dkt. No. 44.

The majority acknowledges this critical distinction. But it stresses that Utah's election system is different because it has a caucus and convention system. Thus, the majority explains, "Utah *has* entered an active primary" because candidates must identify themselves and begin campaigning before the filing period to prepare for the convention.

Majority Op. 16. But triggering *Purcell* based on candidate behavior raises line-drawing problems. Congressional candidates often begin campaigning far in advance of, sometimes years before, a state's formal primary season begins. If federal courts incorporate those considerations into the *Purcell* analysis, it will incentivize candidates who prefer the current map to begin campaigning even earlier to try to insulate the map from federal judicial review. I would not open such an avenue. I believe we should look to a state's *actual* election deadlines when determining if *Purcell* applies. Because Utah's primary season does not begin until the filing period opens, fourteen days from now, Utah is not engaged in an active primary.

Additionally, the Utah Government has confirmed its ability to use the currently enjoined 2021 Map for Utah's upcoming midterms. The "rules of the road," if we enjoined Map 1 and required use of the 2021 Map, would be clear. *Merrill*, 142 S. Ct. at 881. Confusion would not ensue. Utah voters are likely confused enough by the years-long, unresolved, state court litigation that has enjoined the familiar map from the past two congressional elections. Authoritative action by this court—before the primary season begins—would quell such confusion, not stoke it. And despite the majority's concerns, Utah officials would not need to employ "heroic efforts" to revive the 2021 Map. The Lieutenant Governor gave us a deadline, and this court has met it. *Purcell*'s anti-disruption rationale therefore does not bar us from acting.

The League also urges that we apply *Purcell* here under Justice Kavanaugh's reasoning in *Merrill*: that federal courts should apply *Purcell* more strongly when a plaintiff "unduly delayed bringing the complaint to court." *Id.* But Plaintiffs did not do so. The League asserts that Plaintiffs unjustifiably waited after the state court adopted Map 1 on

November 10, 2025 to file for an injunction.  But the record reflects that the state court continued altering Map 1 until December 2025, and did not issue a final order, in part due to the League's objections, until January 6, 2026.  Plaintiffs filed suit only 27 days after the final order—an insignificant delay—and certainly not one from which we should infer nonfeasance by the Plaintiffs and decline to intervene.[14]

Nor does *Purcell*'s federalism rationale bar us from intervening.  *Purcell*, while commonly justified by anti-disruption principles, is also grounded in a federalism principle—protecting states' constitutional interest under the Elections Clause in governing their own elections.  "It is one thing for a State on its own to toy with its election laws close to a State's elections.  But it is quite another thing for a federal court to swoop in and re-do a State's election laws." *Merrill*, 142 S. Ct. at 881.  The former "implicate[s] the authority of state courts to apply their own constitutions to election regulations," but the latter "involves federal intrusion on state lawmaking processes." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 28 (2020) (Roberts, C.J., concurring).

But the state constitutional interest *Purcell* protects belongs to state *legislatures*, not state courts.  "[T]he Elections Clause expressly vests power to carry out its provisions in 'the Legislature' of each State, a deliberate choice that this [c]ourt must respect." *Moore v. Harper*, 600 U.S. 1, 34 (2023).  "The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary

---

[14]    Plaintiffs insist that *Growe v. Emison*, 507 U.S. 25 (1993) required them to wait to file suit in federal court until the state court had entered a final order.  The League counters that they could have sued in November as soon as the court adopted Map 1.  We need not settle this question.  Because it is not immediately clear that we could have heard the case if Plaintiffs brought it shortly after the court adopted Map 1, we should not infer that Plaintiffs unduly delayed by playing it safe.  *Cf. Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) ("Abstention rarely should be invoked, because the federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))).

responsibility for setting election rules." *Democratic Nat'l Comm.*, 141 S. Ct. at 29 (Gorsuch, J., concurring) (citing Art. I, § 4, cl. 1).

State courts have some role to play, to be sure. They must continue to ensure that state election laws pass muster under the state constitution and lawmaking process. *Moore*, 600 U.S. at 23–25 (discussing permissible exercises of state judicial review). But there are lines state courts cannot cross. They cannot "transgress the ordinary bounds of judicial review such that they arrogate to themselves the power vested in state legislatures to regulate federal elections." *Id.* at 36. As the majority points out, a state court may be constitutionally permitted to impose a legislative map under § 2c. But constitutionally permitted acts are a far cry from constitutionally protected ones. State courts may be permitted to impose maps when state legislatures abdicate their duty, but state legislatures are the ones constitutionally empowered to do so under the Elections Clause. And what's more, state courts are given this permission under § 2c as a last resort—"in the event of legislative default." *Branch v. Smith*, 538 U.S. 254, 272 (2003).

Because the interest that state courts have in running elections is limited to "ordinary" judicial review, not to "regulat[ing] federal elections" in the first instance—so too is the *Purcell* doctrine limited to ordinary state court review. It should not apply when constitutional interests are not at stake—when courts regulate elections by imposing maps in the first instance. The Elections Clause "[u]nderstandably" "provides that state legislatures—not federal judges, not state judges . . . bear primary responsibility for setting election rules." *Democratic Nat'l Comm.*, 141 S. Ct. at 29 (citing Art. I, § 4, cl. 1). State legislatures, not state courts, are endowed with this power for good reason:

> Legislators can be held accountable by the people for the rules
> they write or fail to write; typically, judges cannot.

> Legislatures make policy and bring to bear the collective
> wisdom of the whole people when they do, while courts
> dispense the judgment of only a single person or a
> handful.  Legislatures enjoy far greater resources for research
> and factfinding on questions of science and safety than usually
> can be mustered in litigation between discrete parties before a
> single judge.

*Id.  Purcell* protects state legislatures' constitutional interest in governing elections.  Here, the state court imposed a map proposed by a litigant.  The state legislature's constitutional right is not implicated by the state court's act, even if it is constitutionally permitted, and *Purcell* should not apply.

This case sits comfortably outside of the *Purcell* window.  When we expand *Purcell* beyond its foundational purposes, we risk presenting to "every State the opportunity to hold an unlawful election" with no federal recourse.  *Abbott*, 146 S. Ct. at 429 (Kagan, J., dissenting).  "[S]tate courts do not have free rein" under the Elections Clause.  *Moore*, 600 U.S. at 34.  We should not apply *Purcell* here to let them.

## II.    The Competing Maps and Plaintiffs' Proposed Remedy

The absence of a *Purcell* problem here does not resolve the question of whether the state court exceeded its jurisdiction under Proposition 4 by selecting the League of Women Voters' proposed Map 1.  Absent ratification by the Utah Supreme Court, I read Proposition 4's judicial review section as conferring a right of judicial review and the ability to enjoin partisan maps—nothing more.  *See* Utah Code § 20A-19-301(2) (2018) ("If a court of competent jurisdiction determines in any action brought under this Section that a redistricting plan enacted by the Legislature fails to abide by or conform to the redistricting standards, procedures, and requirements set forth in this chapter, the court shall issue a permanent injunction barring enforcement or implementation of the redistricting plan.").  It

36

does not appear to permit a court to provide substitute mapmaking services.  Proposition 4 says a state court can review partisan maps, but it affirms that only "the *Legislature* may enact a new or alternative redistricting plan that abides by and conforms to the redistricting standards, procedures, and requirements of this chapter."  Utah Code § 20A-19-301(8) (2018) (emphasis added).  *See also League of Women Voters of Utah v. Utah State Legislature*, 554 P.3d 872, 917 (Utah 2024) ("[U]nder Proposition 4, the Legislature retained the *ultimate responsibility* for 'divid[ing] the state into congressional, legislative, and other districts.'" (quoting Utah Const. art IX, § 1) (emphasis added) (second alteration in original)).  Unless and until the Utah Supreme Court endorses that this mapmaking practice conforms with Proposition 4, I cannot evaluate whether the state court's practice was authorized under the state "Legislature['s]" power pursuant to the Elections Clause of the United States Constitution.  U.S. Const. art. I, § 4.

Having said that, I also do not believe we have the power to resurrect the 2021 Map, the remedy requested by the Plaintiffs.  The Utah Supreme Court has said that the state court can review the 2021 Map for conformity with Proposition 4.  *See id.* at 921–22.  The state court did so and found it unlawful and has issued a permanent injunction against its use.  While the state court has also found Map C to be unlawful, I do not believe the Elections Clause allows us to require the Lieutenant Governor to substitute the 2021 Map absent directions from the Utah Supreme Court.  Thus, I agree with the majority that Plaintiffs are unlikely to succeed on the merits.  But I would hold our hand on ratifying the

remedy selected by the state court until an authoritative judicial review by the Utah Supreme Court.[15]

Finally, a few words about the state of play in this litigation. In my opinion, a core principle underlying *Branch* is a presumption that the state courts and legislatures are acting diligently and in good faith to enact lawful election maps. When that's true, 2 U.S.C. § 2c functions as a backstop; an emergency provision ensuring elections go on despite a genuine legislative impasse. *See Branch*, 538 U.S. 254, 272 ("[W]hile § 2c assuredly envisions legislative action, it also embraces action by state and federal courts *when the prescribed legislative action has not been forthcoming*.").

My concurrence today applies that presumption, but with some reservations. After the Utah Supreme Court remanded the state case in July 2024, the district court did not hold a hearing on summary judgment until January 2025. It then ordered supplemental briefing with a four-month deadline. After the parties submitted briefs, the court waited another four months before ruling on summary judgment in late-August. The Legislature diligently passed a new map on October 6, 2025. The district court then waited until moments before the Lieutenant Governor's November deadline to strike that map down and adopt a map proposed by the League, leaving no room for legislative accommodation of the court's critique. The case is undoubtedly complex and the issues are worthy of careful consideration. But by waiting more than a year after remand to issue a ruling, and pressing against the Lieutenant Governor's November deadline, the district court created timing and remedy issues that otherwise might not exist. As a result, this court has now been asked to

---

[15]   On February 20, 2026, the Utah Supreme Court dismissed the Legislature's appeal of the district court's August 2025 order on procedural grounds. Despite this legal saga beginning in 2022, Utah's highest court has thus far still not given its authoritative interpretation of Proposition 4 and the state's congressional map.

answer federal and state questions of great import within three weeks, with *Purcell* lurking in the background and the press of exigency at its back.  Further, the court's adoption of a map proposed by an undoubtedly interested, non-governmental party unnecessarily raises doubts about the fairness of the process.  None of this need have happened.

State courts and legislatures have a constitutional duty under the Elections Clause to set the conditions for federal elections.  Diligent pursuit of that duty respects the vital role of public participation in our republic.